DANIELLE M. HOLT
(Nevada Bar No. 13152)
DE CASTROVERDE LAW GROUP
1149 S Maryland Pkwy
Las Vegas, NV 89104
Ph (702) 222-9999
Fax (702) 383-8741
danielle@decastroverdelaw.com

JESSICA L. BLOME
(Cal. Bar No. 314898, admitted pro hac vice)
JENNIFER RAE LOVKO
(Cal. Bar No. 208855, admitted pro hac vice)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com
rlovko@greenfirelaw.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| LAURA LEIGH, individually, and WILD HORSE EDUCATION, a non-profit corporation,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, BUREAU OF LAND MANAGEMENT, TRACY STONE-MANNING, Director of the Bureau of Land Management, and JON RABY, Nevada State Director of the Bureau of Land Management,<br><br>*Federal Defendants*. | Case No. 3:23-cv-00568-ART-CSD<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION TO COMPLETE AND SUPPLEMENT THE ADMINISTRATIVE RECORD AND REQUEST JUDICIAL NOTICE**<br><br>Complaint Filed: Nov. 15, 2023 |

1

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO COMPLETE AND SUPPLEMENT THE ADMINISTRATIVE
RECORD AND REQUEST JUDICIAL NOTICE

Plaintiffs LAURA LEIGH, individually, and WILD HORSE EDUCATION, a non-profit corporation, by and through their counsel, respectfully move the Court for an order directing Defendants United States Department of Interior, Bureau of Land Management, TRACY STONE-MANNING, Director of the Bureau of Land Management, and JON RABY, Nevada State Director of the Bureau of Land Management to complete and supplement the administrative record. Plaintiffs further request judicial notice of relevant Federal Register and Code of Federal Register documents, and to the extent that the Court denies augmentation of the administrative record with requested documents, Plaintiffs seek judicial notice of those documents.

This Motion is based upon the Plaintiffs' Memorandum of Points and Authorities, as well as any oral argument the court may entertain, and any other papers and pleadings in this action.

DATED: June 4, 2024                    Respectfully Submitted,

                                       */s/ Jennifer Rae Lovko*
                                       Jennifer Rae Lovko (Cal. Bar No. 208855,
                                       admitted pro hac vice)
                                       Jessica L. Blome (Cal. Bar No. 314898,
                                       admitted pro hac vice)
                                       GREENFIRE LAW, PC
                                       2748 Adeline Street, Suite A
                                       Berkeley, CA 94703
                                       (510) 900-9502
                                       rlovko@greenfirelaw.com

                                       Danielle M. Holt
                                       (Nevada Bar No. 13152)
                                       DE CASTROVERDE LAW GROUP
                                       1149 S Maryland Pkwy
                                       Las Vegas, NV 89104
                                       (702) 222-9999
                                       danielle@decastroverdelaw.com

                                       *Attorneys for Plaintiffs*

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   Introduction

The Stone Cabin Complex includes the Stone Cabin Herd Management Area (HMA), which contains 407,706 acres, and the Saulsbury HMA, which contains 135,018 acres. On April 11, 2023, the United States Department of Interior, Bureau of Land Management (BLM) published the Stone Cabin Complex Wild Horse Gather Plan Environmental Assessment, DOI-BLM-NV-B020-2023-0005-EA, and its associated Finding of No Significant Impact (FONSI) and Decision Record (DR) (collectively, Gather EA), which authorizes phased gathers over a period of ten years to maintain a wild horse population within the Appropriate Management Level (AML) for the Complex.

Plaintiffs' Complaint alleges five causes of action based upon BLM's actions being in violation of the Administrative Procedures Act (APA), Wild Free-Roaming Horses and Burros Act (WHA) and National Environmental Policy Act (NEPA). DKT 01 at ¶¶77-116.

BLM filed and lodged the Administrative Record (AR) for this case on April 17, 2024. DKT 26, 26-1, 26-2. Counsel for Plaintiffs and Defendants subsequently met and conferred regarding proposed supplementation of the AR. Defendants have agreed to augment the AR with documents referenced within the Gather EA,[1] but the parties did not

---

[1] The parties agreed that the following documents will be added to the AR: Standards for Rangeland Health in accordance with the Mojave-Southern Great Basin RAC; Herbel, H. Carlton., Jerry L. Holechek., Rex D. Pieper., Range Management Principles and Practices. Fifth Edition. 2004; USDOI, BLM. 1994. Guidelines for assessing and documenting cumulative impacts. WO-IB-94-310; BLM. Bureau of Land Management (BLM). 2015. Instruction Memorandum 2015-151 - Comprehensive animal welfare program for wild horse and burro gathers. Washington, D.C.; Burro Program 2021 Strategic Research Plan. Washington, D.C.; BLM. 2022. BLM Wild Horse and Burro Program Research Update. Presentation to the Wild Horse and Burro Advisory Board, September 2022, Phoenix, Arizona; Barnett, J. 2002. Monitoring feral horse and burro impacts on habitat, Sheldon National Wildlife Refuge. Unpublished report, Sheldon NWR, Lakeview, Oregon; Batchelor, J.L., W.J. Ripple, T.M. Wilson, and L.E. Painter. 2015. Restoration of riparian areas following the removal of cattle in the northwestern Great Basin. Environmental Management 55:930-942; Beever, E.A. and P.F. Brussard. 2000. Examining ecological consequences of feral horse grazing using exclosures. Western North American Naturalist 63:236-254; Belnap, J., J.H. Kaltenecker, R. Rosentreter, J. Williams, S. Leonard, and D. Eldridge. 2001. Biological soil crusts: ecology and management. USDI-BLM Technical Reference 1730-2, 119 pp.; Burdick, J., S. Swason, S. Tsocanos, and S. McCue. 2021. Lentic meadows and riparian functions impaired after horse and cattle grazing. Journal of Wildlife Management: DOI: 10.1002/jwmg.22088; Couvreur, M., B. Christian, K. Verheyen and M. Hermy. 2004. Large herbivores as mobile links between isolated nature reserves through adhesive seed dispersal. Applied Vegetation Science 7:229-236. Defendants have agreed to augment the AR after Plaintiffs' Motion to Complete and Supplement the Administrative Record or, in the Alternative, Request for Judicial Notice is ruled upon.

reach agreement on all proposals. Accordingly, Plaintiffs seek to complete and supplement the AR to include:

(1) Documents describing how the current AMLs were determined for the herds in the Stone Cabin Complex;

(2) Documents, studies, and assessments for the 1983 Stone Cabin Herd Management Area Plan (HMAP);

(3) Documents for the 1997 Tonopah Range Management Plan (Tonopah RMP); and

(4) Documents relevant to Plaintiffs' unlawfully withheld and unreasonably delayed claim.

Plaintiffs also seek judicial notice of these documents to the extent the Court does not order them to become part of the AR. Additionally, Plaintiffs seek judicial notice of 51 Fed. Reg. 7410, Mar. 3. 1986; 56 Fed. Reg. 786, January 9, 1991; and 49 Fed. Reg. 49252, Dec. 18, 1984 pursuant to Federal Rule of Evidence 201(b) and 44 U.S.C.S. § 1507.

## II.    Background

As relevant to this motion, Plaintiffs' causes of action address BLM's duties under the WHA and NEPA to (1) create and consider land use plans and HMAPs, (2) comply with its own decisions as adopted through Records of Decision (RODs), and (3) consider all factors relevant to ensuring that gather decisions are based on achieving a thriving natural ecological balance (TNEB) while not significantly affecting the environment. DKT 01.

### A.    Duty to create and consider land use plans and HMAPs

BLM has adopted regulations to implement the WHA, which provide, in part, that HMAPs must be created for HMAs, and "[m]anagement *shall* be at the minimum level necessary to attain the objectives identified in approved land use plans *and* herd management area plans." 43 C.F.R. § 4710.3-1, 4710.4. An HMAP is a critical planning document for federal lands because, through a public process, it "establishes management actions and short- and long-term management and monitoring objectives for a specific [wild horse and burro] herd and its habitat. HMAPs also identify the actions to be taken to accomplish herd

and habitat management objectives." AR at SC_0565 (Wild Horses and Burros Management Handbook H-4700-1).

BLM has never prepared an HMAP for the Stone Cabin Complex, and no HMAP has ever been created for the Saulsbury HMA. AR at SC_6188. But in 1983, BLM adopted, through a ROD, the Stone Cabin Valley HMAP ("1983 HMAP") for the Stone Cabin HMA. AR at SC_09270-SC_09327. The Gather EA does not conform to the 1983 HMAP, with BLM's justification being that "all of the key components of an HMAP have nonetheless been addressed by BLM." AR at SC_06188.

The 1983 HMAP mandates that certain studies and assessment be undertaken to meet objectives for management of wild horses and burros. AR at SC_09287- SC_0927. BLM's local Coordinated Resource Management and Planning (CRMP) group is to "be called upon to review the progress of [the 1983 HMAP] at least once each year. Data collected from studies will be incorporated into the plan as soon as it is available." AR at SC_09297. Further, the 1983 HMAP states:

> As the wild horse program is a relatively new program, much of the data necessary to intensively manage the horses is unavailable. Thus the need for studies is essential. … **As more information becomes available, this plan will be updated**.

AR at SC_SC_09293 (emphasis added).

In 2016, Plaintiff Leigh volunteered with BLM, and as part of her work, she began collecting information for the purposes of updating the 1983 HMAP. DKT 01 at ¶¶51-53. At that time, she found no records to indicate that any of the studies and assessments mandated in the 1983 HMAP had ever been performed. *Id.* at ¶51. When the volunteer position ended, all associated work related to this update also ended. *Id.* at ¶52. Plaintiff Leigh repeatedly contacted BLM between 2017 and 2023 to have work resumed on updating the 1983 HMAP, but she has not received any response to her requests. *Id.*

Plaintiffs aver that Defendants have violated their duty to create HMAPs as required for the Stone Cabin Complex and Saulsbury HMA. As regards the Stone Cabin HMA, Defendants have violated their duty to attain the objectives in the 1983 HMAP, including the

studies and assessments directed therein, their duty to update the 1983 HMAP, and their obligation to make management decisions in line with the objectives set forth in the 1983 HMAP. DKT 01 at ¶¶1, 81-83, 88-90, 97-98, 106-107.

**B.      Duty to comply with decisions as adopted through Records of Decision**

Pursuant to generally recognized principles of federal administrative law, agencies must comply with the decisions and commitments they approve through a ROD. *See Friends of Animals v. Sparks*, 200 F. Supp. 3d 1114, 1123 (D. Mont. 2016); 43 C.F.R. § 1505.34; Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 6 FR 18026. Mitigation, monitoring, and enforcement activities adopted through a decision record on an EA must be implemented as specified. *See id.* Moreover, where an agency has made a binding commitment through a ROD, the failure to adhere to the commitment may constitute a violation of process prohibited by NEPA. *See Friends of Animals*, 200 F. Supp. 3d at 1123.

BLM established five wild horse management objectives with the 1983 HMAP, and for each, it mandated specific studies, monitoring, and assessments. AR at SC_09287-09297. Not only were these activities adopted through a ROD, but BLM recognizes that such activities are essential "(1) to track implementation of the management actions/decisions outlined in the HMAP (implementation monitoring); and (2) to collect the data/information necessary to evaluate the effectiveness of those decisions (effectiveness monitoring)." *Id.* at SC_0597.

BLM also committed itself to the use of certain methodologies for establishing AML and making adjustments to livestock and wild horses allotments through the Tonopah RMP and associated ROD, which is the land use plan addressing the Stone Cabin HMA and Saulbury HMA. AR at SC_0001-SC_0193. Plaintiffs aver that BLM has failed to implement the activities mandated by the 1983 HMAP and Tonopah RMP, as adopted through their respective RODs. DKT 01 at ¶¶30, 37, 51, 81-84, 88-90, 97-98, 106-107.

**C.**    **Duty to consider all factors relevant to ensuring that gather decisions are based on achieving TNEB and do not significantly affect the human environment**

BLM's determination that excess horses need to be removed from the Stone Cabin Complex was made without the requisite consideration and analysis required by the WHA or NEPA. DKT 01 at ¶73. Plaintiffs aver BLM relied on AMLs that were administratively set and not based on evidence, analysis or scientific studies that address TNEB; BLM failed to analyze all direct, indirect, cumulative, and ecological impacts, such as those associated with rangeland health, forage, water, and livestock allocations; BLM improperly relied on AMLs that were administratively set and not based on evidence, analysis or scientific studies, and BLM failed to disclose relevant information to decision-makers and the public. *Id.* at ¶113.

As a threshold matter, NEPA requires agencies to consider whether a proposed action might conflict with the requirements or purpose of another statute. 40 CFR § 1501.1(a). NEPA requires federal agencies to take a "hard look" at environmental consequences before carrying out federal actions. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 373-74 (1989); *Dine Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1027 (10th Cir. 2023). NEPA review requires that "every significant aspect" of the environmental effects of a proposed major federal action be made available to inform agency decisionmakers and the public so that both may "play a role in both the decision-making process and the implementation of" the action. *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). Such review requires consideration of direct, indirect, cumulative, and ecological impacts associated with a proposed action. 40 C.F.R. § 1508.1(g); *Neighbors of Cuddy Mountain v. U.S. Forest Service*, 137 F.3d 1372, 1379 (9th Cir. 1998); *Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978, 991 (8th Cir. 2011). Further, if BLM decides to remove excess wild horses from an HMA, environmental analysis must conform to the land use plan and HMAP for that HMA. 43 C.F.R. §§ 4710.3-1, 4710.4; AR at SC_0602.

As regards AML, the WHA directs the Secretary of the Interior to manage wild horses "in a manner that is designed to achieve and maintain a thriving natural ecological

7

balance on the public lands." 16 U.S.C. § 1333(a). Among the management activities that the Secretary may engage are activities related to the removal of "excess" wild free-roaming horses and burros from the public range. *Id.* at §§ 1332(f), 1333(b). In making determinations regarding such removal, the Secretary must establish AMLs. *See id.* at § 1332(b)(1). AMLs shall reflect optimum population levels necessary to achieve and maintain a thriving, natural ecological balance ("TNEB") on the public lands. *See id.* at § 1332(b)(2); *Dahl v. Clark*, 600 F. Supp. 585, 592-95 (D. Nev. 1984). "AML is a vehicle used to move towards a TNEB, and a trigger by which the BLM is alerted to address population imbalance." *In Def. of Animals v. United States DOI*, 909 F. Supp. 2d 1178, 1192 (E.D. Cal. 2012). Moreover, BLM does not have the authority to remove more than the excess number of wild horses necessary to restore TNEB. *Animal Protection Institute of America*, 109 IBLA 112, 119 (1989).

Thus, the establishment of AML is of the utmost importance because it stands as an accurate proxy by which to assess TNEB. For this reason, "an AML established purely for administrative reasons because it was the level of wild horse use at a particular point in time cannot be justified" under the WHA. *Animal Protection Institute of America*, 109 IBLA 112, 118 (1989). AML determinations based on agreements designed to avoid conflict with, or appease, one stakeholder over another is neither principled nor lawful.

**D.   Causes of Action**

Based on Defendants' violation of their duties, Plaintiff's Complaint contains the following five causes of action:

- First Cause of Action - Writ of Mandamus, 28 U.S.C. § 1361: seeking a writ of prohibition preventing Defendants from further gathering wild horses and burros under the Gather-EA until Defendants have fully complied with the WHA and NEPA by creating an HMAP for the Saulsbury HMA, implementing the objectives within the 1983 HMAP and/or updating the 1983 HMAP with public scoping, and ensuring that future decisions regarding removal of horses be made at the minimum level necessary to attain the objectives identified in approved land use plans and HMAPs.

- Second Cause of Action - Administrative Procedure Act, 5 U.S.C. § 706(1): seeking an order compelling BLM to comply with their statutory and regulatory duty to create an HMAP for the Saulsbury HMA and to fulfill the obligations mandated within the 1983 HMAP and/or update the 1983 HMAP with public

scoping prior to engaging in any removal of horses from the Stone Cabin
Complex.

- Third Cause of Action - Administrative Procedure Act, 5 U.S.C. § 706(2)(A): seeking an order to vacate and set aside the Gather-EA because Defendants' actions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" to the extent that BLM adopted a gather plan without creating an HMAP for the Saulsbury HMA and without achieving the objectives of the 1983 HMAP and/or updating the 1983 HMAP.

- Fourth Cause of Action - Administrative Procedure Act, 5 U.S.C. § 706(2)(C): seeking an order to vacate and set aside the Gather-EA because Defendants' actions are "in excess of statutory jurisdiction, authority, or limitations" to the extent that BLM adopted a gather plan without creating an HMAP for the Saulsbury HMA and without achieving the objectives of the 1983 HMAP and/or updating the 1983 HMAP.

- Fifth Cause of Action - National Environmental Policy Act, 5 U.S.C. § 706(2): seeking an order to vacate and set aside the Gather-EA because BLM failed to analyze every significant aspect of the environmental impacts of removing wild horses from the Stone Cabin Complex, including by (1) failing to analyze all direct, indirect, cumulative, and ecological impacts, such as those associated with rangeland health, forage, water, and livestock allocations, (2) relying on AMLs that were administratively set and not based on evidence, analysis or scientific studies, (3) failing to disclose relevant information to decision-makers and the public, and (4) breaking down management of wild horses into small component parts to avoid a significance determination.

DKT 01.

## III.    Legal Standard

### A.    Completing and/or Supplementing the Administrative Record

Judicial review of agency action under the Administrative Procedure Act (APA) is
generally based on the administrative record that was before the agency at the time of its
challenged action. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420
(1971). The administrative record "consists of all documents and materials directly or
indirectly considered by agency decisionmakers and includes evidence contrary to the
agency's position." *Thompson v. United States Dep't of Labor*, 885 F.2d 551, 555 (9th Cir.
1989). However, the administrative record "is not necessarily those documents that
the *agency* has compiled and submitted as 'the' administrative record." *Id.* (emphasis in

original). Any withheld documents must be asserted in a privilege log. *Bartell Ranch LLC v. McCullough*, No. 3:21-cv-00080-MMD-CLB, 2021 U.S. Dist. LEXIS 245622, at *6-8 (D. Nev. Dec. 27, 2021).

The administrative record should be supplemented if the existing record is insufficient to permit meaningful review consistent with the APA. *Axiom Res. Mgmt. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009). Augmentation of the record may be appropriate (1) where the agency has relied on documents not in the record, (2) when necessary to explain an agency's action; (3) when necessary to determine whether the agency has considered all relevant factors; (4) when necessary to explain technical terms or complex subject matter, (5) in cases involving claims that the agency failed to act in violation of a legal obligation; (6) in cases where extra-record evidence supports non-APA claims, such as a NEPA claim; (7) when an agency excludes information adverse to its position from the administrative record; or (8) when plaintiffs make a showing of agency bad faith. *See Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005); *Fund for Animals v. Williams*, 391 F. Supp. 2d 191, 197-198 (D.D.C. 2005); *San Francisco BayKeeper v. Whitman*, 297 F.3d 877, 886 (9th Cir. 2002); *Animal Def. Council v. Hodel*, 840 F.2d 1432, 1436-1437 (9th Cir. 1988); *Ute Indian Tribe of the Uintah & Ouray Rsrv. v. United States DOI*, No. 2:21-cv-00573, 2024 U.S. Dist. LEXIS 60877, at *5 (D. Utah Apr. 2, 2024).

To ensure fair review of an agency action, the administrative record generally includes everything that was before the agency when it adopted an action. *Fund for Animals*, 391 F. Supp. 2d at 197-198. "The agency may not skew the record in its favor by excluding pertinent but unfavorable information. Nor may the agency exclude information on the grounds that it did not 'rely' on the excluded information in its final decision." *Id.*

B.    **Request for Judicial Notice**

Under the Federal Rules of Evidence, a court may take judicial notice of an adjudicative fact "not subject to reasonable dispute" in one of two circumstances: it is either "(1) generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed.

R. Evid. 201(b). Further, a court "may take judicial notice on its own" and "must take judicial notice if a party requests it and the court is supplied with the necessary information." *Id.* at 201(c).

Documents which may be considered for judicial notice pursuant to Rule 201 include legislative history documents, federal register documents, and other government documents, including reports of government bodies and records found on government websites. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1001 (9th Cir. 2018); *Democratic Nat'l Comm. v. Reagan,* 329 F. Supp. 3d 824, 855 n.12 (D. Ariz. 2018); *Longo v. Seminole Indian Casino-Immokalee*, 813 F.3d 1348, 1349 n.2 (11th Cir. 2016); *Beaver v. Tarsadia Hotels*, 29 F. Supp. 3d 1294, 1320 (S.D. Cal. 2014); *FAS Capital, LLC v. Carr*, 7 F. Supp. 3d 1259, 1266 (N.D. Ga. 2014); *Experian Info. Sols., Inc. v. Lifelock, Inc.*, 633 F. Supp. 2d 1104, 1107 (C.D. Cal. 2009). Also, courts may take judicial notice of the Federal Register. *See* 44 U.S.C.S. § 1507.

## IV.    Argument

Plaintiffs allege the AR is *incomplete* because there are materials that were directly or indirectly considered by BLM. Plaintiffs also allege that the administrative record needs to be *supplemented* to address Plaintiffs' claims that BLM has duties under the WHA and NEPA to (1) create and consider land use plans and HMAPs, (2) comply with its own decisions as adopted through RODS, and (3) consider all factors relevant to ensuring that gather decisions are based on achieving a TNEB and do not significantly affect the human environment.

Judicial notice is appropriate for specific documents referenced within the 1983 HMAP and Tonopah RMP as such documents are reports of government bodies. Judicial notice of the Federal Register is appropriate and relevant to BLM's legal obligations.

### A.    Documents describing how the current AMLs were determined for the herds in the Stone Cabin Complex

Plaintiff's Fifth Cause of Action alleges that BLM's decision to adopt the Stone Cabin Complex Gather EA was arbitrary and capricious as the Gather EA relied on AMLs that were administratively set and not based on evidence, analysis or scientific studies. DKT 01 at ¶¶113-114. Without a valid AML that is appropriately connected to TNEB, BLM could

not determine that an overpopulation existed, which is the prerequisite for removal. *See* 16 U.S.C. §§ 1332, 1333; *Friends of Animals v. Sparks*, 200 F. Supp. 3d 1114, 1126 (D. Mont. 2016); *Dahl v. Clark*, 600 F. Supp. 585, 592-95 (D. Nev. 1984); *Animal Protection Institute of America*, 109 IBLA 112, 118 (1989).

Historically, BLM efforts to establish AML have been a focal point of controversy. Review by the judicial and legislative branch demonstrated that AMLs in the 1970s and 1980s frequently were based on administrative decisions rather than factors related to TNEB. AR at SC_8319. BLM also acknowledged in 2005 that AMLs were not being established in a consistent manner. AR at SC_8319.

In 2008, the Government Accountability Office (GAO) critiqued BLM's Wild Horse and Burro Program (WH&B Program), finding that BLM had not provided formal guidance to its field offices on how AMLs should be established. AR at SC_6915, SC_6927-SC_6929, SC_6941-SC_6949. Instead, field offices used an "informal practice" that did not ensure procedural consistency as to factors used to establish AML. *Id.*  In response, BLM promulgated the Wild Horses and Burros Management Handbook, H-4700-1 (BLM Handbook) in 2010. AR at SC_0555-SC0634.

In 2011, BLM commissioned the National Research Council (NRC or Council) to conduct a study of the WH&B Program. AR at SC_8095. In examining BLM's establishment and monitoring of AMLs, the Council surveyed BLM managers and reviewed the BLM Handbook's provisions. AR at SC_8321-SC_8330. Survey respondents reported considerable variation at the HMA level in approaches used for establishing and adjusting AMLs. AR at SC_8321-SC_8322. NRC also reported that the BLM Handbook did not provide field offices with the clarity needed to ensure that AML was being set appropriately. AR at SC_8330-SC_8335. By way of example, NRC reported that "[t]he handbook does not provide guidance on how to assess a thriving natural ecological balance … It is also easily conflated with the allocation process, which is a policy-driven and sometimes court-adjudicated decision rather than something derived directly from currently available scientific information." AR at SC_8331. The Council concluded that the BLM Handbook "lacks the specificity necessary to

guide managers adequately in establishing and adjusting appropriate management levels." AR at SC_8105.

At the time BLM approved the Gather EA for the Stone Cabin Complex, it was aware of the GAO and NRC critiques related to the setting of AML. Indeed, the GAO and NRC findings are part of the AR. The AR also notes that the AML for the Stone Cabin Complex is 242 – 404 (218 – 364 for the Stone Cabin HMA; 24 – 40 for the Saulsbury HMA). AR at SC_6188. BLM reported that the AML for the Stone Cabin Complex was set in 1992; the AML for the Saulsbury HMA was established in 1996:

> The AML for the Stone Cabin HMA, and a portion of the Saulsbury HMA were established through a Consent Decision signed by Administrative Law Judge David Torbet on May 11, 1992, through the Department of Interior Office of Hearings and Appeals, Hearings Division. The Consent Decision established an AML for the Stone Cabin Allotment (and HMA) of 364 wild horses, and the Ralston Allotment portion of the Saulsbury HMA at 10 wild horses. The AML for the portion of the Saulsbury HMA in the Hunts Canyon Allotment was established as 30 wild horses through a Final Multiple Use Decision (FMUD) in 1996.

AR at SC_6186.[2]

The AR contains the Consent Decision, which was issued in response to lawsuits pursued by ranchers against BLM. AR at SC_1428-SC_1436. No information is provided in this decision regarding the factors considered in setting AML. Plaintiffs ask the AR to be supplemented to include the 1996 FMUD referenced by BLM. Obviously, this document was before BLM at the time it approved the Gather EA, and there is no reason for including the Consent Decision in the AR but not the FMUD. The AR also should be supplemented to include any evidence, analysis or scientific studies that have been used to establish or re-calculate the current AMLs for the Stone Cabin Complex. These documents are necessary to determine whether BLM considered all relevant factors in approving the Gather EA, whether BLM violated its legal obligation to ensure that excess horses were not removed from the Complex in a number more than necessary to

---

[2] During the parties' meet and confer efforts on the AR, BLM stated that the AML of 242 – 404 was "reaffirmed" in the Tonopah RMP, which was issued in 1997. That is incorrect. The Tonopah RMP merely reiterates what the Consent Order and FMUD established. There is no evidence in the RMP that any analysis was done to assess the appropriateness of the AML. AR at SC_0019-SC0020, SC0095. Also, BLM has previously admitted that reaffirming an AML does not require an in-depth evaluation of intensive monitoring data or land health assessment. *See Friends of Animals*, 200 F. Supp. 3d at 1122.

restore TNEB, and whether the failure to act in accordance with its legal obligations constitutes action unlawfully withheld or unreasonably delayed. *See Lands Council*, 395 F.3d at 1030; *Fund for Animals*, 391 F. Supp. 2d at 197-198; *San Francisco BayKeeper*, 297 F.3d at 886; *Animal Def. Council*, 840 F.2d at 1436-1437; *Ute Indian Tribe of the Uintah*, 2024 U.S. Dist. LEXIS  at *5. While BLM may not need to re-calculate AML every time a gather operation is considered, the AR must contain documents necessary to explain BLM's decision. The record must demonstrate the bases for BLM's action. *See Animal Def. Council*, 840 F.2d at 1436-1437. Further, these documents are necessary to demonstrate that Defendants improperly relied on factors not intended by the WHA and its implementing regulations, which also constitutes a violation of process prohibited by NEPA. *See Friends of Animals*, 200 F. Supp. 3d at 1123; *Lands Council*, 395 F.3d at 1030; *Ute Indian Tribe of the Uintah & Ouray Rsrv.*, 2024 U.S. Dist. LEXIS at *5.

      **B.**      **Documents, studies, and assessments for the 1983 HMAP**

The law is clear that BLM "[m]anagement *shall* be at the minimum level necessary to attain the objectives identified in approved land use plans *and* herd management area plans." 43 C.F.R. § 4710.4. The 1983 HMAP embodies the substantive management directives with which BLM must comply under the WHA and NEPA. BLM was required to consider the objectives in the 1983 HMAP, and the adopted Gather EA should have conformed to these objectives. In addition, BLM was required to comply with the commitments it made when it adopted the 1983 HMAP through a ROD, which commitments included objectives and mandated studies/assessments. *See* 43 C.F.R. § 1505.34; *Friends of Animals*, 200 F. Supp. 3d at 1123; 6 FR 18026.

BLM's failure to consider whether the Gather EA would promote the attainment of objectives in the 1983 HMAP, as well as its failure to conduct the studies and assessment mandated within the HMAP, constitutes a violation of the Mandamus and Venue Act, as alleged in Plaintiff's First Cause of Action (failure to address HMAP in creating Gather EA exceeded BLM's authority and jurisdiction), and the APA, as alleged in Plaintiffs' Second, Third, and Fourth Causes of Action (failure to address HMAP in creating Gather EA

constitutes action unlawfully withheld or unreasonably delayed; failure to address HMAP in creating Gather EA was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; failure to address HMAP in creating Gather EA was in excess of statutory jurisdiction, authority, or limitations). DKT 01 at ¶¶80-84, 89-92, 96-100, 106-110.

Plaintiffs ask the AR to be supplemented to include documents referenced within the 1983 HMAP as they are necessary to understand the plan's objectives and directives.[3] These include the Stone Cabin Valley CRMP recommendations, various monitoring plans, and Nevada State Office Manual Supplement 4730, Release NV 4-6. Plaintiffs also seek to supplement the AR with any evidence that BLM actually conducted the numerous assessments and studies required by the 1983 HMAP. These documents are essential to Plaintiffs' claims that BLM improperly relied on other sources that it felt were equivalent to the 1983 HMAP, to establish what obligations BLM was legally committed to, and to show that BLM's failure to conduct or consider mandated studies and assessments before approving the Gather EA was a violation of the agency's legal obligations. *See Lands Council*, 395 F.3d at 1030; *Fund for Animals*, 391 F. Supp. 2d at 197-198; *San Francisco BayKeeper*, 297 F.3d at 886; *Animal Def. Council*, 840 F.2d at 1436-1437; *Ute Indian Tribe of the Uintah*, 2024 U.S. Dist. LEXIS  at *5. They are necessary to demonstrate that Defendants improperly relied on factors not intended by the WHA and its implementing regulations, which also constitutes a violation of process prohibited by NEPA. *See Friends of Animals*, 200 F. Supp. 3d at 1123; *Lands Council*, 395 F.3d at 1030; *Ute Indian Tribe of the Uintah & Ouray Rsrv.*, 2024 U.S. Dist. LEXIS  at *5.

### 1.    Stone Cabin Valley CRMP recommendations

When addressing wild horse habitat conditions, the 1983 HMAP states that "[a] variety of constraints and assumptions have been placed on management efforts within the Stone Cabin Valley HMA through … CRMP recommendations." AR at SC_09284. To fully

---

[3] Defendants state they did not consider the 1983 HMAP directly because the agency otherwise considered "all of the key components of an HMAP." AR at SC_06188. While Plaintiffs do not concede that BLM can simply ignore the 1983 HMAP and instead rely on other documents or information from other sources, Plaintiffs nonetheless retain the right to explore BLM's justification. To do so, Plaintiffs need to understand the objections and directives contained within the 1983 HMAP. This cannot be done without access to the documents referenced within the 1983 HMAP.

understand these constraints and assumptions for the Stone Cabin HMA and the impact of these constraints and assumptions for gather operations, the AR should be supplemented to include the full text of the CRMP recommendations.

### 2.    Monitoring plans

A number of documents are identified in the 1983 HMAP which address monitoring objectives and methods: the Stone Cabin Valley Monitoring Plan, the Stone Cabin Valley Range Plan, the Stone Cabin Allotment Monitoring Plan, the Nevada Range Monitoring Procedures Handbook (1981), and BLM Handbook 4412/4412.22. Each of these establish BLM's obligations and address whether the Gather EA conformed to them.

For wild horse management objectives, the 1983 HMAP states that BLM is to "[p]revent the utilization of key forage species (as outlined in the Stone Cabin Valley Monitoring Plan) from exceeding the allowable use factors." AR at SC_09285. And, "[a]ll vegetative studies will be conducted as described in the Stone Cabin Valley Monitoring Plan." AR at. SC_09292. The 1983 HMAP also states that the Stone Cabin Valley Monitoring Plan provides additional details about "range studies" to be conducted in the HMA. AR at SC_09294.

Utilization studies also are to use the "Key Forage Plant Method" as described in the Nevada Range Monitoring Procedures Handbook (1981) and BLM Handbook 4412.22. *See* AR at SC_09293. For "allowable use factors" to be applied for utilization monitoring, the 1983 HMAP refers to Nevada Range Monitoring Procedures Handbook (1981), BLM Handbook 4412, and BLM Handbook 4412.22. AR at SC_09285, SC_09288. Data from such utilization studies "will be collected contiguous with movement of livestock from the management area, thus acquiring cattle and wild horse use patterns. Utilization data will again be collected prior to cattle reentry into the HMA to determine that portion of the utilization which is made solely by wild horses." AR at SC_09293.

"Trend is defined as a change in vegetation and soil characteristics as a direct result of environmental factors." AR at SC_09293. The 1983 HMAP states that "[t]rend studies will be conducted as per the Stone Cabin Allotment Monitoring Plan." *Id.* Such studies are

identified as being necessary to monitor improvements to vegetation associated with reductions in grazing pressure. *See* AR at SC_09323. The Stone Cabin Range Monitoring Plan is identified as a source for "studies" to be conducted in the HMA. AR at SC_09293. No further information is provided in the 1983 HMAP regarding the scope of these specific "studies."

### 3.      Nevada State Office Manual Supplement 4730, Release NV 4-6

The 1983 HMAP states that "[a]ll projects proposed" for the HMA "will be analyzed in depth to determine if the project will impact the wild free-roaming characteristics of wild horses. Wild horse distribution, seasonal movements, daily movements, and home ranges will also be preserved in the EA in accordance with NSO manual supplement 4730, Release NV 4-6." AR at SC_09290. This manual also is referenced in relation to BLM's study of population, productivity and survival, and age. *See* AR at SC_09295-SC_09296.

### 4.      Studies and assessments mandated by the 1983 HMAP

The 1983 HMAP identifies a significant number of studies and assessments to achieve objectives related to wild horse management. Objective 1 in the HMAP addresses AML and gather plans for removal of excess horses in the Stone Cabin HMA. In this regard, the HMAP creates 5 sub-units within the HMA based upon vegetation and the level of use for each. *See* AR SC_09276-SC_09278, AR09287-09288.

> AML "will be divided among the five sub-units. This division of animals will be based on the actual use levels of animals in each unit, degree of utilization in each area, conflicts within each area, and the total wild horse population in each area, Horses will not be completely removed from any of the sub-units. To assure proper management of the horses in the Point of Rocks Spring sub-unit, the level of horse use on the adjacent USFS Land will also be considered in the total."

AR at SC_09287. BLM did not address the Stone Cabin HMA sub-units in the Gather EA.

Objective 1 also addresses the issue of sex ratios, noting that "BLM will continue to remove a greater proportion of females until a 55-45 (male to female) sex ratio is attained within each of the sub-units." AR at SC_09288. In the Gather EA, BLM ignored this, instead adjusting the sex-ratio up to 60-40 (male to female).  AR at SC_06195.

Objective 2 of the 1983 HMAP aims to control the "utilization of key forage species by horses." AR at SC_09288-SC_09290. To achieve this, monitoring studies are mandated to assess when "adjustments in grazing pressure" should be made. AR at SC_09289. Also, "[s]eedings will be analyzed as a method to provide additional forage within the HMA and help to redistribute the grazing pressure." The Gather EA contains no evidence that any of the mandated monitoring studies have been conducted or considered. Instead, BLM states that "[c]hanges to or the elimination of livestock grazing cannot be made through a wild horse gather decision." AR at SC_6206. Regardless, monitoring studies would be key to showing whether this provision of the 1983 HMAP is being attained, and this is relevant to BLM's each of Plaintiffs' causes of action, including the cause of action based upon NEPA.

Objective 3 of the 1983 HMAP establishes that all projects proposed for the HMA "will be analyzed in depth to determine if the project will impact the wild free-roaming characteristics of wild horses." AR at SC_09290. This analysis requires monitoring of "wild horse distribution, seasonal movements, daily movements, and home ranges." *Id.* While acknowledging that "[e]ach project will be handled on an individual basis," BLM also notes that cumulative impacts must be analyzed. *Id.*

Objective 4 of the 1983 HMAP focuses on providing water for wild horses through the development of water "in areas where there are no existing or proposed waters available to horses. Where waters are not available for horses, waters will be developed." AR at SC_09291. Toward this end, seven proposed water projects were identified for the creation of pipelines, reservoirs, water catchments, and wells. *Id.* The Gather EA does not address these water projects and whether they are being made available to wild horses.

Objective 5 of the 1983 HMAP provides that studies would be established "to acquire additional data on wild horses. Needed data includes information on wild horse sex ratios, age structure, mortality, rate of increase, habitat conditions and validity of total population counts. AR at SC_09291-SC_09296. "Recruitment, seasonal movement and distribution studies will be conducted four times a year." *Id.* Further, "vegetative studies will be conducted." *Id.* Again, it is unclear what studies have been conducted, whether they

complied with the 1983 HMAP provisions, and whether the Gather EA considered attainment of this objective.

### C.    Documents for the Tonopah RMP

The 1997 Tonopah RMP was created to "guide management for the next 10-20 years." In 2012 and 2013, BLM began undertaking a revision of the Tonopah RMP. At that time, some of the issues identified by BLM specific to the Stone Cabin HMA and Saulsbury HMA included a need to (a) balance management of the HMAs in areas that provide sufficient resources for wild horses and burros with other resource uses and values, (b) prioritize forage allocations for wild horses and burros as related to livestock, and (c) develop alternative waters within HMAs for wild horses and burros. The revision of the Tonopah RMP was abandoned before being completed. DKT 01 at ¶58.

The WHA require that gather decisions conform to the objectives of the Tonopah RMP. *See* 43 C.F.R. § 4710.4. The RMP embodies the substantive management directives with which BLM must comply under the WHA and NEPA. In addition, BLM is required to comply with the commitments it made when it adopted the Tonopah RMP through a ROD. *See* 43 C.F.R. § 1505.34; *Friends of Animals*, 200 F. Supp. 3d at 1123; 6 FR 18026.

To address these directives and commitment, Plaintiff needs documents referenced in the RMP, including the 1994 (September) Nevada Rangeland Monitoring Handbook, the Bureau Technical Guides 4400-1, 2, 3, 4, & 7, and the Nevada Grazing Management Manual Supplement H-4120-1. Any assessments or studies conducted pursuant to the RMP also should be included in the AR. These documents are essential to demonstrate that BLM's Gather EA did not conform to the Tonpah RMP and to establish what obligations BLM was legally committed to. *See Lands Council*, 395 F.3d at 1030; *Fund for Animals*, 391 F. Supp. 2d at 197-198; *San Francisco BayKeeper*, 297 F.3d at 886; *Animal Def. Council*, 840 F.2d at 1436-1437; *Ute Indian Tribe of the Uintah*, 2024 U.S. Dist. LEXIS  at *5.

### 1.    1994 (September) Nevada Rangeland Monitoring Handbook

To create healthy, productive rangelands and to address future AMLs, the Tonopah RMP states that BLM will use short-term and/or long-term monitoring data methods as

outlined in the Nevada Rangeland Monitoring Handbook.[4] AR at SC_0017. The Handbook contains a number of data methods including but not limited to the Natural Resources Conservation Service (NRCS) double sampling method and BLM weight estimate vegetation inventory, the quadrat frequency, and the modified key forage plant utilization transect method. DKT at ¶56.

### 2.   Bureau Technical Guides 4400-1, 2, 3, 4, & 7; Nevada Grazing Management Manual Supplement H-4120-1

The RMP references that monitoring studies for livestock grazing are to be conducted pursuant to provisions in these documents. AR at SC_0150. Such monitoring data impacts the RMP's "methodology for adjustment of livestock and wild horse/burro use." AR at SC_0076-SC_0081. To understand what methods BLM committed itself to, the Handbook should be included in the AR.

### 3.   Studies and assessments mandated by the Tonopah RMP

The RMP states that monitoring studies will be conducted to achieve the objectives for wild horse management. AR at SC_0017, SC_0019. It is unclear what studies have been conducted, whether they complied with the RMP provisions, and whether the Gather EA considered attainment of the objectives.

### D.   Documents addressing Plaintiffs' unlawfully withheld and unreasonably delayed claim

Plaintiffs' second cause of action alleges that Defendants have unlawfully withheld or unreasonably delayed their mandatory duty achieve the objectives in the 1983 HMAP, including the studies and assessments directed therein, and have unlawfully withheld or unreasonably delayed their mandatory duty to update the 1983 HMAP. Analysis of whether an action is unreasonably delayed takes into consideration the TRAC factors elucidated in *Telecommunications Research & Action v. FCC* (TRAC), 242 U.S. App. D.C. 222 (D. C. Cir. 1984). The first TRAC factor focuses on whether an agency's inaction is reasonable. *See Vaz v. Neal*, 33 F.4th 1131, 1138 (9th Cir. 2022). It applies a rule of reason analysis that

---

[4] The Handbook in existence at the time the RMP was adopted was published in 1994. The RMP, however, refers to the 1984 version. Plaintiffs believe this may have been a typographical error, but if it was not, then BLM should supplement the AR with the 1984 version.

considers the length of delay and the agency's rationale for inaction. *See id.*; *Ali v. Ordeman*, No. 2:23-cv-02822 CKD, 2024 U.S. Dist. LEXIS 90313, at *14 (E.D. Cal. May 17, 2024).

When a court is asked to review an agency's failure to act, there is no official statement of the agency's justification for its actions or inactions. And as such, courts may look to evidence outside an agency's administrative record because "there is no final agency action to demarcate the limits of the record." *Bundorf v. Jewell*, 142 F. Supp. 3d 1138, 1144 (D. Nev. 2015); *San Francisco BayKeeper*, 297 F.3d at 886 (9th Cir. 2002); *see also Consejo de Desarrollo Economico de Mexicali v. United States*, 438 F. Supp. 2d 1207, 1222 (D. Nev. 2006) ("because the remaining claims are actions to compel agency action unlawfully withheld, the Court will not limit its review to the Administrative Record"). Further, this Court has permitted discovery related to the facts and circumstances surrounding an agency's alleged failure to act. *See Sierra Club v. U.S. Dept of Transp.*, 245 F. Supp. 2d 1109, 1119 (D. Nev. 2003) (reasoning that discovery should be allowed where the requested information is necessary to fairly adjudicate an issue presented by the case).

Thus, in order to show that Defendants' inaction constitutes action unlawfully withheld or unreasonably delayed, the AR should be supplemented to include (1) all documents related to BLM's decision not to create an HMAP for the Stone Cabin Complex or the Saulsbury HMA (2) all documents addressing why BLM has not updated the 1983 HMAP, including documents related to BLM's decision to update the 1983 HMAP in 2016-2017 when Plaintiff Laura Leigh volunteered with BLM, and any documents related to the BLM's decision to abandon the update; and (3) all documents related to BLM's decision not to conduct the studies and assessments mandated by the 1983 HMAP. Such documents are directly relevant to whether or not BLM's decisions and delay have been reasonable.

### E.   Judicial Notice

#### 1.   Documents that are the subject of the Motion to Complete and Supplement the Administrative Record

If the Court denies any request for completing or supplementing the AR, pursuant to Federal Rule of Evidence 201(b), Plaintiffs seek judicial notice of all documents identified above for the reason identified above. These include the 1996 Final Multiple Use Decision

21

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO COMPLETE AND SUPPLEMENT THE ADMINISTRATIVE
RECORD AND REQUEST JUDICIAL NOTICE

(FMUD) addressing AML for the Saulsbury HMA, documents that have been used to establish or re-calculate AMLs for the Stone Cabin Complex or any of its HMAs, documents referenced within the 1983 HMAP (Stone Cabin Valley CRMP recommendations, Stone Cabin Valley Monitoring Plan, Stone Cabin Valley Range Plan, Stone Cabin Allotment Monitoring Plan, Nevada Range Monitoring Procedures Handbook (1981), and BLM Handbook 4412/4412.22), documents (assessment and studies) conducted pursuant to the Tonopah RMP, Nevada State Office Manual Supplement 4730 - Release NV 4-6 1994 (September), Nevada Rangeland Monitoring Handbook, the Bureau Technical Guides 4400-1, 2, 3, 4, & 7, and the Nevada Grazing Management Manual Supplement H-4120-1.

Plaintiffs also request judicial notice of 51 Fed. Reg. 7410, Mar. 3. 1986; 56 Fed. Reg. 786, January 9, 1991; 43 C.F.R. §4700 et seq. (1985); 49 Fed. Reg. 49252, Dec. 18, 1984. The Court may take judicial notice of these because they are relevant in establishing Defendants' mandatory duty to create HMAPs. The contents of the Federal Register and Code of Federal Registration "shall be judicially noticed." 44 U.S.C.S. § 1507; *see also Crimm v. Mo. P. R. Co*., 750 F.2d 703, 710 (8th Cir. 1984).

### 2.    49 Fed. Reg. 49252, Dec. 18, 1984

This document, published in the Federal Register, is relevant for purposes of interpreting the current BLM regulations. It establishes that in 1984, BLM proposed changes to its regulations, introducing mandatory requirements for HMAs and HMAPs. It is relevant for addressing statutory construction of BLM's regulations.

### 3.    43 C.F.R. §4700 et seq. (1985)

This document contains the BLM regulations as of 1985—prior to adoption of the current regulations. It is relevant for purposes of interpreting the current regulations, demonstrating that prior to 1986, the regulations did not provide that HMAs shall be established for the maintenance of wild horse and burro herds, did not contain any language regarding HMAPs, and did not connect any land use or management plans with HMAs.

    **4.**    **51 Fed. Reg. 7410, Mar. 3. 1986**

This document, published in the Federal Register, addresses BLM's final rulemaking for revisions to 43 C.F.R. §4700 et seq. It is relevant in establishing that the current BLM regulations were adopted in 1986.

    **5.**    **56 Fed. Reg. 786, January 9, 1991**

This document, published in the Federal Register, addresses the 1991 amendments to BLM's regulations. It is being submitted to clarify that the 1991 amendments did not alter BLM's mandatory duty to create HMAPs.

**V.**    **Conclusion**

For the foregoing reasons, Plaintiffs request that their motion be granted in its entirety.


DATED: June 4, 2024                       Respectfully Submitted,

                                     /s/ Danielle M. Holt
                                     Danielle M. Holt
                                     (Nevada Bar No. 13152)
                                     DE CASTROVERDE LAW GROUP
                                     1149 S Maryland Pkwy
                                     Las Vegas, NV 89104
                                     (702) 222-9999
                                     danielle@decastroverdelaw.com

                                     /s/ Jennifer Rae Lovko
                                     Jennifer Rae Lovko
                                     (Cal. Bar No. 208855,
                                     admitted pro hac vice)
                                     GREENFIRE LAW, PC
                                     2748 Adeline Street, Suite A
                                     Berkeley, CA 94703
                                     (510) 900-9502
                                     rlovko@greenfirelaw.com

                                   Attorneys for Plaintiffs

### **CERTIFICATE OF SERVICE**

I hereby certify that on June 5, 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which caused all parties or counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.


_____
Jessica San Luis