BRENT M. RESH
(Nevada Bar No. 14940)
BRENT RESH LAW, PLLC
2401 La Solana Way
Las Vegas, NV 89102
(702) 781-6903
brent@brentreshlaw.com

JESSICA L. BLOME
(California Bar No. 314898, admitted pro hac vice)
J. RAE LOVKO
(California Bar No. 208855, admitted pro hac vice)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com
rlovko@greenfirelaw.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| LAURA LEIGH, individually, and WILD HORSE EDUCATION, a non-profit corporation,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT, TRACY STONE-MANNING, Director of the Bureau of Land Management, and JON RABY, Nevada State Director of the Bureau of Land Management,<br><br>*Federal Defendants*. | CASE NO. 3:23-cv-00568-ART-CSD<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR JUDICIAL NOTICE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |

1

To all parties and their attorneys of record:

PLEASE TAKE NOTICE that Plaintiffs LAURA LEIGH and WILD HORSE EDUCATION, a non-profit corporation, hereby move for summary judgment against Defendants UNITED STATES DEPARTMENT OF THE INTERIOR, BUREAU OF LAND MANAGEMENT, TRACY STONE-MANNING, Director of the Bureau of Land Management, and JON RABY, Nevada State Director of the Bureau of Land Management.

Pursuant to the court's modified scheduling order of September 25, 2024 (Dkt. 36), Rule 56 of the Federal Rules of Civil Procedure, and Local Rule 56-1, Plaintiffs' motion is supported by the accompanying Memorandum of Points and Authorities; Declaration of Laura Leigh; Plaintiffs' Motion for Judicial Notice, Memorandum of Points and Authorities, and Declaration of Jennifer Rae Lovko; the Administrative Record; and any written and oral argument and authorities that are presented at or before the hearing on this motion.

DATED: December 13, 2024,                     Respectfully Submitted,


/s/ Brent M. Resh
BRENT M. RESH
(Nev. Bar No. 14940)
BRENT RESH LAW, PLLC
2401 La Solana Way
Las Vegas, NV 89102
(702) 781-6903
brent@brentreshlaw.com

/s/ Jennifer Rae Lovko
Jessica L. Blome (appearing pro hac vice)
Jennifer Rae Lovko (appearing pro hac vice)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com
rlovko@greenfirelaw.com

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGEMENT AND
MEMORANDUM OF AUTHORITIES IN SUPPORT THEREOF

**TABLE OF CONTENTS**

I.   INTRODUCTION ........................................................................................ 10

II.  LEGAL FRAMEWORK ............................................................................ 11

    A.   Wild and Free-Roaming Horses & Burros Act............................... 11

    B.   National Environmental Policy Act ................................................ 12

    C.   Administrative Procedure Act ........................................................ 13

    D.   Mandamus and Venue Act.............................................................. 14

III. STATEMENT OF FACTS ......................................................................... 14

    A.   HMAP for Stone Cabin HMA ....................................................... 14

        1.   The Stone Cabin HMAP contains provisions specific to future gather plans and appropriate management level. ...................................................... 15

        2.   The Stone Cabin HMAP contains provisions specific to water availability...... 17

        3.   The Stone Cabin HMAP contains provisions specific to forage. ..................... 18

    B.   BLM failed to conform the Gather EA to HMAP objectives, including those contained in the Stone Cabin HMAP. ............................................. 18

        1.   Consideration of HMAPs ......................................................... 18

        2.   AML Determination .................................................................. 19

        3.   Rangeland Health and Forage................................................... 20

        4.   Water......................................................................................... 21

        5.   Livestock Allocation................................................................. 22

        6.   Monitor Wild Horse Territory .................................................. 22

IV.  ARGUMENT............................................................................................. 23

    A.   Plaintiffs have standing. ................................................................ 23

        1.   Plaintiffs have prudential standing because their injuries fall within the zone of interest protected by the WHBA and NEPA. .................................... 23

        2.   Plaintiffs have standing under Article III of the United States Constitution. ..... 25

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGEMENT AND MEMORANDUM OF AUTHORITIES IN SUPPORT THEREOF**

B.    BLM has a mandatory duty to create HMAPs and conform gather EAs to HMAPs. 28

    1.    The wording of BLM's implementing regulations creates a mandatory duty to create HMAPs for HMAs. .................................................................. 30

    2.    The regulatory history of the implementing regulations establishes a mandatory duty to create HMAPs for management of wild horses. .................................... 35

C.    BLM abused its discretion and acted arbitrarily and capriciously when it ignored the Stone Cabin HMAP in preparing the Gather EA. ...................................................... 36

D.    BLM has unlawfully withheld and/or unreasonably delayed its duty to create an HMAP for the Saulsbury HMA and to fulfill the obligations mandated by adoption of the Stone Cabin HMAP. ................................................................................ 38

    1.    BLM has a duty to create an HMAP for the Saulsbury HMA. ......................... 39

    2.    BLM has a duty to fulfill the obligations mandated within the Stone Cabin HMAP. ......................................................................................................... 40

E.    BLM abused its discretion and acted arbitrarily and capriciously by failing to analyze every significant aspect of the Gather Plan's impacts. ................................................. 42

    1.    BLM failed to identify necessary data and information. .................................... 42

    2.    BLM failed to consider reasonable alternatives. ............................................... 46

V.    CONCLUSION ............................................................................................................ 48

4

1

# TABLE OF AUTHORITIES

## CASES

*Alaska Survival v. Surface Trasp. Bd.*, 705 F.3d 1073 (9th Cir. 2013) .................................... 46

*Am. Horse Prot. Asso. v. Frizzell*, 403 F. Supp. 1206 (D. Nev. 1975) ............................... 25, 26

*Am. Wild Horse Campaign v. Bernhardt*, 442 F. Supp. 3d 127 (D.D.C. 2020) ...................... 26

*Andujar v. Weinberger*, 69 F.R.D. 690 (S.D.N.Y. 1976) ............................................... 14, 30

*Animal Protection Institute of America*, 109 IBLA 112 (1989) ............................................ 43

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87 (1983).............................. 42

*Bd. of Cnty. Comm'rs of Rocky Mt. Wild v. United States BLM*, 584 F. Supp. 3d 949 (D. Colo.
    2022) ....................................................................................................................... 24

*Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938 (9th
    Cir. 2008) ................................................................................................................. 42

*Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166 (9th Cir. 2002)................................... 38

*Bruce v. First Fed. Sav. & Loan Asso.*, 837 F.2d 712 (5th Cir. 1988) ..................................... 31

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) ....................................... 36

*Castillo v. Ridge*, 445 F.3d 1057 (8th Cir. 2006)............................................................... 14

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104 (2d Cir.
    2017) ................................................................................................................. 25, 26

*Cetacean Cmty. v. Bush*, 386 F.3d 1169 (9th Cir. 2004) .................................................... 25

*Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388 (1987) ............................................................... 23

*Coal. for the Advancement of Reg'l Transp. v. FHA*, 576 F. App'x 477 (6th Cir. 2014) .......... 46

*Dahl v. Clark*, 600 F. Supp. 585 (D. Nev. 1984) ............................................................... 43

*Davidson v. United States Dep't of State*, 113 F. Supp. 3d 183 (D.D.C. 2015)....................... 13

*Department of Water & Power v. Bonneville Power Admin.*, 759 F.2d 684 (9th Cir. 1985) .... 32

*Doe v. Risch*, 398 F. Supp. 3d 647 (N.D. Cal. 2019)......................................................... 39

*E.W. Bliss Co. v. United States*, 77 F.3d 445 (Fed. Cir. 1996) ............................................. 36

*Ecosystem Inv., Partners v. Crosby Dredging, L.L.C.*, 729 F. App'x 287 (5th Cir. 2018) ........ 24

*ErieNet, Inc. v. Velocity Net, Inc.*, 156 F.3d 513 (3d Cir. 1998) ......................................... 31, 32

*Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118 (2d Cir. 2020) ..................... 23

*Firebaugh Canal Co. v. United States*, 203 F.3d 568 (9th Cir. 2000) ................................. 30, 31

*Found. for N. Am. Wild Sheep v. United States Dep't of Agric.*, 681 F.2d 1172 (9th Cir. 1982)42

*Friends of Animals v. Silvey*, 353 F. Supp. 3d 991 (D. Nev. 2018) ............................... 31, 33, 42

*Friends of Animals v. Sparks*, 200 F. Supp. 3d 1114 (D. Mont. 2016) ................... 12, 38, 41, 45

*Friends of the Earth v. Sanderson Farms, Inc*., 992 F.3d 939 (9th Cir. 2021) ........................ 26

*Giddings v. Chandler*, 979 F.2d 1104 (5th Cir. 1992) ............................................................. 23

*Greene v. Costle*, 577 F. Supp. 1225 (W.D. Tenn. 1983) ........................................................ 29

*Hamazaspyan v. Holder*, 590 F.3d 744 (9th Cir. 2009) ......................................................... 30

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ......................................................... 26

*Hernandez-Avalos v. INS*, 50 F.3d 842 (10th Cir. 1995) ........................................................ 23

*In Def. of Animals v. U.S. DOI*, 751 F.3d 1054 (9th Cir. 2014) ............................................. 33

*Independence Mining Co. v. Babbitt*, 105 F.3d 502 (9th Cir. 1997) ................................... 38, 41

*Kingman Reef Atoll Invs., L.L.C. v. DOI*, 195 F. Supp. 2d 1178 (D. Haw. 2002) .................... 25

*Knuckles v. Weinberger*, 511 F.2d 1221 (9th Cir. 1975) ........................................................ 29

*Koopmann v. U.S. Dep't of Transp.*, 335 F. Supp. 3d 556 (S.D.N.Y. 2018) ............................ 13

*Leigh v. Raby*, No. 3:22-cv-00034-MMD-CLB, 2024 U.S. Dist. LEXIS 57734, *11-12 (D. Nev.

2024) .................................................................................................................... 31, 33

*Leigh v. United States DOI*, No. 2:22-cv-01200-MMD-BNW, 2024 U.S. Dist. LEXIS 171947, at

*23 (D. Nev. Sep. 23, 2024) ........................................................................................ 31

*Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024) ................................................... 30

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ....................................................... 25, 26

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012) . 23

*McGarry v. Sec'y of the Treasury*, 853 F.2d 981 (D.C. Cir. 1988) ........................................... 26

6

*McMahon v. Califano*, 476 F. Supp. 978 (D. Mass. 1979) .................................................. 14, 30

*Michigan Head Start Directors Asso. v. Butz*, 397 F. Supp. 1124 (W.D. Mich. 1975) ............ 14

*Mitchael v. Colvin*, 809 F.3d 1050 (8th Cir. 2016) .......................................................... 30

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .................. 36

*N.C. Growers' Ass'n v. UFW*, 702 F.3d 755 (4th Cir. 2012) ..................................................... 43

*N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286 (2d Cir. 2011) .................... 25

*Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233 (9th Cir. 2005) ...................... 12

*Neighbors of Cuddy Mountain v. U.S. Forest Service*, 137 F.3d 1372 (9th Cir. 1998) ....... 47, 48

*New York v. U.S. Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d 475 (S.D.N.Y. 2019) ........ 13

*Nnebe v. Daus*, 644 F.3d 147 (2d Cir. 2011) ........................................................................ 26

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) ..................................................... 11, 36

*Openlands, Midewin Heritage Ass'n v. United States DOT*, 124 F. Supp. 3d 796 (N.D. Ill. 2015) ........................................................................................................................... 46

*Or. Nat. Res. Council Fund v. Brong*, No. 04-693-AA, 2004 U.S. Dist. LEXIS 23251, at *28 (D. Or. Nov. 8, 2004) ......................................................................................................... 36

*Pac. Molasses Co. v. Fed. Trade Com.*, 356 F.2d 386 (5th Cir. 1966) .................................... 28

*Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153 (9th Cir. 1998) .................................... 46

*Rice v. Vill. of Johnstown*, 30 F.4th 584 (6th Cir. 2022) ....................................................... 25

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989) ....................................... 42

*Schulke v. United States*, 544 F.2d 453 (10th Cir. 1976) ....................................................... 14

*Sec'y of Labor v. Seward Ship's Drydock, Inc.*, 937 F.3d 1301 (9th Cir. 2019) ....................... 30

*Service v. Dulles*, 354 U.S. 363 (1957) .......................................................................... 28, 33, 34

*Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978 (8th Cir. 2011) .......................... 47

*Sierra Nev. Forest Prot. Campaign v. Weingardt*, 376 F. Supp. 2d 984 (E.D. Cal. 2005) ....... 43

*Singh v. Still*, 470 F. Supp. 2d 1064 (N.D. Cal. 2007) ............................................................. 14

7

*Telecommunications Research & Action v. FCC (TRAC)*, 242 U.S. App. D.C. 222 (D. C. Cir. 1984) ................................................................................................................... 38

*United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) ............................ 28, 33, 34

*United States v. Henry*, 1 F.4th 1315 (11th Cir. 2021) ................................................ 30

*United States v. Nixon*, 418 U.S. 683 (1974) ............................................................ 28, 33, 34

*Vaz v. Neal*, 33 F.4th 1131 (9th Cir. 2022) ............................................................... 39

*Warth v. Seldin*, 422 U.S. 490 (1975) ...................................................................... 25

*WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920 (9th Cir. 2015) ................... 42

*Workman v. Mitchell*, 502 F.2d 1201 (9th Cir. 1974) ............................................... 14, 30

## S<small>TATUTES</small>

15 U.S.C. §1332(b)(2) ............................................................................................ 43

16 U.S.C. §1331 ................................................................................................... 23, 39

16 U.S.C. §1332 ................................................................................................... 45

16 U.S.C. §1333(a) ............................................................................................... passim

16 U.S.C. §1333(b) ............................................................................................... 28, 33, 46

17 U.S.C. §1331 ................................................................................................... 24

28 U.S.C. §1361 ................................................................................................... 14, 23

42 U.S.C. §4321 ................................................................................................... 10, 42

43 U.S.C. §1331 ................................................................................................... 10

5 U.S.C. §551(13) ................................................................................................. 13

5 U.S.C. §701(b)(2) ............................................................................................... 13

5 U.S.C. §702 ...................................................................................................... 13

5 U.S.C. §706 ...................................................................................................... passim

## O<small>THER</small> A<small>UTHORITIES</small>

49 Fed. Reg. 49252 (December 18, 1984) ............................................................ 35

5 U.S.C.S. §556 ................................................................................................. 13

8

5 U.S.C.S. §557 ................................................................................................ 13

56 Fed. Reg. 786 (January 9, 1991) .................................................................. 35

### REGULATIONS

40 C.F.R. §1501.6(e) ........................................................................................ 12

40 C.F.R. §1505.3 ....................................................................................... passim

40 C.F.R. §1508.1(g); ...................................................................................... 47

40 C.F.R. §1508.9(a)(1) ................................................................................... 12

43 C.F.R. §4700.0-1 ......................................................................................... 11

43 C.F.R. §4700.0-2 ......................................................................................... 11

43 C.F.R. §4710.1 ............................................................................................. 11

43 C.F.R. §4710.3-1 ..................................................................................... passim

43 C.F.R. §4710.4 ........................................................................................ passim

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGEMENT AND
MEMORANDUM OF AUTHORITIES IN SUPPORT THEREOF**

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

The Stone Cabin Complex contains two herd management areas (HMAs): The Stone Cabin HMA and the Saulsbury HMA. On April 11, 2023, the Bureau of Land Management (BLM) published the Stone Cabin Complex Wild Horse Gather Plan Environmental Assessment (Gather EA) and its associated Finding of No Significant Impact (FONSI) and Decision Record (DR). In adopting the Gather Plan, BLM violated the Wild Free-Roaming Horses and Burros Act (43 U.S.C. §1331 et seq.) and the National Environmental Policy Act (42 U.S.C. § 4321 et seq.) because the agency (1) failed to first develop a herd management area plan (HMAP) for the Saulsbury HMA, (2) failed to conform the Gather EA to achieve the objectives of the approved HMAP for the Stone Cabin HMA, and (3) failed to analyze every significant aspect of the environmental impacts of removing wild horses from the Stone Cabin Complex.

This Court previously acknowledged that BLM's duty to create HMAPs is mandatory, and in 2024, BLM was ordered to prepare legally mandated HMAPs in two other complexes for herd management areas (the Pancake Complex and the Blue Wing Complex). In so ordering, the Court recognized that gather plans must conform to both land use plans (LUPs) and approved HMAPs. Despite this, BLM refused to conform the Gather Plan for the Stone Cabin Complex on the approved HMAP for the Stone Cabin HMA and has taken no action to develop an HMAP for the Saulsbury HMA. Such defiance flies in the face of the Wild Free-Roaming Horses and Burros Act (WHBA) and this Court's prior orders.

BLM has demonstrated that the Gather EA was created with a preordained result in mind. Rather than allow the public (or this Court) a meaningful opportunity to assess BLM's conclusions in adopting the Gather Plan, BLM has adopted a plan based almost entirely on unsupported assumptions and broad generalities. The agency did not support BLM's conclusions that there are excess horses in the Stone Cabin Complex that must necessarily be removed. The agency did not analyze every significant aspect of the environmental impacts.

1  ## II.    LEGAL FRAMEWORK

2  ### A.    Wild and Free-Roaming Horses & Burros Act

3  The Wild Free-Roaming Horses and Burros Act (WHBA) provides the statutory authority

4  by which BLM "is authorized and directed to protect and manage wild free-roaming horses and

5  burros as components of the public lands." 16 U.S.C. §1333(a). BLM has adopted regulations,

6  the purpose of which "is to implement the laws relating to the protection, management, and

7  control of wild horses and burros under the administration of the Bureau of Land Management."

8  43 CFR §4700.0-1. The regulations' stated objective is the "management of wild horses and

9  burros as an integral part of the natural system of the public lands under the principle of multiple

10  use; protection of wild horses and burros from unauthorized capture, branding, harassment or

11  death; and humane care and treatment of wild horses and burros[,]" which shall be done pursuant

12  to the establishment of herd management areas (HMAs) and herd management area plans

13  (HMAPs). See id. at §§4700.0-2, 4710.3-1, 4710.4. Management must be undertaken in

14  conformance with HMAPs and land use plans (LUPs), commonly called resource management

15  plans (RMPs). See id. at §§4710.1, 4710.3-1, 4710.4; SC_0670.[1]

16  BLM's Wild Horses and Burros Management Handbook states that LUPs establish

17  "general habitat and population management goals and objectives" for a given area.[2] See

18  SC_0564 (emphasis added). "Habitat or population management and monitoring objectives

19  regarding the management of a specific HMA or complex of HMAs are normally identified in a

20  Herd Management Area Plan (HMAP) rather than a LUP." Id. (emphasis added). In preparing

21  HMAPs, BLM provides for a public scoping comment period; public comment also is dictated

22  by NEPA once an environmental assessment is created for the HMAP. See SC-0591, SC_0595.

23

24  [1] Citations beginning with "SC" are references to the administrative record in this case.

25  [2] Land use plans are a preliminary step in the overall process of managing public lands – 'designed to
26  guide and control future management actions and the development of subsequent, more detailed and
   limited scope plans for resources and uses.'" *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 69, 2382
   (2004) (quoting 43 CFR § 1601.0-2).

27

28

**B.     National Environmental Policy Act**

The National Environmental Policy Act (NEPA) governs decisions by BLM to adopt HMAPs and gather plans. See 42 U.S.C. §4321 et seq. It requires federal agencies to take a "hard look" at the environmental consequences associated with proposed action. Marsh v. Or. Nat. Res. Council, 490 U.S. 360 (1989). NEPA serves the dual purpose of, first, informing agency decisionmakers of the significant environmental effects of proposed major federal actions and, second, ensuring that relevant information is made available to the public so that it "may also play a role in both the decision-making process and the implementation of that decision." See Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989); 350 Montana v. Haaland, 50 F.4th 1254 (9th Cir. 2022).

To meet these goals, NEPA requires a comprehensive Environmental Impact Statement (EIS) for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. §4332(2)(C); 40 C.F.R. §1501.3. To determine whether a proposed action will have significant effects, an agency may prepare an Environmental Assessment (EA). See 40 C.F.R. §1501.54. Where the government makes a finding that no significant impact will occur as a result of proposed action, this decision must be based on a consideration of all relevant factors and supported by a convincing statement of reasons. See Marsh, 490 U.S. at 373-74; 350 Montana, 50 F.4th at 1265. After conducting a proper EA and upon finding that the proposed action will not significantly affect the human environment, the government may issue a finding of no significant impact (FONSI). *See Native Ecosystems Council v. U.S. Forest Serv*., 428 F.3d 1233, 1239 (9th Cir. 2005) (citing 40 C.F.R. §1508.9(a)(1)); see also 40 C.F.R. §1501.6(e). NEPA requires BLM to implement and fulfill the mandates it assigns itself through decision records adopting agency action. *See* 40 C.F.R. §1505.3, *Friends of Animals v. Sparks*, 200 F. Supp. 3d 1114, 1122-25 (D. Mont. 2016).

1

### C.    Administrative Procedure Act

The Administrative Procedure Act (APA) grants a right of judicial review to "[a] person suffering legal wrong because of agency action or adversely affected or aggrieved by agency action." 5 U.S.C. §702. The APA defines "agency action" to "include[] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* §§551(13) 701(b)(2).

Under the APA:

> The reviewing court shall—
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . .
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (D) without observance of procedure required by law;
>
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title [5 USCS §§ 556 and 557] or otherwise reviewed on the record of an agency hearing provided by statute . . .

*Id.* §706.

When addressing a summary judgment motion in an APA case, the court acts more like an appellate tribunal than a trial court because the scope of its review is limited to reviewing the administrative record, deciding relevant questions of law, interpreting statutory and regulatory provisions, and determining the meaning or applicability of agency action. *See* 5 U.S.C. §706; *Koopmann v. U.S. Dep't of Transp.*, 335 F. Supp. 3d 556 (S.D.N.Y. 2018); *New York v. U.S.*

13

*Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d 475, 516 (S.D.N.Y. 2019); *Davidson v. United States Dep't of State*, 113 F. Supp. 3d 183 (D.D.C. 2015).

### D.     Mandamus and Venue Act

Under the Mandamus and Venue Act, [d]istrict courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. §1361. Mandamus relief awarded through summary judgment is appropriate where a plaintiff establishes a defendant owes a clear, nondiscretionary duty to perform an act. *See Castillo v. Ridge*, 445 F.3d 1057, 1060 (8th Cir. 2006); *Schulke v. United States*, 544 F.2d 453, 455 (10th Cir. 1976); *Singh v. Still*, 470 F. Supp. 2d 1064, 1072 (N.D. Cal. 2007). In making such a determination, courts often engage in statutory and regulatory construction. *See Workman v. Mitchell*, 502 F.2d 1201, 1205 (9th Cir. 1974); *McMahon v. Califano*, 476 F. Supp. 978, 982 (D. Mass. 1979); *Andujar v. Weinberger*, 69 F.R.D. 690, 693-94 (S.D.N.Y. 1976); *Michigan Head Start Directors Asso. v. Butz*, 397 F. Supp. 1124, 1138 (W.D. Mich. 1975).

## III.     STATEMENT OF FACTS

### A.     HMAP for Stone Cabin HMA

BLM adopted an HMAP for the Stone Cabin HMA in 1983 (Stone Cabin HMAP); no HMAP exists for the Saulsbury HMA. SC_09270 - SC_09327. The Stone Cabin HMAP underwent NEPA review and was adopted through a Record of Decision. SC_09319 - SC_09327. The Stone Cabin HMAP contains objectives for management of the range, wildlife, watershed, and wild horses. SC_09273- SC_09274. Specific to wild horses, the HMAP contains five objectives, which are to be accomplished through identified management methods. SC_09285 - SC_09296. Predominantly, these management methods consist of studies and assessments for the collection of data that is "necessary to intensively manage the horses." SC_09293 (emphasis added). Completion of these studies and assessments is prioritized as follows: (1) utilization and trend studies, (2) aerial inventories, (3) productivity and survival

studies, (4) total count accuracy studies, (5) sex determination studies, and (6) age structure studies. SC_09293 - SC_09296. Specific protocols for studies are contained within the HMAP, and the frequency of studies also is identified. SC_09285 - SC_09296. For example, "recruitment, seasonal movement and distribution studies will be conducted four times a year." SC_09292. Data on young/adult ratios is to be collected twice a year. *Id*.

The Stone Cabin HMAP provides that BLM's local Coordinated Resource Management and Planning (CRMP) group is to "be called upon to review the progress of [the Stone Cabin HMAP] at least once each year. Data collected from studies will be incorporated into the plan as soon as it is available." AR at SC_09297. Upon collection of this data, BLM states that the Stone Cabin HMAP will be updated. SC_09293. To date, BLM has never incorporated any data from studies and assessments into the Stone Cabin HMAP; BLM has not updated the Stone Cabin HMAP. SC_6188; Dkt. 28-3, p. 3. BLM also has not conducted all of the studies and assessments mandated by the Stone Cabin HMAP, including studies and assessments necessary to address objectives related to future gather plans, appropriate management level, water, and forage. Id. As a result, the Gather Plan does not conform to the Stone Cabin HMAP, as required by the WHBA's implementing regulations.

### 1. The Stone Cabin HMAP contains provisions specific to future gather plans and appropriate management level.

The Stone Cabin HMAP divided the Stone Cabin HMA into five subunits and provides the following associated information:

> Golden Arrow Subunit – "This area supports approximately 300 horses yearlong with some variations due to weather. Livestock use is heaviest from November to May (100-400 head) and slight the remainder of the year (0-50 head)." SC_09277.

> Clifford Springs Basin Subunit – "This area supports approximately 350-450 horses yearlong. Livestock use is heavy (200-500 head) from November to May and slight the remainder of the year (0-50 head)." SC_09277.

15

> M&M Mine-Italian Springs Subunit – "This area supports approximately 175 horses with fluctuations in populations due to season and weather. Livestock use in the area is yearlong with heavier use during November to May (50-300 head)." SC_09277.
>
> North Stone Cabin Ranch Subunit – "This area supports approximately 125-150 horses with variations in population levels due to season and weather. Livestock utilize the area yearlong with heavy use from November to May (100-400 head)." SC_09278
>
> Point Rocks Spring Subunit – "This area supports approximately 100-150 head of horses with variations in population levels due to season and weather. Livestock use of the area is heavy yearlong (100-200 head)." SC_09278.

In addition, BLM reported:

> One area along the northwestern side of the Stone Cabin Valley HMA, within the Point of Rocks Spring subunit, has been identified as an area requiring additional studies and coordination with the USFS due to the movement patterns and use patterns of the horses. Approximately 150 to 200 horses move back and forth across the boundary line (USFS-BLM). It is not presently known which HMA these horses belong in. At this time they will be dealt with in the Stone Cabin Valley plan, but once more is known about these horses they may either fall into the Monitor Wild Horse Territory (USFS) or remain in the Stone Cabin Valley HMA.

SC_09284.

For gather operations, the HMAP directs BLM to divide the horses that will be removed among the five subunits in the HMA. SC_09287- SC_09288. "This division of animals will be based on the actual use levels of animals in each unit, degree of utilization in each area, conflicts within each area, and the total wild horse population in each area. Horses will not be completely removed from any of the sub-units. To assure proper management of the horses in the Point of Rocks Spring sub-unit, the level of horse use on the adjacent USFS Land will also be considered in the total." *Id*. (emphasis added).

In the HMAP, BLM states that the last census in 1982 had reported 1,200 horses residing in the HMA, and the annual rate of increase appeared to be roughly 5%. SC_09280, SC_09282.

16

The health conditions of the 1,200 wild horses in the HMA were "fair-to-good. The population is maintaining itself without distinct signs of poor health." SC_09281. However, BLM noted that the HMAP was constrained by recommendations that the HMA be managed for an "interim population of 575 wild horses." SC_09284. "The rationale behind the selection of the 575 wild horse population level stems from the fact … it [represents] approximately half of the existing wild horse population within the HMA." Id. In the HMAP, BLM states that the appropriate management level (AML)[3] for the HMA will be adjusted in the future "only after adequate monitoring data is collected that shows a need for adjustments." *Id*. Toward this end, the HMAP identifies numerous studies and assessments to be conducted within the HMA. SC_09285 - SC_09296.

The Stone Cabin HMAP provides that "[a]ll projects proposed" for the Stone Cabin HMA will include an in-depth analysis on "if the project will impact the wild free-roaming characteristics of wild horses. Wild horse distribution, seasonal movements, daily movements, and home ranges will also be preserved in the EA [for a proposed project] in accordance with NSO manual supplement 4730, Release NV 4-6." SC_09290.

### 2. The Stone Cabin HMAP contains provisions specific to water availability.

The Stone Cabin HMAP addresses the water needs of the HMA's wild horses, providing that "[w]ater distribution in the HMA will be improved by developing [seven] additional wells and pipelines. … All waters to be developed will be available to horses." SC_09291. "In the event the [seven] projects do not provide adequate water for wild horses, an inventory will be

---

[3] AML is "[t]he number of adult horses or burros (expressed as a range with an upper and lower limit) to be managed within an HMA." SC_0610. The upper limit should represent the "maximum number of [wild horses and burros] that results in a thriving natural ecological balance (TNEB) and avoids a deterioration of the range. This number should be somewhere below the number that would cause damage to the range." *Id.* The lower limit should represent the "number that allows the population to grow to the AML upper limit over 4-5 years, without the need for gathers to remove excess [wild horses and burros] in the interim." *Id.*

1  conducted to determine additional water requirements to be developed in addition to those

2  proposed. Reservoirs, pipelines and water catchments will be considered first and wells as a last

3  resort." *Id.*

4                    **3.    The Stone Cabin HMAP contains provisions specific to forage.**

5          The Stone Cabin HMAP notes "[c]urrent monitoring data indicates the HMA is receiving

6  heavy use of the forage by both livestock and horses. This heavy use is occurring in specific

7  areas and is not consistent throughout the whole HMA. … The exact percentage of use by each

8  group of ungulate is not currently known." SC_09276. At that time, at least 1,500 head of

9  livestock were grazing within the Stone Cabin HMA. SC_09279. To gather more information,

10 the HMAP provides that BLM will conduct studies to monitor range conditions. SC_09283.

11 "These studies will monitor actual use, utilization and trend. Ultimately these studies will be

12 used to determine proper grazing levels of wild horses, wildlife and livestock on the range." *Id.*

13        **B.    BLM failed to conform the Gather EA to HMAP objectives, including those
             contained in the Stone Cabin HMAP.**

14

15        On April 11, 2023, BLM adopted the Gather Plan for the Stone Cabin Complex; it

16 provides "for an initial gather to achieve low AML by gathering and removing excess wild

17 horses with subsequent, follow-up gathers to be conducted over the next 10 years from the date

18 of the initial gather operation for continuing fertility control management, and to remove excess

19 animals if low AML is not achieved with the initial gather or is needed to maintain the

20 population within AML to allow for resource recovery." SC_6185. In the EA, BLM states that

21 "at least 689 excess wild horses above the low end of AML are currently present in the Stone

22 Cabin Complex." SC_6188.

23                    **1.    Consideration of HMAPs**

24        BLM acknowledges that no HMAP exists for the Saulsbury HMA. SC_6188. The agency

25 also notes that the Stone Cabin HMAP has not been updated. *Id.* BLM did not conform the

26 Gather EA to any HMAP objectives, including the Stone Cabin HMAP.

27

28                                        18

1
2
3
4
5

> While BLM has not prepared a formal HMAP document, all of the key
> components of an HMAP have nonetheless been addressed by BLM,
> including the establishment of the HMAs, AMLs and objectives for
> managing the complex (through the Tonopah RMP and other decision
> documents), monitoring and evaluating whether management objectives
> are being met (as summarized in this NEPA document), and establishing
> a ten-year management plan (through the Proposed Action and
> Alternatives being analyzed).

6      *Id*.

7      During the public comment period, many members of the public noted that BLM was

8  required to consider HMAPs before engaging in any removal actions. SC_6331-SC_6333,

9  SC_6360- SC_6361, SC_6385. For the Stone Cabin HMA, BLM needed to ensure that the

10 objectives of the Stone Cabin HMAP were achieved, or in the alternative, BLM could update the

11 HMAP. Id. BLM stated it need not create or consider any HMAPs because "the record otherwise

12 substantiates compliance with" the WHBA. SC_6188. The Gather EA does not address or

13 achieve the objectives, studies, and assessments mandated in the HMAP, however.

14                    **2.      AML Determination**

15     The Gather EA cites AMLs for the Stone Cabin HMA at 218 – 364 horses and for the

16 Saulsbury HMA at 24 – 40 horses. SC_6188. The upper limit of the Stone Cabin HMA was

17 purportedly established by a 1992 consent decision, and the upper limit for the Saulsbury HMA

18 was purportedly established by a 1992 consent decision and a 1996 Final Multiple Use Decision

19 (FMUD). SC_6186. No information exists as regards how or when the lower limits were

20 established. Public comment received by BLM following its publication of the draft Gather EA

21 included comments challenging these AMLs as flawed and outdated. SC_6328. It was noted that

22 the Gather EA does not address what formula, techniques, or scientific evidence were used to

23
24
25
26
27
28                              19

1    establish the AMLs. SC_6328- SC_6331. In response, BLM failed to identify what formula,

2    techniques, or scientific evidence were used.[4] *Id.*

3         The public also noted that the AML for the Complex "presume[d] gather-removal

4    management scenarios only. If fertility control is some portion of a modern management plan,"

5    then "it is reasonable to adjust the expectation that reaching low AML is necessary." SC_6329.

6    BLM did not directly address the substance of this comment. *Id.*

7                    **3.     Rangeland Health and Forage**

8         BLM states that "[m]oderate and heavy utilization is evident on key forage species within

9    the complex." SC_6189.  Also, "riparian degradation is occurring due to the overpopulation of

10   wild horses using" water sources in the Complex. *Id.* To support these statements, BLM

11   references Appendix II, "Vegetation, Climate, and Monitoring Data." *Id.*

12        Appendix II references utilization monitoring conducted in 2022 by BLM staff and

13   Intermountain Range Consultants, Inc. (IRC Inc.) SC_6272. IRC Inc. was retained by Stone

14   Cabin Ranch, LLC.[5] *Id.* It concludes that key species use "ranged from negligible to severe …

15   Continued use by wild horses <u>may</u> impact the species' continued occurrence on the landscape."

16   SC_6272 (emphasis added). In determining whether utilization was attributable to wild horses,

17   domestic cattle or wildlife, "BLM personnel made a judgment … based on the relative

18   abundance and recency of sign observed on the plot, including animal feces, trailing and hoof

19   prints, and known 2021-2022 grazing management actions. Where evidence of utilization by

20   multiple kinds of animals was noted, a proportion of utilization attributable to each was

21   estimated." SC_6273. BLM did not provide the public with a report containing the monitoring

22

23   ────────────────

24   [4] Over the past 15 years, WHE has asked BLM for information supporting AML in dozens of complexes
     and HMAs. BLM has repeatedly refused to provide this information, instead referring the public to AML
     decisions that are not available to the public. WHE Decl., ¶19.

25   [5] Stone Cabin Ranch LLC consists of ranchers with livestock grazing permits in the Stone Cabin
     Complex. This group sued BLM in the related case of COLVIN & SON, LLC, and STONE CABIN
26   RANCH, LLC, v. DEB HAALAND in her official capacity as Secretary of the United States Department
     of the Interior, et al., Nev. District Court Case No. 3:23-cv-00505-LRH-CLB.

27

28

──────────────────────────────────────

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGEMENT AND
MEMORANDUM OF AUTHORITIES IN SUPPORT THEREOF**

utilization data. Instead, the EA merely contains two tables that summarize BLM's findings made in conjunction with Intermountain Range Consultants, Inc. SC_6272. These tables show "wild horse % utilization" exceeded 50% in 7 of 26 monitoring sites. SC_6274. For context, the Stone Cabin HMA has 403,735 acres and the Saulsbury HMA has 81,152 acres. SC_6213. From this vast landscape, BLM's analysis attributes horse utilization above 50% only at the following 7 locations:

| Location[6] | Wild Horse % Utilization | Key Species Use |
|---|---|---|
| Stone Cabin HMA at "SC 13" | 64% | Heavy |
| Stone Cabin HMA at "SC 26" | 72% | Heavy |
| Stone Cabin HMA at "SC 29" | 59% | Moderate |
| Stone Cabin HMA at "SC 15" | 71% | Heavy |
| Stone Cabin HMA at "SC 8.1" | 54% | Moderate |
| Saulsbury HMA at "HC 4" | 69% | Heavy |
| Saulsbury HMA at "HC 8" | 62% | Heavy |

For the remaining 19 monitoring sites in the Complex, the percentage for wild horse utilization was below 50% and key species use ranged from negligible to heavy. SC_6214-SC_6215, SC_6274.

The public asked BLM to provide rangeland utilization and health data for the Stone Cabin Complex. SC_6348, SC_6361. In addition, one commentor noted that BLM's own rangeland health standards and guidelines require a Rangeland Health Assessment be completed prior to gather operations. SC_6348. BLM refused to produce any data. The agency further refused to consider, as an alternative to the adopted gather plan, a plan that would first require completion of a Rangeland Health Assessment. SC_6209, SC_6348.

### 4.    Water

The Gather EA notes that "[w]ater sources on public lands that are available to wild horses are very limited in both HMAs." The public noted that BLM has been directed to assure that there is sufficient water for wild horses. SC_6349. Rather than address this mandate, as

---

[6] The EA does not contain a map showing the locations of these monitoring sites.

provided for in the Stone Cabin HMAP (and in the Tonopah RMP), BLM stated "[t]he vast majority of existing water sources in the Stone Cabin Complex are privately held and managed through the state of NV." SC_6349.

### 5.    Livestock Allocation

Members of the public asked BLM to consider decreasing the number of livestock utilizing the Complex. SC_6348- SC_6349, SC_6354- SC_6358, SC_6362- SC_6363, SC_6378. One commented that BLM should study and address impacts from livestock grazing as "[o]nly then shall multiple-use be reasonably and scientifically reflected in [BLM's] TNEB analyses." SC_6354. BLM stated that such consideration had been undertaken in Chapter 4 of the EA. SC_6354. Chapter 4 covers cumulative effects; it mentions livestock grazing, but no substantive analysis is provided nor is substantive data identified. SC_6242- SC_6246.

BLM did not consider changing livestock allocation as an alternative to the adopted gather plan, stating that such consideration would be inconsistent with the Tonopah RMP and WHBA. SC_6206. Further, BLM responded that "[f]orage allocations are addressed at the Land Use Planning level."

### 6.    Monitor Wild Horse Territory

The Monitor Wild Horse Territory (WHT), which is administered by the US Forest Service (USFS), is located between the Saulsbury and Stone Cabin HMAs. SC_6185. BLM states there is a "known interchange between the wild horse populations within the Monitor WHT and adjacent HMAs," but the Monitor WHT "is not included in the proposed gather area. Any gather, removal, and/or fertility control treatment actions occurring on the Monitor WHT would require a separate decision from [USFS]." SC_6185. Conversely, BLM admits that the gather area will include some Monitor WHT grazing allotments "where wild horses are residing outside of HMA." SC_6331.

Public comment noted that "no studies have been done to show which populations spend more time on BLM or USFS land denoting jurisdiction for removal or population growth

suppression tools, determining if horses are in fact off-HMA or representative of transitory movement (that may have always existed and has increased due to human activity) and setting an accurate AML." SC_6330. Further, a joint EA should be created with USFS. *Id.*

## IV.    ARGUMENT

### A.    Plaintiffs have standing.

Plaintiffs have filed, concurrent with this Motion, the declaration of Laura Leigh, individually and on behalf of Wild Horse Education (WHE Decl.), to establish standing in this matter. All of Plaintiffs' causes of action consist of Mandamus and Venue Act (28 U.S.C. § 1361) or Administrative Procedure Act (5 U.S.C. § 706) claims based upon violations of the WHBA or NEPA.

#### 1.    Plaintiffs have prudential standing because their injuries fall within the zone of interest protected by the WHBA and NEPA.

Under both the Mandamus and Venue Act and the Administrative Procedure Act (APA), the first step in establishing standing requires a demonstration that plaintiff fall within the "zone of interest" protected by the at-issue law, which may include statutes or regulations. *See Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 130 (2d Cir. 2020); *Hernandez-Avalos v. INS*, 50 F.3d 842, 846-847 (10th Cir. 1995); *Giddings v. Chandler*, 979 F.2d 1104, 1108-1110 (5th Cir. 1992). The "zone of interest" test "is not meant to be especially demanding." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399-400 (1987). The Supreme Court has emphasized that a plaintiff's claim need only "arguably" fall within the zone of interest, which "indicate[s] that the benefit of any doubt goes to the plaintiff." *Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d at 128 (2d Cir. 2020) (citing to *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224-225 (2012).) Further, "there need be no indication of congressional purpose to benefit the would-be plaintiff." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399-400 (1987).

The WHBA provides the statutory authority by which the BLM manages wild horses and burros on public lands. *See* 16 U.S.C. §1331 *et seq*. The congressional findings and declaration of policy for the WHBA state:

> Congress finds and declares that wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West; that they contribute to the diversity of life forms within the Nation and enrich the lives of the American people; and that these horses and burros are fast disappearing from the American scene. It is the policy of Congress that wild free-roaming horses and burros shall be protected from capture, branding, harassment, or death; and to accomplish this they are to be considered in the area where presently found, as an integral part of the natural system of the public lands.

17 U.S.C. §1331. This Congressional finding requires that management activities affecting wild horses be conducted at the minimal feasible level. *Id.* at §1333(a). BLM's regulations mandating LUPs and HMAPs were adopted to implement the WHBA. *See* 43 C.F.R. §§4700.0-1, 4700.0-3.

Plaintiffs consist of Americans with an interest in ensuring that wild free-roaming horses are treated as an integral part of public lands, management activities are conducted at the minimal level feasible, and management activities include development and consideration of LUPs and HMAPs. WHE Decl. at ¶¶2, 3-7. As such, they arguably are within the zone of interests to be protected and have a clear right to pursue the relief requested.

As regards NEPA, Congress's purpose in enacting NEPA was to declare a national policy, which will:

> encourage productive and enjoyable harmony between man and his environment; . . . promote efforts which will prevent or eliminate damage to the environment and biosphere . . . ; [and] enrich the understanding of the ecological systems and natural resources important to the Nation. Naturally, NEPA's zone of interests covers environmental injuries and not purely economic ones. . . . Environmental injuries include, but are not necessarily limited to, detrimental effects upon a plaintiff's "recreational use and aesthetic enjoyment."

*Ecosystem Inv., Partners v. Crosby Dredging, L.L.C.*, 729 F. App'x 287, 294-95 (5th Cir. 2018) (internal citations omitted). Conservational interests also are recognized under NEPA. *See Bd. of Cnty. Comm'rs of Rocky Mt. Wild v. United States BLM*, 584 F. Supp. 3d 949, 963 (D. Colo. 2022). Plaintiffs consist of an individual and organization averring environmental, aesthetic, and conservational injuries that fall within NEPA's zone of interests. WHE Decl. at ¶¶11-18.   Thus, they have a clear right to pursue the relief requested.

### 2.    Plaintiffs have standing under Article III of the United States Constitution.

To demonstrate Article III standing to sue, plaintiffs must show (1) they suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) the injury is fairly traceable to defendants' challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

### a)    Plaintiffs have suffered injury in fact.

Standing can apply to an individual, or where an organization is the plaintiff, there are two types of standing: organizational and associational (or representative). *See N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2011); *Warth v. Seldin*, 422 U.S. 490, 511 (1975). Organizational standing exists where an organization sues in its own right to seek judicial relief from injury to itself. *See id.* Alternatively, an organization can assert associational standing to "sue on behalf of its members . . . ." *N.Y. Civil Liberties Union*, 684 F.3d at 294. Further, "[i]t is well settled that where multiple parties seek the same relief, 'the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.'" *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017) (citations omitted).

The injury in fact requirement of standing can be established when a plaintiff is deprived of a procedural right that is connected to the protection of an established interest (such as those established to be within the "zone of interest" of applicable law). *See Rice v. Vill. of Johnstown*,

30 F.4th 584, 591 (6th Cir. 2022); *Kingman Reef Atoll Invs., L.L.C. v. DOI*, 195 F. Supp. 2d 1178, 1187 (D. Haw. 2002); *Am. Horse Prot. Asso. v. Frizzell*, 403 F. Supp. 1206, 1213 (D. Nev. 1975). For example, "[i]nterpreting NEPA broadly, [courts] have recognized standing for individuals and groups of individuals who sue to require preparation of an EIS, when they contend that a challenged federal action will adversely affect the environment." *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1179 (9th Cir. 2004). Additionally, standing exists where plaintiffs challenges an agency action that deprived them of their opportunity to comment. *See McGarry v. Sec'y of the Treasury*, 853 F.2d 981, 984 (D.C. Cir. 1988), holding that in such cases, plaintiffs need only state that "had the opportunity been made available, it would have commented upon" the agency action. For cases involving the WHBA and NEPA, "[i]t is clear that the person who observes . . . a particular animal threatened by a federal decision is facing perceptible harm, since the very subject of his interest will no longer exist." *Am. Wild Horse Campaign v. Bernhardt*, 442 F. Supp. 3d 127, 144 (D.D.C. 2020), quoting *Lujan*, 504 U.S. at 566. *See also Am. Horse Prot. Asso.*, 403 F. Supp. at 1214 (finding an injury in fact where aesthetic or environmental interests has been impacted).

For organizations, standing exists where the challenged violation results in an impairment of the organization's ability to fulfill its mission or has resulted in a diversion of resources from other activities of the organizations. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *Friends of the Earth v. Sanderson Farms, Inc*., 992 F.3d 939, 942 (9th Cir. 2021); *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104 (2d Cir. 2017)*; Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011).

Plaintiff Laura Leigh, individually, has suffered injury because of Defendants' failure to create an HMAP and failure to adequately conduct an environmental review under NEPA. Ms. Leigh has visited, observed, and photographed the wild horses at the Stone Cabin Complex repeatedly over the past 15 years and has formed unique and special relationships with individual horses. WHE Decl. at ¶¶11, 14-16. She experiences great enjoyment from watching young foals

born in the Complex become curious and strong adult horses who then create their own families. *Id.* at ¶15. But, BLM's action (or inaction) threatens Ms. Leigh's ability to recreate and enjoy these horses. *Id.* at ¶¶16-18. Further, by failing to rely upon (or create) any HMAPs prior to gathering horses in the Stone Cabin Complex and by failing to include monitoring data in the Gather EA, Ms. Leigh's right to comment has been impaired. *Id.* at ¶20, 25-29. As a result of these failings, Ms. Leigh has been prevented from submitting comments necessary to consideration of whether or not horses should be gathered, such as comments to reduce livestock grazing for the protection of wild horses or comments related to the *actual* condition of the range. *Id.* By failing to adhere to the procedural requirements of the WHBA and NEPA, Ms. Leigh suffered injury to her aesthetic and procedural interests—interests that are recognized under the WHBA and NEPA as challenged by the Mandamus and Venue Act and APA. *Id.* at ¶22.

WHE is a national nonprofit corporation whose mission is to protect and preserve wild horses and burros on the range. *Id.* at ¶¶4-7. It aims to remove the curtain that veils governmental activities against wild horses from the public eye in order to advance wild horse advocacy and support. It also aims to facilitate public awareness and participation in wild horse issues. *Id.* at ¶5. Advocating for the wild horses in the Stone Cabin Complex is a past, present, and future important issue WHE and its members. *Id.* at ¶10. In this regard, WHE has documented gathers at the Stone Cabin Complex and witnessed the harmful impacts to wild horses. *Id.* at ¶11. Members of the WHE have suffered injury to their aesthetic and procedural interests, including their individual right to comment upon management practices associated with the Stone Cabin Complex and protect their aesthetic interest in the herd. *Id.* at ¶12-20. Because of this, WHE has established injury in fact for associational standing. The WHE also has organizational standing because the Gather EA has caused the organization to divert an inordinate amount of resources to the Stone Cabin Complex. *Id.* at ¶30.

        **b)**        **Plaintiffs' injury is fairly traceable to BLM's conduct and likely to be redressed by a favorable court decision.**

Each and every injury addressed above is predicated upon Defendant's failure to follow the WHBA (and its implementing regulations) and NEPA. The relief being sought would result in the prohibition of any future gathers (and corresponding future injuries) until Defendants complied with the WHBA, NEPA, and APA. By doing so, injury to Plaintiffs' individual, associational, and organizational interests would be rectified.

**B.     BLM has a mandatory duty to create HMAPs and conform gather EAs to HMAPs.**

Plaintiffs' First, Second, Third, and Fourth causes of action allege that Defendants have failed to comply with their duties to (1) prepare an HMAP for the Saulsbury HMA, (2) prepare an HMAP for the Saulsbury HMA prior to approving and acting on gather plans, and (3) consider and fulfill the objectives in the Stone Cabin HMAP.[7] Dkt. 1, pp. 16-21. These duties are created by regulations that BLM adopted to implement the WHBA. *See* 43 C.F.R. §§4710.3-1, §4710.4. When an administrative agency promulgates regulations, these regulations "must be scrupulously observed." *Pac. Molasses Co. v. Fed. Trade Com*., 356 F.2d 386, 389 (5th Cir. 1966) (citing *Service v. Dulles*, 354 U.S. 363 (1957)). This is so even where the regulations limit the agency's discretion beyond that required by statute. *See United States v. Nixon*, 418 U.S. 683, 695-96 (1974); *Service*, 354 U.S. at 387-388; *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265-268 (1954). Where an agency violates such regulations, "any action taken as a result . . . cannot stand." *Pac. Molasses Co.,* 356 F.2d at 390.

BLM's implementing regulations establish mandatory duties to create and conform to HMAPs. The WHBA provides the statutory authority by which the Secretary of the Interior "is authorized and directed to protect and manage wild free-roaming horses and burros as

---

[7] The First Cause of Action is brought under the Mandamus and Venue Act; the Second Cause of Action is brought under Section 706(1) of the APA for the unlawful withholding or unreasonable delay of agency action; the Third Cause of Action is brought under Section 706(2)(A) of the APA for agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; the Fourth Cause of Action is brought under Section 706(2)(C) of the APA for agency action in excess of statutory jurisdiction, authority, or limitations. Dkt. 1, pp. 16-21.

components of the public lands." 16 U.S.C. §1333(a). "All management activities shall be at the minimal feasible level." *Id.* This includes management activities related to the removal of excess animals. *See id.* at §1333(b).

The Secretary has delegated its responsibilities to the BLM, which in response has adopted implementing regulations. *See* 43 C.F.R. §4700 *et seq*. Subpart 4710 of BLM's regulations, entitled "Management Considerations" addresses HMAs and HMAPs as follows:

> §4710.3-1   Herd management areas.
>
> Herd management areas shall be established for the maintenance of wild horse and burro herds. In delineating each herd management area, the authorized officer shall consider the appropriate management level for the herd, the habitat requirements of the animals, the relationships with other uses of the public and adjacent private lands, and the constraints contained in §4710.4. The authorized officer shall prepare a herd management area plan, which may cover one or more herd management areas.
>
> §4710.4   Constraints on management.
>
> Management of wild horses and burros shall be undertaken with the objective of limiting the animals' distribution to herd areas. Management shall be at the minimum level necessary to attain the objectives identified in approved land use plans and herd management area plans.

43 C.F.R. §§4710.3-1, 4710.4. Courts often interpret the meaning of statutory or regulatory provisions to determine if an agency's actions violate a legal mandate. *See Knuckles v. Weinberger*, 511 F.2d 1221 (9th Cir. 1975); *New York v. United States HHS*, 414 F. Supp. 3d 475, 517-18 (S.D.N.Y. 2019); *Greene v. Costle*, 577 F. Supp. 1225, 1228 (W.D. Tenn. 1983). The U.S. Supreme Court has recognized this role specifically in cases involving APA claims:

> Congress … enacted the APA "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices."  It was the culmination of a "comprehensive rethinking of the place of administrative agencies in a regime of separate and divided powers."

In addition to prescribing procedures for agency action, the APA delineates the basic contours of judicial review of such action. … Section 706 directs that "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." It further requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law."

The APA thus codifies for agency cases the unremarkable, yet elemental proposition reflected by judicial practice dating back to *Marbury*: that courts decide legal questions by applying their own judgment. It specifies that courts, not agencies, will decide "*all* relevant questions of law" arising on review of agency action, — even those involving ambiguous laws — and set aside any such action inconsistent with the law as they interpret it. And it prescribes no deferential standard for courts to employ in answering those legal questions.

*Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2261 (2024) (internal citations omitted).

In reviewing a statute or regulation, courts must first look to the wording of the law. *See Workman v. Mitc*hell, 502 F.2d 1201, 1205 (9th Cir. 1974); *McMahon v. Califano*, 476 F. Supp. 978, 982 (D. Mass. 1979); *Andujar v. Weinberger*, 69 F.R.D. 690, 693-94 (S.D.N.Y. 1976). A well-settled principle of statutory construction is that each word of a statute must be accorded meaning. See *Hamazaspyan v. Holder*, 590 F.3d 744, 749 (9th Cir. 2009). Statutory titles and headings also can be viewed to establish meaning. See *United States v. Henry*, 1 F.4th 1315, 1333 (11th Cir. 2021). The regulatory history of a regulation can assist courts. See *Sec'y of Labor v. Seward Ship's Drydock, Inc*., 937 F.3d 1301, 1310 (9th Cir. 2019).

### 1. The wording of BLM's implementing regulations creates a mandatory duty to create HMAPs for HMAs.

Section 4710.3-1 of BLM's implementing regulations focuses on the creation of HMAs "for the maintenance of wild horse and burro herds." 43 C.F.R. §4710.3-1. This section states that HMAPs "shall" be prepared for HMAs. Id. There can be no doubt that the use of the word "shall" establishes a mandatory duty. See *Firebaugh Canal Co. v. United States*, 203 F.3d 568,

573-74 (9th Cir. 2000) ("[t]he term 'shall' is usually regarded as making a provision mandatory, and the rules of statutory construction presume that the term is used in its ordinary sense unless there is clear evidence to the contrary"); cf. *Mitchael v. Colvin*, 809 F.3d 1050, 1054 (8th Cir. 2016) (finding that the term "may" does not establish a "clear and non-discretionary duty.") Indeed, earlier this year, this Court in the matters Leigh v. Raby and Leigh v. United States DOI ordered BLM to prepare legally mandated HMAPs pursuant to the WHBA's implementing regulations for the Pancake Complex of Herd Management Areas and the Blue Wing Complex of Herd Management Areas. See *Leigh v. Raby*, No. 3:22-cv-00034-MMD-CLB, 2024 U.S. Dist. LEXIS 57734, *11-12 (D. Nev. 2024) (hereafter Leigh/Pancake Complex); *Leigh v. United States DOI*, No. 2:22-cv-01200-MMD-BNW, 2024 U.S. Dist. LEXIS 171947, at *23 (D. Nev. Sep. 23, 2024) (hereafter Leigh/*Blue Wing Complex*).

### a)   The wording of the implementing regulations creates a mandatory duty to consider HMAPs and to comply with the WHBA's minimum feasible level requirement.

The WHBA provides that "[a]ll management activities <u>shall</u> be at the minimal feasible level." 16 U.S.C. §1333(a) (emphasis added). The "minimum feasible level" means "the minimum number of habitat or population management tools or actions necessary." *Friends of Animals v. Silvey*, 353 F. Supp. 3d 991, 1009 (D. Nev. 2018). The wording of the WHBA's implementing regulations codify that the minimum tools include consideration of both LUPs and HMAPs. *See* 43 C.F.R. §4710.4 ("[m]anagement <u>shall</u> be at the minimum level necessary to attain the objectives identified in approved land use plans <u>and</u> herd management area plans"). Such consideration is mandatory for the use of the word "shall" establishes a mandatory duty. *See Firebaugh Canal Co.*, 203 F.3d at 573-74. The regulation's use of the word "and" also establishes that BLM must consider both LUPs and HMAPs. *See Bruce v. First Fed. Sav. & Loan Asso.*, 837 F.2d 712, 714-15 (5th Cir. 1988) (finding that the use of the word "and" is "to be accepted for its conjunctive connotation rather than as a word interchangeable with 'or'"); *see also ErieNet, Inc. v. Velocity Net, Inc.*, 156 F.3d 513, 516 (3d Cir. 1998) (holding that effect

must be given to all of a law's provisions, "so that no part will be inoperative or superfluous, void, or insignificant.")

In 2024, this Court noted that "LUPs and HMAPs are not equivalent documents." *Leigh/Pancake Complex*, 2024 U.S. Dist LEXIS 57734 at *12-14. Not only are these documents substantively different, but the parties "aggrieved by an HMAP have different procedural rights and administrative review processes" than those who wish to protest LUPs. *Id.* BLM may not rely on creation of an LUP in place of creation of an HMAP. *See id.*

   **b)**  **The wording of the implementing regulations creates a mandatory duty to create HMAPs prior to engaging in management actions.**

Not only must BLM consider HMAP objectives when engaging in management activities, but Plaintiffs contend that BLM must actually create HMAPs *prior* to engaging in management activities. It is a fundamental canon of regulatory interpretation that regulations dealing with the same subject must be read together and harmonized. *See Department of Water & Power v. Bonneville Power Admin.*, 759 F.2d 684, 693, fn. 13 (9th Cir. 1985). In this case, both Section 4710.3-1 and 4710.4 are under a subpart entitled "Management Considerations." *See* 43 C.F.R. §4700 et seq. Section 4710.3-1 mandates the creation of HMAPs and specifically references Section 4710.4 as a *constraint on management of HMAs*. *See* 43 C.F.R. §4710.3-1. In turn, Section 4710.4 establishes that BLM's management actions are constrained by having to consider the objectives of HMAPs and LUPs. *See id.* at §4710.4. The operative word is "constraint," whose plain and ordinary meaning is a condition that acts as a "restriction or limitation." *See* Exh. A to Plaintiffs' RJN.

 The only logical interpretation of these two sections, read together, is that BLM must create HMAPs prior to engaging in management actions. The regulations envision that BLM's management be undertaken with consideration of objectives that were formed after the scoping process and public involvement required by HMAPs and LUPs – at a minimum. To hold that BLM can proceed without such consideration would make Section 4710.4 superfluous – a result

that goes against the basic rules guiding statutory construction. *See ErieNet, Inc.*, 156 F.3d at 516. Surely the regulations do not intend that BLM's mandate to proceed with management at the minimum level necessary be undertaken without any connection to objectives (addressed by an HMAP but not by an LUP. The regulations establish requirements that must be complied with to satisfy the WHBA's requirement that management occur at the minimal feasible level. *See* 43 C.F.R. §4710.3-1.

In *Leigh/Pancake Complex*, Judge Miranda Du did not agree that an HMAP must be created prior to adoption of a gather plan:

> The requirement to prepare HMAPs should be read in the context of other implementing regulations of the WHBA, as well as the WHBA's controlling statutory language. The WHBA requires that the Secretary of the Interior manage wild horses in a manner that will "achieve and maintain a thriving natural ecological balance" on public land. 16 U.S.C. § 1333(a). If the Secretary determines an area is overpopulated, she must fulfill her duty to maintain ecological balance by "immediately remov[ing] excess animals from the range." Id. at §1333(b)(2) (emphasis added). Though Plaintiffs assert that the directive to manage wild horses at "the minimal feasible level" is operative here, *id*. at §1333(a), "Congress could not have intended that the 'minimal' management requirement would force the BLM to ignore these other statutory mandates," *In Def. of Animals v. U.S. DOI*, 751 F.3d 1054, 1066 (9th Cir. 2014).

*Leigh*, 2024 U.S. Dist LEXIS 57734 at *8. Thus, though Congress may not have explicitly demanded strict adherence to HMAPs, Congress did dictate that management occur at the minimal feasible level:

> All wild free-roaming horses and burros are hereby declared to be under the jurisdiction of [BLM] for the purpose of management and protection in accordance with the provisions of this chapter. … All management activities shall be at the minimal feasible level.

16 U.S.C. § 1333(a). And as noted above, "minimal feasible level" has been defined to mean "the minimum number of habitat or population management tools or actions" to be considered prior to gathers. See Friends of Animals, 353 F. Supp. 3d at 1009. In keeping with

this definition, BLM's implementing regulations mandate that both LUPs and HMAPs are part of this minimum number of habitat or population management tools. See 43 C.F.R. §§4710.3-1, 4710.4. These regulations constrain (or limit) the manner by which gather decisions can be made. See Nixon, 418 U.S. at 695-96; Service, 354 U.S. at 387-88; Shaughnessy, 347 U.S. at 265-68. In deciding to adopt a gather plan without the creation of an HMAP, BLM has skipped a vital step that would allow consideration of various management alternatives to a gather plan, such as changes to livestock grazing allotments and more. Instead, the Gather EA focuses only on the permanent removal of wild horses from the Stone Cabin Complex (the most extreme management action available to the agency).

In *Shaughnessy*, the Attorney General adopted regulations that limited certain of his discretionary powers relating to immigration. *See Shaughnessy*, 347 U.S. at 265-268. The Court held the Attorney General was unable to exercise the full discretion that was his prior to the regulation's enactment; should he wish to restore his full discretionary authority, he would need to amend the regulations. *See id.*; *see also Nixon*, 418 U.S. at 695-96 (finding that where the Attorney General delegated some of his powers to a Special Prosecutor via regulations, the Attorney General could not reassert these powers without amendment of the regulations). Similarly, in *Service*, Congress awarded the Department of State broad discretion in making determinations to terminate Department employees. *See Service*, 354 U.S. at 387-88. The Department thereafter adopted regulations that established standards and procedural requirements governing such termination, which regulations the Secretary of State did not follow. *See id.* The Court ruled that "[w]hile it is of course true that under the [statute] the Secretary was not obligated to impose upon himself these more rigorous substantive and procedural standards, neither was he prohibited from doing so . . . and having done so he could not, so long as the Regulations remained unchanged, proceed without regard to them." *Id.* at 388. In other words, BLM made the decision to implement its authority under the WHBA by adopting regulations that mandate management based upon both LUPs and HMAPs. This decision

purposely established "constraints on management." Now, if BLM regrets that decision, it must go through the process of changing Section 4710.4 to allow consideration of Gather EAs in the absence of LUPs and HMAPs. Accordingly, Plaintiffs disagree with Judge Du's conclusion that gather decisions can be made without first creating HMAPs.

### 2. The regulatory history of the implementing regulations establishes a mandatory duty to create HMAPs for management of wild horses.

The clear and plain language of BLM's regulations creates a mandatory duty for BLM to create HMAPs before engaging in management activities; therefore, there is no need to look further for purposes of statutory construction. But, to the extent the court seeks to look deeper into the intent of the regulations, the regulatory history cements BLM's duties. The current BLM regulations were adopted in 1986, as amended in 1991. *See* Exhs. B-F to RJN. Prior to 1986, the regulations did not provide that HMAs "shall be established for the maintenance of wild horse and burro herds," did not contain any language regarding HMAPs, and did not connect any land use or management plans with HMAs.[8] *See* 43 CFR §4700 et seq. (1983), attached as Exh. E to RJN.

In 1984, BLM proposed changes to its regulations, introducing the requirements for HMAs and HMAPs, which were published for comment. *See* 49 Fed. Reg. 49252 at proposed §§4710.3-1, 4710.4, attached as Exh. F to RJN.  This proposed rulemaking revises the provisions on wild free-roaming horses and burros in Part 4700 to reduce the regulatory burden on the public, to clarify the management procedures of the Bureau of Land Management as they affect the public, to remove unnecessary self-regulating provisions, and to arrange the regulations by

---

[8] The pre-1986 regulations provided that the BLM "may designate and maintain specifically designated ranges principally for the protection and preservation of wild free-roaming horses and burros." Exhibit D at §4730.5.  Herd management areas are mentioned once, without context. *Id.* The regulations stated that the BLM "shall, in connection with the designation of a specific range, develop a proposed wild free-roaming horse or burro management plan designed to protect, manage, and control wild free-roaming horses and burros on the area on a continuing basis." *Id.* at §4730.6. These plans are not tied to ensuring that maintenance activities are "undertaken with the objective of limiting the animals' distribution to herd areas" nor at ensuring that management "shall be at the minimum level necessary." *Id.* at §4700 et seq.

subject. *Id.* at Summary on p. 49252. Specific to management considerations, "[t]he proposed rulemaking amends existing Subpart 4730 as new Subpart 4710 to <u>link the management of wild free-roaming horses and burros with the Bureau's planning system</u>; to identify precisely the lands that will be considered for wild horse and burro management; <u>to require that herd management area plans be prepared for all herd management areas</u> . . ." *Id.*, emphasis added. In so doing, the requirement to consult both LUPs and HMAPs was created under a section entitled "Constraints on management" – a title that was non-existent in the earlier regulations. *See* 43 C.F.R. §4710.4; *cf.* Exh. E. Thus, the regulatory history further establishes that HMAPs were purposely included in the regulations as a mandatory duty for all herd management areas and for the purpose of management activities affecting wild horses.

## C. BLM abused its discretion and acted arbitrarily and capriciously when it ignored the Stone Cabin HMAP in preparing the Gather EA.

The APA provides that a court may set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. §706(2)(A). Dkt. 1, p. 19. This section of APA provides a court may set aside agency action where the there is no "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983), quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). Such examination takes into consideration whether the government's action is consistent with applicable statutes or regulations. *See E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996); 5 U.S.C. §706(2)(A).

Agency action will be set aside pursuant to Section 706(2) of the APA where an agency does not conform its action to required plans. *See Norton v. S. Utah Wilderness All*., 542 U.S. 55, 69 (2004); *Or. Nat. Res. Council Fund v. Brong*, No. 04-693-AA, 2004 U.S. Dist. LEXIS 23251, at *28 (D. Or. Nov. 8, 2004). Thus, for example, where statutes and regulations direct BLM to manage in accordance with approved land use plans, BLM is prevented from taking site-specific actions that do not conform with these plans. *See id.* In such circumstances, where BLM adopts a

site-specific action that does not conform with land use plans, the action can be set aside. *See id.* In the alternative, if BLM wishes to adopt a site-specific action that departs from a land use plan, it must first update or amend the land use plan. *See Norton*, 542 U.S. at 69.

As addressed above in Section IV.B., BLM's implementing regulations legally mandate that BLM consider both LUPs and HMAPs before adopting management actions in HMAs. "Management shall be at the minimum level necessary to attain the objectives identified in approved land use plans and herd management area plans." 43 C.F.R. § 4710.4. NEPA also requires that BLM fulfill the mandates it promises to implement. *See* 40 C.F.R. §§1505.3. This includes, but is not limited to, conditions, monitoring and mitigation measures approved by a Record of Decision. *See id.*

Here, Defendants violated the WHBA and NEPA by approving the Gather Plan without considering whether the Plan attained the objectives of the Stone Cabin HMAP and without ensuring that the monitoring requirements and conditions of the Stone Cabin HMAP were implemented. If BLM had considered the HMAP, the agency would have been forced to conclude that the Gather Plan did not conform to the approved Stone Cabin HMAP. For example, the Gather Plan does not take into consideration the actual use within each of the Stone Cabin HMA's five subunits, as required by the Stone Cabin HMAP. SC_09287-SC_09288. The EA for the Gather Plan also did not include an in-depth analysis of the Gather Plan's impact on the wild free-roaming characteristics of wild horses in the Stone Cabin HMA. SC_09290.

The Stone Cabin HMAP objectives related to range, wildlife, watershed, forage and wild horses similarly were ignored. SC_09273-SC_09274. BLM has not conducted the studies and assessments <u>necessary</u> for proper management (including but not limited to trend studies, productivity and survival studies, recruitment studies, and seasonal movement studies). SC_09283-SC_09296. BLM has not monitored range conditions pursuant to actual use, utilization, and trend studies for wild horses, wildlife, and livestock, as dictated by the Stone Cabin HMAP. SC_09283. Nor did the Gather Plan address the HMAP's provisions regarding

37

water distribution. SC_09291. BLM also stated that the HMAP would be updated after more data became available, but the HMAP has not been updated. SC_09293.

Accordingly, BLM's adoption of the Gather Plan must be set aside as arbitrary and capricious, an abuse of discretion, and contrary to the law.

**D.    BLM has unlawfully withheld and/or unreasonably delayed its duty to create an HMAP for the Saulsbury HMA and to fulfill the obligations mandated by adoption of the Stone Cabin HMAP.**

Section 706(1) of the APA requires courts to compel agency action that has been unlawfully withheld or unreasonably delayed. 5 U.S.C. §706(1). The elements of this claim involve the establishment of a clear right to a mandatory duty, and as addressed above in Section IV.B. and Section IV.C, Plaintiffs have established that BLM has a duty to develop an HMAP for the Saulsbury HMA and a duty to fulfill the mandates it promised to implement through the Stone Cabin HMAP. See 40 C.F.R. §1505.3, 43 C.F.R. §4710.4; *Friends of Animals*, 200 F. Supp. 3d at 1123-25.

The 9th Circuit distinguishes between action that is "unreasonably delayed" and action that is "unlawfully withheld," with the former applying to agency inaction in the face of a discretionary deadline, and the latter applying to actions where a mandatory deadline exists. *See Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1177 n.11 (9th Cir. 2002). For cases involving action "unreasonably delayed," courts balance the following "TRAC" factors:

> (1) the time agencies take to make decisions must be governed by a "rule of reason"[;] (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason [; ](3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake [;] (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority[;] (5) the court should also take into account the nature and extent of the interests prejudiced by the delay[;] and (6) the court need not :find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed."

1    *Independence Mining Co. v. Babbitt*, 105 F.3d 502, 507 n. 7 (9th Cir. 1997) (quoting

2    *Telecommunications Research & Action v. FCC (TRAC)*, 242 U.S. App. D.C. 222, (D. C. Cir.

3    1984). But where a deadline exists, courts do not consider the TRAC factors. *See Biodiversity*,

4    309 F.3d at 1176 and n.11.

5    **1.    BLM has a duty to create an HMAP for the Saulsbury HMA.**

6    BLM has unlawfully withheld creation of an HMAP for the Saulsbury HMA. Section

7    4710.4, read in conjunction with Section 4710.3-1, establishes the deadline by which BLM must

8    create HMAPs. See 43 C.F.R. §§4710.3-1, 4710.4. HMAPs must be created prior to gather

9    decisions as part of the minimum tools that must be considered for management. See id. This is a

10   concrete timeframe; the BLM has no discretion to create the HMAP after management is

11   undertaken. Through the WHBA implementing regulations, BLM has provided a management

12   framework that recognizes the need for both LUPs and HMAPs. LUPs establish general goals

13   and objectives; HMAPs establish habitat or population goals and objectives specific to an HMA

14   or complex. SC_0564. Both are necessary for management actions, including gather actions. See

15   43 C.F.R. §§4710.3-1, 4710.4.

16   Even if the court were to find that the application of TRAC factors is warranted, the

17   Court should still grant summary judgment and order BLM to create an HMAP for the Saulsbury

18   HMA. The first and second TRAC factors consider whether the time for agency action has been

19   reasonable. *See Vaz v. Neal*, 33 F.4th 1131, 1138 (9th Cir. 2022); *Doe v. Risch*, 398 F. Supp. 3d

20   647, 656-657 (N.D. Cal. 2019). The regulations mandating the creation of HMAPs for HMAs

21   was adopted in 1986 – almost 40 years ago! See Exhs. B-F to RJN. BLM has had more than

22   ample time to create an HMAP for the Saulsbury HMA. Yet, in this case, BLM has refused to

23   create an HMAP for the Saulsbury HMA, and this refusal has occurred despite the public asking

24   the agency to honor its duty. SC_6331-SC_6333, SC_6360- SC_6361, SC_6385.

25   The third and fifth TRAC factors focus on human health and welfare, as well as the

26   nature and extent of the interests prejudiced by the delay. See *Doe*, 398 F. Supp. 3d at 657. Here,

27

28                                              39

the WHBA's main interest is to protect wild horses, with a recognition that such interest is "an integral part of the natural system of the public lands." 16 U.S.C. §1331.  Further, Congress recognized that this interest is important to "enriching the lives of the American people." Id.  By not creating an HMAP for the Saulsbury HMA, BLM's actions do not consider the full range of management options available to protect wild horses, and delay goes against the interests specifically elucidated by Congress.

The fourth TRAC factor examines the effect of compelling action on other agency activities or priorities. See id. at 658. Plaintiffs are unaware of any negative effect associated with compelling BLM to create an HMAP. The sixth, and final TRAC factor, merely holds that courts need not find agency impropriety prior to compelling action. See id.

Taken together, contemplation of the TRAC factors leads to the conclusion that no reasonable justification exists for BLM's delay in creating an HMAP, and this delay flies in the face of Congress' stated intent for legislating the WHBA. Thus, even if the court considers BLM's inaction as being "unreasonably delayed" versus "unlawfully withheld," summary judgment should be granted, and the Court should compel BLM to create an HMAP for the Saulsbury HMA.

**2.    BLM has a duty to fulfill the obligations mandated within the Stone Cabin HMAP.**

To achieve its objectives, the Stone Cabin HMAP mandates a number of management methods and directives for the Stone Cabin HMA. As addressed above in Section IV.C., BLM has not implemented many of these mandates. BLM has unlawfully withheld implementation of the following mandates, which provide deadlines for implementation, and request that the Court compel BLM action on each:

- For all gather operations, divide the horses to be removed among the five sub-units of the Stone Cabin HMA based on "the actual use levels of animals in each unit, degree of

utilization in each area, conflicts within each area, and the total wild horse population in each area." SC_09287.

- Before any gather operation, conduct an "in-depth [analysis] to determine if the [Gather Plan] will impact the wild free-roaming characteristics of wild horses" in the Stone Cabin HMA. SC_09290.

- Conduct recruitment, seasonal movement and distribution studies four times a year. SC_09292.

- Collect information on young/ adult ratios in July and January of each year. SC_09292.

As regards mandates without specific deadlines, BLM also has unreasonably delayed implementation. The TRAC factors weigh in favor of an order compelling agency action. *See Independence Mining Co.*, 105 F.3d at 507 n. 7. The Stone Cabin HMAP was adopted in 1983 – over 40 years ago. No reasonable basis exists for BLM's delay. Further, as addressed above in Section IV.D.1., delay goes against the interests specifically elucidated by Congress with the WHBA. Delay also goes against the interests of NEPA, which recognizes the enforceability of conditions, monitoring, and mitigation measures established in the environmental assessment and adopted through a record of decision. *See* 40 C.F.R. §1505.3; *Friends of Animals*, 200 F. Supp. 3d at 1123-25. Plaintiffs are unaware of any negative effect associated with compelling BLM to act upon the mandates of the Stone Cabin HMAP. Therefore, summary judgment should be granted and BLM ordered to act on the following mandates:

- Analyze seedings as a method to provide additional forage within the HMA and help to redistribute the grazing pressure. This analysis will include feasibility studies. SC_09290.

- "Develop water in areas where there are no existing or proposed waters available to horses. Where waters are not available for horses, waters will be developed." SC_09291. In fulfilling this mandate, conduct an inventory "to determine additional water requirements to be developed." *Id.*

- Conduct a distribution/movement study to establish whether horses in the Point Rocks Spring Subunit belong to the Monitor WHT or Stone Cabin HMA. SC_09292.
- Conduct trend studies, productivity and survival studies, and vegetative studies in the Stone Cabin HMA. SC_09283-SC_09296.
- Update the Stone Cabin HMAP.

### E.    BLM abused its discretion and acted arbitrarily and capriciously by failing to analyze every significant aspect of the Gather Plan's impacts.

NEPA governs decisions by BLM to gather horses. *See* 42 U.S.C. §4321 *et seq*. Environmental analysis, in the context of wild horse gathers, has been interpreted to encompass not only impacts to public rangelands, but it includes impacts on the horses as well. *Friends of Animals v. Silvey*, 353 F. Supp. 3d 991, 1010 n.11 (D. Nev. 2018). Plaintiffs' Fifth Cause of Action alleges BLM violated NEPA when it failed to analyze every significant aspect of the environmental impacts of removing wild horses from the Stone Cabin Complex. Dkt. 1, p. 21. BLM's decision to adopt the Stone Cabin Complex Gather EA was arbitrary and capricious and not in accordance with law in violation of the APA, 5 U.S.C. § 706(2). *Id.*

### 1.    BLM failed to identify necessary data and information.

NEPA review requires that "every significant aspect" of the environmental effects of a proposed major federal action be made available to inform agency decisionmakers and the public so that both may "play a role in both the decision-making process and the implementation of" the action. *See Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). To fulfill NEPA's public disclosure requirements, BLM must provide to the public the environmental data and information relied upon in developing the agency's opinions and decisions. *See WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 925 (9th Cir. 2015); *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 953 (9th Cir. 2008). Summaries of data are insufficient unless the public has access to baseline data. *See WildEarth*

42

*Guardians*, 790 F.3d at 925. Incorporating sources of data by reference is only allowed if reasonably available to the public. *See id.*

When public comments are received, BLM must respond to the comments. *See Found. for N. Am. Wild Sheep v. United States Dep't of Agric.*, 681 F.2d 1172, 1179 (9th Cir. 1982). Where the public raises significant questions about a proposed action and the agency does not address them (or improperly dismisses them), adoption of the action may be invalidated. *See N.C. Growers' Ass'n v. UFW*, 702 F.3d 755, 770 (4th Cir. 2012); *Sierra Nev. Forest Prot. Campaign v. Weingardt*, 376 F. Supp. 2d 984, 990 (E.D. Cal. 2005). BLM has failed to disclose relevant information and data in the Gather EA for the Stone Cabin Complex. Specifically, the public requested BLM provide data and information related to AMLs, the Stone Cabin HMAP, and rangeland health; BLM refused to provide any of the requested data and information. SC_6188, SC_6206, SC_6209, SC_6214- SC_6215, SC_6272- SC_6274, SC_6328- SC_6331, SC_6348, SC_6354, SC_6361.

### a)     AML

To determine that "excess" horses exist in the Complex, BLM compares population inventories to current AMLs. *See* 16 U.S.C. §1333. AMLs must be established through site-specific data that addresses the optimum population levels necessary to achieve and maintain a TNEB. *See* 15 U.S.C. § 1332(b)(2); *Dahl v. Clark*, 600 F. Supp. 585, 592-95 (D. Nev. 1984); SC_6186. Where AML does not reflect this, BLM may not rely upon it in removal decisions. *See Dahl*, 600 F. Supp. at 592-93 (BLM may not establish AML without evidence, analysis, or studies; establishing AML to avoid the need for any AUMs reduction is in violation of the Wild Horse Act); *Animal Protection Institute of America*, 109 IBLA 112 (1989) (BLM cannot base removal decisions on AMLs established "purely for administrative reasons" rather than on studies establishing "the optimum number which results in a thriving natural ecological balance and avoids a deterioration of the range").

Historically, BLM efforts to establish AML have been a focal point of controversy. During the 1970s and 1980s, reviews of BLM's setting of AMLs consistently reported that AMLs were not based on thorough assessments of range conditions and did not consider carrying capacity of the range. SC_8318- SC_8319. In 2011, BLM commissioned the National Research Council (NRC) to conduct a study of the agency's Wild Horse and Burro Program. SC_8095- SC_8096. The NRC's report, published in 2013, concluded BLM was inconsistent in its approach to establishing and monitoring AMLs. SC_8318- SC_8319. This lack of consistency is based, in part, on BLM not providing necessary guidance to its staff on what data collection methodologies should be used to assess and monitor AML. SC_8334- SC_8335. The NRC concluded that:

> It is therefore necessary to develop and maintain standards for transparency, quality, and equity in AML establishment, adjustment, and monitoring. … The public should be able to understand the methods used and how they are implemented and should be able to access the data used to make decisions. Transparency will also encourage high quality in data acquisition and use. Data and methods used to inform decisions must be scientifically defensible. … [Additionally, e]nvironmental variability and change, changes in social values, and the discovery of new information require that AMLs be adaptable.

SC_8106; *see also* SC_8334-SC_8355 (addressing recommendations for scientifically defensible methodologies and adaptive management).

For the AMLs relevant to the Stone Cabin Complex, BLM states:

> The AML for the Stone Cabin HMA, and a portion of the Saulsbury HMA were established through a Consent Decision signed by Administrative Law Judge David Torbet on May 11, 1992, through the Department of Interior Office of Hearings and Appeals, Hearings Division. The Consent Decision established an AML for the Stone Cabin Allotment (and HMA) of 364 wild horses, and the Ralston Allotment portion of the Saulsbury HMA at 10 wild horses. The AML for the portion of the Saulsbury HMA in the Hunts Canyon Allotment was established as 30 wild horses through a Final Multiple Use Decision (FMUD) in 1996. The FMUD was issued following an interdisciplinary analysis of monitoring data, the completion of an Allotment Evaluation for the allotment, and the involvement of interested public.

44

SC_6186. Public comment received by BLM following its publication of the draft Gather EA included comments challenging these AMLs and asking for information relied upon in adopting them. SC_6328- SC_6331. Despite the NRC's admonition that BLM should act transparently in AML establishment, adjustment, and monitoring, the public has not been provided with information or documents necessary to understand the bases for AMLs in the Stone Cabin HMA and Saulsbury HMA. *Id.* The 1992 consent decision and 1996 FMUD are not included in the administrative record; the methods, protocols, and data relied on for the AMLs is unknown.

The adoption of the Gather EA should be set aside because neither the public nor this Court are able to discern whether BLM's determination of "excess" horses is based on valid AMLs. Without this information, a proper review of the gather plan's impacts on horses is not possible.

### b)      HMAPs

During the public comment period, many members of the public noted that BLM was required to consider HMAPs before engaging in any removal actions. SC_6331-SC_6333, SC_6360- SC_6361, SC_6385. For the Stone Cabin HMA, BLM needed to ensure that the objectives of the Stone Cabin HMAP were achieved, or in the alternative, BLM could update the HMAP. *Id.* The Gather EA does not address or achieve the objectives, studies, and assessments mandated in the HMAP, however. As such, the Gather Plan is based on analysis unsupported by any HMAP's legally required objectives. *See* 40 C.F.R. §1505.3; 43 C.F.R. §4710.4; *Friends of Animals*, 200 F. Supp. 3d at 1123-25.

### c)      Rangeland Health

The first step in a gather decision involves a determination that "excess" horses exist; the second step requires a determination that the removal of horses is necessary. *See* 16 U.S.C. § 1333. Necessity is based upon impacts to the range or TNEB.  *See* 16 USC §§ 1332, 1333.

The Gather EA states that horses are impacting the range, but BLM has failed to provide any data or information to support this opinion. SC_6189, SC_6214- SC_6215, SC_6272, SC_6274. At best, the Gather EA reveals that horses are one source of impact at a minority of monitoring sites (7 out of 26 sites). SC_6274.

The public asked BLM to provide rangeland utilization and health data for the Stone Cabin Complex. SC_6348, SC_6361. BLM refused these requests. SC_6209, SC_6348. No data has been provided to show that horses are a primary or necessary cause of damage at these sites; BLM does not demonstrate that removal of horses will remedy any observed rangeland damage. As a result of BLM's refusal, neither the public nor this Court are able to determine that the removal of horses is necessary. Without this information, a proper review of the gather plan's impacts on horses and the range is not possible.

### 2. BLM failed to consider reasonable alternatives.

EAs must consider every reasonable alternative, with the range dictated by a proposed project's purpose and need. *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1160 (9th Cir. 1998). Here, the "purpose" of the Gather EA for the Stone Cabin Complex "is to gather and remove excess wild horses from within and outside of the Stone Cabin Complex and to reduce the wild horse population growth rates to achieve and maintain established AML." SC_6189. Such action is connected to the "need" "to prevent undue or unnecessary degradation of the public lands associated with excess wild horses, and to restore a TNEB and multiple-use relationship on public lands, consistent with the provisions of Section 1333(b) of the WHBA. Id.

A statement of purpose and need "will fail if it unreasonably narrows the agency's consideration of alternatives so that the outcome is preordained." *Alaska Survival v. Surface Trasp. Bd.*, 705 F.3d 1073, 1084 (9th Cir. 2013). In determining whether the purpose and need are reasonable, courts look at whether the administrative record supports the identified purpose and need. See *Coal. for the Advancement of Reg'l Transp. v. FHA*, 576 F. App'x 477, 488 (6th Cir. 2014); *Openlands*, *Midewin Heritage Ass'n v. United States DOT*, 124 F. Supp. 3d 796, 807

(N.D. Ill. 2015). If the purpose and need are not substantiated in the NEPA analysis (or are substantiated by faulty analysis), approval of a project through a decision record will be found to be arbitrary and capricious. *See Openlands, Midewin Heritage Ass'n*, 124 F. Supp. 3d at 807.

### a) The Gather EA's purpose and need statement is not substantiated.

BLM's purpose and need statement is not substantiated by the administrative record. As noted above in Section IV.E.1., BLM has failed to substantiate its opinions regarding the determination that excess horses reside in the Complex and removal is necessary to protect the range and TNEB. The Gather EA also fails to substantively address the multiple uses of the Complex. Instead, BLM relies on faulty AMLs and unsupported assumptions on rangeland health. Without current data and information, the Gather EA fails to establish any need (and corresponding purpose). For this reason, the Gather EA should be set aside. See Animal Protection Institute of America, 116 IBLA at 244.

### b) The Gather EA's purpose and need statement is drawn too narrowly.

The purpose and need are so narrowly drawn that the only alternatives open for consideration are gather plans to remove wild horses permanently from public lands. By focusing only on hypothetical impacts that horses have on rangeland, BLM has refused to consider reasonable alternatives addressing changes to AML, changes to forage allocations for livestock, and holding off future gathers until a Rangeland Health Assessment is conducted. SC_6188, SC_6206, SC_6209, SC_6214- SC_6215, SC_6272- SC_6274, SC_6328- SC_6331, SC_6348, SC_6354, SC_6361. The purpose and need are so narrowly drawn that BLM also fails to analyze any alternatives addressed in the Stone Cabin HMAP, such as consideration of seeding for purposes of improving rangeland health, limiting off-road vehicles and other surface damaging activities, or developing additional water sources in the Complex. SC_09273, SC_09274,

SC_09278- SC_09279, SC_09290. Each of these alternatives is reasonable and within BLM's authority to act upon.

### c)    The Gather EA fails to analyze all direct, indirect, cumulative, and ecological impacts.

NEPA review requires consideration of direct, indirect, cumulative, and ecological impacts associated with a proposed action. *See* 40 C.F.R. § 1508.1(g); *Neighbors of Cuddy Mountain v. U.S. Forest Service*, 137 F.3d 1372, 1379 (9th Cir. 1998); *Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978, 991 (8th Cir. 2011). In the Gather EA, BLM acknowledges that past actions and reasonably foreseeable future actions include wild horse gathers and population growth suppression, livestock grazing, mineral exploration and extraction, oil and gas exploration, recreation including dispersed camping and hunting, land use authorizations and wildfire suppression. SC_6245. The public commented that BLM's analysis did not provide any details regarding the impacts associated with these activities, but the agency refused to provide further analysis. SC_6354, SC_6361.

To "consider" cumulative effects, some quantified or detailed information is required. *Neighbors of Cuddy Mountain v. U.S. Forest Service*, 137 F.3d 1372, 1379 (9th Cir. 1998). BLM completely ignores this obligation, and as such, the agency has failed to take a hard look at impacts to the environment and wild horses.

## V.    CONCLUSION

BLM has completely ignored its mandatory obligation to create and consider HMAPs. In failing to support the conclusions that excess horses reside in the range and must necessarily be removed and in failing to consider reasonable alternatives, BLM has demonstrated that the Gather EA was created with a preordained result in mind. Rather than allow the public (or this Court) a meaningful opportunity to assess BLM's conclusions, BLM has adopted a plan based almost entirely on unsupported assumptions and broad generalities. Both the WHBA and NEPA

require more. For these reasons, Plaintiffs request that their Motion for Summary Judgment be granted.

DATED:  December 13, 2024                    Respectfully Submitted,


                                             */s/ Jennifer Rae Lovko*
                                             Jessica L. Blome
                                             (Cal. Bar No. 314898, appearing pro hac vice)
                                             Jennifer Rae Lovko
                                             (Cal. Bar No. 208855, appearing pro hac vice)
                                             GREENFIRE LAW, PC
                                             2748 Adeline Street, Suite A
                                             Berkeley, CA 94703
                                             (510) 900-9502
                                             jblome@greenfirelaw.com
                                             rlovko@greenfirelaw.com

                                             *Attorneys for Plaintiffs*

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGEMENT AND MEMORANDUM OF AUTHORITIES IN SUPPORT THEREOF**

1

2

## CERTIFICATE OF SERVICE

I hereby certify that on December 13, 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which caused all parties or counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

*/s/ Jessica San Luis*

Jessica San Luis