1    BRENT M. RESH
     (Nevada Bar No. 14940)
2    BRENT RESH LAW, PLLC
     2401 La Solana Way
3    Las Vegas, NV 89102
     (702) 781-6903
4    brent@brentreshlaw.com

5
     JESSICA L. BLOME
6    (California Bar No. 314898, admitted pro hac vice)
     J. RAE LOVKO
7    (California Bar No. 208855, admitted pro hac vice)
     GREENFIRE LAW, PC
8    2748 Adeline Street, Suite A
     Berkeley, CA 94703
9    (510) 900-9502
     jblome@greenfirelaw.com
10   rlovko@greenfirelaw.com

11   *Attorneys for Plaintiffs*

12              **UNITED STATES DISTRICT COURT**

13                **DISTRICT OF NEVADA**

14   LAURA LEIGH, individually, and WILD
     HORSE EDUCATION, a non-profit
     corporation,
15                                              CASE NO. 3:23-cv-00568-ART-CSD

16              *Plaintiffs*,                   **AMENDED DECLARATION OF
                                                LAURA LEIGH INDIVIDUALLY AND
                    v.                          ON BEHALF OF WILD HORSE
17                                              EDUCATION**

18   UNITED STATES DEPARTMENT OF
     INTERIOR, BUREAU OF LAND
     MANAGEMENT, TRACY STONE-
19   MANNING, Director of the Bureau of Land
     Management, and JON RABY, Nevada State
20   Director of the Bureau of Land Management,

21              *Federal Defendants*.

22

23

24

25

26                                  1

I, Laura Leigh, hereby declare and state:

1.    The facts contained in this declaration are known personally to me and, if called as a witness, I could and would testify competently thereto under oath.

## A. Standing

2.    I am a U.S. citizen residing in the State of Nevada.

3.    I am the founder and current President of the non-profit organization Wild Horse Education (WHE), which has its principal place of business at 216 Lemmon Drive, #316, Reno, NV 89506. In addition, I am an active member and supporter of WHE.

4.    WHE is a national nonprofit corporation dedicated to research, journalism, and public education concerning the activities and operations of federal and state management of the free roaming horse and wild burro populations.

5.    The mission of WHE is to protect and preserve wild horses and burros on range, during and after capture. WHE works to do so in multiple ways. First, WHE provides information and education to the public about the current situation with American wild horses and burros and the issues surrounding public land management and wild horses. In this, WHE aims to remove the curtain that veils governmental activities against wild horses from the public eye in order to advance wild horse advocacy and support. Second, WHE also aims to facilitate public awareness and participation in wild horse issues, such as in comments on proposed agency actions. Third, WHE also advocates for the creation of a sane, scientifically-based management strategy for these animals in the wild. Fourth, WHE promotes public adoptions of formerly wild horses and supports those who adopt them for rescue and sanctuary. WHE has, since its founding, advocated for enforceable welfare rules for management from range, through capture and into holding.

2

AMENDED DECLARATION OF LAURA LEIGH INDIVIDUALLY AND
ON BEHALF OF WILD HORSE EDUCATION

6.   WHE frequently submits comments during the NEPA process on BLM proposed plans, including but not limited to Environmental Assessments (EAs). WHE has participated at hearings made available for public comment on BLM proposed plans, too.

7.   WHE has an interest in ensuring that wild free-roaming horses are treated as an integral part of public lands, management activities are conducted at the minimal level feasible, and management activities include development and consideration of land use plans and herd management area plans.

8.   WHE has more than 300,000 members and followers, with the majority of that number being individuals across the United States, and educates and informs these members and the American public about wild horses and burros through articles, photographs, videos, and sharing data and other information. WHE's members and supporters regularly attend and observe wild horse and burro roundups, removals, and holding pens.

9.   It is WHE's standard practice to send trained members of WHE to observe wild horse gathers conducted by the Bureau of Land Management (BLM) throughout the United States. When observing gather operations, our members document the events by filming the operations on video, capturing photographs, and writing written reports from the area designated by BLM for public observers. It is also WHE's standard practice to make documentation of the wild horse gathers and range data available to the public and to use this documentation to show and support any concerns we have directly to the BLM.

10.   Advocating for the wild horses in the Stone Cabin Complex is a past, present, and future important issue for Wild Horse Education.

11.   I, and other WHE members and supporters, have attended and observed past wild horse roundups, removals, and holding pens in the Stone Cabin Complex. We have submitted public comments on numerous proposed actions associated with the Stone Cabin Complex, including for the Gather EA.

**AMENDED DECLARATION OF LAURA LEIGH INDIVIDUALLY AND
ON BEHALF OF WILD HORSE EDUCATION**

12.    I, and other WHE members and supporters, visit the Stone Cabin Complex for photography, observing wildlife, and other recreational and professional pursuits. We gain aesthetic enjoyment from observing, attempting to observe, hearing, seeing evidence of, and studying wild horses. The opportunity to possibly view wild horses, or signs of horses, in these areas is of significant interest and value to us and increases our use and enjoyment of Nevada's public lands. I, and other WHE members and supporters, have engaged in these activities in the past and have specific plans to do so again in the future.

13.    WHE members and supporters observe capture activities and monitor the herds of Stone Cabin HMA and Saulsbury HMA. In the future, WHE intends to continue to have its members and supporters attend and observe wild horse roundups, removals, and holding pens in the Stone Cabin Complex

14.    Over the past 15 years, I have visited, viewed, observed, and documented wild horses in the Stone Cabin Complex. Many of WHE's members and supporters have similarly engaged the wild horses in the Stone Cabin Complex. As a result, we have formed strong bonds with the wild horses in the Stone Cabin Complex.

15.    I experience great enjoyment from watching young foals born in the Complex become curious and strong adult horses who then create their own families.

16.    Because of our strong bond with the wild horses in the Stone Cabin Complex, it is often very emotional to observe wild horses being gathered and captured from their homes in the Complex. Both I and WHE's members and supporters experience great sadness when we observe horses we have visited, observed, enjoyed, and known in the past, be rounded up and lose their freedom. It is also very difficult to witness gathers in which the horses appear to be injured or in distress, or in which horses are euthanized during the gather operation. This is especially true when we know the individual horse or horses in question from time spent visiting, viewing, and enjoying them in their wild.

4

17.     I have grave concerns that the past, present, and future BLM actions with regards to wild horses in the Stone Cabin Complex horses will adversely affect my ability to recreate and enjoy, such as through visiting, observing, and photographing, the wild horses of these herds in the future.

18.     The further gathering and removal of wild horses in the Stone Cabin Complex due to the challenged actions will adversely affect the substantial recreational, aesthetic, and conservational interests of myself and other WHE members and supporters.

**B. Comments for the Stone Cabin Complex Gather EA**

19.     I, as well as WHE members and supporters, actively participated in the public commenting process of the Stone Cabin Complex Gather EA, which was finalized on April 11, 2023. In these comments, we addressed the need for HMAPs, rangeland health assessments, appropriate consideration of cumulative effects, and re-evaluation of appropriate management levels (AMLs) to eliminate outdated AMLs created for administrative convenience, and more. We also noted that the adopted gather plan violates the immediacy requirement of the WHA. I and WHE have, over the past 15 years, repeatedly asked BLM to provide information substantiating AML in dozens of complexes and HMAs, but BLM has been steadfast in its refusal to provide such information. Instead, BLM simply refers to AML decisions that are not accessible by the public.

20.     By failing to rely upon (or create) any herd management area plans prior to gathering horses in the Stone Cabin Complex and by failing to include monitoring data in the Gather EA, WHE and I have had our right to comment impaired. As a result of these failings, we have been prevented from submitting comments for actual consideration as necessary to address whether or not horses should be gathered, such as comments to reduce livestock grazing for the protection of wild horses or comments related to the *actual* condition of the range.

**AMENDED DECLARATION OF LAURA LEIGH INDIVIDUALLY AND**
**ON BEHALF OF WILD HORSE EDUCATION**

21.     The further gathering and removal of wild horses in the Stone Cabin Complex due to the challenged actions will adversely affect the substantial recreational, aesthetic, and conservational interests of myself and other WHE members and supporters.

22.     By failing to adhere to the procedural requirements of the WHA and NEPA, I and WHE suffer injury to our aesthetic and procedural interests—interests that are recognized under the WHA and NEPA as challenged by the Mandamus and Venue Act and APA.

**C.  Herd Management Area Plans**

23.     The Stone Cabin Complex contains the Stone Cabin Herd Management Area (HMA) and Saulsbury HMA. I am aware that BLM has failed to create Herd Management Area Plans (HMAPs) for the Saulsbury HMA and Stone Cabin Complex. An HMAP was created for the Stone Cabin HMA in 1983; however, BLM did not conform the Gather EA to this HMAP nor has BLM updated the HMAP, as envisioned by adoption of the HMAP.

24.     In 2016, I volunteered with BLM, and at this time, I began working on collecting information and compiling data to create HMAPs in several HMAs including Stone Cabin. During this work, I found no records to indicate that any of the studies mandated in the 1983 HMAP had ever been performed. In 2017, my volunteer position ended, and all associated work related to updating the Stone Cabin HMA HMAP also ended. Between 2017 and 2023, I repeatedly contacted the BLM Battle Mountain District Office to have work resumed on updating the HMAP, but BLM did not respond to my requests. Ultimately, BLM decided not to update the 1983 HMAP for the Stone Cabin HMA.

25.     When creating HMAPs, BLM is supposed to provide the public with a meaningful opportunity to participate. Had any HMAPs been created (or updated) for the Stone Cabin Complex and its HMAs, I would have submitted comments during the appropriate scoping period.

6

26.     I and WHE were injured by the lack and unavailability of information that are supposed to be evaluated and presented to the public when an HMAP is created.

27.     Proving this point, when we commented on the Gather EA regarding subject matter that would have been considered during the development of an HMAP, BLM responded by stating that such comments were either outside the scope of the Gather EA and/or already addressed by LUPs.

28.     Had BLM prepared an HMAP for the Stone Cabin Complex and its HMAs, however, I and WHE would have been able to raise concerns about the Stone Cabin Complex's AMLs, livestock grazing and forage allocation, and herd-specific management actions.

29.     Had BLM prepared an HMAP for the Stone Cabin Complex and its HMAs, I and WHE would have gained information available through said HMAP and been able to use the information to further our advocacy mission; namely, to spread information and awareness to the public regarding wild horse and public lands issues.

30.     The lack of an HMAP and the information it provides has caused WHE to divert and expend resources in order to attempt to gather information ourselves. The creation of the Gather EA without any HMAP has caused WHE to divert and expend resources in order to address the EA's deficiencies.

**D. Exhaustion of Remedies**

31.     On May 9, 2023, I and WHE timely appealed Defendants' approval of the Gather EA to the United States Interior Board of Land Appeals and petitioned for an order staying the decision.

32.     On November 7, 2023, I and WHE voluntarily dismissed their appeal to the United State Interior Board of Land Appeals to challenge Defendants' action with the complaint in this action.

//

1    I declare under penalty of perjury under the laws of the State of California that the

2    foregoing is true and correct. Executed this 16th day of December, 2024 in Battle Mountain,

3    Nevada.

4

5                                    By:  _/s/ Laura Leigh_____
                                         Laura Leigh

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26
                                         8

1

**CERTIFICATE OF SERVICE**

2

     I hereby certify that on December 17, 2024, I electronically filed the foregoing document

3

with the Clerk of the Court using the CM/ECF system, which caused all parties or counsel of

4

record to be served by electronic means, as more fully reflected on the Notice of Electronic

5

Filing.

6

                                                              */s/ Jessica San Luis*

7

                                                              Jessica San Luis

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**AMENDED DECLARATION OF LAURA LEIGH INDIVIDUALLY AND ON BEHALF OF WILD HORSE EDUCATION**