LISA L. RUSSELL
U.S. Department of Justice
Deputy Assistant Attorney General
Environment & Natural Resources Division

JOSEPH W. CRUSHAM, Trial Attorney (CA Bar No. 324764)
Wildlife & Marine Resources Section
YOUNG A. KANG, Trial Attorney (FL Bar No. 1025505)
Natural Resources Section
P.O. Box 7611, Ben Franklin Station
Washington, DC 20044-7611
Phone: (202) 307-1145 (Crusham)
Email: joseph.crusham@usdoj.gov
Phone: (202) 514-2415 (Kang)
Email: young.kang@usdoj.gov

*Attorneys for Federal Defendants*

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEVADA

| | |
|---|---|
| LAURA LEIGH, individually, and WILD HORSE EDUCATION, a non-profit corporation, | Case No. 3:23-cv-00568-ART-CSD |
| *Plaintiffs*, | **FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| UNITED STATES DEPARTMENT OF THE INTERIOR, BUREAU OF LAND MANAGEMENT, JON RABY, Acting Director of the Bureau of Land Management, and KIMBERLY PRILL, Acting Nevada State Director of the Bureau of Land Management,[1] | |
| *Federal Defendants.* | |

Federal Defendants the U.S. Department of Interior, Bureau of Land Management ("BLM"), Jon Raby, and Kimberly Prill cross-move for summary judgment, and oppose Plaintiffs' motion for summary judgment, ECF No. 38.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Jon Raby, Acting Director of BLM, and Kimberly Prill, Acting Nevada State Director of BLM, are automatically substituted for Tracy Stone-Manning and Jon Raby, respectively.

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................... 1

LEGAL BACKGROUND ......................................................................................... 2

    I.    The Wild Free-Roaming Horses and Burros Act ...................................... 2

    II.    National Environmental Policy Act ......................................................... 3

FACTUAL BACKGROUND ..................................................................................... 3

    I.    The Stone Cabin Gather Plan and Decision .............................................. 3

    II.    Plaintiffs' Claims .................................................................................... 9

    III.    BLM has Begun Scoping on an HMAP for the Stone Cabin Complex ...................... 9

LEGAL STANDARD ............................................................................................. 10

ARGUMENT ......................................................................................................... 11

    I.    The Stone Cabin Decision and Gather Plan Comply with the Wild Horse Act ...... 11

        a.    Prior Orders and Prudential Mootness Resolve All Issues Related to the Creation of an HMAP for the Saulsbury HMA. ............................................... 12

            i.    Prior Orders from this District Confirm That BLM has a Duty to Prepare HMAPs, But BLM Need Not Prepare HMAPs Before Conducting Gathers. ............................................... 13

            ii.    Plaintiffs' Unreasonable Delay Claim for a Saulsbury HMAP is Prudentially Moot Because BLM is Already Preparing an HMAP for the Stone Cabin Complex ............................................... 16

        b.    Plaintiffs' Claims Regarding the 1983 Stone Cabin HMAP Fail. ................... 17

i.      Plaintiffs' APA Section 706(1) Claim to Compel BLM to "Achieve the Objectives" of the 1983 HMAP is Prudentially Moot and Also Fails Because the HMAP Does Not Create Binding Legal Obligations. ....... 17

ii.     Plaintiffs' APA Section 706(2) Claim Regarding the 1983 HMAP Fails. ........................................................................... 21

    1.   *BLM Need Not Consider or Achieve an HMAP's Objectives Before Gathering Excess Animals.* .................................. 21

    2.   *The Stone Cabin Decision is Not Inconsistent with the 1983 HMAP.* ................................................................. 25

II.   BLM Complied with NEPA.................................................................. 28

    a.   NEPA Does Not Require BLM to Satisfy HMAP Objectives Through the Gather Plan............................................................ 28

    b.   BLM Took the "Hard Look" Required by NEPA. ......................... 29

    c.   BLM's Purpose and Need Statement and Alternatives Analysis Comply with NEPA. ......................................................... 32

III.   Vacatur of the Stone Cabin Gather Decision is Not Warranted. ............................. 35

CONCLUSION.......................................................................................... 37

iii

1

## TABLE OF AUTHORITIES

2

**Cases**                                                                    **Page(s)**

3
4
*All. for Legal Action v. FAA*,
    69 Fed. Appx. 617 (4th Cir. 2003) ........................................................ 32

5
6
*All. for the Wild Rockies, Inc. v. U.S. Army Corps of Eng'rs*,
    237 F. Supp. 3d 1079 (D. Or. 2017) ..................................................... 16

7
*All. for Wild Rockies v. Cooley*,
    661 F. Supp. 3d 1025 (D. Mont. 2023) .................................................. 29

8
9
*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
    988 F.2d 146 (D.C. Cir. 1993) ............................................................. 36

10
11
*Am. Horse Prot. Ass'n, Inc. v. Watt*,
    694 F.2d 1310 (D.C. Cir. 1982) ............................................................. 2

12
13
*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
    462 U.S. 87 (1983) ............................................................................. 11

14
*California v. Block*,
    690 F.2d 753 (9th Cir. 1982) ................................................................. 3

15
16
*Cal. Cmtys. Against Toxics v. EPA*,
    688 F.3d 989 (9th Cir. 2012) ............................................................... 36

17
18
*Citizens to Pres. Overton Park v. Volpe*,
    401 U.S. 402 (1971) ........................................................................... 10

19
*City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*,
    123 F.3d 1142 (9th Cir. 1997) ............................................................. 32

20
21
*Clark v. Bear Stearns & Co.*,
    966 F.2d 1318 (9th Cir. 1992) ............................................................. 14

22
23
*Colvin & Son, LLC v. Haaland*,
    No. 3:23-CV-00204-ART-CLB, 2025 WL 266718 (D. Nev. Jan. 22, 2025) ............. passim

24
25
*Deutsche Bank Nat'l. Tr. Co. v. F.D.I.C.*,
    744 F.3d 1124 (9th Cir. 2014) ............................................................. 16

26
*Friends of Animals v. BLM*,
    548 F. Supp. 3d 39 (D.D.C. 2021) ....................................................... 24

27
28
*Friends of Animals v. BLM*,
    16-CV-0199, 2017 WL 5247929 (D. Wyo. Mar. 20, 2017) ................. 31, 34

*Friends of Animals v. Culver*,
610 F. Supp. 3d 157 (D.D.C. 2022) ............................................................... 36

*Friends of Animals v. Silvey*,
353 F. Supp. 3d 991 (D. Nev. 2018) ........................................................ 2, 31

*Friends of Animals v. Sparks*,
200 F. Supp. 3d 1114 (D. Mont. 2016) .................................................. 20, 29

*Fund for Animals, Inc. v. BLM*,
460 F.3d 13 (D.C. Cir. 2006) ........................................................................ 2

*In Def. of Animals v. U.S. Dep't of Interior*,
751 F.3d 1054 (9th Cir. 2014) ............................................................. passim

*In Def. of Animals v. U.S. Dep't of Interior*,
909 F. Supp. 2d 1178 (E.D. Cal. 2012) ...................................................... 22

*Kleppe v. Sierra Club*,
427 U.S. 390 (1976) ..................................................................................... 10

*Lands Council v. McNair*,
537 F.3d 981 (9th Cir. 2008) ...................................................................... 10

*League of Wilderness Defenders-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*,
549 F.3d 1211 (9th Cir. 2008) .................................................................... 30

*Leigh v. Raby*,
726 F. Supp. 3d 1207 (D. Nev. 2024) .................................................. passim

*Leigh v. U.S. Dep't of the Interior*,
No. 2:22-CV-01200-MMD-BNW, 2024 WL 4279156 (D. Nev. Sept. 23, 2024) ............ passim

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360 (1989) ............................................................................... 3, 10

*Moore v. Palmer*,
No. 22-CV-539 JLS (LR), 2023 WL 2593964 (S.D. Cal. Mar. 20, 2023) ................................ 2

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
463 U.S. 29 (1983) ....................................................................................... 10

*Nat'l Fam. Farm Coal. v. EPA*,
966 F.3d 893 (9th Cir. 2020) ...................................................................... 36

*Native Ecosystems Council v. United States Forest Serv.*,
428 F.3d 1233 (9th Cir. 2005) .................................................................... 33

*Nat. Res. Def. Council v. Norton*,
No. 1:05-cv-01207-OWW-LJO, 2007 WL 14283 (E.D. Cal. Jan. 3, 2007) ........................... 16

*Neighbors of Cuddy Mountain v. Alexander*,
303 F.3d 1059 (9th Cir. 2002) ........................................................................................ 3

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) .......................................................................... 11, 18, 20, 23

*Nova Stylings, Inc. v. Ladd*,
695 F.2d 1179 (9th Cir. 1983) ........................................................................... 12

*Nw. Env't Advocs. v. EPA*,
537 F.3d 1006 (9th Cir. 2008) ........................................................................... 11

*Oregon Natural Resources Council Fund v. Brong*,
No. CIV.04-693-AA, 2004 WL 2554575 (D. Or. Nov. 8, 2004) ........................... 23

*Oyeniran v. Holder*,
672 F.3d 800 (9th Cir. 2012) ............................................................................. 14

*Pub. Emps. for Env't Resp. v. Nat'l Park Serv.*,
No. CV 19-3629 (RC), 2021 WL 1198047 (D.D.C. Mar. 30, 2021) ..................... 18

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989) ......................................................................... 3, 29, 30

*Stout v. U.S. Forest Serv.*,
869 F. Supp. 2d 1271 (D. Or. 2012) .................................................................. 20

*TRAC v. FCC*,
750 F.2d 70 (D.C. Cir. 1984) ............................................................................ 13

*Tyler v. Cisneros*,
136 F.3d 603 (9th Cir. 1998) ............................................................................ 29

*U.S. v. Texas*,
599 U.S. 670 (2023) .......................................................................................... 36

*W. Org. of Res. Councils v. Bernhardt*,
412 F. Supp. 3d 1227 (D. Mont. 2019) ............................................................. 15

*Westlands Water Dist. v. U.S. Dep't of Interior*,
376 F.3d 853 (9th Cir. 2004) ............................................................................ 32

*Wild Wilderness v. Allen*,
871 F.3d 719 (9th Cir. 2017) ............................................................................ 32

*WildEarth Guardians v. Mont. Snowmobile Ass'n,*
    790 F.3d 920 (9th Cir. 2015) ...................................................................... 30

**Statutes**

5 U.S.C. §§ 701–06 .................................................................................... 10

5 U.S.C. § 706(1) ....................................................................................... 11

5 U.S.C. § 706(2) ....................................................................................... 10

16 U.S.C. § 1331 .......................................................................................... 2

16 U.S.C. § 1332(c) ...................................................................................... 2

16 U.S.C. § 1333(a) ............................................................................... 2, 22

16 U.S.C. § 1333(b)(2) ......................................................................... passim

28 U.S.C. § 1361 ........................................................................................... 9

42 U.S.C. § 4321 ......................................................................................... 29

42 U.S.C. § 4331 ......................................................................................... 29

43 U.S.C. § 1732(a) .............................................................................. 23, 26

**Rules**

Fed. R. Evid. 401(b) ..................................................................................... 2

**Regulations**

40 C.F.R. § 1505.3(a) .................................................................................. 28

40 C.F.R. § 1508.1(j) .................................................................................... 3

43 C.F.R. § 4710.3-1 ..................................................................................... 2

43 C.F.R. § 4710.4 ................................................................................ 22, 23

**Legislative Materials**

S. Rep. No. 92-242 (1971) ........................................................................... 34

**INTRODUCTION**

The Stone Cabin Complex in Nevada contains an unsustainable overpopulation of wild horses. As of late 2022, BLM estimated the population to be about 931 horses, nearly four times the low appropriate management level ("AML") for the Complex—242 horses. Thus, pursuant to the Wild Free-Roaming Horses and Burros Act ("Wild Horse Act"), on April 11, 2023, BLM determined that it was necessary to gather and remove excess horses from the Stone Cabin Complex ("Stone Cabin Decision") to "restore a thriving natural ecological balance to the range, and protect the range from the deterioration associated with overpopulation." 16 U.S.C. § 1333(b)(2). This Court recently upheld the Stone Cabin Decision in a related case brought by ranchers who alleged that BLM had not planned to conduct gathers swiftly enough. *See Colvin & Son, LLC v. Haaland*, No. 3:23-CV-00204-ART-CLB, 2025 WL 266718 (D. Nev. Jan. 22, 2025). Armed with formalistic claims that do not meaningfully challenge the overpopulation on the Complex, Plaintiffs seek to prevent BLM from gathering animals and to compel BLM to take numerous actions before any gathers. Their claims lack merit.

First, all of Plaintiffs' claims related to herd management area plans ("HMAPs") fail. BLM acknowledges that it has prepared an HMAP for only one of the two herd management areas ("HMAs") within the Complex. Two decisions from this District's Chief Judge last year confirm that BLM has a duty to create HMAPs, but it need not create them before gathering horses. In compliance with those orders, on February 7, 2025, BLM began scoping on an HMAP for the entire Stone Cabin Complex and anticipates issuing the document within the next year. While Plaintiffs falsely assert that BLM is acting in "defiance" of prior orders, ECF No. 38 at 10, Plaintiffs seek to re-litigate issues precluded by those very orders, including whether BLM can gather horses before creating an HMAP. As explained in more detail below, Plaintiffs' claims related to HMAPs are either precluded by prior orders, prudentially moot because BLM has already begun preparing a new HMAP for the Complex, or otherwise fail on the merits.

Second, Plaintiffs' claims under the National Environmental Policy Act ("NEPA") fail. As explained below, NEPA does not require BLM to satisfy HMAP objectives prior to approving

a gather decision, BLM has taken NEPA's requisite "hard look," and BLM's purpose and need statement and alternatives analysis comply with NEPA.

For these reasons, the Court should deny Plaintiffs' Motion for Summary Judgment, ECF No. 38, grant Federal Defendants' Motion, and enter judgment for Federal Defendants.[2]

## LEGAL BACKGROUND

### I.    The Wild Free-Roaming Horses and Burros Act

In 1971, Congress passed the Wild Horse Act, 16 U.S.C. § 1331 *et seq.*, which directs the Secretary of the Interior to provide for the protection and management of wild horses "in the area where presently found, as an integral part of the natural system of the public lands." *Id.* But after only a few years, the wild horse population had grown dramatically, "and action [was] needed to prevent a successful program from exceeding its goals and causing animal habitat destruction." *Am. Horse Prot. Ass'n, Inc. v. Watt*, 694 F.2d 1310, 1316 (D.C. Cir. 1982) (citation omitted). Thus, in 1978, Congress passed amendments to the Wild Horse Act, which gave the Secretary greater authority and discretion to manage and remove excess horses. *Id.* at 1316–18.

Section 3 of the Wild Horse Act directs the Secretary to manage wild horses and burros "to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1333(a). "The Bureau (as the Secretary's delegate) carries out this function in localized [HMAs.]" *Fund for Animals, Inc. v. BLM*, 460 F.3d 13, 15 (D.C. Cir. 2006); *see* 16 U.S.C. § 1332(c); 43 C.F.R. § 4710.3-1. In each HMA, BLM typically establishes an AML range. *See Friends of Animals v. Silvey*, 353 F. Supp. 3d 991, 1008 (D. Nev. 2018), *aff'd*, 820 F. App'x 513 (9th Cir. 2020) ("BLM is given great deference [] in establishing AMLs…"). If BLM determines there is

---

[2] Plaintiffs submitted a Request for Judicial Notice regarding regulations, provisions of the Federal Register, and dictionary definitions. ECF No. 39. The Court need not take judicial notice over regulations or provisions of the Federal Register—they are legal authority that Plaintiffs may cite, and the Court may consider, without resort to the Federal Rules of Evidence. *See, e.g.*, *Moore v. Palmer*, No. 22-CV-539 JLS (LR), 2023 WL 2593964, at *3 (S.D. Cal. Mar. 20, 2023) (denying request for judicial notice of legal authority and collecting cases). Additionally, because Plaintiffs refer to these materials as part of their effort to re-litigate precluded issues, they are not "of consequence in determining" this action and are thus irrelevant. *See* Fed. R. Evid. 401(b). That said, Federal Defendants otherwise take no position on Plaintiffs' Request.

an overpopulation of wild horses and burros and that action is necessary to remove them, BLM must immediately act to remove the excess animals to achieve AML. 16 U.S.C. § 1333(b)(2).

## II.    National Environmental Policy Act

NEPA serves the dual purpose of informing agency decision-makers of the environmental effects of proposed federal actions and ensuring that relevant information is made available to the public so it "may also play a role in both the decisionmaking process and the implementation of that decision." *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). NEPA requires the agency to take a "hard look" at the potential environmental consequences of its decision-making. *Id.* at 350.

But NEPA does not mandate particular results or impose substantive environmental obligations.  *Id.* at 350–51; *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989).  Instead, "NEPA ensures that [an] agency will not act on incomplete information."  *Marsh*, 490 U.S. at 371. To this end, judicial review of NEPA decisions examines whether the analysis includes a "reasonably thorough discussion of the significant aspects of the probable environmental consequences" to inform the exercise of agency discretion.  *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982) (citation omitted).  An Environmental Assessment ("EA") is a "concise public document" that serves to support an agency's determination of "whether to prepare an environmental impact statement . . . or a finding of no significant impact." 40 C.F.R. § 1508.1(j). "Once the court is satisfied that an agency's exercise of discretion is truly informed, the court must defer to that informed discretion." *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1071 (9th Cir. 2002) (cleaned up).

## FACTUAL BACKGROUND

## I.    The Stone Cabin Gather Plan and Decision

The Stone Cabin Complex is managed by BLM and includes the Stone Cabin HMA and Saulsbury HMA. SC_6185. The Stone Cabin HMA is about 30 miles east of Tonopah in Nye County, Nevada, and contains 407,706 acres. SC_6185–86. The Saulsbury HMA contains 135,018 acres and is divided into a southern and northern parcel. *Id.* The southern parcel is

immediately west of the Stone Cabin HMA and south of Highway 6. SC_6185. The northern parcel is east of the Stone Cabin HMA and north of Highway 6. *Id.* The Monitor Wild Horse Territory ("WHT") is located between the Saulsbury and Stone Cabin HMAs. *Id.* Although there is some interchange of wild horses between the Stone Cabin Complex and the Monitor WHT, the Monitor WHT is managed solely by the Forest Service—i.e., it is not part of a Joint Management



Map 1. Gather area for the Stone Cabin Complex wild horse gather.

5

SC_6187

4

Area ("JMA")—and is thus outside the scope of BLM's Stone Cabin Decision. *Id.*[3]

The AML range for the Stone Cabin Complex is 242 to 404 wild horses. SC_6188. This breaks down to an AML range of 218–364 horses for the Stone Cabin HMA, and 24–40 horses for the Saulsbury HMA. *Id.* The AML range for the Complex was established in the 1990s, both through administrative proceedings before the Department of Interior's Office of Hearings and Appeals, as well as a Final Multiple Use Decision, which was "issued following an interdisciplinary analysis of monitoring data, the completion of an Allotment Evaluation for the allotment, and the involvement of interested public." SC_6186. In 1997, BLM issued the Tonopah Resource Management Plan ("Tonopah RMP"), which reaffirmed AML for the Stone Cabin and Saulsbury HMAs and obligates BLM to, among other things, manage horses in both HMAs at these AMLs. SC_19–20 (setting forth objective and determinations for "Wild Horse and Burros"); *see* SC_6189–90 (explaining conformance with Tonopah RMP).

In July 2021, BLM conducted an emergency resource flight before an emergency gather within the Stone Cabin HMA and observed 432 horses on the north side of the Stone Cabin HMA and 233 horses on the Saulsbury HMA. SC_6188. This was the direct count observed by BLM and did not account for unseen horses that were likely present. *Id.* Extrapolating from the observed direct count, BLM estimates that the 2021 population was about 1,097 total wild horses in the Stone Cabin Complex, and 931 in the Fall of 2022. *Id.* The Fall 2022 estimate was made by taking the 2021 estimate, subtracting the 321 horses gathered during the 2021 emergency gather on the Stone Cabin HMA, and applying the estimated 20% herd growth rate. *Id.* Thus, as of Fall 2022, BLM determined that the Stone Cabin Complex's wild horse population was more than double

---

[3] In Plaintiffs' Statement of Facts—without providing any legal authority or mentioning the issue in their Argument—they assert that BLM should create a "joint EA" with the Forest Service, presumably for a gather plan that includes the Monitor WHT. *See* ECF No. 38 at 22–23. BLM has agreed with Forest Service to jointly manage certain areas containing wild horses. *See, e.g.*, *Colvin*, 2025 WL 266718, at *1 (describing the Little Fish JMA as being "jointly managed by the Forest Service and the BLM"). But Plaintiffs cannot force BLM and the Forest Service to reach such an agreement. Put simply, the Court lacks jurisdiction over any claims relating to the Forest Service's management of the Monitor WHT because Plaintiffs have not sued the Forest Service. *See* SC_6185 ("Any gather, removal, and/or fertility control treatment actions occurring on the Monitor WHT would require a separate decision from the US Forest Service.").

the high AML of 404, and nearly four times the low AML of 242. *Id.*

Based on these results, BLM began a process to determine whether excess wild horses are present in the Stone Cabin Complex, and whether removal of those excess animals is necessary. *See* 16 U.S.C. § 1333(b)(2). On October 25, 2022, under NEPA and the Wild Horse Act, BLM issued a draft gather plan EA for public review and comment. SC_1642. On April 11, 2023, BLM issued a Final Environmental Assessment ("Stone Cabin EA") and the Stone Cabin Decision. SC_6182; SC_6174.

The Stone Cabin EA explains that BLM has determined, based on "all current information available" to it, that "at least 689 excess" horses exist within the Stone Cabin Complex and that such excess wild horses "need to be removed in order to achieve the established AML, restore a thriving natural ecological balance . . . and prevent further degradation of rangeland resources." SC_6189. BLM's determination was based on several factors. Most importantly, wild horse populations within the Stone Cabin Complex "far exceed the established AML range." *Id.* The overpopulation is contributing to moderate and heavy utilization of key forage species within the Complex which, if sustained, could result in "long term changes to rangeland health." *Id.* Moreover, absent gathers to achieve AML, future emergency removals will be required. *Id.* Additionally, the dire conditions within the Complex are forcing horses to relocate outside of HMA boundaries onto "public lands that are not managed for wild horses," causing vehicle collisions and creating a "public safety issue and risk of injury or death for the excess wild horses." *Id.*

The Stone Cabin EA describes the proposed action (Alternative A, or "Stone Cabin Gather Plan"), which involves three components:

1. Initially, gather and remove excess wild horses to achieve low AML within the proposed gather area either in a single first gather or with a follow-up gather(s) if all excess animals are not captured and removed in a single initial gather . . .
2. Over the 10-year period, apply population growth suppression methods . . . to gathered and released horses over multiple gathers. . .
3. Over the 10-year period . . . conduct[] additional/maintenance gathers after the initial gather(s) to bring wild horse population back to low AML if the population grows to again exceed high AML. . . SC_6193.

The Stone Cabin EA also analyzes an Alternative B, which would involve gathering and removing excess animals to within the AML range "without population growth suppression treatments," as well as a No Action Alternative, under which no gathers to remove excess wild horses would occur. SC_6192.

The Stone Cabin EA notes that BLM has not issued an "updated" HMAP for the Complex since the 1983 Stone Cabin Valley Wild Horse Herd Management Plan ("1983 HMAP" or "Stone Cabin HMAP"), which analyzes the Stone Cabin HMA. SC_6188. That said, "BLM has determined under the [Wild Horse Act] that excess wild horses are present and that a gather for removal of excess animals and continuing application of population growth suppression measures over a 10-year period is necessary to achieve and maintain a thriving natural ecological balance." *Id.* Thus, "[w]hile BLM has not prepared a formal HMAP document, all of the key components of an HMAP have nonetheless been addressed by BLM, including the establishment of the HMAs, AMLs and objectives for managing the complex (through the Tonopah RMP and other decision documents), monitoring and evaluating whether management objectives are being met (as summarized in this NEPA document), and establishing a ten-year management plan (through the Proposed Action and Alternatives being analyzed)." *Id.*

The Stone Cabin EA analyzes in detail the potential environmental effects of each alternative, SC_6209–42, including effects to the wild horses in the Complex, SC_6213–30. BLM determined that the Gather Plan's "[r]emoval of excess wild horses and achievement of AML would be expected to improve health for the animals that remain within the Complex." SC_6218. Specifically, "[d]ecreased competition for forage and water resources would reduce stress and promote healthier animals[.]" *Id.* Moreover, removals of excess horses combined with the fertility controls "should result in improved health and condition of mares and foals as the actual population comes into line with the population level that can be sustained with available forage and water resources, and would allow for healthy range conditions (and healthy animals) over the longer-term." *Id.* Additionally, achieving AML and reducing growth rates "would reduce damage to the range from the current overpopulation of wild horses and allow vegetation resources to start

recovering." *Id.* The EA also notes that gathers may impact individual horses, including a very small chance of mortality (0.5% of 1% of horses gathered) and separating "members of individual bands of wild horses." *Id.* The Gather EA next analyzes the effects of contraception and sex ratio skewing as proposed by the Gather Plan, SC_6218–23, followed by an analysis of the effects on horses of helicopter gathers, SC_6223–26, water/bait trapping, SC_6226, temporary holding facilities, SC_6226–27, as well as transport to and housing within off-range corrals and pastures, SC_6227–28.

BLM determined that the No Action Alternative would result in horses being subject to "increased stress and possible death as a result of increased competition for water and/or forage as the population continues to grow even further in excess of the land's capacity to meet the wild horses' habitat needs." SC_6228. The heavy use of rangeland resources would increase and "degradation could become irreversible in areas where ecological thresholds are passed." *Id.* Given that wild horses face very limited predation within the Complex, "there would be a steady increase in wild horse numbers for the foreseeable future, which would continue to exceed the carrying capacity of the range." *Id.* BLM found this would lead to horses dying of starvation and lack of water, which would "have obvious consequences to the long-term viability of the herd." SC_6229. Moreover, "[a]llowing wild horses to die of dehydration and starvation would be inhumane treatment and would be contrary to the [Wild Horse Act], which mandates removal of excess wild horses." *Id.*

In addition to effects on wild horses, BLM also analyzed the possible effects to riparian/wetland areas, wildlife, special status plants and animals, livestock grazing, wilderness areas, noxious weeds and invasive species, vegetation, and soils/watersheds. *See* SC_6230–42.

The Stone Cabin Decision adopts the Stone Cabin Gather Plan (Alternative A in the EA). SC_6174–75. BLM found implementation of the Gather Plan "is necessary to remove excess wild horses and bring the wild horse population back to within the established AML range in order to achieve a thriving natural ecological balance between wild horses, wildlife, livestock, vegetation and the available water" as required by the Wild Horse Act. SC_6175. The Stone Cabin Decision

reiterates BLM's findings that the No Action Alternative would not comply with the Wild Horse Act nor the Tonopah RMP. *See* SC_6176.

## II.    **Plaintiffs' Claims**

Plaintiffs bring five claims. Plaintiffs' first claim is brought under the Mandamus Act, 28 U.S.C. § 1361, and alleges that BLM violated the Wild Horse Act and its regulations when it "authorized the gather and removal of wild horses and burros from the Stone Cabin Complex without first developing a[n] HMAP for the Saulsbury HMA and without achieving the objectives of the 1983 HMAP for the Stone Cabin HMA." ECF No. 1 ¶¶ 77–84. Plaintiffs seek a "writ of prohibition" preventing BLM from gathering animals until it prepares an HMAP for Saulsbury and "implement[s] the objectives within the 1983 HMAP." *See id.* ¶ 84. Plaintiffs' second claim is identical to the first, the only difference being that it is brought under Administrative Procedure Act ("APA") Section 706(1) and seeks to compel BLM to create a Saulsbury HMAP and "fulfill the obligations mandated by the 1983 HMAP" or update the document. *Id.* ¶¶ 85–92. Plaintiffs' third and fourth claims are brought under APA Section 706(2) and again allege that BLM acted unlawfully by approving the Stone Cabin Decision before creating a Saulsbury HMAP and "without achieving the objectives of the 1983 HMAP for the Stone Cabin HMA." *Id.* ¶¶ 93–111. Plaintiffs' fifth claim alleges that BLM violated Section 706(2) and NEPA by failing to "analyze every significant aspect of the environmental impacts of removing wild horses from the Stone Cabin Complex." *Id.* ¶¶ 112–116. Based on their third, fourth, and fifth claims, Plaintiffs ask for the Stone Cabin Decision to be vacated and set aside. *Id.* ¶¶ 101, 111, 116.

## III.    **BLM has Begun Scoping on an HMAP for the Stone Cabin Complex**

As detailed below, in two decisions last year, Chief Judge Miranda Du held that BLM has a mandatory duty to prepare HMAPs and that BLM cannot comply with this mandate through other means. *See Leigh v. Raby*, 726 F. Supp. 3d 1207, 1221–22 (D. Nev. 2024) ("*Leigh I*"); *Leigh v. U.S. Dep't of the Interior*, No. 2:22-CV-01200-MMD-BNW, 2024 WL 4279156 (D. Nev. Sept. 23, 2024) ("*Leigh II*"). Both decisions issued after BLM signed the Stone Cabin Decision Record on April 11, 2023. Thus, to comply with the *Leigh I* and *Leigh II*'s holdings, on February 7, 2025,

BLM began scoping for a new HMAP that will cover the Stone Cabin Complex (both the Saulsbury and Stone Cabin HMAs) as well as the Little Fish Lake JMA. *See* Stone Cabin Complex Management Evaluation, BLM NATIONAL NEPA REGISTER, https://eplanning.blm.gov/eplanning-ui/project/2036341/510 (last visited February 28, 2025). As explained on BLM's website and in the attached declaration of Perry B. Wickham, Field Manager for the Tonopah Field Office, BLM intends to issue the HMAP in approximately one year. *Id.*; *see* Declaration of Perry B. Wickham ("Wickham Decl."), ¶ 5.

## LEGAL STANDARD

Wild Horse Act and NEPA claims are reviewed under the APA, 5 U.S.C. §§ 701–06. *See In Def. of Animals v. U.S. Dep't of Interior,* 751 F.3d 1054, 1061 (9th Cir. 2014). APA Section 706(2) provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [or] in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2).

Section 706's "arbitrary and capricious" standard of review is narrow—the Court cannot "substitute its judgment for that of the agency." *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971). The burden of proof remains on the plaintiff. *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976). The "arbitrary and capricious" standard is necessarily deferential. A decision is arbitrary and capricious only "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983); *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008). In other words, there must be a "clear error of judgment." *Marsh*, 490 U.S. at 378. "[A] reviewing court must generally be at its most deferential" when reviewing determinations involving agencies' technical expertise and

scientific judgments. *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983).

An agency action is "not in accordance with law," if it conflicts with the language of the substantive statute at issue. *See Nw. Env't Advocs. v. EPA*, 537 F.3d 1006, 1014 (9th Cir. 2008). Likewise, an agency action is "in excess of statutory jurisdiction, authority, or limitation," if the action is not "congruent" with such substantive statute. *See Leigh I*, 726 F. Supp. 3d at 1221–22.

APA Section 706(1) permits courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). But courts can compel agency action "only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) ("*SUWA*"). If there is a "firm deadline" for taking an action, plaintiffs can sue for "unlawfully withheld" agency action. *See Leigh I*, 726 F. Supp. 3d at 1215–16. But if a deadline for action is not firm and permits the agency some discretion, a claim under Section 706(1) is one for "unreasonably delayed" agency action. *See id.*

## ARGUMENT

### I.    <u>The Stone Cabin Decision and Gather Plan Comply with the Wild Horse Act</u>

BLM complied with the Wild Horse Act. Based on "all information currently available" to BLM, the agency determined that there is an excess of horses on the Stone Cabin Complex that must be removed in order to "restore a thriving natural ecological balance to the range, and protect the range from the deterioration associated with overpopulation[.]" 16 U.S.C. § 1333(b)(2). As of 2022, BLM found the Complex's population was almost four times the low-AML of 242 horses. SC_6188. BLM's expert determination that excess animals must be removed from the Complex is entitled to deference, and triggers BLM's obligation to "immediately" remove excess horses— i.e., to begin removing animals "as promptly as reasonably possible." *See Colvin*, 2025 WL 266718, at *5 (citation omitted).

Plaintiffs do not meaningfully dispute that there is a dramatic excess of horses on the Complex. Instead, they advance several formalistic arguments about whether BLM created or properly considered HMAPs. Each argument lacks merit. *First*, Plaintiffs' claims related to

preparation of a Saulsbury HMAP fail. In cases brought by these same Plaintiffs, Judge Du already decided twice that BLM may gather horses before preparing an HMAP, such that Plaintiffs are precluded from rearguing this issue here. And Plaintiffs' claim to compel BLM to prepare a Saulsbury HMAP should be dismissed as prudentially moot because BLM has already begun creating an HMAP for the entire Stone Cabin Complex. *Second*, Plaintiffs' claims related to BLM's 1983 Stone Cabin HMAP also fail. Their claim to compel BLM to "achieve" the objectives of or update the 1983 HMAP is prudentially moot, as BLM has already begun preparing a new HMAP for the Complex, and because BLM cannot be compelled to undertake the 1983 HMAP's aspirational objectives. Plaintiffs' claim to set aside the Stone Cabin Decision because it allegedly does not "achieve" or "conform" to the 1983 HMAP's objectives also lacks merit. There is no statutory or regulatory requirement mandating that BLM achieve an HMAP's objectives before gathering horses and, either way, the record shows that BLM's Stone Cabin Decision and Gather Plan are consistent with the 1983 HMAP's objectives.[4]

### a. Prior Orders and Prudential Mootness Resolve All Issues Related to the Creation of an HMAP for the Saulsbury HMA.

Plaintiffs' arguments regarding creation of an HMAP for the Saulsbury HMA have either already been decided such that issue preclusion bars their re-litigation, or else they are prudentially moot because BLM has begun scoping on an HMAP for the Stone Cabin Complex.

---

[4] Plaintiffs' first claim is brought under the Mandamus and Venue Act. *See* ECF No. 1 ¶¶ 77–84. To the extent that the claim seeks to compel BLM to create or "conform" to HMAPs, it is not viable because Plaintiffs can seek review under the APA. *See Leigh II*, 2024 WL 4279156, at *11 (granting judgment to BLM on similar mandamus claim "[b]ecause an adequate remedy is available under the APA"); *Nova Stylings, Inc. v. Ladd*, 695 F.2d 1179, 1182 (9th Cir. 1983) ("The availability of review through the [APA] . . . is an adequate remedy precluding mandamus jurisdiction."). To the extent that Plaintiffs seek a "writ of prohibition" barring BLM from gathering animals, this relief is not available under the Mandamus Act (or the APA). *See Leigh II*, 2024 WL 4279156, at *11 (finding that request for a "writ of prohibition" preventing gathers failed because "the Mandamus and Venue Act and APA Section 706(1) only allow the Court to compel BLM to gather excess horses and burros more quickly"). Thus, Plaintiffs' first claim fails.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

    i. <u>Prior Orders from this District Confirm That BLM has a Duty to Prepare HMAPs, But BLM Need Not Prepare HMAPs Before Conducting Gathers.</u>

In *Leigh I*—a case brought by the same Plaintiffs as this one—Chief Judge Miranda Du decided whether BLM had, under APA Section 706(1), "unlawfully withheld, or alternatively unreasonably delayed, preparing HMAPs" for HMAs in the Pancake Complex. 726 F. Supp. 3d at 1215. Judge Du held that BLM had not "unlawfully withheld" preparation of HMAPs because there was no firm deadline for doing so, expressly rejecting Plaintiffs' argument that 43 C.F.R. §§ 4710.3-1 and 4710.4 required preparation of an HMAP before gathers. *Id.* at 1216–17 ("Reading the regulations as Plaintiffs request would force BLM to put gathers on hold for months, years, or perhaps even decades until an HMAP is approved, instead of conducting immediate removals."). Thus, "BLM may conduct management activities on HMAs which do not yet have an approved HMAP," including gathers. *Id.*

With no "firm deadline for preparing HMAPs," *Leigh I* evaluated whether BLM "unreasonably delayed" preparing HMAPs. *Id.* at 1217. First, Judge Du held that BLM has a duty to create HMAPs per 43 C.F.R. § 4710.3-1, and BLM could not "substantially" comply with this duty through other plans. *See id.* at 1218–19. Second, *Leigh I* held that, through application of the *TRAC* factors, BLM's delay in creating an HMAP since 43 C.F.R. § 4710.3-1's promulgation in 1986 was unreasonable. *See id.* at 1219–20 (citing *TRAC v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984)). Thus, *Leigh I* ordered BLM to "develop and approve one or more HMAPs for the Pancake Complex HMAs within the next year." *Id.* at 1221, 1231.

*Leigh I* rejected Plaintiffs' HMAP arguments under APA Section 706(2). Judge Du held that because "BLM may gather excess horses without first preparing and approving an HMAP," all of Plaintiffs' Section 706(2) arguments—i.e., that it was unlawful or arbitrary and capricious to approve a gather plan before preparing an HMAP—failed. *See id.* at 1221.

*Leigh II*, also brought by both Plaintiffs here, reiterated these holdings. There, Judge Du held that—based on *Leigh I*—issue preclusion barred Plaintiffs from re-litigating "whether the [Wild Horse Act] and its implementing regulations require BLM to prepare an HMAP before

conducting a gather." 2024 WL 4279156, at *9; *see id.* ("Collateral estoppel bars the re-litigation of this question. The Blue Wing Complex HMAPs have not been unlawfully withheld because there is no firm deadline for preparing an HMAP."). Next, *Leigh II* again held that BLM has a duty to prepare HMAPs and—through application of the *TRAC* factors—that BLM had unreasonably delayed performance of this duty. *Id.* at *9–11. BLM had already begun scoping on an HMAP for the Blue Wing Complex at issue in *Leigh II* with the intent to complete the HMAP by May 2025 *Id.* at *11, n.12. Judge Du ultimately ordered BLM to prepare the HMAP by September 20, 2025. *Id.* Moreover, based on *Leigh I*, Judge Du again rejected Plaintiffs' argument that the gather plan violated APA Section 706(2) because it was issued "without an HMAP in place." *Id.* at *12; *see id.* ("As the Court has already found that BLM may gather excess horses and burros even if no HMAP is in place, Plaintiffs have not shown that BLM acted out of accordance with the [Wild Horse Act] or its implementing regulations.").

Thus, *Leigh I* and *Leigh II* decided three legal issues: (1) BLM has a duty to prepare HMAPs per 43 C.F.R. § 4710.3-1 that BLM cannot meet through other documents; (2) BLM may conduct gathers and other management activities on HMAs even if no HMAP is in place, such that there is no "firm deadline" for preparing an HMAP and any Section 706(1) claim is one for unreasonably delayed, not unlawfully withheld, action; and (3) a gather plan cannot be set aside under Section 706(2) because it was issued without an HMAP in place.

Issue preclusion, or collateral estoppel, "applies to a question, issue, or fact when four conditions are met: (1) the issue at stake was identical in both proceedings; (2) the issue was actually litigated and decided in the prior proceedings; (3) there was a full and fair opportunity to litigate the issue; and (4) the issue was necessary to decide the merits." *Oyeniran v. Holder*, 672 F.3d 800, 806 (9th Cir. 2012), as amended (May 3, 2012); *see also Clark v. Bear Stearns & Co.*, 966 F.2d 1318, 1320 (9th Cir. 1992) ("Collateral estoppel, or issue preclusion, bars the relitigation of issues actually adjudicated in previous litigation between the same parties.").

While this case raises some slightly distinct issues about the 1983 Stone Cabin HMAP, discussed below, nearly all the issues raised by Plaintiffs about failure to prepare an HMAP for

the Saulsbury HMA were decided by *Leigh I* and *Leigh II*. For instance, Plaintiffs spend pages seeking to establish that BLM has a duty to create HMAPs that cannot be met by other means, ECF No. 38 at 28–31, but the parties to this case fully litigated this precise issue twice already. *See Leigh I*, 726 F. Supp. 3d at 1218–19; *Leigh II*, 2024 WL 4279156, at *9. Federal Defendants do not dispute or seek to re-litigate this point.

Plaintiffs, however, improperly try to re-litigate whether BLM may approve gather plans before preparing an HMAP. They argue that BLM has "unlawfully withheld" preparation of a Saulsbury HMAP because "HMAPs must be created prior to gather decisions." ECF No. 38 at 39. Moreover, while it is not argued within their opening brief, Plaintiffs allege that the Stone Cabin Decision is unlawful under APA Section 706(2) because it was issued "without first developing a[n] HMAP for the Saulsbury HMA[.]" ECF No. 1 ¶¶ 93–111.[5] Plaintiffs may "disagree with Judge Du's conclusion that gather decisions can be made without first creating HMAPs." ECF No. 38 at 35. But they have had *two* full and fair opportunities to litigate this issue, and both times Judge Du held that BLM may gather animals before creating HMAPs. Indeed, Judge Du already held that preclusion bars re-litigation of this issue. *Leigh II*, 2024 WL 4279156, at *9 (*Leigh I* raised "identical questions about whether the [Wild Horse Act] and its implementing regulations require BLM to prepare an HMAP before conducting a gather," the issue was fully litigated in *Leigh I*, the government and Plaintiffs "had a full opportunity to litigate" the question, and "resolution of the issue was necessary to the merits").

Accordingly, *Leigh I* and *Leigh II* preclude nearly all issues related to preparation of an HMAP for the Saulsbury HMA. Under Section 706(1), Plaintiffs are precluded from arguing that BLM has "unlawfully withheld" issuance of a Saulsbury HMAP. Under Section 706(2), Plaintiffs are precluded from challenging the Stone Cabin Decision because it was issued without a Saulsbury HMAP in place. *Leigh I* and *Leigh II* confirm that BLM has a duty to complete an

---

[5] Plaintiffs have waived this claim by failing to argue it in their opening brief. *See W. Org. of Res. Councils v. Bernhardt*, 412 F. Supp. 3d 1227, 1240 n.4 (D. Mont. 2019) (collecting cases).

HMAP for the Saulsbury HMA, and the only remaining issue is whether BLM has unreasonably delayed carrying out this duty under Section 706(1).[6]

    ii.   <u>Plaintiffs' Unreasonable Delay Claim for a Saulsbury HMAP is Prudentially Moot Because BLM is Already Preparing an HMAP for the Stone Cabin Complex.</u>

Given Judge Du's holdings in *Leigh I* and *Leigh II*, BLM has committed to completing an HMAP for the entire Stone Cabin Complex and intends to issue the HMAP within one year. *See* Wickham Decl. ¶¶ 3–5. *see also* Stone Cabin Complex Management Evaluation, BLM NATIONAL NEPA REGISTER, https://eplanning.blm.gov/eplanning-ui/project/2036341/510 (last visited February 28, 2025). Thus, Plaintiffs' claim that BLM has "unreasonably delayed" preparation of an HMAP for the Saulsbury HMA under Section 706(1) is prudentially moot.

The doctrine of prudential mootness "permits a court to 'dismiss [a claim] not technically moot if circumstances have changed since the beginning of litigation that forestall any occasion for meaningful relief[.]'" *Deutsche Bank Nat'l. Tr. Co. v. F.D.I.C.*, 744 F.3d 1124, 1135 (9th Cir. 2014) (citation omitted). Prudential mootness "has particular applicability in cases . . . where the relief sought is an injunction against the government. A court should decline to grant declaratory or injunctive relief where the government has already changed or is in the process of changing[its] policies[.]" *Nat. Res. Def. Council v. Norton*, No. 1:05-cv-01207-OWW-LJO, 2007 WL 14283, at \*7 (E.D. Cal. Jan. 3, 2007) (cleaned up); *see also All. for the Wild Rockies, Inc. v. U.S. Army Corps of Eng'rs*, 237 F. Supp. 3d 1079, 1084 (D. Or. 2017) (noting that prudential mootness has been applied to Endangered Species Act claims where the action agency had begun the consultation process that plaintiffs sought to compel).

---

[6] Issue preclusion does not apply to whether BLM's delay has been unreasonable. The *TRAC* factors mandate fact-specific analysis, such that a prior determination that BLM has unreasonably delayed preparing HMAPs for different HMAs is not an "identical issue" subject to issue preclusion. *See Leigh II*, 2024 WL 4279156, at \*9-11 (not applying issue preclusion to unreasonable delay, but relying on *Leigh I*'s reasoning). As discussed below, the Court need not decide this issue because it is prudentially moot. But if the Court declines to find the issue prudentially moot, given that Saulsbury HMA was established in 1981, SC_6244, and no HMAP has been prepared, Federal Defendants do not argue that an analysis of the *TRAC* factors here would lead to a meaningfully different outcome than in *Leigh I* and *Leigh II*.

Here, BLM has committed itself to preparing an HMAP for the Stone Cabin Complex and intends to complete the process within one year. Wickham Decl. ¶¶ 3–5. There is no need for the Court to enter an order directing BLM to fulfill its regulatory requirement to prepare an HMAP for the Saulsbury HMA when the agency has already committed itself to doing so. Thus, the Court should decline to grant relief on Plaintiffs' unreasonable delay claim related to creation of an HMAP for the Saulsbury HMA because the claim is prudentially moot.[7]

**b. Plaintiffs' Claims Regarding the 1983 Stone Cabin HMAP Fail.**

Next, Plaintiffs bring two claims related to the 1983 Stone Cabin HMAP. First, under Section 706(1), Plaintiffs seek to compel BLM to "achieve the objectives" in and "update" the 1983 HMAP. ECF No. 1 ¶ 90. Second, under Section 706(2), Plaintiffs argue that the Stone Cabin Decision is arbitrary and capricious or unlawful because it was issued "without achieving the objectives of the 1983 HMAP[.]" *Id.* ¶¶ 97, 106. Both claims fail.

i. Plaintiffs' APA Section 706(1) Claim to Compel BLM to "Achieve the Objectives" of the 1983 HMAP is Prudentially Moot and Also Fails Because the HMAP Does Not Create Binding Legal Obligations.

Plaintiffs ask the Court to compel BLM to take several actions they claim are "mandated" by the Stone Cabin HMAP, including updating the document. *See* ECF No. 38 at 40–42. This claim is prudentially moot because BLM has already begun the process of creating an HMAP for the Stone Cabin Complex, which will update (and supersede) the 1983 HMAP. And regardless, the claim fails under well-established law that it is improper to compel compliance with aspirational statements in land management plans.

First, the Court need not reach the merits of this claim because it is prudentially moot. As explained above, BLM has already committed itself to preparing an HMAP for the Stone Cabin Complex and intends to issue the HMAP within one year. Wickham Decl. ¶¶ 3–5. Thus, even

---

[7] If the Court declines to find this claim prudentially moot, the Court should follow *Leigh II*'s reasoning and craft a "reasonable deadline" for the HMAP that is after BLM's estimated date for completion in February 2026. *See* 2024 WL 4279156, at *11 n.12 (declining to exercise discretion to apply prudential mootness and finding BLM's commitment to complete an HMAP by "early May 2025 leads the Court to find that September 20, 2025, is a reasonable deadline").

1  assuming Plaintiffs' claim is cognizable, there is no need to order BLM to "update" the 1983

2  HMAP when it is already doing so. And it would make little sense to compel BLM to carry out

3  proposed actions from a 42-year-old document that is soon to be superseded and rendered a

4  nullity. *See, e.g.*, *Pub. Emps. for Env't Resp. v. Nat'l Park Serv.*, No. CV 19-3629 (RC), 2021 WL

5  1198047, at *11 (D.D.C. Mar. 30, 2021) ("[C]ourts regularly find that actions challenging

6  superseded, expired, or withdrawn agency polices or decision documents are moot because they

7  no longer present a live controversy."). Thus, Plaintiffs' Section 706(1) claim related to the 1983

8  Stone Cabin HMAP is prudentially moot and should be dismissed. *See* ECF No. 1 ¶ 90.

9         Even if prudential mootness did not apply, Plaintiffs' claim fails. Courts can compel action

10  under Section 706(1) "only where a plaintiff asserts that an agency failed to take a *discrete* agency

11  action that it is *required to take*." *SUWA*, 542 U.S. at 64. "The limitation to required agency action

12  rules out judicial direction of even discrete agency action that is not demanded by law." *Id.* at 65.

13  The discreteness and mandatory requirements prevent "undue judicial interference with

14  [agencies'] lawful discretion" and "avoid judicial entanglement in abstract policy disagreements

15  which courts lack both expertise and information to resolve." *Id.* at 66.

16         *SUWA* held that "[a] statement by BLM [in a land use plan] about what it plans to do, at

17  some point, provided it has the funds and there are not more pressing priorities, cannot be plucked

18  out of context and made a basis for suit under § 706(1)." *See id.* at 71; *id.* ("[A] land use plan is

19  generally a statement of priorities; it guides and constrains actions, but does not (at least in the

20  usual case) prescribe them."). The reason for this is simple: "allowing general enforcement of

21  plan terms would lead to pervasive interference with BLM's own ordering of priorities." *Id.* As

22  *SUWA* explained, if a court ordered BLM to immediately prepare "all of the detailed plans"

23  allegedly required by the land use plan at issue, this would "divert BLM's energies from other

24  projects throughout the country that are in fact more pressing," and "ultimately operate to the

25  detriment of sound environmental management." *Id.* at 72. Thus, *SUWA* held that BLM's

26  statements in plans "to the effect that" BLM "will do" certain actions like supervision and

27  monitoring, "are not [] legally binding commitment[s] enforceable under § 706(1)." *See id.*

28

*SUWA* forecloses Plaintiffs' Section 706(1) claim related to the 1983 HMAP.[8] The HMAP's purpose is to "coordinate[] the objectives of other programs and is designed so as to facilitate" a list of broad, aspirational "objectives" regarding management of the range, wildlife, watershed, and wild horses within Stone Cabin HMA. SC_9273–74.[9] Plaintiffs focus on the wild horse objectives. The 1983 HMAP notes that "[i]n reviewing plans for the area it appears that very similar objectives" for wild horse management exist within "other plans." SC_9285. The HMAP summarizes the "[m]anagement objectives" to include: (1) establishing AML; (2) monitoring range use and availability of forage; (3) maintaining the "wild free roaming characteristics of the horses" in the HMA; (4) providing water for horses in the HMA "where possible"; and (5) establishing "studies to acquire additional data on wild horses." SC_9285–86.

After describing these objectives, the HMAP goes on to describe "management method[s]" that BLM "will" do related to these five objectives. *See* SC_9287–92. For example, as to Objective 4, BLM states that "[w]ater distribution in the HMA *will be* improved by developing additional wells and pipelines[.]" SC_9291 (emphasis added). And as for Objective 5, the HMAP notes studies to collect data on "sex ratios, age structures, young/adult ratios, distribution and movement patterns, *will be* established on wild horse populations in the Stone Cabin HMA." SC_9292 (emphasis added). While Plaintiffs seek to compel BLM to "update" the HMAP, they cite no statute or regulation creating such a duty. ECF No. 38 at 41–42. Instead, they rely on the HMAP's statement that "[a]s more information becomes available, this plan *will be* updated." SC_9293 (emphasis added).

---

[8] As explained below, an HMAP is not a "land use plan" of the type considered in *SUWA*, but a subsidiary document intended to help BLM "track[] progress toward achieving" a land use plan's goals. SC_565. While this distinction is relevant for Plaintiffs' 706(2) claim based on the HMAP, *SUWA*'s reasoning that statements in planning documents that BLM "will" undertake certain actions are non-enforceable bars Plaintiffs' Section 706(1) claim.

[9] The record erroneously includes two documents with the beginning Bates number of SC_9270—the 1983 HMAP (SC_9270–327) and the 1994 Guidelines for Assessing and Documenting Cumulative Impacts (SC_9270–342). *See* ECF No. 37-2 (index at rows 33 and 238). The error was introduced when BLM supplemented the record on October 4, 2024, and does not appear to affect any documents other than the two identified. This brief cites only to the 1983 HMAP.

BLM's statements in the Stone Cabin HMAP that it "will" take certain actions are not "legally binding commitment[s] enforceable under § 706(1)." *See SUWA*, 542 U.S. at 72; *see also Stout v. U.S. Forest Serv.*, 869 F. Supp. 2d 1271, 1279–80 (D. Or. 2012) (holding that forest plan standard to "[r]esolve conflicts between livestock, big game, and wild horses in accordance with the maintenance of a wild horse herd averaging 100 head" did "not constitute a statement of binding self-commitment" to maintain a 100-head herd).[10] Plaintiffs cite nothing suggesting otherwise, nor do they identify anything in the HMAP indicating that the actions they seek to compel are binding commitments. *See SUWA*, 542 U.S. at 69 (noting presumption that plans are unenforceable "absent clear indication of binding commitment in the terms of the plan"). Indeed, *SUWA* noted that if a plan conditions items on funding, this indicates such items are not enforceable obligations, *see id.* at 71, and everything in the 1983 HMAP is expressly "contingent upon available funding." SC_9297.

A generous read of Plaintiffs' brief suggests that, based on *Friends of Animals v. Sparks*, 200 F. Supp. 3d 1114 (D. Mont. 2016), Plaintiffs believe the HMAP is enforceable because BLM issued a Record of Decision ("ROD"). *See* ECF No. 38 at 14, 38, 41. But *Sparks* is not on point. The plaintiffs there sought relief under only APA Section 706(2), not Section 706(1). *See* 200 F. Supp. 3d at 1124. *Sparks* also distinguished *SUWA* because the commitment at issue was discrete and made in the ROD. *Id.* Plaintiffs point to no similarly discrete commitment in the ROD here, which merely states that the proposed action—to "implement the management objectives" of the Stone Cabin HMAP—was "accepted." *See* SC_9319–21.[11]

---

[10] Moreover, as discussed below in relation to Plaintiffs' Section 706(2) claim regarding the 1983 Stone Cabin HMAP, the record shows that BLM has acted and continues to act consistent with the HMAP's objectives, including undertaking a litany of studies, monitoring, and assessments on the issues Plaintiffs identify. Thus, the premise of Plaintiffs' Section 706(1) claim—that BLM has not taken actions to achieve the HMAP's broad objectives—is incorrect.

[11] Because they are not legally required, the Court need not decide whether the items Plaintiffs seek to compel are discrete. *See SUWA*, 542 U.S. at 72. But plainly, Plaintiffs seek to compel non-discrete actions that could not be compelled without interference with BLM's day-to-day operations. *See* ECF No. 38 at 41 (seeking to compel BLM to determine whether gathers will "impact the wild free-roaming characteristics of wild horses"); *SUWA*, 542 U.S. at 66–67 (explaining that non-discrete actions cannot be compelled without "injecting the judge into day-

Thus, Plaintiffs' Section 706(1) claim to compel BLM to "achieve the objectives" of the 1983 HMAP fails. The claim is prudentially moot because BLM is already at work on a Stone Cabin Complex HMAP which will update and supersede the 1983 HMAP. Moreover, the 1983 HMAP does not create legally binding commitments enforceable under Section 706(1).

ii.  Plaintiffs' APA Section 706(2) Claim Regarding the 1983 HMAP Fails.

Plaintiffs also allege that the Stone Cabin Decision should be set aside under APA Section 706(2) because it was issued "without" BLM "achieving the objectives of the 1983 HMAP." ECF No. 1 ¶¶ 97, 106. Their brief slightly recasts these claims,[12] arguing that the Stone Cabin Decision should be set aside because BLM approved it "without considering whether the Plan attained the objectives of the Stone Cabin HMAP and without ensuring that the monitoring requirements and conditions of the Stone Cabin HMAP were implemented." ECF No. 38 at 37. However Plaintiffs frame these claims, they fail. First, Plaintiffs fail to show that BLM is required by statute or regulation to achieve or consider the objectives of the 1983 HMAP before gathering horses. Second, Plaintiffs fail to show that the Stone Cabin Gather Decision is "inconsistent" with the 1983 HMAP because nothing in the HMAP requires that BLM take any actions before gathering excess animals and the record shows BLM has acted consistent with the HMAP.

1.  *BLM Need Not Consider or Achieve an HMAP's Objectives Before Gathering Excess Animals.*

BLM complied with its regulatory duty to create an HMAP for the Stone Cabin HMA in 1983. Contrary to Plaintiffs' arguments, there is no statutory or regulatory requirement that BLM consider or achieve an HMAP's objectives before gathering horses. Indeed, preventing BLM from gathering excess horses because it allegedly failed to properly consider the 1983 HMAP would be contrary to the Wild Horse Act.

---

to-day agency management"). If the Court were to enter an order consistent with Plaintiffs' requests, the Court would have to superintend BLM's management of the Stone Cabin HMA.

[12] Plaintiffs confusingly combine their argument that failure to consider the 1983 HMAP violates the Wild Horse Act and NEPA. ECF No. 38 at 36–37. As explained below, Plaintiffs' reliance on 40 C.F.R. § 1505.3 to argue that the Stone Cabin Decision violates NEPA is misplaced.

The Wild Horse Act requires BLM to manage wild horses in a manner that will "achieve and maintain a thriving natural ecological balance" on public land. 16 U.S.C. § 1333(a). As part of this management, if BLM determines an HMA is overpopulated with excess animals, BLM is required to "*immediately* remove excess animals from the range." *Id.* § 1333(b)(2) (emphasis added). This Court recently explained that this mandate requires BLM to "conduct the required gathers as promptly as reasonably possible after making a necessary-to-remove-excess-animals determination." *Colvin*, 2025 WL 266718, at *5.

Plaintiffs assert that the requirement for BLM to consider or "conform" gather decisions to HMAPs is created by 43 C.F.R. § 4710.4, which provides that "[m]anagement shall be at the minimum level necessary to attain the objectives identified in approved land use plans and [HMAPs]." But as Judge Du held, the requirement to manage wild horses at "the minimal feasible level," 16 U.S.C. § 1333(a), cannot overcome BLM's obligation to immediately remove excess animals. *See Leigh I*, 726 F. Supp. 3d at 1216 ("Congress could not have intended that the 'minimal' management requirement would force the BLM to ignore these other statutory mandates." (quoting *In Def. of Animals*, 751 F.3d at 1066)). For this reason, notwithstanding 43 C.F.R. § 4710.4, Judge Du held that BLM may gather horses on "HMAs which do not yet have an approved HMAP." *Id.* at 1217.

Judge Du's reasoning applies with equal force to whether BLM must consider or achieve an HMAP's objectives before gathering horses.[13] BLM has determined that there is an excess of horses within the Stone Cabin Complex and that a "gather is necessary to remove excess wild horses and bring the wild horse population back to within the established AML range[.]" SC_6175. Other than a few misplaced arguments as to the Stone Cabin EA's "purpose and need" under NEPA, discussed below, Plaintiffs do not meaningfully challenge the excess determination. Nor would any such argument have merit because BLM's determination is entitled to deference. *In Def. of Animals v. U.S. Dep't of Interior*, 909 F. Supp. 2d 1178, 1191 (E.D. Cal. 2012) ("BLM

---

[13] Reinforcing this, Plaintiffs' argument that BLM must achieve and consider an HMAP's objectives before gathering horses is based on the same reading of 43 C.F.R. §§ 4710.3-1 and 4710.4 that Judge Du rejected in *Leigh I* and *Leigh II*. *See* ECF No. 38 at 28–30.

has discretion in determining whether an excess population in fact exists, since the Secretary can make that determination on the basis of whatever information he has at the time of his decision." (cleaned up)); *see* 16 U.S.C. § 1333(b)(2). BLM's excess determination triggered a duty to begin gathering horses to achieve AML as promptly as reasonably possible. *See Colvin*, 2025 WL 266718, at *5. Plaintiffs' argument that the Stone Cabin Decision should be set aside would "force BLM to put gathers on hold" until BLM "considers" or "achieves" the objectives in a document from 1983, "instead of conducting immediate removals." *See Leigh 1*, 726 F. Supp. at 1217. Such a delay would conflict with BLM's duty to immediately gather excess animals and should be rejected. *See id.* at 1217 (regulations "must comport with [Wild Horse Act] itself"); *id.* at 1228 (noting that BLM could authorize a gather despite not finishing a rangeland evaluation because in "determining whether a gather is necessary, BLM must act immediately, even if more relevant information could become available at a later date" (cleaned up)).

In arguing that BLM must "conform" to the HMAP before gathering animals, Plaintiffs rely on *SUWA*'s statement that actions "inconsistent with the provisions of a land use plan" may be found "contrary to law pursuant" under APA Section 706(2). *See* ECF No. 38 at 36; 542 U.S. at 69. But this language from *SUWA* is based on the Federal Land Policy and Management Act's ("FLPMA's") requirement that BLM manage lands "in accordance" with "land use plans." *Id.* at 67 (citing 43 U.S.C. § 1732(a)).[14] Per 43 C.F.R. § 4710.4, HMAPs and land use plans are distinct documents. *See Leigh 1*, 726 F. Supp at 1218 (noting that regulations "explicitly distinguish HMAPs from [land use plans]"). This is also reflected by BLM's Wild Horses and Burros Management Handbook, which notes that HMAPs are subsidiary to land use plans. *See* SC_555, 565 ("An HMAP assists the authorized officer in tracking progress toward achieving [land use plan] goals. HMAPs tier to and must be in conformance with the applicable [land use plan]."). The approved land use plan for the Stone Cabin Complex is the Tonopah RMP,[15] which was

---

[14] The other case Plaintiffs cite—*Oregon Natural Resources Council Fund v. Brong*—also concerned consistency with land use plans under FLPMA. *See* No. CIV.04-693-AA, 2004 WL 2554575, at *4 (D. Or. Nov. 8, 2004), *aff'd*, 492 F.3d 1120 (9th Cir. 2007).

[15] "RMPs are a type of [land use plan]." *Leigh 1*, 726 F. Supp. 3d at 1218 n.6; *see* SC_612–13.

issued 14 years after the 1983 HMAP. Plaintiffs do not argue that BLM's Stone Cabin Decision is "inconsistent" with the terms of the governing Tonopah RMP. Nor could they. *See* SC_6189–91 (explaining that the Gather Plan conforms with "the Wild Horse and Burro Objectives of the Tonopah RMP"); SC_6176 (same). Thus, *SUWA* does not support Plaintiffs' attempt to vacate the Stone Cabin Decision because BLM allegedly failed to suitably consider or achieve the 1983 HMAP's objectives.

Indeed, courts have held that BLM has "considerable flexibility in choosing which types of plans to use" in managing an HMA. *Friends of Animals v. BLM,* 548 F. Supp. 3d 39, 67 (D.D.C. 2021) (explaining that BLM "could use an array of approaches to manage an HMA," including using or not using an HMAP). Despite finding that BLM's regulations require preparation of an HMAP, *Leigh 1* acknowledged that HMAPs may be "redundant if an RMP includes the same information that an HMAP would cover," as is the case here. *See* 726 F. Supp. 3d at 1219; SC_6188 (explaining that between Stone Cabin Gather Plan and Tonopah RMP, "all key components of an HMAP" have been addressed by BLM). Thus, even accepting Plaintiffs' arguments as true, it would be a reasonable exercise of BLM's discretion to conform the Stone Cabin Decision to the Tonopah RMP and rely on the updated analyses, data, and monitoring in the Stone Cabin Gather Plan, rather than the 1983 HMAP. Said another way, since there is no statutory or regulatory requirement for BLM to update an HMAP, it is unreasonable to suggest that BLM must always conform gather decisions to HMAPs, no matter how old. *See* SC_0602 (Handbook providing that gather plans should tier their analyses to "[land use plans], HMAPs, or other relevant decision documents, *as appropriate*" (emphasis added)). This is especially true here, where BLM has substantiated through current data and assessment that there are excess horses that must be removed to achieve a thriving natural ecological balance.

Thus, Plaintiffs' Section 706(2) arguments regarding the Stone Cabin HMAP fail because their premise—that an alleged failure to suitably consider or achieve the HMAP's objectives is a basis for setting aside the Stone Cabin Decision—is incorrect.

2.   *The Stone Cabin Decision is Not Inconsistent with the 1983 HMAP.*

Even assuming a gather decision can be set aside for "inconsistency" with an HMAP, Plaintiffs have failed to show that the Stone Cabin Decision is inconsistent with the 1983 HMAP.

As explained above, the Stone Cabin HMAP does not contain binding obligations with which BLM must comply. Instead, it sets out aspirational objectives for managing wild horses on the HMA, along with examples of the types of studies and monitoring that could be done to further those objectives. Plaintiffs' Section 706(2) claim for "inconsistency" with the HMAP is predicated on the notion BLM must "achieve" the HMAP's objectives prior to approving a gather plan. *See* ECF No. 1 ¶ 97 (alleging BLM violated the Wild Horse Act and its regulations when it "authorized the gather and removal of wild horses and burros from the Stone Cabin Complex . . . without achieving the objectives of the 1983 HMAP"). But Plaintiffs identify nothing in the HMAP providing that BLM must achieve any of the objectives—nor conduct any of the suggesting monitoring or studies—before gathering animals. Thus, the premise of Plaintiffs' claim is flawed. Because the HMAP does not make gathering animals contingent on any of its objectives or management methods, the HMAP cannot be a basis for setting aside the Gather Plan.

At any rate, the Stone Cabin Gather Plan acknowledges the 1983 HMAP, SC_6188, and the document is included within BLM's record, SC_9270. Moreover, the Gather Plan and supporting record show that BLM has acted and continues to act consistent with the broad "Wild Horse Management Objectives" from the Stone Cabin HMAP, and has done studies, monitoring, and assessments consistent with the HMAP.

For example, Objective 1 of the HMAP relates to setting AML for the Stone Cabin HMA, which, as of 1983, was set at 575 animals. *See* SC_9285. All the "management methods" under Objective 1 relate to this 575 AML figure. *See* SC_9287–88. But the Tonopah RMP issued in 1997 reflects that AML for the Stone Cabin HMA was adjusted to 364 animals. SC_20. In issuing the Stone Cabin Decision, BLM was required under FLPMA to use the Tonopah RMP's AML of

1    364 animals for the Stone Cabin HMA. *See* SC_6186; 43 U.S.C. § 1732(a).[16] Thus, any claim

2    that BLM has acted "inconsistent" with the 1983 HMAP's first objective fails.

3        Objective 2 relates to monitoring of range use and the availability of "key forage species."

4    *See* SC_9285. The Gather Plan found that "[m]oderate and heavy utilization is evident on key

5    forage species within the [Stone Cabin Complex] . . . which, if sustained over time, interferes

6    with vegetative regrowth and results in long term changes to rangeland health due to the loss of

7    native vegetation." SC_6189. In assessing effects to horses from the Gather Plan, BLM found that

8    "[r]angeland resources have been and are currently being impacted within the Stone Cabin and

9    Saulsbury HMAs due to the over-population of horses." SC_6214. Detailed monitoring data

10   showed that "[k]ey species use ranged from negligible to severe use at key areas, with some key

11   areas lacking key species entirely." *Id.* The Gather Plan includes a table specifying use of key

12   forage species and the percentage used by horses and livestock, respectively. SC_6214–15. *See*

13   *also* SC_6271–74 (Appendix II, containing more detailed information on vegetation); SC_663–

14   1420 (monitoring data from 2012–2022 including water inventories, flights to count wild horses,

15   and rangeland monitoring). Moreover, while some of the management methods for Objective 2

16   relate to adjusting "grazing pressure," SC_9289, the Gather Plan notes that "[c]hanges to or the

17   elimination of livestock grazing cannot be made through a wild horse gather decision." SC_6206.

18   And "even with significantly reduced levels of livestock grazing within the gather area relative to

19   the permitted levels authorized in the 1997 Tonopah RMP, there is insufficient habitat for the

20   current population of wild horses, as confirmed by monitoring data." *Id.*; *see also* SC_6206–07.

21       Objective 3 broadly relates to maintaining the "wild free roaming characteristics" of

22   horses and generally calls for assessment of impacts to horses for "projects proposed" in the Stone

23   Cabin HMA. SC_9286, SC_9290. Plaintiffs baldly assert that BLM failed to do this here, ECF

---

24   [16] Plaintiffs assert that BLM failed to consider the "actual use" levels by horses in determining

25   AML. ECF No. 38 at 37. But as explained in more detail below, a gather plan is not the proper

26   document to adjust AML, and BLM properly used the AML from the 1997 Tonopah RMP. To

27   the extent that Plaintiffs wish to challenge AML for the Complex, they have challenged the wrong

action, as the Stone Cabin Gather Plan does not adjust AML, and BLM is not required to re-verify

previously set AMLs before gathering animals. *See Leigh I*, 726 F. Supp. 3d at 1227–28.

28

No. 38 at 37, but the Stone Cabin Gather Plan analyzes the potential affects to horses in detail. SC_6213–17 (describing current conditions for wild horses in Complex including water availability, rangeland and forage use, genetic diversity, connectivity and interchange of herds); SC_6217–29 (analyzing effects from proposed action on wild horses, including that removing excess animals is "expected to improve health for the animals that remain" and improve rangeland conditions, and population controls would "extend the time interval between required gathers and reduce disturbance to individual animals as well as to the herd social structure over the foreseeable future"); SC_6228–29 (analyzing effects from No Action Alternative, including that "[a]llowing wild horses to die of dehydration and starvation would be inhumane treatment and would be contrary to the [Wild Horse Act], which mandates removal of excess wild horses").

Objective 4 relates to provision of water for wild horses "where possible." SC_9291. The record contains over a hundred pages of water inventory data for the Stone Cabin Complex. SC_633–766; *see also* SC_6213 ("Water available for use by wild horses within the HMAs is limited to a few perennial sources including Warm Spring, Point of Rock Spring, and Sidehill Spring in the Stone Cabin HMA and Hunts Creek in the Saulsbury HMA, which tend to produce water year-round."); *id.* ("These water sources are monitored throughout the summer to make sure water is available for wild horses.").

Finally, Objective 5 relates to "acquir[ing] additional data on wild horses." SC_9291–92. BLM did extensive monitoring and data collection related to the wild horse populations as part of rendering the Stone Cabin Gather Plan. *See, e.g.*, SC_663–1420. The HMAP generally calls for studies on sex ratios, distribution and movement of horses, population counts, use of range resources, and genetic monitoring. SC_9291–96. Information on each of these topics is in the Stone Cabin Gather Plan and record. *See* SC_767, SC_829, SC_1006, SC_1038, SC_1065, SC_1262, SC_1305 (population counts); SC_1287–1300 (field report outlining "wild horse resource conditions" including water sources, horse body conditions, and range conditions); SC_6213–17 (outlining water use and drought conditions, rangeland resources including habitat and vegetation conditions, population counts, and genetic monitoring, which reflects movement

between herds); SC_6218–23 (analyzing "use of contraception and sex ratio skewing"). And again, even assuming there is a study called for by the 1983 HMAP that BLM has not yet done, Plaintiffs point to nothing in the HMAP requiring any study be done before gathering animals.

Thus, Plaintiffs' Section 706(2) claim fails because Plaintiffs have not shown that any action approved in the Stone Cabin Decision is "inconsistent" with the 1983 HMAP. To the contrary, BLM has acted and continues to act consistent with its broad objectives.

Finally, as explained above, Plaintiffs' complaints are ultimately academic because BLM has already begun the process of creating a new HMAP for the Stone Cabin Complex. Wickham Decl. ¶¶ 3–5. Considering this, as well as BLM's active duty to "immediately" begin gathering excess horses on the Complex, the Court should exercise its discretion to find any Section 706(2) claim based on the Stone Cabin HMAP prudentially moot.

## II.     BLM Complied with NEPA.

Plaintiffs also raise scattered arguments in an attempt to undermine BLM's NEPA analysis for the Stone Cabin Decision. As discussed below, each argument fails.

### a.   NEPA Does Not Require BLM to Satisfy HMAP Objectives Through the Gather Plan.

As an initial matter, Plaintiffs try to repackage their allegations related to the 1983 Stone Cabin HMAP into a NEPA claim through 40 C.F.R. § 1505.3. But this regulation does not require BLM to ensure that the 1983 HMAP's objectives are attained or updated before the gather.

Section 1505.3(a) states that "[m]itigation and other conditions established in the environmental impact statement or during its review and *committed as part of the decision* shall be implemented by the lead agency or other appropriate consenting agency." (citation omitted) (emphasis added). Critical here, and what Plaintiffs fail to demonstrate, is whether the mitigation or "other conditions" allegedly outlined in the 1983 HMAP have been committed to as part of the agency's decision to gather horses. BLM has made no commitment in the Stone Cabin EA or Decision to attain or update the 1983 HMAP's objectives as part of or before a gather decision. Nor does the ROD from 1983 make such a commitment—the ROD merely states that the

proposed action of implementing the HMAP's objectives is "accepted." SC_9319–21. Thus, 40 C.F.R. § 1505.3(a) is not a basis for setting aside the Stone Cabin EA or Decision.

Plaintiffs' reliance on *Sparks* is misplaced. There, the issue was whether BLM had to recalculate AML before a gather. *Sparks*, 200 F. Supp. 3d at 1121. After reaffirming that the Wild Horse Act itself did not require recalculating AML before a gather, the court focused on BLM's specific commitment in the relevant ROD. *Id.* at 1123. In the ROD, BLM made an explicit commitment that it would recalculate AML "within five years or after the revision to the Billings RMP, whichever comes first." *Id.* at 1125. Citing 40 C.F.R. § 1505.3, the court stated that BLM had to do so because of this express commitment in the ROD. *Id.* at 1123. The analysis in *Sparks* accords with the other decisions in this circuit, which all rely on an express agency commitment when applying Section 1505.3. *See Sparks*, 200 F. Supp. 3d at 1123–25; *Tyler v. Cisneros*, 136 F.3d 603, 608–9 (9th Cir. 1998) (where the court ruled that agency was bound to a memorandum of agreement that it entered into as part of the NEPA process); *All. for Wild Rockies v. Cooley*, 661 F. Supp. 3d 1025, 1036–38 (D. Mont. 2023) (discussing *Sparks* and *Tyler* to hold that Fish and Wildlife Service was bound to commitments made in a ROD).

BLM made no express commitment in either the 1983 HMAP ROD or the Stone Cabin Decision/EA to attain or update the HMAP's objectives before gathering horses. Thus, any NEPA claim based on Section 1505.3 fails. *See Leigh I*, 726 F. Supp. 3d at 1227–1228 (rejecting Plaintiffs' arguments that AML relied on for gather decision was invalid because "[e]xisting management plans . . . do not commit BLM to recalculating the AML in any particular timeframe"). As explained above, to the extent that Plaintiffs claim BLM has "unreasonably delayed" achieving the HMAP's objectives, this claim fails. *See Supra*, Argument Section I.b.ii.

### b. BLM Took the "Hard Look" Required by NEPA.

NEPA requires federal agencies to consider the impacts of, and alternatives to, federal actions significantly affecting the environment. 42 U.S.C. §§ 4321, 4331. NEPA ensures that federal agencies take a "hard look" at the environmental consequences of their proposed actions before deciding to proceed. *Robertson*, 490 U.S. at 350–51. Although NEPA establishes

procedures by which agencies must consider the environmental impacts of their actions, it does not dictate substantive results. *Id*. at 350.

Here, BLM's Stone Cabin EA fulfilled NEPA's requirements by taking a hard look at the environmental impacts of its action. BLM considered a wide range of impacts, including, but not limited to, impacts on the wild horses themselves, riparian and wetland areas, livestock grazing, and vegetation. *See generally* SC_6209–42. These sections of the Stone Cabin EA also discussed cumulative impacts in the context of the affected resource, in addition to a section dedicated to the discussion of cumulative impacts. *See id*.; SC_6242–46. The EA's discussion of these impacts reflects and is supported by BLM's own monitoring and observations, the agency's expert interpretation of that information, and scientific journals. *See e.g.*, SC_6218–23 (discussing the effects of contraception and sex-skewing management methods on wild horses); *see also supra*, Argument Section I.b.ii.2 (describing some of BLM's analysis in the EA and the data relied upon).

Plaintiffs do not raise any deficiencies with the sufficiency of BLM's NEPA analysis but focus on alleged failures to provide the underlying data for the EA's conclusions.[17] Under NEPA, an agency must share "relevant information" so that the public can play a role in the decisionmaking process. *See WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 924, 926–27 (9th Cir. 2015) (quoting *Robertson*, 490 U.S. at 349, and discussing the agency's failure to disclose data in the context of the public's ability to participate in the NEPA process). BLM has met that obligation here.

---

[17] Plaintiffs state that "[c]hapter 4 covers cumulative effects; it mentions livestock grazing, but no substantive analysis is provided nor is substantive data provided" but does not elaborate on this claim. BLM provided substantive data regarding livestock grazing including a table summarizing grazing and another table displaying the proportion of rangeland utilization by different animals. SC_6214–15; SC_6235. Based on this data, other data contained in the record, and its discussion focused on livestock grazing, BLM provided its analysis of cumulative effects, including livestock grazing, on the environment. SC_6242–46; *see also League of Wilderness Defenders-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 549 F.3d 1211, 1218 (9th Cir. 2008) (clarifying that the focus when reviewing a cumulative effects analysis is whether "'the evidence . . . provided to support [the agency's] conclusions, along with other materials in the record,' ensure that the agency 'made no clear error of judgment that would render its action arbitrary and capricious.'" (citation omitted)).

For example, although one of Plaintiffs' chief complaints is about the disclosure of rangeland health data, BLM provided that data in the EA. In the EA, BLM explained its methodology for determining rangeland utilization and provided the results of its evaluation, which outlined the effect of wild horses on rangeland health. SC_6214–15; SC_6272–74. This is the data that BLM relied on in its analyses, including its analysis of cumulative effects. SC_6214–15; SC_6229–30. Plaintiffs have not explained how the raw data, summarized in the tables in the EA and included in the administrative record, was necessary for Plaintiffs to participate in the NEPA process. In other words, Plaintiffs have not identified any portion of BLM's analysis where the agency's disclosures are deficient to the point that they prevent Plaintiffs from meaningfully engaging in the NEPA process or otherwise limited their advocacy. *See e.g.* SC_6275–80 (EA appendix discussing population modeling methodology and providing the modeling results).

Plaintiffs also attempt to use NEPA to challenge AML, arguing that because the EA did not provide "the methods, protocols, and data" relied on when setting AML, the public cannot verify the validity of AML. But the gather plan here does not set or adjust AML. SC_6186 (explaining that AML was set in 1992 and 1996 for the Complex, and reaffirmed in the 1997 Tonopah RMP); SC_6206 (discussing why raising AML is not a suitable alternative because it would not meet the purpose and need of the project, or be consistent with the Tonopah RMP, Wild Horse Act, and other statutes). Nor is BLM required to reevaluate or reaffirm AML before authorizing gathers. *See In Def. of Animals,* 751 F.3d at 1064 n.13 ("[N]othing in the [Wild Horse] Act requires the BLM to determine new AMLs based on current conditions every time the BLM decides to take action to restore the already-established AMLs."); *Friends of Animals*, 353 F. Supp. 3d at 1008 ("BLM's reliance on the previously approved and established AMLs [for gather decision] was not arbitrary and capricious."). *Friends of Animals v. BLM,* No. 16-CV-0199, 2017 WL 5247929, at *8 (D. Wyo. Mar. 20, 2017) ("[T]he gather document is not the appropriate mechanism for adjusting the AML of an HMA[.]").

In fact, Judge Du rejected similar claims in *Leigh I*. She noted that BLM need not show "an AML range remains valid before relying upon it," and it was irrelevant that BLM had not

finished a certain rangeland assessment because "BLM must act immediately" in gathering excess horses, "even if more relevant information could become available at a later date." 726 F. Supp. 3d at 1227–28 (citations omitted); *see also id.* at 1229–30 (rejecting claim that BLM inadequately supported AMLs as part of gather plan). Thus, because NEPA does not require BLM to verify AML, any alleged failure to provide "the methods, protocols, and data" underlying AML was not an obstacle to Plaintiffs' participation in the Gather Plan NEPA process. As stated in the EA, BLM's determination that there were excess horses was based on a previously set AML that was reaffirmed in the Tonopah RMP. The Ninth Circuit has approved of such an approach. *See In Def. of Animals*, 751 F.3d at 1064 n.13 ("Although Plaintiffs fault the BLM for relying on 'decade-old' AMLs from 2001 without conducting a new analysis, the 2008 Eagle Lake Resource Management Plan 'validated' those AMLs."). Plaintiffs' AML-related claims are misplaced.

### c.   BLM's Purpose and Need Statement and Alternatives Analysis Comply with NEPA.

An agency is afforded significant discretion in defining the purpose and need for NEPA documents. *Wild Wilderness v. Allen*, 871 F.3d 719, 728–29 (9th Cir. 2017); *see also Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 866 (9th Cir. 2004). When evaluating the reasonableness of a purpose and need statement, the court considers the nature of the federal action being proposed. *See e.g.*, *City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155–57 (9th Cir. 1997) (holding that a purpose and need statement for a traffic project was not unreasonable for setting a specific traffic flow goal in light of the issues the project was addressing); *see also All. for Legal Action v. FAA*, 69 Fed. Appx. 617, 622 (4th Cir. 2003) (per curiam) ("The reasonableness of a given statement of purpose and need depends first on the nature of the proposed federal action."). Similarly, when an action is taken under a specific statute, the statutory objectives of the project "serve as a guide by which to determine the reasonableness of objectives outlined in an [EA]." *Westlands Water Dist.*, 376 F.3d at 866. An agency is only required to consider alternatives that are reasonable in light of the purpose and need, and in this

1  way also considers the nature of the federal action in its alternatives analysis. *See Native*

2  *Ecosystems Council v. United States Forest Serv.*, 428 F.3d 1233, 1246–47 (9th Cir. 2005).

3       The Stone Cabin Decision was issued pursuant to Congress' specific mandate in Section

4  1333(b) of the Wild Horse Act and this mandate is essential to the "nature of the federal action

5  being proposed." As stated in the EA and that statute, once it is determined that an area is

6  overpopulated, BLM must *immediately* remove excess animals from the range to restore a thriving

7  natural ecological balance. 16 U.S.C. § 1333(b)(2); *see Colvin*, 2025 WL 266718, at *5

8  (explaining that once excess determination is made, BLM must begin removing animals "as

9  promptly as reasonably possible"). The Stone Cabin EA's purpose, to gather excess horses to

10  achieve AML, and its need, to restore a thriving natural ecological balance as required by the

11  Wild Horse Act, are reasonable considering the statute's strict mandate. *See id.*; SC_6189.

12       Considering that mandate, the purpose and need statement is adequately substantiated by

13  the record. The EA's purpose and need statement provides:

14          The purpose of the Proposed Action is to gather and remove excess wild horses

15          from within and outside of the Stone Cabin Complex and to reduce the wild
        horse population growth rates to achieve and maintain established AML.

16
        The need for the action is to prevent undue or unnecessary degradation of the

17          public lands associated with excess wild horses, and to restore a [thriving
        natural ecological balance] and multiple-use relationship on public lands,

18          consistent with the provisions of Section 1333(b) of the [Wild Horse Act].

19  SC_6189. The chief justification for the purpose and need, and the finding compelling BLM to

20  act here, is that there are an excess number of horses. *See* SC_6188–89. The record contains ample

21  data and analysis demonstrating that there is such an excess of wild horses, and that this excess is

22  degrading rangeland health. *See id.*; SC_6213–14. The EA provides population data, including

23  direct counts from helicopter flights and an emergency gather, and describes its methodology for

24  population estimates. *Id*. This data showed that the population exceeded the combined high AML

25  for Stone Cabin and Saulsbury HMAs by approximately 527 animals, more than 100% over the

26  high AML. SC_6288–89. Thus, BLM concluded that to comply with the Wild Horse Act and

27  restore a thriving natural ecological balance, BLM must conduct a gather.

28

To the extent that Plaintiffs challenge the purpose and need statement merely to challenge the AML, the Court should reject their argument. *See* ECF No. 38 at 47 ("BLM['s] [purpose and need statement] relies on faulty AMLs"). As explained, the Gather Plan does not set AML, and courts have held that a gather plan is an inappropriate tool for setting AML. SC_6186; *In Def. of Animals*, 751 F.3d at 1064 n.13; *Friends of Animals*, 2017 WL 5247929, at *8. Plaintiffs cannot use their challenge to the EA's purpose and need as another way to attack the AMLs.

For the same reasons that the purpose and need statement is reasonable, BLM's range of alternatives was reasonable. The Wild Horse Act mandates the removal of horses to achieve a thriving natural ecological balance because BLM has determined that there are an excess number of horses. 16 U.S.C. § 1333(b)(2); *see Leigh I*, 726 F. Supp. 3d at 1215–16. Accordingly, other than a no-action alternative, it was reasonable for BLM to only consider alternatives that involve the removal of horses. *See e.g.* SC_6207–8 (rejecting an alternative to allow for "natural means" of population control because the Wild Horse Act mandates horse removal here); *see Leigh I*, 726 F. Supp. 3d at 1223 ("Allowing the range to naturally limit populations would therefore not only be inhumane but would also violate the [Wild Horse Act's] mandates to immediately remove excess horses, protect the range from the deterioration associated with overpopulation, and preserve and maintain a thriving natural ecological balance.").

Nor was BLM arbitrary and capricious in its consideration of those alternatives. Plaintiffs argue that BLM did not consider altering livestock allocations as an alternative to removals. But BLM *did* consider that alternative and explained that it was rejected because "it is inconsistent with the Tonopah RMP, and the [Wild Horse Act] which directs the Secretary to immediately remove excess wild horses." SC_6206–7 (discussing and rejecting an alternative involving reallocation of livestock grazing). The agency further explained that eliminating or reducing grazing would not be in line with Congress' intent to manage wild horses as one of the many uses of public land, and that livestock changes cannot be made in a gather plan decision. *Id.* (citing S. Rep. No. 92-242 (1971) (Conf. Rep.)); *see Leigh I*, 726 F. Supp. 3d. at 1226–27 (rejecting Plaintiffs' similar argument that BLM failed to consider reducing grazing).

BLM rejected an alternative requiring completion of a Rangeland Health Assessment before the gather for similar reasons. SC_6209. BLM explained that 16 U.S.C. § 1333(b)(2) does not contemplate delaying a gather for an assessment, and doing so would violate the statute's mandate for an immediate removal of horses.[18] *Id.*; *see Leigh 1*, 726 F. Supp. 3d at 1228 ("BLM did not need to wait to conduct a gather until it had completed the rangeland evaluation.").

In another attempt to force BLM to update AML before a gather, Plaintiffs argue that BLM failed to consider an alternative where BLM delays the gather to reevaluate and potentially raise AML. BLM considered this option and rejected it. SC_6206. Delay of a gather would conflict with the Tonopah RMP, Wild Horse Act, or other statutes because it would allow for further degradation of rangeland health when the statutes and land use plan call for immediate removal of excess horses. *Id.* Furthermore, considering monitoring data confirming that excess horses are harming the range, it would not be reasonable to *raise* AML. BLM explained that raising AML would not improve rangeland health, and for those reasons would not meet the purpose and need. *Id.* Thus, based on the Tonopah RMP, Wild Horse Act, other applicable statutes, and the purpose and need, BLM's range of alternatives here was not unreasonably narrow, nor was its elimination of alternatives arbitrary and capricious. *See Leigh I*, 726 F. Supp. 3d at 1227–28 (rejecting Plaintiffs' argument that BLM "did not adequately support its decision not to raise the AML range" as part of the gather decision based on the Wild Horse Act, relevant plans, and Plaintiffs' failure to show that raising AML would promote the health of existing wild horse populations).

Thus, BLM complied with NEPA in considering alternatives and the purpose and need of the Stone Cabin Gather EA.

### III.    Vacatur of the Stone Cabin Gather Decision is Not Warranted.

As explained throughout, BLM complied with the Wild Horse Act, NEPA, and the APA in issuing the Stone Cabin Gather Decision. But even if the Court were to find that BLM

---

[18] Plaintiffs also confusingly argue that BLM "refused to consider" conducting a Rangeland Health Assessment before the gather. ECF No. 38 at 21. BLM considered that alternative and rejected it. SC_6209.

1    committed legal error, under no circumstance is vacatur of the Decision appropriate. *See, e.g.*,

2    ECF No. 1 ¶¶ 101, 111, 116 (seeking vacatur of the Stone Cabin EA and Decision).

3         When determining whether to grant vacatur, courts consider the seriousness of the

4    agency's errors and the potential disruptive consequences (including environmental or economic

5    harm) of vacatur. *See Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992–94 (9th Cir. 2012)

6    (citing *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993);

7    *Nat'l Fam. Farm Coal. v. EPA*, 966 F.3d 893, 929 (9th Cir. 2020)). Given the expansive power

8    of vacatur, courts must carefully consider whether it is appropriate. *See, e.g.*, *U.S. v. Texas*, 599

9    U.S. 670, 702–03 (2023) (Gorsuch, J., concurring) ("A district court should think twice—and

10   perhaps twice again—before" granting vacatur, which is an "expansive equitable power")

11   (cleaned up).

12        Here, the alleged errors Plaintiffs identify in BLM's analyses are not serious and there

13   would be serious environmental harm if the Decision were vacated. As explained above, Plaintiffs

14   raise several formalistic, technical arguments, including that BLM failed to suitably consider the

15   42-year-old Stone Cabin HMAP, or failed to properly consider certain alternatives under NEPA.

16   Nowhere do Plaintiffs meaningfully challenge BLM's determination that there is an excess of

17   horses on the Stone Cabin Complex that BLM must remove immediately to restore a thriving

18   natural ecological balance to the range. As explained in the Stone Cabin Gather EA, failure to

19   remove excess animals will cause environmental harm to the Complex, including to the wild horse

20   population. SC_6228–29 (explaining that failure to conduct removals would lead to horses dying

21   of starvation and dehydration, be contrary to the Wild Horse Act's requirements for humane

22   handling and immediate removals, and would instead cause increased damage to the rangeland).

23        Thus, even if the Court determines that BLM committed legal error, the proper remedy

24   would be to remand without vacatur, as BLM could easily address any minor deficiencies on

25   remand, and vacatur would cause severe environmental harm. *See, e.g.*, *Friends of Animals v.

26   Culver*, 610 F. Supp. 3d 157, 172–73 (D.D.C. 2022) (explaining that where BLM has

27   substantiated its excess determination, "vacatur of the Decision would harm the ecological

28

36

interests that the Decision is necessary to protect," and that vacatur was inappropriate because "the endangered and rapidly deteriorating range cannot wait").

## CONCLUSION

For these reasons, BLM complied with NEPA, the Wild Horse Act, and the APA in rendering the Stone Cabin Decision. Thus, the Court should deny Plaintiffs' motion for summary judgment, grant Federal Defendants' cross-motion, and enter judgment for Federal Defendants.

Dated: February 28, 2025

Respectfully submitted,
LISA L. RUSSELL
U.S. Department of Justice
Deputy Assistant Attorney General
Environment & Natural Resources Division

*/s/ Joseph W. Crusham*
JOSEPH W. CRUSHAM,
Trial Attorney (CA Bar No. 324764)
Wildlife & Marine Resources Section
YOUNG A. KANG
Trial Attorney (FL Bar No. 1025505)
Natural Resources Section
P.O. Box 7611, Ben Franklin Station
Washington, DC 20044-7611
Phone: (202) 307-1145 (Crusham)
Email: joseph.crusham@usdoj.gov
Phone: (202) 514-2415 (Kang)
Email: young.kang@usdoj.gov

*Attorneys for Federal Defendants*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2025, I electronically filed and served the foregoing with the Clerk of the Court for the United States District Court for the District of Nevada using the CM/ECF system, which will send notification of this filing to the attorneys of record.


*/s/ Joseph W. Crusham*
Joseph W. Crusham
Attorney for Federal Defendants