BRENT M. RESH
(Nevada Bar No. 14940)
BRENT RESH LAW, PLLC
2401 La Solana Way
Las Vegas, NV 89102
(702) 781-6903
brent@brentreshlaw.com

JESSICA L. BLOME
(California Bar No. 314898, admitted pro hac vice)
J. RAE LOVKO
(California Bar No. 208855, admitted pro hac vice)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com
rlovko@greenfirelaw.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

LAURA LEIGH, individually, and WILD HORSE EDUCATION, a non-profit corporation,

        *Plaintiffs*,

        v.

UNITED STATES DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT, TRACY STONE-MANNING, Director of the Bureau of Land Management, and JON RABY, Nevada State Director of the Bureau of Land Management,

        *Federal Defendants*.

CASE NO. 3:23-cv-00568-ART-CSD

**PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................................8

II.   ARGUMENT ........................................................................................................9

    A.   Summary judgment should be granted as to Plaintiffs' Second Cause of Action. ...........9

        1.   BLM has unreasonably delayed creating an HMAP for the Saulsbury HMA. ..........9

        2.   BLM unlawfully withheld and unreasonably delayed fulfillment of its obligations as mandated by adoption of the Stone Cabin HMA HMAP. ................10

            a)   Plaintiffs' claim is not prudentially moot. .........................................11

            b)   The Stone Cabin HMA HMAP creates binding legal obligations. ...................11

    B.   Summary judgment should be granted as to Plaintiffs' Third and Fourth Causes of Action. .....................................................................................................13

        1.   BLM is required to consider approved HMAPs ......................................13

            a)   Wild Horse Act .................................................................13

                (1)   *Leigh I* ..................................................................14

                (2)   *Friends of Animals v. BLM* .................................................16

            b)   NEPA ...........................................................................16

         2.   BLM's failure to consider the Stone Cabin HMA HMAP violates Section 706(2) of the APA. ...........................................................................19

            a)   Objective 1 .....................................................................20

            b)   Objective 2 .....................................................................21

            c)   Objective 3 .....................................................................22

            d)   Objective 4 .....................................................................22

            e)   Objective 5 .....................................................................23

    C.   Summary judgment should be granted as to Plaintiffs' Fifth Cause of Action. ............24

        1.   BLM failed to identify necessary data and information. .............................24

            a)   BLM failed to provide data and information on AML and Rangeland Health. ..........................................................................25

(1)   BLM's excess horse determination is not substantiated by the
administrative record. ..................................................................25

(2)   BLM's determination that a gather is necessary is not substantiated
by the administrative record. .......................................................26

b)   BLM failed to provide data and information on its achievement of the
Stone Cabin HMA HMAP objectives ...............................................27

2.   BLM failed to consider reasonable alternatives. .......................................27

3.   BLM failed to analyze all direct, indirect, cumulative, and ecological
impacts. .........................................................................................28

D.   Vacatur is Appropriate ....................................................................28

III.   CONCLUSION ....................................................................................31

**PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY
JUDGMENT AND REPLY TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF AUTHORITIES

**CASES**

*350 Montana v. Haaland*, 50 F.4th 1254 (9th Cir. 2022) ........................................... 29, 31

*Alaska Survival v. Surface Trasp. Bd.*, 705 F.3d 1073 (9th Cir. 2013) ................................. 28, 30

*All. for the Wild Rockies v. Cooley*, 661 F. Supp. 3d 1025 (D. Mont. 2023)................................ 18

*Animal Protection Institute of America*, 109 IBLA 112 (1989) .............................................. 25, 26

*Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938 (9th Cir. 2008) ................................................... 24, 30

*Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166 (9th Cir. 2002)........................................ 14

*Bowen v. Massachusetts*, 487 U.S. 879 (1988)........................................................... 9

*Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989 (9th Cir. 2012)................................................. 29

*Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982 (Fed. Cir. 2018) ........................................... 14

*Friends of Animals v. BLM,* 548 F. Supp. 3d 39 (D.D.C. 2021)............................................. 14, 16

*Friends of Animals v. Silvey*, 353 F. Supp. 3d 991 (D. Nev. 2018).............................................. 13

*Friends of Animals v. Sparks*, 200 F. Supp. 3d 1114 (D. Mont. 2016)...................... 14, 17, 18, 25

*Hunt v. Imperial Merch. Servs., Inc.*, 560 F.3d 1137 (9th Cir. 2009)......................................... 10

*Independence Mining Co. v. Babbitt*, 105 F.3d 502 (9th Cir. 1997) ........................................... 12

*Leigh v. Raby*, 726 F. Supp. 3d 1207 (D. Nev. 2024)................................................... 12, 14, 15

*Leigh v. United States DOI*, No. 2:22-cv-01200-MMD-BNW, 2024 U.S. Dist. LEXIS 171947, (D. Nev. Sep. 23, 2024) ........................................ 10

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ......................................................... 9

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) ........................................................ 11

*Mach Mining, LLC v. EEOC*, 575 U.S. 480 (2015)................................................................ 9

*Marble Mountain Audubon Soc. v. Rice*, 914 F.2d 179 (9th Cir. 1990) ....................................... 25

*March for Life v. Burwell*, 128 F. Supp. 3d 116 (D.D.C. 2015)............................................... 15

*Marsh v. Oregon Natural Resources Council*, 490 U.S. 360 (1989)........................................... 19

4

**PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

*Massachusetts v. Watt*, 716 F.2d 946 (1st Cir. 1983) ................................................... 19

*Mont. Wildlife Fedn v. Haaland*, 127 F.4th 1 (9th Cir. 2025) ...................................... 29

*Nat'l Cable Television Ass'n, Inc. v. Am. Cinema Eds., Inc.*, 937 F.2d 1572 (Fed. Cir. 1991) ...................................................................................................................... 16, 18

*Natural Desert Ass'n v. Zinke*, 250 F. Supp. 3d 773 (D. Or. 2017) ............................... 29

*Neighbors of Cuddy Mountain v. U.S. Forest Service*, 137 F.3d 1372 (9th Cir. 1998)......... 28, 30

*Norton v. S. Utah Wilderness All. (SUWA)*, 542 U.S. 55 (2004) ................................... 11

*Olson v. State of Cal.*, 104 F.4th 66 (9th Cir. 2024) ..................................................... 15

*Organized Fishermen v. Franklin*, 846 F. Supp. 1569 (S.D. Fla. 1994) ....................... 15

*Peoples Rights Org. v. City of Columbus*, 152 F.3d 522 (6th Cir. 1998) ...................... 15

*Pollinator Stewardship Council v. EPA*, 806 F.3d 520 (9th Cir. 2015) ........................ 29

*Roe v. Shanahan*, 359 F. Supp. 3d 382 (E.D. Va. 2019) ............................................... 15

*Siskiyou Reg'l Educ. Project v. Rose*, 87 F. Supp. 2d 1074 (D. Or. 1999) .................... 25

*The Lands Council v. Powell*, 395 F.3d 1019 (9th Cir. 2005) ....................................... 14

*Tugaw Ranches, LLC v. United States DOI*, 362 F. Supp. 3d 879 (D. Idaho 2019)...................... 9

*Tyler v. Cisneros*, 136 F.3d 603 (9th Cir. 1998) ...................................................... 17, 18

*United States v. Morton Salt Co.*, 338 U.S. 632 (1950)................................................... 9

*Webster v. Fall*, 266 U.S. 507 (1925) .................................................................... 16, 18

*WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920 (9th Cir. 2015) ..... 24, 25, 26, 30

**STATUTES**

16 U.S. Code § 1331 et seq. ............................................................................................ 8

16 U.S. Code § 1332 ................................................................................................ 25, 30

16 U.S. Code § 1333 .......................................................................................... 13, 25, 30

16 U.S. Code § 1333(a) .................................................................................................. 13

16 U.S. Code § 1333(b)(2) ............................................................................................. 15

5

**PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

42 U.S.C. § 4321 et seq. ................................................................................................ 8

5 U.S. Code § 706(1) ............................................................................... 9, 12, 14, 15

5 U.S. Code § 706(2) ...................................................................................... passim

5 U.S. Code § 706(2)(A) .......................................................................... 13, 14

5 U.S. Code § 706(2)(C) ................................................................................ 13

**REGULATIONS**

40 C.F.R. § 1505.3 ........................................................................................ 18, 19

40 C.F.R. § 1505.3(a) ................................................................................... 17, 18

40 C.F.R. § 4710. ................................................................................................ 13

43 C.F.R. § 1505.3 ............................................................................................. 13

43 C.F.R. § 4710.4 ...................................................................................... passim

**PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

1

## TABLE OF ABBREVIATIONS

2

3    AML                          Appropriate Management Level

4    APA                          Administrative Procedures Act

5    BLM                          Bureau of Land Management

6    EA                           Environmental Assessment

7    HMA                          Herd Management Area

8    HMAP                         Herd Management Area Plan

9
10   LUP                          Land Use Plan

11   NEPA                         National Environmental Policy Act

12   TNEB                         Thriving Natural Ecological Balance

13   TRAC                         Telecommunications Research & Action Center v. FCC

14
     Wild Horse Act               Wild and Free-Roaming Horses and Burros Act

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.     INTRODUCTION

As addressed in Plaintiffs' opening brief, (1) Bureau of Land Management (BLM) abused its discretion and acted arbitrarily and capriciously when it ignored the Herd Management Area Plan (HMAP) for the Stone Cabin Herd Management Area (HMA) in preparing the environmental assessment (EA) for the Stone Cabin Complex Gather Plan; (2) BLM unlawfully withheld and/or unreasonably delayed its duty to create an HMAP for the Saulsbury HMA and to fulfill the obligations mandated by adoption of the Stone Cabin HMAP; and (3) BLM abused its discretion and acted arbitrarily and capriciously by failing to analyze every significant aspect of the Gather Plan's impacts pursuant to the National Environmental Policy Act (NEPA) 42 U.S.C. § 4321 et seq. Defendants' opposition and cross-motion fails to demonstrate otherwise. As discussed below, Defendants' arguments necessarily fail because they ignore or misrepresent certain of Plaintiffs' allegations and selectively rely on passages from caselaw, while ignoring the context of legal rulings.

BLM admits it has a duty to create HMAPs for every HMA but asks the Court not to order BLM to create an HMAP for the Saulsbury HMA, apparently as a courtesy. BLM also acknowledges that the Wild and Free-Roaming Horses and Burros Act (Wild Horse Act) 16 U.S.C. § 1331 et seq., requires the agency to manage public lands at the minimum level necessary to attain the objectives identified in approved land use plans (LUPs) and HMAPs but nevertheless argues that this directive does not apply to gather operations. In essence, despite recognizing the law, BLM argues that it is above the law.

Similarly, BLM offers no justification for failing to provide data and information relied upon in making its determination that excess horses exist in the Stone Cabin Complex and removal of those horses is necessary to achieve and maintain a thriving natural ecological balance (TNEB). In this regard, Defendants ask the Court to defer to BLM's conclusions, ultimately ignoring that these conclusions are not substantiated by the challenged Environmental Assessment (EA) for the Gather Plan. Such deference is unwarranted.[1]

---

[1] All of Plaintiffs' claims are brought as violations of the Administrative Procedures Act (APA).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II.    ARGUMENT

### A.    Summary judgment should be granted as to Plaintiffs' Second Cause of Action.

Plaintiffs' Second Cause of Action is based on 5 U.S. Code Section 706(1) of the Administrative Procedures Act (APA), which requires Courts to compel agency action that has been unlawfully withheld or unreasonably delayed. Dkt. 1, p. 18. The Court must compel BLM to comply with the Wild Horse Act because (1) BLM has unreasonably delayed creating an HMAP for the Saulsbury HMA, and (2) BLM has unlawfully withheld, or unreasonably delayed, fulfillment of its obligations as mandated by adoption of the Stone Cabin HMA HMAP. Dkt. 38, pp. 38-42.

### 1.    BLM has unreasonably delayed creating an HMAP for the Saulsbury HMA.

Defendants concede that BLM has a duty to create an HMAP for the Saulsbury HMA, and they admit that application of the *TRAC* factors establishes that the agency has unreasonably delayed creating the Saulsbury HMAP. Dkt. 43, pp. 9, 13, & 16 n. 6. Nonetheless, the agency argues that the Court should not grant summary judgment because Plaintiffs' claim is "prudentially moot," stating BLM began scoping for an HMAP of the Stone Cabin Complex (which includes the Saulsbury HMA) on February 7, 2025, and "intends to issue the HMAP in approximately one year." Dkt. 43, pp. 1, 17-18. This intention only arose after 40 years of inaction, repeated requests by the public, and the filing of the instant lawsuit. Dkt. 38, pp. 39-40.

Without an order establishing BLM's duty to create an HMAP by a date certain, BLM is

---

The "whole purpose" of the APA is "accountability." *Tugaw Ranches, LLC v. United States DOI*, 362 F. Supp. 3d 879, 888 (D. Idaho 2019) (citing *Bowen v. Massachusetts*, 487 U.S. 879, 891-92 (1988)). Recognizing that government agencies engage in "legal lapses and violations" especially when there is "no consequence," the Supreme Court has "long applied a strong presumption favoring judicial review of administrative action." *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 489 (2015). In this regard, the APA serves "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950)). To ensure that these excesses are checked, no discretion is afforded an agency's legal obligations. *See id.* at 392-93.

likely to evade judicial oversight of its long-overdue mandatory duty, leaving the agency the option of simply changing its mind and not creating an HMAP. Indeed, the Honorable Judge Miranda Du previously addressed this same issue. *See Leigh v. United States DOI*, No. 2:22-cv-01200-MMD-BNW, 2024 U.S. Dist. LEXIS 171947, at *27 n.12 (D. Nev. Sep. 23, 2024). In that case, Judge Du ruled that BLM had unreasonably delayed creation of an HMAP for the Blue Wing Complex in Nevada and ordered BLM to complete an HMAP by September 23, 2025. *See id.* This ruling occurred despite the fact that BLM informed the court it had begun the process for developing an HMAP and intended to complete the HMAP within one year. *See id.* In reaching her ruling, Judge Du wrote: "Because BLM's commitment to completing the HMAP within one year is not binding, the Court declines to find that Plaintiffs' motion to compel the production of an HMAP under the APA is prudentially moot." *See id.*; *see also Hunt v. Imperial Merch. Servs., Inc*., 560 F.3d 1137, 1142 (9th Cir. 2009) (dismissal of claim not warranted "merely because it may become moot in the near future").

The Court must enter summary judgment directing BLM to prepare an HMAP for the Saulsbury HMA (or Stone Cabin Complex) by at least February 8, 2026 (one year from the agency's alleged project start date).

### 2.    BLM unlawfully withheld and unreasonably delayed fulfillment of its obligations as mandated by adoption of the Stone Cabin HMA HMAP.

The Stone Cabin HMA HMAP contains objectives for management of the range, wildlife, watershed, and wild horses. SC_09273-SC_09274. Specific to wild horses, the HMAP contains five objectives, which are to be accomplished through numerous, identified management methods. SC_09285-SC_09296. Plaintiffs' Second of Cause of Action avers that BLM has unlawfully withheld and unreasonably delayed fulfilling these objectives and management methods. Dkt. 1, p. 18. In opposition, Defendants incorrectly assert that Plaintiffs' claim is prudentially moot, and the HMAP does not create binding legal obligations. Dkt. 43, pp. 24-28.

### a)    Plaintiffs' claim is not prudentially moot.

Defendants argue this claim is prudentially moot because BLM intends to prepare a new HMAP for the Stone Cabin Complex (which includes the Stone Cabin HMA) within one year. Dkt. 43, pp. 17-18. As addressed above in Section II.A.1, dismissal based upon an unenforceable intention is not warranted in this case. Nothing in BLM's history supports deference to BLM's intention.

### b)    The Stone Cabin HMA HMAP creates binding legal obligations.

Defendants next argue that the Stone Cabin HMA HMAP did not result in the creation of legally binding obligations, largely relying upon the Supreme Court's ruling in *Norton v. S. Utah Wilderness All.* (*SUWA*), 542 U.S. 55, 69 (2004) as support. Dkt. 43, pp. 17-20. That case, however, does not foreclose Plaintiffs' claims. In *SUWA*, an LUP contained language that BLM would monitor and close the Factory Butte area to off-road vehicles "if warranted." *SUWA*, 542 U.S. at 71-72. BLM subsequently engaged in "informal monitoring," but the plaintiff demanded BLM implement a formal monitoring program. *Id.* In addressing this claim, the court stated that a claim for unreasonable delay may only succeed if BLM "failed to take a discrete agency action that it [was] required to take." *Id.* at 64. "The limitation to discrete agency action" prevents "broad programmatic" challenges. *Id.* A plaintiff "cannot seek *wholesale* improvement" of a "program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made. Under the terms of the APA, [plaintiff] must direct its attack against some particular 'agency action' that causes it harm." *Id.* (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990)).

In considering whether agency action was required, the *SUWA* court looked to whether there was a "clear indication of binding commitment" in the LUP.[2] *Id.* at 69, 71. Upon close examination, the court found that the language in the LUP identified BLM's priorities and

---

[2] Defendants do not argue that Plaintiffs' Section 706(2) claims are precluded by *SUWA* or its progeny. Their argument is limited to Plaintiffs' Section 706(1) claim.

intentions but did not create mandatory legal obligations that could be compelled through Section 706(1) of the APA *See id.* at 71-72. This conclusion was based on the court's finding that (1) BLM's handbook "specifies that land use plans are normally not used to make site-specific implementation decisions[,]" (2) the Board of Land Appeals does not review land use plans because such plans are considered "a policy determination, not an implementation decision[,]" and (3) statements in land use plans normally are constrained by funding considerations. *Id.* at 70-71.

In this case, Plaintiffs are not seeking to compel action identified in an LUP, but instead seek to compel action based on statements within an HMAP. Land use plans and HMAPs "are not equivalent documents." *Leigh v. Raby*, 726 F. Supp. 3d 1207 (D. Nev. 2024) ("*Leigh I*"). Unlike LUPs, BLM's handbook specifies that HMAPs are created to allow for evaluation and monitoring of the wild horse populations and associated habitat for the exact purpose of addressing population and habitat management in specific HMAs. SC_0560, SC_0564-SC_0565, SC_0597. Importantly, BLM also considers them to be *implementation decisions*. SC_0564.

Defendants do not argue that the objectives and management methods identified in the HMAP for the Stone Cabin HMA are insufficiently discrete to be enforceable. Instead, they argue the HMAP is unenforceable because it contains the following provision: "All actions undertaken pursuant to this plan are contingent upon available funding." SC_09297. While this provision might be relevant if Defendants' argued they unlawfully withheld or unreasonably delayed fulfillment of the HMAP based on budgetary constraints, Defendants do not make this argument. *See Independence Mining Co. v. Babbitt*, 105 F.3d 502, 507 n. 7 (9th Cir. 1997) (holding courts may consider the effect of expediting delayed action on agency activities of a higher or competing priority). And, there is no evidence, for example, that budget constraints prevented BLM from fulfilling the HMAP's directive that gathers occur by dividing the horses to be removed among the five sub-units of the Stone Cabin HMA. SC_09287-SC_09288.

The Court should enter summary judgment compelling BLM to implement the HMAP's mandates. Dkt. 38, pp. 41-42 (identifying specific mandates).

**B.    Summary judgment should be granted as to Plaintiffs' Third and Fourth Causes of Action.**

Plaintiffs' Third Cause of Action is based on Section 706(2)(A) of the APA, which requires courts to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S. Code § 706(2)(A). Plaintiffs' Fourth Cause of Action is based on Section 706(2)(C) of the APA, which requires courts to set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations." *Id.* at § 706(2)(C). Both claims aver that Defendants violated 16 U.S.C. § 1333, 40 C.F.R. § 4710.4, and 43 C.F.R. § 1505.3 when BLM authorized the gather and removal of wild horses and burros from the Stone Cabin Complex without ensuring the Gather Plan achieved the objectives of the Stone Cabin HMA HMAP. Dkt. 38, pp. 19-21. Defendants wrongly assert that BLM is not required to consider approved HMAPs when adopting a gather plan, and even if the agency were required to do so, the challenged Gather Plan mostly conforms to the Stone Cabin HMA HMAP. Dkt. 43, pp. 28-35.

**1.    BLM is required to consider approved HMAPs.**

The duty to consider the Stone Cabin HMA HMAP objectives and management methods arises both from the Wild Horse Act and NEPA independently. *See* 16 U.S.C. § 1333(a); 43 C.F.R. § 4710.4; 43 C.F.R. § 1505.3.

**a)    Wild Horse Act**

The Wild Horse Act provides that "[a]ll management activities shall be at the minimal feasible level." 16 U.S.C. § 1333(a). The "minimum feasible level" means "the minimum number of habitat or population management tools or actions necessary." *Friends of Animals v. Silvey*, 353 F. Supp. 3d 991, 1009 (D. Nev. 2018). The wording of the Wild Horse Act's implementing regulations codify that the minimum tools include consideration of both LUPs and HMAPs. *See* 43 C.F.R. § 4710.4 ("Management shall be at the minimum level necessary to attain the objectives identified in approved land use plans and herd management area plans"). Such considerations serve as "Constraints on Management" of HMAs. *Id.* Defendants cite *Leigh*

13

**PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

*I* and *Friends of Animals v. BLM,* 548 F. Supp. 3d 39 (D.D.C. 2021) for the proposition that BLM can ignore approved HMAPs despite the mandate contained in 43 C.F.R. § 4710.4. Dkt. 43, pp. 28-31. Neither case supports such a proposition.

### (1)    *Leigh I*

Defendants correctly note that in *Leigh I*, Judge Du ruled BLM could gather horses on HMAs which *do not yet have* an approved HMAP due to the Wild Horse Act's immediacy requirement; however, Defendants incorrectly jump to the conclusion that this ruling allows the agency to ignore HMAPs before gathering horses on HMAs which *do have* approved HMAPs. Dkt. 43, p. 22. No court has ever held that the duty established by 43 C.F.R. § 4710.4 can be ignored where approved LUPs and HMAPs exist.

Defendants' reliance on Judge Du's ruling ignores that she was addressing a challenge based upon Section 706(1) of the APA, with the plaintiffs in that case arguing that BLM had unlawfully withheld or unreasonably delayed creating any HMAPs for HMAs within the Pancake Complex. *See Leigh I*, 726 F. Supp. 3d at 1215. As noted above in Section II.A.2.b, Section 706(1) allows courts to compel withheld or delayed agency action only if that action is both discrete and legally required. *See SUWA*, 542 U.S. at 64 (2004). Where action meets this requirement, the Ninth Circuit next determines whether the deadline for agency action is firm or discretionary. *See Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1177 n.11 (9th Cir. 2002). Section 706(2), on the other hand, provides courts with the authority to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "An agency's action is arbitrary and capricious if it fails to consider important aspects of the issues before it, if it supports its decisions with explanations contrary to the evidence, or if its decision is either inherently implausible or contrary to governing law." *Friends of Animals v. Sparks*, 200 F. Supp. 3d 1114, 1121 (D. Mont. 2016) (*Sparks*) (citing *The Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005)). The standard of review for claims based on action being arbitrary and capricious is equated with the "rational basis" standard. *See Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 992 (Fed. Cir. 2018);

---

14

1    *Organized Fishermen v. Franklin*, 846 F. Supp. 1569, 1573 (S.D. Fla. 1994).

2        In *Leigh I*, after concluding that HMAP preparation "is indisputably a discrete action,"

3    Judge Du analyzed "whether the deadline for preparing an HMAP is firm or discretionary—that

4    is, whether the HMAP is being unlawfully withheld or unreasonably delayed, respectively."

5    *Leigh I*, 726 F. Supp. 3d at 1215-16. Plaintiffs argued "that the interplay between two BLM

6    regulations sets a firm deadline for preparing HMAPs: BLM must have an approved

7    HMAP *before* performing management activities on an HMA." *Id.* at 1216 (emphasis in

8    original). Judge Du disagreed, finding that the deadline for HMAP preparation was discretionary

9    (and therefore addressed under the unreasonably delayed prong of Section 706(1)). In so

10    concluding, the Court noted that BLM could gather horses on HMAs which did *not yet have* an

11    "approved HMAP." *Id.* at 1217.  Otherwise, to order the agency to create an HMAP (which

12    might take months or years) would violate the Wild Horse Act's requirement to immediately

13    remove excess horses from public lands. *See id.* (citing 16 U.S.C. § 1333(b)(2)).

14        Here, Plaintiffs' 706(2) claim need not address whether the deadline for HMAP creation

15    is firm or discretionary because the Stone Cabin HMA HMAP has already been approved.

16    SC_09319. The immediacy requirement of the Wild Horse Act is not implicated because no

17    delay related to HMAP creation is at issue. Rather, BLM need only consider whether the Gather

18    Plan is conducted in a manner that attains the objectives of approved LUPs and the approved

19    Stone Cabin HMA HMAP.[3] *See* 43 C.F.R. § 4710.4.

20    ─────────────────────────

21    [3] Plaintiffs are unaware of any court addressing the manner in which BLM is to address

22    attainment of objectives in approved LUPs and HMAPs pursuant to 43 C.F.R. § 4710.4.
    However, as the standard for Plaintiffs' 706(2) claim is similar to rational basis review, cases

23    addressing equal protection claims are germane. *See Roe v. Shanahan*, 359 F. Supp. 3d 382, 411
    (E.D. Va. 2019) (holding that rational basis review of equal protection claims is similar to the

24    APA's standard for 706(2) claims). In that context, the rational basis standard requires that the
    means adopted through government action bear a rational relationship to identified objectives.

25    *See Olson v. State of Cal.*, 104 F.4th 66, 76-77 (9th Cir. 2024); *March for Life v. Burwell*, 128 F.
    Supp. 3d 116, 126 (D.D.C. 2015); *Peoples Rights Org. v. City of Columbus*, 152 F.3d 522, 532

26    (6th Cir. 1998). Accordingly, BLM's Gather Plan must include means (management actions) that
    bear a rational relationship to the Stone Cabin HMA HMAP objectives. BLM did not consider

27    the Stone Cabin HMA HMAP objectives when preparing the Gather Plan, and Defendants do not
    argue that the means they employ bear a rational relationship to the HMAP objectives.

28

1

2

**(2)**    *Friends of Animals v. BLM*

3    Defendants state that *Friends of Animals v. BLM* stands for the proposition that BLM can

4    "'use an array of approaches to manage an HMA,' including using or not using an HMAP." Dkt.

5    43, p. 24 (citing *Friends of Animals v. BLM*, 548 F. Supp. 3d 39, 67 (D.D.C. 2021)). In that case,

6    the plaintiff was challenging a long-term gather plan and argued that plan could not "be

7    reconciled with the overall procedures for wild horse management as explained in BLM's

8    handbook." *Friends of Animals*, 548 F. Supp. 3d at 67. In addressing this, the court stated:

9

10    > Although [plaintiff] is correct that the handbook sets forth these categories, it is
    > also clear that the Bureau has considerable flexibility in choosing which types of
    > plans to use and what to put in them. The handbook, for example, contemplates that
    > the Bureau could use an array of approaches to manage an HMA. It might, for
    > example, use a land use plan, an EA, an established AML, and a gather plan. Or the
    > Bureau might use an AML, an HMAP, and a gather plan. Or some other
    > combination. Thus, although the categories may offer useful organizational tools,
    > the handbook and manual leave the authorized officer with considerable discretion
    > in framing her decision. [Plaintiff] points to nothing in either document that
    > expressly forbids the authorized officer from issuing a long-term gather decision.

11

12

13

14    *Id.* The court was looking at BLM's handbook and not at the requirements of the Wild Horse Act

15    or its regulations. The court was not asked to address BLM's duty pursuant to 43 C.F.R. §

16    4710.4. As such, the case is not relevant to Plaintiffs' claim and has no precedential value. *See*

17    *Webster v. Fall*, 266 U.S. 507, 511 (1925) ("[q]uestions which merely lurk in the record, neither

18    brought to the attention of the court nor ruled upon, are not to be considered as having been so

19    decided as to constitute precedents"); *Nat'l Cable Television Ass'n, Inc. v. Am. Cinema Eds.,*

20    *Inc.*, 937 F.2d 1572, 1581 (Fed. Cir. 1991) ("[w]hen an issue is not argued or is ignored in a

21    decision, such decision is not precedent to be followed in a subsequent case in which the issue

22

23    arises").

24

25    **b)    NEPA**

26    Not only does the Wild Horse Act require that the Gather Plan be conducted with means

27    that are rationally connected to HMAP objectives, but NEPA also requires that BLM fulfill the

28

**PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY
JUDGMENT AND REPLY TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

mandates it promises to implement. *See* 40 C.F.R. § 1505.3(a). Section 1505.3 of NEPA's regulations, which is entitled "Implementing the Decision," states that "[m]itigation and other conditions established in the environmental impact statement or during its review and committed as part of the decision shall be implemented by the lead agency or other appropriate consenting agency." 40 C.F.R. § 1505.3(a). This commitment comports with "generally recognized principles of federal administrative law," which hold that "an agency must comply with its own decisions and regulations once they are adopted." *Sparks*, 200 F. Supp. 3d at 1123-1124.

Where an agency does not comply with its own decisions, courts can set aside subsequent actions—including gather plans. For example, in *Sparks*, the court held that BLM's Record of Decision for an LUP committed the agency to re-calculating AML. *See id.* at 1125. Because the agency did not do so, a subsequently adopted gather plan violates Section 706(2) of the APA. *See id.*

> BLM failed to maintain the relevant AML when it failed to follow its own commitment to recalculate the 2009 AML within five years. By operating with an outdated AML when it made its 2015 decision, BLM's excess animal determination was based, at least in part, on pure guesswork. Regardless of BLM's reliance on range information, BLM had no accurate AML off of which to work. Without an accurate AML, BLM's duty to remove could not be triggered because BLM could not properly determine that an overpopulation existed, which is the prerequisite for removal.

*Id.* at 1126.

The EA for the Stone Cabin HMAP only examined two alternatives: the HMAP as adopted (the "action" alternative) versus no HMAP (the "no action" alternative). SC_09321. The Record of Decision "accepted [the action alternative] as written." SC_09319. Defendants incorrectly argue that this acceptance does not obligate BLM to commitments contained within the HMAP because the Decision itself did not *expressly* identify each and every mitigation measure and condition being accepted. Dkt. 43, pp. 28-29. Plaintiffs are unaware of any decision requiring express language in the Record of Decision as a precondition to the enforceability of a plan's mitigation measures and conditions. Defendants cite decisions in *Sparks*, 200 F. Supp. 3d at 1123–25, *Tyler v. Cisneros*, 136 F.3d 603, 608–9 (9th Cir. 1998), and *All. for the Wild Rockies*

*v. Cooley*, 661 F. Supp. 3d 1025, 1036–38 (D. Mont. 2023) to argue otherwise, but these cases do not support Defendants' position. Dkt. 43, p. 29. In each of these cases, the courts ruled that 40 C.F.R. § 1505.3 committed agencies to statements made during the NEPA review or in a record of decision (or its equivalent).[4] While it is true that the courts examined express statements, none of the courts established a rule regarding express language, instead basing their conclusions on the specific facts of the cases before them. None held that the record of decision was non-binding if it only accepted an alternative in full. As such, the cases have no precedential value. *See Webster*, 266 U.S. at 511; *Nat'l Cable Television Ass'n, Inc.*, 937 F.2d at 1581.

As previously noted, BLM's own handbook recognizes HMAPs are implementation decisions. SC_0564. Here, because the EA for the Stone Cabin HMA HMAP only looked at one action alternative, there was no need for BLM to expressly delineate which mitigation measures and conditions were being accepted—they all were. Defendants' position, on the other hand, would result in the Record of Decision's acceptance having no meaning. What was BLM

---

[4] In *Sparks*, the court found that express language in the challenged record of decision obligated BLM to recalculate AML. *See Sparks*, 200 F. Supp. 3d at 1125. However, the court's analysis also discussed Section 1505.3 as merely holding that "any mitigation measures set out in an environmental impact statement are 'directly binding' on an agency," and an "agency must comply with mitigation measures agreed to by [the] agency in [the] NEPA review process." *Id.* at 1123 (citations omitted).

In *Tyler*, the agency adopted a memorandum of agreement to address mitigation measures for a low-income housing project, and the EA recommended that the agreement be included as a condition to project approval. *See Tyler*, 136 F.3d at 605-06. Based on this, the agency published a Notice of Finding of No Significant Impact, stating that no environmental impact statement would be required because the mitigation measures in the memorandum of agreement would adequately address any adverse effects on the environment. *See id.* at 606. No record of decision was published. *See id.* The court, relying on 40 C.F.R. § 1505.3(a) and a provision of the National Historic Preservation Act, ruled that the memorandum of agreement was enforceable. *See id.* at 608-09.

In *All. for the Wild Rockies*, an agency issued a record of decision that adopted a plan for the recovery of grizzly bears. *See All. for the Wild Rockies*, 661 F. Supp. 3d at 1030-1031. The record of decision contained express language regarding certain conditions, and the court agreed these were enforceable. *See id.* at 1043. In so doing, the court wrote that agencies must comply with conditions agreed to during the NEPA review process. *See id.* at 1038.

---

accepting if not the HMAP's mitigation measures and conditions? To find that an agency may conduct NEPA review and then commit themselves to nothing goes against the very purpose of NEPA. As the U.S. Supreme Court has noted, NEPA has an "action-forcing" purpose. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371 (1989). Environmental review is conducted to ensure that NEPA's goals are "infused into the ongoing programs and actions of the Federal Government." *Id.* at 371 n. 14 (quoting congressional record); *see also Massachusetts v. Watt*, 716 F.2d 946, 952 (1st Cir. 1983) (NEPA review "is aimed at presenting governmental decision-makers with relevant environmental data before they *commit* themselves to a course of action") (emphasis added)). To safeguard this action-forcing purpose, 40 C.F.R. §1505.3 mandates adopted decisions actually be implemented.

### 2.    BLM's failure to consider the Stone Cabin HMA HMAP violates Section 706(2) of the APA.

Plaintiffs have established that BLM approved the HMAP, and pursuant to both the Wild Horse Act and NEPA, BLM was therefore required to (a) ensure the Gather Plan was rationally related to attaining the objectives in the HMAP, and (b) before adopting the Gather Plan, consider whether the HMAP's objectives and associated management methods had occurred. *See* 43 C.F.R. § 4710.4; 40 C.F.R. § 1505.3. Defendants argue BLM sufficiently considered the HMAP, stating "the Gather Plan and supporting record show that BLM has acted and continues to act consistent with the broad 'Wild Horse Management Objectives' from the Stone Cabin HMAP, and has done studies, monitoring, and assessments consistent with the HMAP." Dkt. 43, p. 25. This is nothing more than a post-decision litigation position. As discussed below, BLM did not consider the HMAP nor abide by its obligations under the Wild Horse Act or NEPA.

The Stone Cabin HMAP addresses objectives for the range, wildlife, watershed, and wild horses in the Stone Cabin HMA. SC_09273-SC_09274. Specific to wild horses, the HMAP contains five management objectives, each to be fulfilled through identified management methods. SC_09285-SC_09292. The management methods include a number of studies and assessments. SC_09293-SC_09296.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### a)    Objective 1

Objective 1 specifically addresses how future gather operations are to be conducted, stating that BLM must start by conducting a horse inventory. SC_09285. Then:

> Once the number of animals to be removed is established, that figure will be divided among the five sub-units [of the HMA, which consist of the Golden Arrow Area, Clifford Springs Basin, Italian Springs Area, North Stone Cabin Ranch Area, and Point of Rocks Spring Area]. This division of animals will be based on the actual use levels of animals in each unit, degree of utilization in each area, conflicts within each area, and the total wild horse population in each area. Horses will not be completely removed from any of the sub-units. To assure proper management of the horses in the Point of Rocks Spring sub-unit, the level of horse use on the adjacent USFS Land will also be considered in the total.

SC_09276-SC_09278, SC_09287. Further, gather operations are to attain and maintain a 55-45 (male to female) sex ratio for each sub-unit. SC_09288.

BLM argues that it achieved this objective because it considered the AML of 364, as established in the Tonopah Resource Management Plan (issued after the HMAP's adoption). Dkt. 43, pp.25-26. This is irrelevant because BLM completely ignores that the HMAP provides specific instructions that gather decisions be based on HMA sub-units, requiring sub-unit inventories, utilization studies, and conflict considerations. The Gather Plan does not contain any mention of, or analysis associated with, the HMA's five sub-units. The Gather Plan does not distribute removal of the horses among the five sub-units, as required by the Stone Cabin HMA HMAP.

The focus on HMA sub-units was adopted because the range receives "heavy use of the forage by *both* livestock and horses. This heavy use [occurs] in specific areas, and is not consistent throughout the whole HMA." SC_09276. BLM's failure to consider this important aspect of range health is contrary to the objectives of the Stone Cabin HMA HMAP, and the agency's decision to ignore the HMAP is not supported by any rational explanation. As such, BLM acted arbitrarily and capriciously in violation of Section 706(2) of the APA.

20

PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY
JUDGMENT AND REPLY TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

1

2

**b)**    **Objective 2**

The second objective focuses on preventing "utilization of key forage species [annual grasses, perennial grasses and grasslike, annual forbs, perennial forbs and biennial forbs, and shrubs, half shrubs, and trees] … from exceeding the allowable use factors by more than 10% in each of the 5 sub-units." SC_09288, SC_09306. And the HMAP contains a table identifying the exact allowable use factors (or portion of forage that can be safely consumed) for each of these key forage species by season and annually. SC_09306. To assess forage utilization, the HMAP states "[t]he Key Forage Plant Method is the technique used for this management plan." SC_09293. "Utilization data will be collected contiguous with movement of livestock from the management area, thus acquiring cattle and wild horse use patterns. Utilization data will again be collected prior to cattle reentry into the HMA to determine that portion of the utilization which is made solely by wild horses." SC_09293.

BLM states the Gather Plan is consistent with this objective because data on forage use was considered.[5] Dkt. 43, p. 26. That data, however, does not focus on the five sub-units of the HMA nor does the data specify that allowable use factors are being exceeded by more than 10%. SC_6274-SC_6274. BLM also does not indicate that it used the Key Forage Plant Method to examine forage in the sub-units. The data was not collected contiguous with movement of livestock from the management area. Because BLM did not follow the HMAP directives, the agency was forced to use its subjective judgment to estimate what portion of utilization should be attributed to horses versus cattle. SC_6214. BLM's failure to consider this objective and its attendant management methods is contrary to the Stone Cabin HMA HMAP, and the agency's decision to ignore the HMAP is not supported by any rational explanation. As such, BLM acted arbitrarily and capriciously in violation of Section 706(2) of the APA.

_____

[5] Plaintiffs' Fifth Cause of Action, addressed below in Section II.C., addresses this data in more detail.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

     **c)**  **Objective 3**

  Objective 3 focuses on sustaining the free-roaming characteristics of the horses in the Stone Cabin HMA. SC_09290. The objective is fulfilled by considering cumulative impacts associated with human activity. *Id.* In the EA for the Gather Plan, BLM admits cumulative impacts from human activity exist and will continue to impact horses in the reasonably foreseeable future, but the agency offers absolutely no discussion on what the impacts actually are or will be. SC_6243-SC_6246. When the public asked BLM to elaborate, it refused to do so. SC_6336, SC_6354, SC_6361, SC_6367.

  BLM's failure to consider this objective and its attendant management methods is contrary to the Stone Cabin HMA HMAP, and the agency's decision to ignore the HMAP is not supported by any rational explanation. As such, BLM acted arbitrarily and capriciously in violation of Section 706(2) of the APA.

     **d)**  **Objective 4**

  The fourth objective states BLM is to "[p]rovide water for wild horses throughout the Stone Cabin Valley HMA where possible. Develop water in areas where there are no existing or proposed waters available to horses. Where waters are not available for horses, waters will be developed." SC_09291. Ten water projects are identified for implementation by 1984. SC_09291. These projects are designed to improve water distribution and availability because "[m]any areas within the HMA receive very little use due to the lack of water in these areas. Improved water distribution will relieve many areas of the heavy use they presently receive as a result of better distribution of grazing animals." SC_09290. Further:

> All waters to be developed will be available to horses. In the event the above projects do not provide adequate water for wild horses, an inventory will be conducted to determine additional water requirements to be developed in addition to those proposed. Reservoirs, pipelines and water catchments will be considered first and wells as a last resort. Wild horse priorities for potential joint funded water developments are shown above.

SC_09291.

**PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Defendants argue that because the administrative record for the Gather Plan contains "water inventory data," the Gather Plan is consistent with Objective 4 of the HMAP. Dkt. 43, p. 27. Actually, the EA states that water sources in the Stone Cabin HMA are very limited, being found only at the perennial sources at Warm Spring, Point of Rock Spring, and Sidehill Spring. SC_6189, SC_6213. No mention is made of the ten water projects that the HMAP identified for implementation. No analysis or discussion is included regarding consideration of additional water projects. Indeed, BLM said "[a]dditional water developments are outside of the scope of this EA." SC_6372. Clearly, the Gather Plan was not created in a manner designed to achieve this objective. The Gather Plan is not consistent with the HMAP's mandate to improve water distribution in order to better distribute range use by horses.

As regards the "water inventory data" that Defendants reference, this data is not mentioned in the EA, and BLM does not allege that it considered this data in concluding that "additional water developments are outside of the scope of this EA." In the administrative record, Defendants reference a document at SC_663–766, which contains water inventory data from 2012. More specifically, the data consists of thirteen field observations made primarily in May of 2012 in Stone Cabin "South" and Stone Cabin "North." SC_663–766. Dkt. 43, p. 27. Nothing about these outdated field observations or the EA demonstrates that the Gather Plan considered attainment of Objective 4, and the agency's decision to ignore the HMAP is not supported by any rational explanation. As such, BLM violated Section 706(2) of the APA.

### e)    Objective 5

The final objective directs BLM to "[e]stablish studies to acquire additional data on wild horses." SC_09291. Detailed information is provided regarding the type of studies to be conducted, the priority to be given different studies, and the frequency of conducting studies. SC_09292- SC_09296. The studies include those to collect information on horse population, sex ratios, age structures, young/adult ratios, seasonal movement and distribution, recruitment, forage utilization, and soil. *Id.* Because the Point of Rocks Spring Area is located near the Monitor Wild Horse Territory, BLM also is required to conduct a movement and distribution

study on USFS lands "to determine if the horses that use this area belong to the USFS Monitor herd or the BLM Stone Cabin herd. This study will be established cooperatively between the Tonopah Ranger District and the Tonopah Resource Area." SC_09292.

BLM argues the Gather Plan is consistent with this objective because the agency considered population size, water sources, horse body conditions, range conditions, and genetic monitoring. Dkt. 43, pp. 27-28. As addressed above, population inventories were not done for each of the HMA's five sub-units, and the EA did not analyze water sources. BLM did not collect data on sex ratios, age structures, young/adult ratios, seasonal movement and distribution, recruitment, or soil. The agency's review of forage utilization was not conducted as directed by the HMAP, which led to BLM making subjective judgments about whether use was attributed to wild horses, cattle, or wildlife. SC_6214. Finally, BLM did not comply with the HMAP's mandate to work with the US Forest Service regarding the Monitor Wild Horse Territory.

BLM's failure to consider this objective and its attendant management methods is contrary to the Stone Cabin HMA HMAP, and the agency's decision to ignore the HMAP is not supported by any rational explanation. As such, BLM acted arbitrarily and capriciously in violation of Section 706(2) of the APA.

C.    **Summary judgment should be granted as to Plaintiffs' Fifth Cause of Action.**

Plaintiff's Fifth Cause of Action alleges that BLM violated Section 706(2) of the APA and NEPA when it failed to identify necessary data and information, failed to address reasonable alternatives, and failed to analyze all direct, indirect, cumulative, and ecological impacts. Dkt. 38, pp. 42-48.

1.    **BLM failed to identify necessary data and information.**

In order to meet the public disclosure requirements of NEPA, BLM must disclose the data and information relied upon in developing the agency's opinions and decisions. *See WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 925 (9th Cir. 2015); *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 953 (9th Cir. 2008). Without this data and information, the public is "severely limited in its ability to

participate in the decision-making process." *See WildEarth Guardians*, 790 F.3d at 926. Without this data and information, the Court cannot assume that the basis for an agency's decision is reasoned. *Id.* at 927; *see also Siskiyou Reg'l Educ. Project v. Rose*, 87 F. Supp. 2d 1074, 1091 (D. Or. 1999) ("'An agency must set forth a reasoned explanation for its decision … Conclusions that are reached without any study or supporting documentation are insufficient to satisfy an agency's NEPA obligations") (citing *Marble Mountain Audubon Soc. v. Rice*, 914 F.2d 179, 182 (9th Cir. 1990)).

Plaintiffs' Motion for Summary Judgment demonstrated that BLM failed to disclose relevant information and data in the EA for the Gather Plan. Dkt. 38, pp. 42-46. Specifically, the public requested BLM provide data and information related to AMLs, compliance with the Stone Cabin HMA HMAP, and rangeland health; BLM refused to provide any of the requested data and information. SC_6188, SC_6206, SC_6209, SC_6214- SC_6215, SC_6272- SC_6274, SC_6328- SC_6331, SC_6348, SC_6354, SC_6361.

### a)    BLM failed to provide data and information on AML and Rangeland Health.

The first step in a gather decision involves a determination that "excess" horses exist; the second step requires a determination that the removal of horses is necessary. *See* 16 U.S.C. § 1333. Necessity is based upon impacts to the range (or TNEB). *See* 16 USC §§ 1332, 1333.

### (1)    BLM's excess horse determination is not substantiated by the administrative record.

Regarding AML data and information, BLM argues that it was not required to set or adjust AML in the EA for the Gather Plan. Dkt. 43, pp.31-32. Plaintiffs are not challenging the AML decision in this case, but rather, Plaintiffs contend that BLM was required to provide information and records establishing how AML was formulated. Without this information, the public and this Court are unable to assess whether "BLM's excess animal determination was based, at least in part, on pure guesswork." *Sparks*, 200 F. Supp. 3d at 1126; *see also Animal Protection Institute of America*, 109 IBLA 112 (1989) (BLM cannot base removal decisions on AMLs established "purely for administrative reasons" rather than on studies establishing "the

optimum number which results in a thriving natural ecological balance and avoids a deterioration of the range"). BLM offers no rational reason for refusing the public's request to have this information—perhaps because the AML was set "purely for administrative reasons." *Animal Protection Institute of America*, 109 IBLA 112.

BLM violated NEPA's public disclosure requirement, and there is nothing to substantiate that the agency's excess horse determination was a reasoned decision. Therefore, summary judgment is appropriate.

### (2)    BLM's determination that a gather is necessary is not substantiated by the administrative record.

As regards data and information on rangeland health, Defendants state "[t]he record contains ample data and analysis demonstrating that … excess [wild horses are] degrading rangeland health." Dkt. 43, p. 33. While the EA does reference a March 2022 study by BLM and Intermountain Range Consultants, Inc. that examined forage utilization, the actual study and its underlying data were not provided to the public. SC_6214-SC_6215. Instead, the EA merely summarizes the study findings in a table. *Id.* While this table identifies 28 "plots" used for the collection of data, the location of these plots is not specified.[6] *Id.*

In *WildEarth Guardians*, the Ninth Circuit addressed a similar case that involved an agency's failure to provide data about the location and concentration of winter ranges inhabited by big game. *See WildEarth Guardians*, 790 F.3d at 925-26. The Court ruled against the government agency, finding that "[w]ithout data on the location …, the public was severely limited in its ability to participate in the decision-making process." *Id.* Not only is the table insufficient to allow the public to determine where the range may be impacted, but there is no data or information upon which to determine the cause of forage impacts. Instead, BLM states:

> At each plot, BLM personnel made a judgment as to whether utilization was attributable to wild horses, domestic cattle, or wildlife.[7] This determination was

---

[6] The table designates each plot by numerical codes, but these codes are not defined, and no map is provided identifying the location of the plots.

[7] The table containing BLM's subjective judgment on attribution does not, however, attribute any

**PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

based on the relative abundance and recency of sign observed on the plot, including animal feces, trailing and hoof prints, and known 2021-2022 grazing management actions. Where evidence of utilization by multiple kinds of animals was noted, a proportion of utilization attributable to each was estimated.

SC_6214.

BLM provides no data regarding observations made at the 22 plots. It does not explain how the agency estimated proportional attribution.[8] Also, no information is provided regarding the threshold at which impacts to forage trigger a necessity to remove horses.[9] BLM violated NEPA's public disclosure requirement, and there is nothing to substantiate that the agency made a reasoned decision that removal of excess horses is necessary to address range impacts. Therefore, summary judgment should be granted.

> **b)  BLM failed to provide data and information on its achievement of the Stone Cabin HMA HMAP objectives**

As previously addressed in Section II.B., BLM violated the Wild Horse Act and NEPA by failing to consider the Stone Cabin HMA HMAP. It also violated NEPA's public disclosure requirement by failing to provide data demonstrating the agency's compliance with the HMAP despite the public asking for such data. SC_6331.

> **2.  BLM failed to consider reasonable alternatives.**

The purpose and need statement in the EA for the Gather Plan focuses on removing horses from the Stone Cabin Complex to prevent rangeland degradation and restore a TNEB and multiple-use relationship. SC_6189. Plaintiffs argue that this statement is too narrowly drawn and unsubstantiated, with BLM improperly relying on it to justify eliminating alternatives from serious consideration. Dkt. 38, pp. 46-48.

BLM all but admits that the purpose and need statement is based almost solely on the

---

damage to wildlife.

[8] Indeed, even though the agency notes that wild horses, domestic cattle, and wildlife utilize the land, no attribution was given to wildlife for forage impacts.

[9] Had BLM followed the procedures outlined in the HMAP for the Stone Cabin HMA, then necessity might have been shown by demonstrating that key forage utilization was exceeding allowable use factors by more than 10%. SC_09288, SC_09306.

agency's determination that there are an excess number of horses in the Complex. Dkt. 43, p. 33. To the extent that rangeland health or TNEB were considered, such consideration was not based on data made available to the public nor on any identified methodology for allocating range impacts to horses. SC_6214-SC_6215. This lack of data-driven consideration caused the agency to adopt a preordained result – horses would be gathered without substantive consideration given to changing AML or forage allocations, holding off on future gathers until additional rangeland health data was collected, or addressing alternatives proposed in the Stone Cabin HMA HMAP. Dkt. 38, pp. 47-48; *see also Alaska Survival v. Surface Trasp. Bd.*, 705 F.3d 1073, 1084 (9th Cir. 2013) (a statement of purpose and need "will fail if it unreasonably narrows the agency's consideration of alternatives so that the outcome is preordained").

### 3.    BLM failed to analyze all direct, indirect, cumulative, and ecological impacts.

In the EA, BLM acknowledges that past actions and reasonably foreseeable future actions include wild horse gathers and population growth suppression, livestock grazing, mineral exploration and extraction, oil and gas exploration, recreation including dispersed camping and hunting, land use authorizations and wildfire suppression. SC_6245. To "consider" cumulative effects, some quantified or detailed information is required. *Neighbors of Cuddy Mountain v. U.S. Forest Service*, 137 F.3d 1372, 1379 (9th Cir. 1998).

Defendants half-heartedly assert that BLM did adequately consider cumulative impacts, referencing the fact that it provided a summary table addressing forage use by cattle and horses. Dkt. 43, p.30. As previously addressed, this summary is insufficient and includes subjective judgments concerning allocation of use among cattle, horses, and wildlife. Defendants do not even attempt to argue that sufficient information was provided for the other identified categories of cumulative impacts.

### D.    Vacatur is Appropriate

Defendants argue that even if BLM committed legal error, vacatur of the EA and Record of Decision is not appropriate. Dk.t 43, pp. 35-36. In so doing, Defendants suggest that vacatur is

an extraordinary remedy, which is untrue. In fact, "[t]he presumptive remedy for violations of NEPA and the Administrative Procedure Act is vacatur." *350 Montana v. Haaland*, 50 F.4th 1254, 1259 (9th Cir. 2022). Courts only retain "equitable consideration in 'limited circumstances' to remand a decision without vacatur while the agency corrects its errors." *Mont. Wildlife Fedn v. Haaland*, 127 F.4th 1, 50 (9th Cir. 2025) (quoting *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015)). "Whether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'" *Id.* (quoting *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989 at 992 (9th Cir. 2012).

In looking at the seriousness of the error, courts look at what impact the error had "in contravening the purposes of [NEPA]." *Or. Natural Desert Ass'n v. Zinke*, 250 F. Supp. 3d 773, 774, (D. Or. 2017). These purposes include (1) ensuring informed decision-making and (2) ensuring meaningful public participation. *See id.* Courts also consider "whether the agency would likely be able to offer better reasoning or whether by complying with procedural rules, it could adopt the same rule on remand, or whether such fundamental flaws in the agency's decision make it unlikely that the same rule would be adopted on remand." *Pollinator Stewardship Council*, 806 F.3d at 532. Courts address the disruptive consequences of vacatur by examining whether vacatur risks environmental or economic harm. *See Mont. Wildlife Fedn*, 127 F.4th at 51-52. However, even where such harm is found, if the agency's errors are significant enough, this alone will not warrant remand without vacatur. *See id.*

Here, Defendants argue that any errors that may have occurred are merely "formalistic." Dkt. 43, p. 36. This is not so; Defendants' legal errors are serious. By failing to provide the data underlying its conclusions, BLM thwarted NEPA's purpose of ensuring informed decision-making and meaningful public participation. See *Or. Natural Desert Ass'n*, 250 F. Supp. 3d at 774. BLM's analysis was so flawed that it will be unlikely to adopt the same Gather Plan on remand. BLM ignored the objectives and management methods in the HMAP for the Stone

Cabin HMA, and by doing so, failed to address the HMAP's directives addressing horses, the

range, water development, and the impacts of human activity. SC_09276, SC_09290-SC_09291.

To actually comply with the HMAP, the agency will have to address specific objectives—

objectives that will, by their very nature, cause any future gather plan to be different than the

challenged Gather Plan. For example, BLM will have to consider water development and ensure

that any removal of horses is distributed among the sub-units of the Stone Cabin HMA.

SC_09276-SC_09278, SC_09285-SC_09288. And to actually comply with NEPA's

requirements, BLM will have to disclose data and information relied upon in making its

determination that excess horses reside in the Complex and their removal is necessary to sustain

the range (or TNEB). *See* 16 USC §§ 1332, 1333; *WildEarth Guardians*, 790 F.3d at 925; *Bering

Strait Citizens for Responsible Res. Dev.*, 524 F.3d at 953. BLM will need to address cumulative

impacts and consider reasonable alternatives. *See Alaska Survival*, 705 F.3d at 1084; *Neighbors

of Cuddy Mountain*, 137 F.3d at 1379. Nothing in the record supports the conclusion that the

current Gather Plan will remain unchanged upon remand.

      As regards vacatur's potential to have disruptive consequences, Defendants state that

"failure to remove excess animals will cause environmental harm to the Complex, including to

the wild horse population." SC_6228–29 (explaining that failure to conduct removals would lead

to horses dying of starvation and dehydration, be contrary to the Wild Horse Act's requirements

for humane handling and immediate removals and would instead cause increased damage to the

rangeland)." Dkt. 43, p. 36. The pages referenced by Defendants contain no data and do not

address when additional impacts to the environment or the health of horses could occur should

removal be temporarily halted. Moreover, Defendants' statement assumes that excess horses

exist in the Complex, and their removal is necessary to protect the range—an assumption not supported by the administrative record.

On balance, the seriousness of Defendants' multiple errors, in comparison to some unknown, hypothetical impacts caused by vacatur, weigh in favor of this Court ordering vacatur as NEPA's presumptive remedy. *See 350 Montana*, 50 F.4th at 1259.

## III. CONCLUSION

Plaintiffs respectfully ask this Court to grant summary judgment based upon Defendants' violation of the APA, NEPA, and the Wild Horse Act. Certainly, BLM's management of wild horses on public lands does require the removal of horses, at times, but the decision to do so must comport with the law and BLM's legal obligations. The decision must follow NEPA's procedural rules and consider previously approved LUPs and HMAPs. The decision must be made transparently, providing the public and decision-makers with supporting data and information before the agency is committed to action.

DATED: March 28, 2025                Respectfully Submitted,

*/s/ Jennifer Rae Lovko*
GREENFIRE LAW, PC
Jessica L. Blome
(Cal. Bar No. 314898, appearing pro hac vice)
Jennifer Rae Lovko
(Cal. Bar No. 208855, appearing pro hac vice)
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com
rlovko@greenfirelaw.com

BRENT M. RESH
(Nevada Bar No. 14940)
BRENT RESH LAW, PLLC
2401 La Solana Way
Las Vegas, NV 89102
(702) 781-6903
brent@brentreshlaw.com

*Attorneys for Plaintiffs*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF SERVICE**

I hereby certify that on March 28, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which caused all parties or counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

*/s/ Jennifer Rae Lovko*
Jennifer Rae Lovko

**PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**