ADAM R.F. GUSTAFSON
U.S. Department of Justice
Acting Assistant Attorney General
Environment & Natural Resources Division

JOSEPH W. CRUSHAM, Trial Attorney (CA Bar No. 324764)
Wildlife & Marine Resources Section
YOUNG A. KANG, Trial Attorney (FL Bar No. 1025505)
Natural Resources Section
P.O. Box 7611, Ben Franklin Station
Washington, DC 20044-7611
Phone: (202) 307-1145 (Crusham)
Email: joseph.crusham@usdoj.gov
Phone: (202) 514-2415 (Kang)
Email: young.kang@usdoj.gov

*Attorneys for Federal Defendants*

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEVADA

| | |
|---|---|
| LAURA LEIGH, individually, and WILD HORSE EDUCATION, a non-profit corporation,<br><br>  *Plaintiffs*,<br><br>  v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, BUREAU OF LAND MANAGEMENT, JON RABY, Acting Director of the Bureau of Land Management, and KIMBERLY PRILL, Acting Nevada State Director of the Bureau of Land Management,[1]<br><br>  *Federal Defendants.* | Case No. 3:23-cv-00568-ART-CSD<br><br>**FEDERAL DEFENDANTS' REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT** |

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Jon Raby, Acting Director of BLM, and Kimberly Prill, Acting Nevada State Director of BLM, are automatically substituted for Tracy Stone-Manning and Jon Raby, respectively.

i

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 2

I.    Plaintiffs' Claims Regarding Creation of a Saulsbury HMAP are Precluded,
      Conceded, or Prudentially Moot. ...................................................................... 2

II.   Plaintiffs' Claims Regarding the 1983 Stone Cabin HMAP Fail. ..................... 3

      a.    Plaintiffs' Section 706(1) Claim is Prudentially Moot and Will Become
            Constitutionally Moot; Regardless, It Fails Because the 1983 HMAP Does
            Not Contain Binding Obligations. ............................................................ 3

      b.    Plaintiffs' Section 706(2) Claims Fail. ..................................................... 7

            i.    Neither the Wild Horse Act nor Any Regulations Required BLM to
                  "Achieve" the 1983 HMAP's Objectives Before Gathering
                  Excess Animals. .............................................................................. 8

            ii.   The Stone Cabin Decision is Consistent with the 1983 HMAP. ........ 12

III.  BLM Complied with NEPA ............................................................................. 16

      a.    BLM Has Met Its NEPA Obligations to Provide Relevant Information ............... 16

      b.    BLM Considered a Reasonable Range of Alternatives ............................ 19

IV.   Vacatur is Not Appropriate. ........................................................................... 19

CONCLUSION ............................................................................................................ 20

# TABLE OF AUTHORITIES

**Cases**                                                                       **Page(s)**

*Angeles v. U.S. Airways, Inc.*,
   No. C 12-05860, 2013 WL 622032 (N.D. Cal. Feb. 19, 2013) ........................................ 2, 8, 12

*Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*,
   126 F.3d 1158 (9th Cir. 1997) ................................................................................ 16

*Bartell Ranch LLC v. McCullough*,
   No. 21-cv-00080, 2023 WL 1782343 (D. Nev. Feb. 6, 2023).................................... 16, 18

*Colvin & Son, LLC v. Haaland*,
   No. 3:23-CV-00204-ART-CLB, 2025 WL 266718 (D. Nev. Jan. 22, 2025) ...................... 8, 18

*Friends of Animals v. BLM*,
   548 F. Supp. 3d 39 (D.D.C. 2021) ......................................................................... 10

*Friends of Animals v. Culver*,
   610 F. Supp. 3d 157 (D.D.C. 2022) ....................................................................... 20

*Friends of Animals v. Sparks*,
   200 F. Supp. 3d, 1114 (D. Mont. 2016) ................................................................. 11

*Friends of Se.'s Future v. Morrison*,
   153 F.3d 1059 (9th Cir. 1998) ............................................................................. 18

*Idaho Rivers United v. U.S. Forest Serv.*,
   857 F. Supp. 2d 1020 (D. Idaho 2012) .................................................................... 7

*Leigh v. Raby*,
   726 F. Supp. 3d 1207 (D. Nev. 2024)........................................................ 8, 9, 10, 17

*Leigh v . U.S. Dep't of Interior*,
   No. 3:23-CV-00568-ART-CSD, 2024 WL 4236796 (D. Nev. Sept. 19, 2024) ...................... 17

*Leigh v. U.S. Dep't of Interior*,
   No. 2:22-CV-01200-MMD-BNW, 2024 WL 4279156 (D. Nev. Sept. 23, 2024)..................... 3

*Marsh v. Or. Nat. Res. Council*,
   490 U.S. 360 (1989)........................................................................................ 18

*Native Ecosystems Council v. U.S. Forest Serv.*,
   428 F.3d 1233 (9th Cir. 2005) ............................................................................. 19

iii

*Norton v. S. Utah Wilderness All.,*
    542 U.S. 55 (2004) ................................................................................................ 4, 5, 6, 7

*Nw. Env't Def. Ctr. v. Gordon,*
    849 F.2d 1241 (9th Cir. 1988) ............................................................................... 4

*Robertson v. Methow Valley Citizens Council,*
    490 U.S. 332 (1989) ............................................................................................... 16

*Tam v. IndyMac Bank,*
    No. CV 08-06458, 2010 WL 11596627 (C.D. Cal. Jan. 27, 2010) ......................... 4

*Westlands Water Dist. v. U.S. Dep't of Interior,*
    376 F.3d 853 (9th Cir. 2004) ............................................................................... 18

*WildEarth Guardians v. Mont. Snowmobile Ass'n,*
    790 F.3d 920 (9th Cir. 2015) ............................................................................... 16

**Statutes**

16 U.S.C. § 1333(a) .................................................................................................... 6

16 U.S.C. § 1333(b)(2) ........................................................................................... 13, 18

**Regulations**

40 C.F.R. § 1505.3 ..................................................................................................... 11

**INTRODUCTION**

As explained in Federal Defendants' Opening Brief, ECF No. 43, BLM issued the Stone Cabin Decision after determining that there are excess horses on the Stone Cabin Complex and that gathers are necessary to restore a thriving natural ecological balance to the range. Plaintiffs' Response, ECF No. 44, repeats the formalistic arguments from their opening motion again without meaningfully disputing BLM's excess and necessity determinations, which mandate BLM gather horses as promptly as reasonably possible. Each of Plaintiffs' claims fail.

First, BLM is already working on a new HMAP for the Stone Cabin Complex, which moots Plaintiffs' APA Section 706(1) claims regarding HMAPs. And Plaintiffs' attempt to set aside the Stone Cabin Decision under APA Section 706(2) for not "achieving" the 1983 HMAP's objectives fails. In compliance with the Wild Horse Act, BLM issued the Stone Cabin Decision based on undisputed, current information showing that excess animals exist and must be removed. Nothing in the Wild Horse Act, its regulations, or the 1983 HMAP required BLM to "achieve" the HMAP's objectives before authorizing gathers. Plaintiffs' position that BLM cannot authorize gathers until "achieving" a forty-year-old plan's objectives cannot be reconciled with the Wild Horse Act's mandate to immediately remove excess animals. And either way, BLM has acted consistent with the 1983 HMAP's objectives.

Second, Plaintiffs' NEPA claims fail. As explained in Federal Defendants' Opening Brief, BLM has met its obligations to provide information and data underlying its decisions and considered a reasonable range of alternatives.

Thus, for the reasons below and in Federal Defendants' Opening Brief, the Court should deny Plaintiffs' motion, grant Federal Defendants' cross-motion, and enter judgment for Federal Defendants.

1

**ARGUMENT**

I.    **Plaintiffs' Claims Regarding Creation of a Saulsbury HMAP are Precluded, Conceded, or Prudentially Moot.**

As shown in Federal Defendants' Opening Brief, *Leigh I* and *Leigh II* preclude re-litigation of nearly all the issues Plaintiffs raise regarding creation of a Saulsbury HMAP. ECF No. 43 at 19–23. Namely, Plaintiffs are estopped from arguing: (1) that BLM unlawfully withheld creation of a Saulsbury HMAP; and (2) that the Stone Cabin Decision is unlawful under APA Section 706(2) because it was issued without an approved Saulsbury HMAP in place. *Id.* at 21–22. Plaintiffs do not respond to Federal Defendants' preclusion argument and thus concede its merit. *See, e.g.*, *Angeles v. U.S. Airways, Inc.*, No. C 12-05860, 2013 WL 622032, at *4 (N.D. Cal. Feb. 19, 2013) (collecting cases holding failure to respond to an argument "amounts to a concession"); *see also* ECF No. 43 at 22 n.5 (noting that Plaintiffs independently waived their Section 706(2) claim regarding the Saulsbury HMAP by failing to argue it in their opening brief).[2]

The only remaining issue—whether BLM has "unreasonably delayed" creating a Saulsbury HMAP under Section 706(1)—is prudentially moot because BLM has committed to completing an HMAP for the entire Stone Cabin Complex. Federal Defendants' Opening Brief explained that prudential mootness is a discretionary doctrine particularly applicable where, as here, the government has already begun taking the action plaintiffs seek to compel. *See* ECF No. 43 at 23–24. Plaintiffs do not engage with the authorities cited or arguments made by Federal Defendants. Instead, they claim that the Court must order BLM to complete the HMAP "by a date certain," or else BLM could "simply chang[e] its mind" and not complete the HMAP. ECF No. 44 at 9–10.

BLM has not merely stated that it plans to complete an HMAP for the entire Stone Cabin Complex—it submitted a declaration attesting that it has formally begun the process and intends to complete the HMAP in one year. *See* ECF No. 43-1 (Wickham Declaration); Stone Cabin

---

[2] Likewise, Plaintiffs do not respond to Federal Defendants' argument that their Mandamus and Venue Act claim fails. *See* ECF No. 43 at 19 n.4. Thus, Plaintiffs concede that their first claim lacks merit, and the Court should enter judgment for Federal Defendants.

Complex Management Evaluation, BLM National NEPA Register, https://eplanning.blm.gov/eplanning-ui/project/2036341/510 (last visited April 25, 2025). Plaintiffs' speculation that BLM will renege on its commitment is baseless.[3] Moreover, submission of a declaration further evidences BLM's commitment and distinguishes it from *Leigh II* where—without a declaration buttressing the public HMAP notice—Judge Du declined to dismiss a similar claim as prudentially moot. *See Leigh v. U.S. Dep't of Interior*, No. 2:22-CV-01200-MMD-BNW, 2024 WL 4279156, at *11 n.12 (D. Nev. Sept. 23, 2024) ("*Leigh II*"). The Court should exercise its discretion and dismiss this claim as prudentially moot.

That said, as explained in Federal Defendants' Opening Brief, if the Court declines to find this issue prudentially moot, it should follow Judge Du's reasoning and craft a deadline for issuing the HMAP that is at least a few months after BLM's target of February 7, 2026. *See id.* (finding BLM's commitment to complete an HMAP by "early May 2025 leads the Court to find that September 20, 2025, is a reasonable deadline"); ECF No. 43 at 17 n.7.

## II.   Plaintiffs' Claims Regarding the 1983 Stone Cabin HMAP Fail.

Federal Defendants' Opening Brief argued that Plaintiffs' various claims related to the 1983 HMAP lack merit. ECF No. 43 at 24–35. Plaintiffs' Response fails to show otherwise.

### a.   Plaintiffs' Section 706(1) Claim is Prudentially Moot and Will Become Constitutionally Moot; Regardless, It Fails Because the 1983 HMAP Does Not Contain Binding Obligations.

Plaintiffs' second claim seeks to compel BLM to "achieve the objectives" in or to "update" the 1983 HMAP. ECF No. 1 ¶ 90.

First, as explained in Federal Defendants' Opening Brief, this claim is prudentially moot, and the Court need not reach its merits. ECF No. 43 at 24–25. Plaintiffs' Response devotes only a few sentences to this issue, ECF No. 44 at 11, likely because it is hard to imagine a claim better

---

[3] Plaintiffs imply that BLM is creating a Stone Cabin Complex HMAP only because of this lawsuit, rather than to conform with Judge Du's recent decisions. This is belied by BLM beginning the process of creating an HMAP for the Antelope and Triple B Complexes last year, despite there being no case challenging the absence of an HMAP for those HMAs. *See*, *e.g.*, Antelope and Triple B Complexes Management Evaluation, BLM National NEPA Register, https://eplanning.blm.gov/eplanning-ui/project/2034747/510 (last visited April 25, 2025).

fit for dismissal as prudentially moot. BLM is already working on a new HMAP for the entire Stone Cabin Complex, which will update and supersede the 1983 HMAP. It would be a waste of judicial and government resources to order BLM to "achieve" the objectives in the 1983 HMAP which will soon be replaced by a new HMAP with different, more current objectives. *See, e.g.*, *Tam v. IndyMac Bank*, No. CV 08-06458, 2010 WL 11596627, at *10 (C.D. Cal. Jan. 27, 2010) (dismissing for prudential mootness in part because "[c]onsiderations of prudence and judicial efficiency . . . militate against issuing decisions that would be largely advisory"). Plaintiffs do not dispute the illogic of such an order. And given that updating the 1983 HMAP is relief they seek, ECF No. 1 ¶ 90, their insistence on marching forward with a claim to compel BLM to "achieve" the 1983 HMAP's objectives is hard to understand.

Moreover, if the Court orders BLM to complete the new Stone Cabin Complex HMAP by a date certain—as Plaintiffs request regarding their Saulsbury HMAP claim—this claim will be constitutionally moot because there would be no effective relief available to Plaintiffs. *See, e.g.*, *Nw. Env't Def. Ctr. v. Gordon*, 849 F.2d 1241, 1244 (9th Cir. 1988) ("The basic question in determining mootness is whether there is a present controversy as to which effective relief can be granted."). Again, updating the 1983 HMAP is relief Plaintiffs seek through this claim, and they would obtain it via an order to complete the new Stone Cabin Complex HMAP by a date certain. Although Plaintiffs also ask the Court to compel BLM to "achieve" the objectives of the 1983 HMAP, this would be inconsistent with ordering BLM to complete the Stone Cabin Complex HMAP. Said another way, it would be contradictory for the Court to order BLM to complete a new, updated HMAP by a date certain, and simultaneously order BLM to "achieve" the objectives of the old HMAP. Thus, Plaintiffs' Section 706(1) claim regarding the 1983 HMAP is prudentially or—depending how the Court resolves their Saulsbury HMAP claim— constitutionally moot.

Second, even if this claim remained live, achieving the 1983 HMAP's objectives are not legally required, discrete actions that can be compelled under Section 706(1). *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) ("*SUWA*"). As explained in Federal Defendants'

Opening Brief, *SUWA* forecloses Plaintiffs' Section 706(1) claim because it makes clear that the 1983 HMAP's objectives and statements are not legally required. ECF No. 43 at 25–28. Plaintiffs' efforts to distinguish the case fail. In *SUWA*, the plaintiffs were seeking to compel BLM to comply with a statement in a land use plan that a certain area "will be monitored and closed if warranted." 542 U.S. at 68 (emphasis added). Plaintiffs asked the Court to "conclude that a statement in a plan that BLM 'will' take this, that, or the other action, is a binding commitment that can be compelled under § 706(1)." *Id.* at 69. The Court declined, holding that plan terms are not legally required "absent clear indication of binding commitment in the terms of the plan." *Id.*

Plaintiffs identify nothing in the 1983 HMAP even suggesting any of its statements are legally binding, let alone do they find the "clear indication" *SUWA* requires. Rather, just like the plan in *SUWA*, the 1983 HMAP contains mere "statement[s] by BLM about what it plans to do, at some point, provided it has the funds and there are not more pressing priorities[.]" *SUWA*, 542 U.S. at 71; *compare id.* at 68 (land use plan stating that specified area "*will be* monitored and closed if warranted") (emphasis added), *with* SC_9291 ("Water distribution in the HMA *will be* improved by developing additional wells and pipelines[.]) (emphasis added)."

Plaintiffs try to downplay the significance of the 1983 HMAP expressly conditioning "all actions" on "available funding," SC_9297, claiming that funding limitations are relevant only as a defense to a claim that a legal obligation has been unreasonably delayed. ECF No. 44 at 12. This misreads *SUWA.* The case concerned whether plan statements create legal obligations in the first place, not whether there has been a delay in implementing them. And *SUWA* held that plans generally do not contain binding legal obligations because that "would commit the agency to actions far in the future, for which funds have not yet been appropriated." *SUWA*, 542 U.S. at 71. In fact, *SUWA* found the plan at issue impliedly conditioned all actions on funding but noted that "[s]ome plans make explicit that implementation of their programmatic content is subject to budgetary constraints," *id.*, as does the 1983 HMAP. The express conditioning of the 1983 HMAP's suggested actions on funding—coupled with the lack of a "clear indication of binding

1    commitment"—renders the 1983 HMAP not legally binding. *See id.* at 69.[4] Because the 1983

2    HMAP's objectives are not legally required, they cannot be compelled under Section 706(1).

3        Plaintiffs also assert that Federal Defendants "do not argue that the objectives and

4    management methods identified in the [1983 HMAP] are insufficiently discrete to be

5    enforceable." ECF No. 44 at 12. This is incorrect. To be sure, Federal Defendants' Opening Brief

6    argued that "the Court need not decide whether the items Plaintiffs seek to compel are discrete"

7    because they are not legally required. ECF No. 43 at 27–28 n.11. But Federal Defendants made

8    clear that "Plaintiffs seek to compel non-discrete actions that could not be compelled without

9    interference with BLM's day-to-day operations." *Id.*

10       Again, the 1983 HMAP's objectives are broad, aspirational planning goals regarding the

11   technical details of wild horse management within the Stone Cabin HMA. *See, e.g.*, SC_9286

12   ("Maintain the wild free roaming characteristics of the horses" and "[e]stablish studies to acquire

13   additional data on wild horses"). And the point of the discrete action limitation is to "avoid judicial

14   entanglement in abstract policy disagreements which courts lack both expertise and information

15   to resolve." *SUWA*, 542 U.S. at 66–67.

16       An order requiring BLM to "achieve" the 1983 HMAP's objectives would improperly

17   "inject[] the [Court] into day-to-day agency management" to supervise whether and how, for

18   example, BLM is maintaining the "wild free-roaming characteristics" of the horses in the Stone

19   Cabin HMA. *See id.*; ECF No. 43 at 27–28 n.11. Indeed, one of the examples *SUWA* gave of a

20   non-discrete duty that courts cannot enforce is BLM's obligation to "manage wild free-roaming

21   horses and burros in a manner that is designed to achieve and maintain a thriving natural

22   ecological balance." 542 U.S. at 67 (quoting 16 U.S.C. § 1333(a)). And if the Court had any doubt

23   that compelling compliance with the 1983 HMAP's objectives would necessitate superintending

24   _____

25   [4] Unable to find the requisite "clear indication" of binding commitments within the 1983 HMAP,
     Plaintiffs generally cite the Wild Horses and Burros Management Handbook for the proposition

26   that HMAPs are more site-specific than land use plans and can be considered "[i]mplementation
     decisions." ECF No. 44 at 12; SC_564. The Handbook does not state that HMAPs create binding

27   legal obligations, nor do HMAPs' possible categorization as "implementation decisions"
     overcome the fact that the 1983 HMAP itself contains no indication of binding commitments.

28

BLM's day-to-day management of the Stone Cabin HMA, it need only look at Plaintiffs' Response. There, Plaintiffs gripe that the vast amount of studies, monitoring, and data in the record are insufficient because, in some instances, BLM did not use the outdated terms or methods Plaintiffs believe the 1983 HMAP requires. *See* ECF No. 44 at 20–24; *see also id.* at 15 n. 3 (admitting that no court has ever addressed "the manner in which BLM is to address attainment" of HMAP objectives, and suggesting the Court conduct a nebulous inquiry into whether BLM's actions "bear a rational relationship" to the objectives).

Thus, what Plaintiffs seek is for the Court to monitor the granular details of BLM's "achievement" of the broad, aspirational goals in the 1983 HMAP. This is what the discrete action limitation is designed to prevent. *See, e.g.*, *Idaho Rivers United v. U.S. Forest Serv.*, 857 F. Supp. 2d 1020, 1029–31 (D. Idaho 2012) (citing *SUWA* and rejecting claim to compel action per management plans because the plans were "statements of priorities, offering imprecise guidance as to how the Court could judge Forest Service compliance without inserting itself into day-to-day administration of federal lands").

Finally, again, as explained in Federal Defendants' Opening Brief and below, because the record shows that BLM has acted consistent with the 1983 HMAP, the premise of Plaintiffs' Section 706(1) claim is incorrect. ECF No. 43 at 27 n.10; *id.* at 32–35. Their claim also fails for this reason.

### b. Plaintiffs' Section 706(2) Claims Fail.

Federal Defendants' Opening Brief also showed that Plaintiffs' Section 706(2) claims—which seek to set aside the Stone Cabin Decision as inconsistent with the 1983 HMAP because it issued without BLM "achieving" or "considering" the HMAP's objectives—lack merit. ECF No. 43 at 28–35. Plaintiffs' Response again fails to show otherwise. First, neither the Wild Horse Act nor any regulations required BLM to "achieve"—or consider whether it has "achieved"—the 1983 HMAP's objectives before authorizing gathers. Second, either way, the Stone Cabin Decision is consistent with the 1983 HMAP. Indeed, as explained in more detail below, Plaintiffs appear to concede that nothing in the 1983 HMAP requires BLM to achieve the objectives—nor

conduct any of the suggested monitoring or studies—before gathering animals. Thus, even assuming Plaintiffs' formalistic gripes with the studies and monitoring BLM has done have merit (they do not), such complaints are not a basis for setting aside the Stone Cabin Decision.

> i. *Neither the Wild Horse Act nor Any Regulations Required BLM to "Achieve" the 1983 HMAP's Objectives Before Gathering Excess Animals.*

Federal Defendants' Opening Brief explained that preventing BLM from conducting gathers because it allegedly failed to "achieve" the 1983 HMAP's objectives would be contrary to the Wild Horse Act. ECF No. 43 at 28–30. Doing so would conflict with the Wild Horse Act's mandate that BLM gather excess animals "as promptly as reasonably possible" by putting gathers on hold indefinitely while BLM "achieves" the 1983 HMAP's goals to Plaintiffs' satisfaction. *Id.* (quoting *Colvin & Son, LLC v. Haaland*, No. 3:23-CV-00204-ART-CLB, 2025 WL 266718, at *5 (D. Nev. Jan. 22, 2025)). Federal Defendants argued that Judge Du's reasoning from *Leigh I*—which rejected the argument that failure to prepare an HMAP *at all* was a basis to set aside a gather decision—applies and supports rejecting Plaintiffs' claim. ECF No. 43 at 29–30 (citing *Leigh v. Raby*, 726 F. Supp. 3d 1207, 1221–22 (D. Nev. 2024) ("*Leigh I*")). Additionally, Federal Defendants argued that Plaintiffs relied on inapposite cases involving the Federal Land Policy and Management Act's ("FLPMA's") requirement that BLM manage lands "in accordance" with "land use plans" to show that BLM must ensure gather decisions are "consistent" with HMAPs. ECF No. 43 at 30–32. Because the Stone Cabin Decision is consistent with the governing land use plan—the Tonopah RMP—the authority Plaintiffs relied on were irrelevant. *Id.*

Plaintiffs do not respond to the latter argument and thus concede that their FLMPA cases are irrelevant because the Stone Cabin Decision is consistent with the Tonopah RMP. *See, e.g.*, *Angeles*, 2013 WL 622032, at *4.

Plaintiffs try to distinguish *Leigh I*, but their effort to sidestep Judge Du's reasoning fails. *Leigh I* held that BLM may gather horses on "HMAs which do not yet have an approved HMAP." *Leigh I*, 726 F. Supp. 3d at 1217. Judge Du rejected Plaintiffs' argument that 43 C.F.R. § 4710.4 mandates creation of an HMAP before gathering animals because that "would force BLM to put

gathers on hold for months, years, or perhaps even decades until an HMAP is approved, instead of conducting immediate removals." *Id.* at 1217. Judge Du explained that "[a]s the [Wild Horse Act] implementing regulations must comport with the [Wild Horse Act] itself," they must be read to allow BLM to "conduct management activities on HMAs which do not yet have an approved HMAP." *Id.* (citation omitted).

As explained in Federal Defendants' Opening Brief, this reasoning applies equally to whether BLM must "achieve"—or consider whether it has "achieved"—an approved HMAP's objectives before gathering horses. ECF No. 43 at 29–30. Here, BLM applied its expertise and determined—based on current information—that there are excess animals in the Stone Cabin Complex that must be removed, which triggers BLM's obligation to remove animals as promptly as reasonably possible. *Id.* To read 43 C.F.R. § 4710.4 as barring BLM from gathering until it "achieves" the 1983 HMAP's objectives is contrary to the Wild Horse Act. *See Leigh I*, 726 F. Supp at 1216–17.

Plaintiffs do not respond to the merits of Federal Defendants' argument. Instead, they claim *Leigh I* is irrelevant because it concerned a Section 706(1) claim, not a Section 706(2) claim. ECF No. 44 at 14–15. Plaintiffs are wrong. While the discussion of why 43 C.F.R. § 4710.4 does not prevent BLM from gathering animals first occurred within analysis of Section 706(1) claims, as discussed below, *Leigh I* rejected the Section 706(2) claims based on this same reasoning.

Under Section 706(2)(A), Plaintiffs claimed in *Leigh I* that BLM's adoption of a gather plan was "arbitrary and capricious, an abuse of discretion, and contrary to the law in light of BLM's mandatory duty to prepare an HMAP prior to conducting herd management activities." *Leigh I*, 726 F. Supp. 3d at 1221. Judge Du rejected this claim, noting that she had "already found that BLM may gather excess horses without first preparing and approving an HMAP," meaning that "BLM's interpretation of its duties therefore does not conflict with binding law, nor does it lack a reasonable basis." *Id.* Judge Du rejected Plaintiffs' Section 706(2)(C) claim for the same reason. *Id.* ("BLM likewise did not act in excess of statutory jurisdiction, authority, or limitations

by gathering horses before preparing an HMAP for the Pancake Complex" because "[a]gain, the gather [plan] was congruent with the [Wild Horse Act] and its implementing regulations."). Thus, Plaintiffs are simply mistaken. Judge Du's reasoning that their interpretation of 43 C.F.R. § 4710.4 conflicts with BLM's mandate to immediately remove excess animals was the basis for rejecting the Section 706(2) claims in *Leigh I*.

In short, just as it would conflict with the Wild Horse Act to read 43 C.F.R. § 4710.4 to bar BLM from conducting gathers before approving an HMAP, it would conflict with the Wild Horse Act to read the regulation to bar BLM from conducting gathers until it "achieves"—or considers whether it has "achieved"—the 1983 HMAP's objectives to Plaintiffs' satisfaction.

Plaintiffs claim that "[t]he immediacy requirement of the Wild Horse Act is not implicated because no delay related to HMAP creation is at issue." ECF No. 44 at 15. This is disingenuous. To be sure, there would be no delay in gathers "related to HMAP creation" because the 1983 HMAP already exists. But if 43 C.F.R. § 4710.4 were read to require BLM to "achieve" an HMAP's objectives before gathering animals, this would result in gather decisions being delayed for further analysis notwithstanding BLM's determination that there are excess animals that must be immediately removed. This delay would prevent immediate removals from occurring and conflict with the Wild Horse Act. Moreover, there would be a delay in gathers if—as Plaintiffs request—the Court vacates the Stone Cabin Decision under Section 706(2) for failure to properly consider or achieve the 1983 HMAP's objectives. With the Stone Cabin Decision set aside, BLM could not conduct gathers in the Stone Cabin Complex, and it could take "months" or "years" for BLM to "achieve" the 1983 HMAP's objectives to Plaintiffs' satisfaction, "instead of conducting immediate removals" that the Wild Horse Act requires. *See Leigh I*, 726 F. Supp. 3d at 1216–17.[5]

---

[5] Plaintiffs seek to distinguish *Friends of Animals v. BLM*, 548 F. Supp. 3d 39 (D.D.C. 2021), claiming it has "no precedential value" because it did not analyze 43 C.F.R. § 4710.4. ECF No. 44 at 16. But Federal Defendants cited the case for the general proposition that BLM has discretion to manage an HMA via various methods, which Plaintiffs do not refute. ECF No. 43 at 31. Nor do Plaintiffs address Federal Defendants' larger point that "it would be a reasonable exercise of BLM's discretion to conform the Stone Cabin Decision to the Tonopah RMP and rely on the updated analyses, data, and monitoring in the Stone Cabin Gather Plan, rather than the 1983 HMAP." *Id.*; *see Leigh I*, 726 F. Supp. 3d at 1219 (noting that while HMAPs must be

1    Finally, as explained in Federal Defendants' Opening Brief, Plaintiffs' reliance on a
2    NEPA regulation—40 C.F.R. § 1505.3—for the proposition that the Stone Cabin Decision needed
3    to "achieve" the 1983 HMAP's objectives also fails. ECF No. 43 at 35–36. Section 1505.3
4    obligates an agency action only if that action was committed to as part of the decision. 40 C.F.R.
5    § 1505.3 ("[m]itigation and other conditions established in the environmental impact statement
6    or during its review and committed as part of the decision shall be implemented by the lead agency
7    or other appropriate consenting agency.") (citation omitted). Thus, unless BLM made a
8    commitment that it would "achieve" the 1983 HMAP objectives before authorizing subsequent
9    gather decisions, Section 1505.3 cannot be used to set aside the Stone Cabin Decision. On this
10   point, Plaintiffs misconstrue the Federal Defendants' argument. Federal Defendants do not argue
11   that a decision made during the NEPA process must "expressly identify each and every mitigation
12   measure and condition being accepted." ECF No. 44 at 17. Instead, Federal Defendants argue that
13   because neither the Stone Cabin Decision nor the 1983 ROD commit BLM to "achieve" or update
14   the 1983 HMAP's objectives before gathering animals, Section 1505.3 cannot be used to set aside
15   the Stone Cabin Decision. ECF No. 43 at 35–36. Plaintiffs have failed to demonstrate that BLM
16   has made any such commitment or otherwise address the argument Federal Defendants advanced.
17   Thus, Section 1505.3 did not compel BLM to update or "achieve" the 1983 HMAP objectives
18   before approving the Stone Cabin Decision.

19   For these reasons, Plaintiffs' continued reliance on *Friends of Animals v. Sparks* is
20   misplaced. ECF No. 44 at 16–17. There, the ROD mandated that BLM recalculate AML within
21   five years, and the Court held that BLM's decision to gather horses six years later *without*
22   updating AML was invalid because it used an outdated AML. *Friends of Animals v. Sparks*, 200
23   F. Supp. 3d, 1114, 1123–25 (D. Mont. 2016). The ROD here merely provides that BLM
24   "accepted" the proposed action of "implement[ing] the management objectives." SC_9319–21.
25   Unlike *Sparks*, the "action" is much broader—generally implementing the goals of a plan—and

26
27   prepared, they may in practice be "redundant if an RMP includes the same information that an
28   HMAP would cover").

there is no specified timetable for taking it. Put simply, there is nothing in the 1983 HMAP ROD mandating BLM "achieve" the 1983 HMAP's objectives by a date certain, and certainly not before issuing gather decisions like the Stone Cabin Decision.

Thus, for all these reasons, Plaintiffs' APA 706(2) claims regarding the 1983 HMAP fail.

### ii. The Stone Cabin Decision is Consistent with the 1983 HMAP.

Even if "inconsistency" with the 1983 HMAP under Section 706(2) were a viable claim against the Stone Cabin Decision, it fails. As a threshold issue, Federal Defendants' Opening Brief argued that this claim rests on a faulty premise. ECF No. 43 at 32. Plaintiffs' theory is that BLM violated the Wild Horse Act and its regulations when it "authorized the gather and removal of wild horses and burros from the Stone Cabin Complex . . . without achieving the objectives of the 1983 HMAP." ECF No. 1 ¶¶ 97, 106. But nothing in the 1983 HMAP itself mandates that BLM "must achieve any of the objectives—nor conduct any of the suggest[ed] monitoring or studies—before gathering animals." ECF No. 43 at 32. Plaintiffs ignore this argument and therefore concede it. *See Angeles*, 2013 WL 622032, at *4.

Thus, the Court need not wade into Plaintiffs' fly specking about the sufficiency of the vast information in the record related to the 1983 HMAP's objectives. Because Plaintiffs have conceded that the 1983 HMAP does not condition gathers on "achieving" its objectives or suggested actions, a supposed failure to take actions allegedly mandated by the 1983 HMAP cannot be a basis for setting aside the Stone Cabin Decision as "inconsistent" with the 1983 HMAP.[6]

Moreover, as explained in Federal Defendants' Opening Brief, BLM included the 1983 HMAP in its record as something directly or indirectly considered, the document is noted in the Stone Cabin Gather Plan, SC_6188, and the record shows that BLM has acted consistent with the 1983 HMAP's objectives. ECF No. 43 at 32–35. Plaintiffs rebut none of these arguments. Instead,

---

[6] It is clear from Plaintiffs' Response that—while styled as a separate Section 706(2) claim—this claim is just a repackaging of Plaintiffs' Section 706(1) claim that BLM has not taken every action in the 1983 HMAP to their satisfaction. As explained above and in Federal Defendants' Opening Brief, their Section 706(1) claim fails.

they double down on the false notion that if BLM has not taken every action exactly as suggested by the 1983 HMAP, the Stone Cabin Decision is "inconsistent" with the 1983 HMAP. Their specific gripes on each objective lack merit.

Regarding Objective 1, Federal Defendants explained that—although the 1983 HMAP indicates an AML of 575 animals—the Tonopah RMP reflects that AML for the Stone Cabin HMA was subsequently adjusted to 364 animals. ECF No. 43 at 32–33; SC_9285, SC_20. Moreover, the management methods suggested by Objective 1 in the 1983 HMAP all relate to the outdated 575 AML, including the removal of excess animals by "sub-unit," which is the focus of Plaintiffs' Response. *See* SC_9287–88; ECF No. 44 at 20. The 1983 HMAP provides that the "first step" for Objective 1 will be an "inventory" to "determine how many horses will need to be removed *to reach the interim population figure of 575 animals.*" SC_9287 (emphasis added). "Once the number of animals to be removed is established, that figure will be divided among the five sub-units." *Id.* Thus, the predicate for this supposed "sub-unit" requirement is application of the outdated 575 AML. As required by the Tonopah RMP—and thereby FLPMA—BLM used the current 364 AML in issuing the Stone Cabin Decision. *See* ECF No. 43 at 32–33. The Tonopah RMP includes no discussion of the "sub-units" suggested by the 1983 HMAP, nor does it require BLM to remove excess animals by "sub-unit" as Plaintiffs desire. *Cf.* SC_565 ("HMAPs tier to and must be in conformance with the applicable [land use plan].").[7]

_____

[7] Plaintiffs claim that this "sub-unit" analysis is required because of the 1983 HMAP's observation that—over forty years ago—"[c]urrent monitoring data indicates the HMA is receiving heavy use of the forage by both livestock and horses." ECF No. 44 at 20; SC_9276. The Stone Cabin Gather Plan includes a detailed, *current* analysis of forage utilization by horses and cattle, *see* SC_6214–15, SC_1328–1417, and finds that grazing "has decreased from historical levels" in the ten years before the Stone Cabin Decision, *see* SC_6235. *See also* SC_6205–06 (noting that "levels of livestock grazing within the gather area" have "significantly reduced" compared to levels authorized under Tonopah RMP.). If BLM were to ignore current information regarding the range conditions and instead rely on monitoring from over 40 years ago—and supposed requirements stemming from that outdated data—this would conflict with the Wild Horse Act. *See* 16 U.S.C. § 1333(b)(2) (requiring BLM to make gather decisions based on "all information *currently* available" to it) (emphasis added).

As Plaintiffs note, Objective 2 is based on preventing overuse of forage within the Stone Cabin HMA. *See* ECF No. 44 at 21. The Stone Cabin Gather Plan does exactly this. It collected and analyzed utilization data within the HMA, specifying the total level of utilization, and the percent attributable to horses and cattle. SC_6214–15; *see also* SC_1328–42 (detailed Saulsbury HMA forage utilization data); SC_1343–1417 (detailed Stone Cabin HMA forage utilization data). And the gathers authorized under the Stone Cabin Decision are expected to "improve forage quantity and quality." SC_6225. Plaintiffs argue that the 1983 HMAP required BLM to use the "Key Forage Plant Method" from 1981 to analyze utilization. SC_9293; ECF No. 44 at 21. Unsurprisingly, BLM has updated and modified its methodology and terminology since 1983. Indeed, the "Key Forage Plant Method" is now referred to as the "Landscape Appearance Method,"[8] which BLM used—along with other methods—to thoroughly analyze forage utilization for the Stone Cabin Decision. *See, e.g.*, SC_1402 (Landscape Appearance Method); SC_1343 ("Stubble Height" method); SC_1349 ("Key Species" method); SC_1348 ("Height-Weight" method). Thus, Plaintiffs' complaint is not just inaccurate—BLM *did* use the method called in the 1983 HMAP—it also highlights the absurdity of their quest to hold BLM to the details of a forty-year-old plan.

Objective 3 broadly relates to maintaining "the wild-free roaming characteristics of the horses" in the HMA and analyzing the effects of proposed projects to "determine if the project will impact the wild free-roaming characteristics of wild horses." SC_9290. As Federal Defendants explained in their Opening Brief, the Stone Cabin Gather Plan includes detailed analysis on impacts to wild horses from the proposed activities, including their "free-roaming" nature. ECF No. 43 at 33–34 (citing SC_6213–29); *see also* SC_6309 ("[T]here is no expectation that gelding wild horses will cause them to lose their free-roaming nature."). Plaintiffs ignore this

---

[8] *See Utilization Studies and Residual Measurement, Interagency Technical Reference*, U.S. FOREST SERVICE AND BLM (1996), at page 119, available at https://archive.org/details/utilizationstudi00unse/page/119/mode/1up?q=key+forage+plant+method ("Landscape Appearance Method (formerly the Key Forage Plant Method)") (last visited April 25, 2025).

analysis. Instead, they latch onto the 1983 HMAP noting, as an aside, that the "cumulative impact[s]" of "[p]rojects involving an increase in human activity" should be analyzed. SC_9290. The requirement to analyze cumulative impacts comes from NEPA, not the 1983 HMAP. But either way, Plaintiffs can muster only vague, false assertions that BLM has included "absolutely no discussion" of cumulative impacts from "human activity" on wild horses. ECF No. 44 at 22. BLM analyzed the effects of past, present, and reasonably foreseeable future actions—including human activities like gathers, mining, and camping—in the Stone Cabin Complex. SC_6243–46. BLM concluded that—along with the proposed action—the combination of all these actions "should result in more stable and healthier wild horse populations," and "fewer multiple-use conflicts." SC_6246. Plaintiffs also ignore BLM's conclusion that "[i]f no action is taken, cumulative effects will be negative across all resources," including on horses. *Id.* (noting degradation of habitat "for all wildlife" and that "[a]n increase in multiple-use conflicts within and around the gather area would be expected as more wild horses would be forced to seek forage and water sources outside of the Complex").

Regarding Objective 4, Plaintiffs argue that because the record does not show that BLM has completed each of the water projects proposed by the 1983 HMAP, the Stone Cabin Decision is inconsistent with the 1983 HMAP. ECF No. 44 at 22–23. Again, the 1983 HMAP does not condition gathers on completing these or any projects. BLM's consideration of water sources for wild horses within the Stone Cabin Complex is consistent with Objective 4. SC_6213 (noting that "water sources are monitored throughout the summer to make sure water is available for wild horses"). Moreover, gathering horses to reach AML furthers Objective 4 because it would reduce competition for water and thereby provide more water to the horses that remain. *See* SC_6218 (finding that "[r]emoval of excess wild horses and achievement of AML" would result in, among other benefits to wild horses, "[d]ecreased competition for forage and water resources" which "would reduce stress and promote healthier animals").

Finally, on Objective 5, Plaintiffs again proceed on the false premise that unless BLM has done every study suggested by the 1983 HMAP, the Stone Cabin Decision conflicts with the 1983

HMAP. ECF No. 44 at 23–24. As explained in Federal Defendants' Opening Brief, BLM did extensive monitoring of wild horses, which is consistent with Objective 5's goal of establishing "studies to acquire additional data on wild horses." SC_9291; ECF No. 43 at 34–35.

In sum, Plaintiffs' Section 706(2) claim fails. The 1983 HMAP does not require BLM to attain any objectives or take certain actions before authorizing gathers. Thus, Plaintiffs cannot use an alleged failure to do something they believe the 1983 HMAP requires to show the Stone Cabin Decision is inconsistent with the 1983 HMAP. And—regardless—the record shows that BLM has acted consistent with the 1983 HMAP's objectives.

### III.    BLM Complied with NEPA

#### a.    BLM Has Met Its NEPA Obligations to Provide Relevant Information

Under NEPA, an agency must share "relevant information" so that the public can play a role in the decisionmaking process. *See WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 924, 927 (9th Cir. 2015) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)). Plaintiffs' Response makes clear that rather than seeking relevant information that would aid public participation, they are merely seizing on any perceived lack of data regardless of relevance. *See Bartell Ranch LLC v. McCullough*, No. 21-cv-00080, 2023 WL 1782343, at *19 (D. Nev. Feb. 6, 2023) ("[T]he Court may not 'fly speck an EIS and hold it insufficient on the basis of inconsequential, technical deficiencies.'") (quoting *Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1184 (9th Cir. 1997)). BLM has provided the relevant information in the Gather EA to meet its NEPA obligations.

NEPA does not require BLM to provide the data and information underlying the AML used in the Gather EA in order to accomplish its goal of informed public participation in the decisionmaking process because the decision at issue did not establish or modify the AML. Rather, as part of deciding that gathers are necessary, BLM utilized the current AML as part of its determination that there are excess horses on the HMA. As explained in Federal Defendants' Opening Brief, BLM did not set AML in the Gather EA—BLM relied on a previously set AML, and it need not reevaluate or reaffirm AML in the Gather EA. ECF No. 43 at 38–39. Thus, the

"information and records" Plaintiffs seek "establishing how AML was formulated" are irrelevant to the decisions that were made in the Gather EA. ECF No. 44 at 25. In fact, this Court recognized as much when it rejected Plaintiffs' attempt to include certain AML documents in the administrative record, citing the fact that the Gather EA did not set AML. *Leigh v. U.S. Dep't of Interior*, No. 3:23-CV-00568-ART-CSD, 2024 WL 4236796, at *4 (D. Nev. Sept. 19, 2024) (rejecting supplementation request in part because BLM explained that "the Gather EA does not set or adjust the AML, but instead uses AMLs that were previously established"); *see also Leigh I*, 726 F. Supp. 3d at 1227 ("BLM had no statutory or self-imposed requirements to assess the AML" in issuing gather plan). Accordingly, Plaintiffs have not demonstrated that the information they request would aid public participation with the decisions made in this EA and fail to carry their NEPA claim with respect to the data and information underlying AML.

BLM has also met its burden to provide information underlying its analysis of cumulative impacts.[9] The Gather EA provided or described BLM's own monitoring and observations, including a rangeland health study, the agency's expert interpretation of that information, and scientific journals that it relied on in its analysis. *See* SC_6209–46 (describing environmental effects on various aspects of the environment, including cumulative effects); SC_6247-6310 (a list of references cited and various appendices containing the information BLM relied on); *see also e.g.,* ECF No. 43 at 32-35 (summarizing some of BLM's analysis and sources relied on). This information includes maps, "[v]egetation, [c]limate, and [m]onitoring [d]ata," literature reviews, explanation of population modeling, and other sources relied upon by BLM in its analysis of cumulative impacts. *See* SC_6267-6310. Again, Plaintiffs have not explained how such information is insufficient to allow the public to participate in the decisionmaking process. BLM has met its NEPA burdens to provide the information underlying its cumulative impacts analysis.

---

[9] Plaintiffs have not, and still do not, challenge the sufficiency of BLM's analysis of these issues beyond a claim that BLM has not provided sufficient information. *See* ECF No. 38 at 48; ECF No. 44 at 28.

BLM has also sufficiently substantiated the need for a gather.[10] Agencies are afforded considerable deference in defining purpose and need, and courts conduct their review under a rule of reasonableness. *See Friends of Se.'s Future v. Morrison*, 153 F.3d 1059, 1066–67 (9th Cir. 1998). The EA's purpose and need are guided by the specific statutory objectives of the Wild Horse Act. *See Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 866 (9th Cir. 2004). Here, once it is determined that an area is overpopulated and that action is necessary to remove excess animals, the statute requires BLM to *immediately* remove the excess animals from the range to restore a thriving natural ecological balance. 16 U.S.C. § 1333(b)(2); *see Colvin*, 2025 WL 266718, at *5 (explaining that once excess/necessity determinations are made, BLM must begin removing animals "as promptly as reasonably possible"). In the Gather EA, BLM provided the data the agency relied on to find that there were excess horses degrading rangeland health and that a gather was necessary. ECF No. 43 at 41. This data included information like a rangeland health study, direct counts from helicopter flights and a description of BLM's methodology for population estimates. SC_6188, 6213–14. Ultimately, Plaintiffs point to irrelevant information to argue that BLM did not provide information substantiating the purpose and need but fail to demonstrate how any alleged missing information has prevented the public from participating in the decisionmaking process. Instead, Plaintiffs ask the Court to engage in impermissible "fly specking" of the data, studies, and expertise underlying BLM's decision. *See Bartell Ranch LLC*, 2023 WL 1782343, at *19; *see e.g.,* ECF No. 44 at 27.

Finally, Plaintiffs' claim that BLM failed to "provide data" relating to the 1983 HMAP's objectives is simply wrong. ECF No. 44 at 27. The record is teeming with data and analysis relating to the objectives. *See supra*, Section II.b.ii.

---

[10] Plaintiffs' argument is that BLM did not provide the public with certain information during the NEPA process. To the extent that Plaintiffs contest the *sufficiency* of BLM's explanation for the purpose and need, or whether BLM substantiated its finding under the Wild Horse Act about the need for a gather, the detailed monitoring worksheets and data—including those identified by Plaintiffs, ECF No. 44 at 26—are included in the administrative record and were clearly considered by the agency in determining that gathers are necessary. *See* SC_1328–1342, 1343–1417; *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989) (stating that courts defer to agency expertise on matters requiring "a high level of technical expertise.").

**b.  BLM Considered a Reasonable Range of Alternatives**

The range of alternatives considered in the EA, and BLM's analysis of those alternatives were reasonable in light of statutory goals and mandates. *See Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246-47 (9th Cir. 2005) (explaining that whether an alternative is reasonable and must be considered in an EA depends on the nature of the proposed action). As explained, once BLM determines that there is an excess number of horses and that removal is necessary, the Wild Horse Act mandates the immediate removal of horses to achieve a thriving natural ecological balance.[11] BLM's range of alternatives and its analysis of the alternatives reflects this mandate. *See* ECF No. 43 at 34–35; *see e.g.,* SC_6206–09 (explaining that certain alternatives were considered and rejected because they would fail to comply with statutory mandates). Furthermore, the Gather EA sufficiently considered the alternatives proposed by Plaintiffs, explaining that those alternatives would result in BLM violating Congress' strict mandate in the Wild Horse Act. *See* ECF No. 43 at 41–42; SC_6202-09; *see also Native Ecosystems Council.*, 428 F.3d at 1246–47. Rather than contending with BLM's analysis of its alternatives, Plaintiffs reiterate their claims that BLM did not provide information on its analysis of rangeland health. As discussed above, BLM has provided that information. BLM's alternatives analysis complies with NEPA.

**IV.    Vacatur is Not Appropriate.**

Finally, Plaintiffs fail to show that vacatur is appropriate. As Federal Defendants explained, the legal errors that Plaintiffs allege are not serious and could be easily addressed on remand through supplemental analyses without the need for vacatur. ECF No. 43 at 42–45. Plaintiffs simply repeat their merits arguments and speculate that BLM "will be unlikely to adopt the same Gather Plan on remand." ECF No. 44 at 29–31.

In terms of environmental damage that would result from vacatur, Plaintiffs argue that it cannot be "assume[d]" that excess horses exist in the Complex" or that "their removal is necessary

---

[11] Plaintiffs reiterate their complaint that BLM has not substantiated the finding that there are an excess number of horses degrading rangeland health. As explained above, BLM has sufficiently supported its analysis.

to protect the range." *Id.* at 30–31. Even if the Court were to find legal error and rule that BLM must do additional analysis, Plaintiffs' attempt to cast doubt on whether excess animals must be removed from the Complex is absurd. BLM's monitoring data revealed that—as of Fall 2022— the population was more than double AML. SC_6188. Plaintiffs do not contest the accuracy of this data, nor that the growth rate for wild horses is at least 20%. *See id.* Thus, by now, with no gathers having occurred yet under the Stone Cabin Decision, the overpopulation has almost certainly worsened, which jeopardizes not only the health of the range, but the wild horses themselves. *See* SC_6228 (finding that without gathers, overpopulation puts horses at "risk of death by starvation and lack of water" which would "have obvious consequences to the long-term viability of the herd").

Plaintiffs also seek to dismiss BLM's finding that gathers are needed to prevent harm to the range and wild horses because BLM has not determined "when additional impacts to the environment or the health of horses could occur should removal be temporarily halted." ECF No. 44 at 30. But—in issuing the Stone Cabin Decision—BLM determined that such harms *were already occurring*. SC_6189 (finding that wild horses must be removed to "restore a thriving natural ecological balance" and "prevent *further* degradation of rangeland resources." (emphasis added)). Thus, it is not a question of when harm would occur without a gather, but how long ongoing harms will persist and worsen.

Accordingly, because vacatur would delay necessary gathers from occurring and "harm the ecological interests that the [Stone Cabin] Decision is necessary to protect," vacatur is not appropriate. *See Friends of Animals v. Culver*, 610 F. Supp. 3d 157, 172–73 (D.D.C. 2022)

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' Motion for Summary Judgment, grant Federal Defendants' Cross-Motion for Summary judgment, and enter judgment for Federal Defendants.

Dated: April 25, 2025

Respectfully submitted,
ADAM R.F. GUSTAFSON
U.S. Department of Justice
Acting Assistant Attorney General
Environment & Natural Resources Division

*/s/ Joseph W. Crusham*
JOSEPH W. CRUSHAM,
Trial Attorney (CA Bar No. 324764)
Wildlife & Marine Resources Section
YOUNG A. KANG
Trial Attorney (FL Bar No. 1025505)
Natural Resources Section
P.O. Box 7611, Ben Franklin Station
Washington, DC 20044-7611
Phone: (202) 307-1145 (Crusham)
Email: joseph.crusham@usdoj.gov
Phone: (202) 514-2415 (Kang)
Email: young.kang@usdoj.gov

*Attorneys for Federal Defendants*

1

2 <u>**CERTIFICATE OF SERVICE**</u>

3    I hereby certify that on April 25, 2025, I electronically filed and served the foregoing with

4 the Clerk of the Court for the United States District Court for the District of Nevada using the

5 CM/ECF system, which will send notification of this filing to the attorneys of record.

6

7                                                    */s/ Joseph W. Crusham*

8                                                    Joseph W. Crusham
                                                     Attorney for Federal Defendants
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28