UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| WILD HORSE EDUCATION, et al. | Case No. 3:23-cv-00568-ART-CSD |
| Plaintiffs, | |
| v. | **ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT** |
| UNITED STATES DEPARTMENT OF THE INTERIOR, BLM, et al. | |
| Defendants. | |

Animals rights plaintiffs Wild Horse Education and Laura Leigh have filed suit against the U.S. Bureau of Land Management ("BLM"), U.S. Department of the Interior, BLM Director Tracy Stone-Manning, and Nevada BLM Director Jon Raby on the grounds that a recent plan to round up wild horses in Nevada violates the Wild Free Roaming Horses and Burros Act ("WHA") and the National Environmental Policy Act of 1969 ("NEPA"). Before the Court are the parties' cross-motions for summary judgment. (ECF Nos. 38, 43.) As explained in further detail below, the Court finds that BLM must prepare a herd management area plan ("HMAP") for the Saulsbury HMA but that the agency did not violate the WHA or NEPA. The Court accordingly grants in part and denies in part both motions.

## I.    BACKGROUND

The Stone Cabin Complex is an approximately 800,000-acre area near Tonopah in Nye County, Nevada, comprised of two herd management areas ("HMAs"): the Stone Cabin HMA and the Saulsbury HMA. SC_6185. The Stone Cabin HMA contains 407,706 acres and the Saulsbury HMA contains 135,018 acres. SC_6185–56.

The appropriate management level ("AML") for the Stone Cabin Complex is 242 to 404 wild horses. SC_6188. That breaks down to an AML range of 218 to

364 horses for the Stone Cabin HMA and 24 to 40 horses for the Saulsbury HMA. *Id.* The AML range for the Stone Cabin HMA and a portion of the Saulsbury HMA was established through a Consent Decision in 1992. SC_6186. The AML range for the other portion of the Saulsbury HMA was established through a Final Multiple Use Decision ("FMUD") in 1996. *Id.*

In July 2021, BLM conducted an emergency resource flight before an emergency gather and counted 432 horses on the north side of Stone Cabin HMA and 233 horses on the Saulsbury HMA, for a total of 665 horses. SC_6188. Because this was the direct count and did not account for unseen horses that were likely present, BLM estimated that 1,097 horses were present in the complex in 2021. *Id.* BLM estimated that 931 horses were present in the complex in the fall of 2022 by subtracting the 321 horses gathered during the emergency gather and applying a 20 percent growth rate. *Id.* Thus, BLM estimated that the high AML was exceeded by more than approximately 527 horses in 2022. *Id.*

In October 2022, BLM issued a draft environmental assessment ("EA") of its gather plan. SC_1642. BLM received 1,441 comments during the public comment period, notifying BLM about a wide range of concerns. SC_6327. BLM responded to all comments. SC_6328–87.

In April 2023, BLM issued a Final EA, a Finding of No Significant Impact ("FONSI"), and the Decision Record. SC_6182, SC_6174, SC_6178. The Final EA considered three alternatives: (1) the proposed action or Alternative A, which included gathers and population growth suppression methods; (2) Alternative B, which included gathers without population growth suppression methods; and (3) the no-action alternative, under which no gathers or management to control population growth rates would occur. SC_6192. The Decision Record adopted Alternative A.  SC_6174–75.

Plaintiffs brought this suit in November 2023, bringing five claims under the Mandamus Act, the APA, and NEPA. (ECF No. 1.) Both parties now cross-

move for summary judgment. (ECF Nos. 38, 43.)

## II.    LEGAL STANDARD

The motions seek summary judgment on Plaintiffs' claims that BLM violated the WHA and NEPA. (ECF Nos. 38, 43.) "Because neither NEPA nor the [WHA] contain[s] an internal standard of judicial review, the Administrative Procedure Act [("APA")] governs this court's review of the BLM's actions." *In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of Interior*, 751 F.3d 1054, 1061 (9th Cir. 2014); *see also* 5 U.S.C. § 702.

APA Section 706(1) instructs courts to compel "unlawfully withheld or unreasonably delayed" agency action. 5 U.S.C. § 706(1). APA Section 706(2) instructs courts to set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or taken "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

## III.    DISCUSSION

### A. APA Section 706(1) and the Mandamus and Venue Act

"District courts have jurisdiction 'to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff,' pursuant to the Mandamus Act, 28 U.S.C. § 1361, and a similar provision of the APA, 5 U.S.C. § 706(1), which allows courts to compel 'agency action unlawfully withheld or unreasonably delayed.'" *Agua Caliente Tribe of Cupeño Indians of Pala Rsrv. v. Sweeney*, 932 F.3d 1207, 1216 (9th Cir. 2019). The Court will consider Plaintiffs' causes of action under both statutes together "because the relief sought is essentially the same." *Id.* (quoting *Indep. Mining Co. v. Babbitt*, 105 F.3d 502, 507 (9th Cir. 1997)); *see Leigh v. United States Dep't of the Interior*, No. 2:22-CV-01200-MMD-BNW, 2024 WL 4279156, at *8 (D. Nev. Sept. 23, 2024) ("*Leigh II*").

Plaintiffs first allege that BLM has unlawfully withheld, or unreasonably delayed, preparing an HMAP for the Saulsbury HMA and "achieving the objectives

of the Stone Cabin HMAP." (ECF No. 1 at 18; ECF No. 38 at 38–42); *see* 5 U.S.C. § 706(1). Where there is a firm deadline, an action may be unlawfully withheld, and where the deadline is discretionary, the action may be unreasonably delayed. *See Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1177 n.11 (9th Cir. 2002).

### 1. Unlawfully Withheld HMAP

Defendants assert that Plaintiffs are estopped from arguing that a firm deadline exists by which BLM must complete an HMAP. (ECF No. 43 at 21–22.) The Court agrees. In a recent case in this district which involved the same parties as this case, the court held that there is no firm deadline for developing an HMAP and therefore an HMAP cannot be unlawfully withheld. *Leigh v. Raby*, 726 F. Supp. 3d 1207, 1217 (D. Nev. 2024) (Du., J) ("*Leigh I*"). In *Leigh II*, the court held that plaintiffs were estopped making the same argument again. 2024 WL 4279156 at *9.

Collateral estoppel applies when four conditions are met: "(1) the issue at stake was identical in both proceedings; (2) the issue was actually litigated and decided in the prior proceedings; (3) there was a full and fair opportunity to litigate the issue; and (4) the issue was necessary to decide the merits." *Oyeniran v. Holder*, 672 F.3d 800, 806 (9th Cir. 2012), *as amended* (May 3, 2012). Although the facts here are not identical to those in *Leigh I*, the issue raised—whether the WHA and its implementing regulations require BLM to prepare an HMAP before conducting a gather—is the same. 726 F. Supp. 3d at 1217, 1221. This issue was litigated and decided in *Leigh I*; the parties had a full and fair opportunity to litigate the issue; and resolution of the issue was necessary to the merits. *See id.* Collateral estoppel bars re-litigation of this question. The Stone Cabin Complex HMAPs have not been unlawfully withheld because there is no firm deadline for preparing an HMAP. The Court therefore only need assess whether the HMAPs have been unreasonably delayed. *Id.*

4

### 2. Unreasonably Delayed HMAP for Saulsbury HMA

Under the APA, courts may compel withheld or delayed agency action "only where a plaintiff asserts than an agency failed to take a *discrete* agency action that it is *required* to take." *Norton v. S. Utah Wilderness All.* 542 U.S. 55, 64 (2004) ("*SUWA*"). The limitation to *discrete* agency action precludes "broad programmatic attack[s]." *Id.* "The limitation to *required* agency action rules out judicial direction of even discrete agency action that is not demanded by law." *Id.* at 65. Together, these limitations "avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *Id.* at 66.

Preparing an HMAP is a discrete action that the agency is required to take. *Leigh I,* 726 F. Supp. 3d at 1215–18. Defendants concede that they have not prepared an HMAP for the Saulsbury HMA but argue that the Court should find the issue prudentially moot because BLM is already preparing an HMAP for the entire Stone Cabin Complex and intends to issue the HMAP within one year. (ECF No. 43 at 23.)

Prudential mootness permits a court to "dismiss an appeal not technically moot if circumstances have changed since the beginning of litigation that forestall any occasion for meaningful relief." *Deutsche Bank Nat. Tr. Co. v. F.D.I.C.,* 744 F.3d 1124, 1135 (9th Cir. 2014). Unlike constitutional mootness, the prudential mootness doctrine is discretionary. *See Hunt v. Imperial Merchant Servs., Inc.,* 560 F.3d 1137, 1142 (9th Cir. 2009) (courts are "not required to dismiss a live controversy as moot merely because it may become moot in the near future"). "Indeed, the Ninth Circuit has found a suit prudentially moot only once, where no assets remained for distribution in a bankruptcy proceeding." *White v. United States Army Corps of Eng'rs*, 659 F. Supp. 3d 1045, 1052 (N.D. Cal. 2023).

Here, Defendants ask the court to find this issue prudentially moot based on a declaration by Perry Wickham, Field Manager for the Tonopah Field Office, which states that "[i]t is the BLM's intent to complete the process and issue [an

HMAP for the Stone Cabin Complex] in approximately one year from February 7, 2025." (ECF No. 43-1 at 1.) But this voluntary commitment to completing the HMAP within one year is not binding. *See Leigh II*, 2024 WL 4279156, at *11 n.12. The Court therefore declines to find the issue prudentially moot.

To determine whether an agency's delay is unreasonable, the Ninth Circuit uses the six-factor balancing test announced by the D.C. Circuit in *Telecommunications Research & Action Center v. FCC* ("*TRAC*"), 750 F.2d 70, 80 (D.C. Cir. 1984). *See Vaz v. Neal*, 33 F.4th 1131, 1137 (9th Cir. 2022). In *Leigh I*, the court found applied these factors and found that a 38-year delay in creating an HMAP was unreasonable. 726 F. Supp. 3d at 1221. The court ordered BLM to develop and approve one or more HMAPs for the HMAs at issue within one year. *Id.* In *Leigh II*, the court again found a 38-year delay unreasonable and ordered BLM to prepare an HMAP within one year. 2024 WL 4279156, at *9, *21.

Defendants concede that an analysis of the TRAC factors here would not lead to a meaningfully different outcome than that in *Leigh I* and *Leigh II*, given that the Saulsbury HMA was established in 1981 and no HMAP has been prepared. (ECF No. 43 at 23 n.6.) The delay here was longer than the delay in *Leigh I* and *Leigh II*, and the Court finds the analysis of the TRAC factors in those cases persuasive. As in *Leigh I* and *Leigh II*, two TRAC factors support compelling agency action for unreasonable delay: the decades-long delay (addressing the first and most important factor) and the limited impact that preparing an HMAP will have on BLM's other priorities (addressing the fourth factor, the effect of expending delayed action on agency activities of a higher or competing priority). 726 F. Supp. 3d at 1219–1221; 2024 WL 4279156, at *9–10.

The Court therefore finds that BLM's delay in preparing an HMAP for the Saulsbury HMA was unreasonable. The Court grants Plaintiffs' motion and denies Defendants' motion as to the claim that Defendants unreasonably delayed preparing an HMAP for the Saulsbury HMA. BLM must develop and approve an

HMAP for the Saulsbury HMA within the next year.

### 3. Unreasonably Delayed "Achievement of Objectives" in the Stone Cabin HMAP

It is uncontested that BLM has complied with its mandatory duty to create an HMAP for the Stone Cabin HMA. Plaintiffs argue that BLM unlawfully withheld or unreasonably delayed achieving certain objectives within the 1983 Stone Cabin HMAP. (ECF No. 38 at 40–42.) Defendants argue that this claim is both prudentially moot and fails under *SUWA* because statements in an HMAP are not legally binding commitments enforceable under APA § 706(1). (ECF No. 43 at 24–28.) The Court declines to find this issue prudentially moot for the reasons explained above, but the Court agrees that BLM's statements in the 1983 Stone Cabin HMAP are not enforceable under § 706(1).

In *SUWA*, the Supreme Court addressed a § 706(1) claim alleging that BLM failed to comply with a statement in a land use plan that a particular area "will be monitored and closed if warranted." 542 U.S. at 67–68. The Court concluded that "a statement in a plan that BLM 'will' take this, that, or the other action" is not a binding commitment that can be compelled under § 706(1) "at least absent clear indication of binding commitment in the terms of the plan." *Id.* at 69. The Court explained: "A statement by BLM about what it plans to do, at some point, provided it has the funds and there are not more pressing priorities, cannot be plucked out of context and made a basis for suit under § 706(1)." *Id.* at 71. The Court held that the plan's statements "to the effect that BLM will conduct 'Use Supervision and Monitoring' in designated areas—like other 'will do' projections of agency action set forth in land use plans—are not a legally binding commitment enforceable under § 706(1)." *Id.* at 72.

Although the plan at issue here is an HMAP, not a land use plan, the statements that Plaintiffs challenge in the Stone Cabin HMAP are analogous to those that the Court found to be not legally binding in *SUWA*. The HMAP "is

1    designed to facilitate" several objectives relating to range, wildlife, watershed, and

2    wild horses. SC_9273–74. Plaintiffs ask the Court to compel BLM to achieve the

3    five wild horse management objectives, pointing to "will" statements within the

4    lengthy descriptions of management methods for those objectives. SC_09295–92;

5    (ECF No. 38 at 41–42.)

6        The first wild horse management objective is to "[e]stablish the number of

7    wild horses to be used as an interim population from which to begin monitoring

8    studies on each of the 5 sub-units." SC_09287. The description of management

9    methods under this objective includes a statement that "[t]his division of animals

10   will be based on the actual use levels of animals in each unit, degree of utilization

11   in each area, conflicts within each area, and the total wild horse population in

12   each area." SC_09287. The second objective is to "[p]revent the utilization of key

13   forage species . . . from exceeding the allowable use factors by more than 10% in

14   each of the 5 sub-units . . ." SC_9288. The management methods section explains

15   that several steps "will be taken" to achieve this objective, including monitoring

16   studies. SC_09289. The third objective is to "[m]aintain the wild-free roaming

17   characteristics of the horses in the Stone Cabin Valley HMA." SC_09286,

18   SC_09290. The management methods section explains that "projects proposed

19   for the Stone Cabin HMA will be analyzed to determine if the project will impact

20   the wild free-roaming characteristics of wild horses." SC_09290. The fourth

21   objective is to "[p]rovide water for wild horses throughout the Stone Cabin Valley

22   HMA where possible" and the management methods section states that "[w]ater

23   distribution in the HMA will be improved by developing additional wells and

24   pipelines." SC_09291. The fifth objective is to "[e]stablish studies to acquire

25   additional data on wild horses." SC_09291. And in a section summarizing

26   planned studies, the HMAP states that "[a]s more information becomes available,

27   this plan will be updated." SC_09293.

28       Like the land use plan at issue in *SUWA*, the objectives in the Stone Cabin

HMAP guide, but do not prescribe, agency action. Plaintiffs have not pointed to any clear indication of binding commitment in the HMAP, and the Court is unable to find any. In *SUWA*, the Court read in an "implied" budgetary constraint in reasoning that the plan did not commit the agency to actions "far in the future, for which funds have not yet been appropriated." 542 U.S. at 71. Here, the HMAP makes explicit that implementation of its objectives is subject to budgetary constraints, stating that "[a]ll actions undertaken pursuant to this plan are contingent upon available funding." SC_09297. The statements about what BLM "will do" are not legally binding commitments enforceable under § 706(1). Holding otherwise would result in "much vaguer plans from BLM in the future—making coordination with other agencies more difficult, and depriving the public of important information concerning the agency's long-range intentions." *SUWA*, 542 U.S. at 72.

Because the Court finds that the objectives of the 1983 Stone Cabin HMAP are not legally binding commitments, it need not assess whether they are discrete. The Court denies Plaintiffs' motion and grants Defendants' motion as to the claim that Defendants unlawfully withheld or unreasonably delayed achieving the objectives of the Stone Cabin HMAP.

### B. Gather Plan Arbitrary and Capricious

The Court may set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Plaintiffs' third cause of action alleges that BLM's adoption of the gather plan and EA was arbitrary and capricious because it authorized the gather and removal of wild horses without first developing an HMAP for the Saulsbury HMA and without achieving the objectives of the Stone Cabin HMAP. (ECF No. 1 at 19–20.)

### 1. Saulsbury HMAP

As the Court has already found, BLM may approve gather plans before

preparing an HMAP. Plaintiffs have not shown that BLM acted out of accordance with the WHA or its implementing regulations by adopting the gather plan before preparing an HMAP for the Saulsbury HMA. *See Leigh I*, 726 F. Supp. 3d at 1221; *Leigh II*, 2024 WL 4279156 at *12.

### 2. Stone Cabin HMAP Objectives

Plaintiffs argue that the gather plan should be set aside because it was approved "without considering whether [it] attained the objectives of the Stone Cabin HMAP and without ensuring that the monitoring requirements and conditions of the Stone Cabin HMAP were implemented." (ECF No. 38 at 37.) Defendants argue that this claim fails because, first, Plaintiffs fail to show that BLM is required to achieve or consider the objectives of the 1983 HMAP before gathering horses and, second, Plaintiffs fail to show that the gather plan is inconsistent with the 1983 HMAP. (ECF No. 43 at 28–35.)

Plaintiffs point to *SUWA* and *Oregon Natural Resources Council Fund v. Brong*, No. CIV.04-693-AA, 2004 WL 2554575 (D. Or. Nov. 8, 2004), *aff'd*, 492 F.3d 1120 (9th Cir. 2007), for the proposition that agency action will be set aside pursuant to § 706(2) where an agency does not conform its action to required plans. Both cases involved land use plans, not HMAPs. In *SUWA*, the Court explained, "The statutory directive that BLM manage 'in accordance with' land use plans, and the regulatory requirement that authorizations and actions 'conform to' those plans, prevent BLM from taking actions inconsistent with the provisions of a land use plan." 542 U.S. at 69. But that language comes from the Federal Land Policy and Management Act ("FLPMA") and its accompanying regulations on land use plans. *Id.* at 67 (citing 43 U.S.C. § 1732(a) and 43 CFR § 1610.5–3(a) (2003)). *Oregon Natural Resources Council Fund* likewise concerned FLPMA and land use plans. 2004 WL 2554575, at *4. HMAPs and land use plans are distinct documents. *See Leigh I*, 726 F. Supp. at 1218 (noting that the regulations explicitly distinguish between HMAPs and land use plans); *see also*

*Friends of Animals v. BLM*, 548 F. Supp. 3d 39, 47 (D.D.C. 2021) (distinguishing broader land use plans from narrower HMAPs).

Plaintiffs argue that 43 C.F.R. § 4710.4, which provides that "[m]anagement shall be at the minimum level necessary to attain the objectives identified in approved land use plans and [HMAPs,]" requires BLM to consider or conform gather decisions to HMAPs. But as the court explained in *Leigh I*, this regulatory requirement must be read in the context of the WHA's controlling statutory language and other implementing regulations. 726 F. Supp. 3d at 1216. If BLM determines that an area is overpopulated, it must "immediately remove excess animals from the range." 16 U.S.C. § 1333(b)(2). Plaintiffs' argument that the gather plan should be set aside until BLM achieves the objectives in a document from 1983 would force BLM to put gathers on hold for a significant period of time, conflicting with its statutory duty to gather horses to achieve AML as promptly as reasonably possible. *See Colvin & Son, LLC v. Haaland*, 763 F. Supp. 3d 1176, 1182 (D. Nev. 2025); *Leigh I*, 726 F. Supp. 3d at 1217–18 ("Reading the regulations as Plaintiffs request would force BLM to put gathers on hold for months, years, or perhaps even decades until an HMAP is approved, instead of conducting immediate removals.").

As to Plaintiffs' third cause of action, Plaintiffs' motion is denied and Defendants' motion is granted.

### C. Gather Plan in Excess of BLM's Authority

For the same reasons, BLM did not act in excess of statutory jurisdiction, authority, or limitations by adopting the Stone Cabin Complex gather plan before preparing an HMAP for the Saulsbury HMA or "achieving the objectives" of the Stone Cabin HMA. Neither party makes any independent arguments under this claim, and the Court has addressed all relevant arguments in its consideration of the § 706(2)(A) claim. The gather plan was congruent with the WHA and its implementing regulations, and adopting a gather plan for an area which did not

11

1    yet have an HMAP was within BLM's authority.

2        Plaintiffs' motion is denied, and Defendants' motion is granted, as to

3    Plaintiffs' fourth cause of action.

4                    **D. Compliance with NEPA**

5        Plaintiffs' final claim is that BLM violated NEPA by failing to analyze every

6    significant aspect of the environmental impacts of removing wild horses from the

7    Stone Cabin Complex. (ECF No. 1 at 21–22.)

8        Although NEPA lacks a substantive mandate, its "action-forcing"

9    procedural requirements help carry out a "national commitment to protecting and

10   promoting environmental quality." *Robertson v. Methow Valley Citizens Council*,

11   490 U.S. 332, 348 (1989); *accord* 42 U.S.C. § 4331. One such means by which

12   NEPA forces action is its requirement that agencies take a "hard look" at the

13   environmental consequences of their proposed actions. *See Kern v. BLM,* 284 F.3d

14   1062, 1066 (9th Cir. 2002).

15       NEPA serves two fundamental objectives. First, it "ensures that the agency,

16   in reaching its decision, will have available, and will carefully consider, detailed

17   information concerning significant environmental impacts." *Methow Valley*

18   *Citizens Council*, 490 U.S. at 349. Second, it requires "that the relevant

19   information will be made available to the larger audience that may also play a

20   role in both the decisionmaking process and the implementation of that decision."

21   *Id.* "[T]he central principle of judicial review in NEPA cases is deference." *Seven*

22   *Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 145 S. Ct. 1497, 1511 (2025).

23       Plaintiffs argue that BLM failed to make available "necessary data and

24   information" for the public, failed to consider a reasonable range of alternatives,

25   and failed to take the required "hard look" at the environmental consequences of

26   the gather plan. (ECF No. 38 at 42–48.)

27                **1. Relevant Information and Data**

28       Plaintiffs argue that BLM did not make available "necessary data and

information" for the public, relying primarily on *WildEarth Guardians v. Montana Snowmobile Association*, 790 F.3d 920, 925 (9th Cir. 2015). In *WildEarth Guardians*, the Ninth Circuit held that an environmental impact statement ("EIS") did not provide the public adequate access to information about the impact of snowmobiles on big game wildlife because it did not identify the location of the winter range for big game animals, establish where snowmobiles might impact that range, or discuss what options were available to avoid the impacts. *Id.* at 925, 928–29. The EIS provided only "partial data" and did not allow the public to "play a role in both the decisionmaking process and the implementation of that decision." *Id.* at 928–29 (citing *Methow Valley Citizens Council*, 490 U.S. at 349).

### i. Sufficient AML Data

Plaintiffs argue that the public was unable to evaluate whether BLM's determination of excess horses was based on valid AMLs because BLM did not include sufficient information or data underlying those AMLs in the EA. Plaintiffs do not directly challenge the validity of the AMLs. Defendants argue that such information was unnecessary because the gather plan did not set or adjust AML, and because BLM is not required to reevaluate or reaffirm AML before authorizing gathers.

In the Stone Cabin Complex draft (and final) EA, Section 1.1, BLM explains that the AML for the Stone Cabin HMA and a portion of the Saulsbury HMA (364 horses) was established through a Consent Decision by Administrative Law Judge David Torbet on May 11, 1992. SC_1646. The AML for the other portion of the Saulsbury HMA (30 horses) was established through a Final Multiple Use Decision ("FMUD") in 1996. *Id.* The FMUD was issued "following an interdisciplinary analysis of monitoring data, the completion of an Allotment Evaluation for the allotment, and the involvement of interested public." *Id.*

Plaintiffs assert that the gather plan should be set aside because BLM did

1  not include the 1992 and 1996 decisions in the EA or administrative record,[1] but

2  do not explain why such information would be necessary for the public to play a

3  role in the decision-making process. BLM was not required to reevaluate or set

4  AML in the EA. *See Leigh I*, 726 F. Supp. 3d at 1227; *In Def. of Animals*, 751 F.3d

5  at 1064 n.13 ("nothing in the [WHA] requires the BLM to determine new AMLs

6  based on current conditions every time the BLM decides to take action to restore

7  the already-established AMLs"). "Nor must BLM show that an AML range remains

8  valid before relying upon it." *Leigh I*, 726 F. Supp. 3d at 1227.

9       During the public comment period, several individuals and organizations

10  challenged the validity of the AMLs and the lack of information supporting them.

11  SC_6328–SC_6330. One comment by Wild Horse Education and others noted

12  that the EA did not "provide any formula of how AML was set or when it would

13  be revised." SC_6328. BLM responded with a reference to Section 1.1 of the EA,

14  which explains that the AMLs were established through the 1992 and 1996

15  decisions. *Id.* BLM stated that "[c]urrent monitoring data does not support

16  establishment of a new AML and instead indicates that there is an overpopulation

17  of wild horses and that excess animals need to be removed." *Id.* Another comment

18  stated that "BLM fails to provide any scientific evidence to support the AML."

19  SC_6329. BLM referred to the same section and noted that "[w]hen wild horse

20  and burro herd sizes are above AML, that can lead to or contribute to ecological

21  and habitat degradation," citing a 2021 study. SC_6329.

22

23  _____

24  [1] Earlier in this lawsuit, Plaintiffs sought to supplement the administrative record to include documents and decisions underlying the AMLs, including the two decisions. (ECF No. 27.) The Court denied that request because Plaintiffs failed to show that consideration of those materials was necessary for the Court's determination of the issues and because the requests were overbroad. (ECF No. 34.) Plaintiffs complain that those documents are not in the administrative record, but the Court does not need to view those documents to determine whether BLM made the relevant information available to the public. *See Methow Valley Citizens Council*, 490 U.S. at 349; (ECF No. 34 at 6.)

BLM properly considered and responded to these comments. Because the HMAP did not set or adjust AML in the HMAP, detailed information explaining how those AMLs were set—beyond the summary of the 1992 and 1996 decisions that were provided—was not required. Plaintiffs have not shown that BLM's failure to include more information underlying 1992 and 1996 decisions in the EA prevented the public from playing a meaningful role in the decision-making process.

### ii.    HMAP

Plaintiffs briefly argue that the gather plan was deficient because it did not address or achieve the objectives of the 1983 Stone Cabin HMAP. (ECF No. 38 at 45.) This claim is based on arguments that the Court has already rejected.

### iii.    Sufficient Rangeland Health Data

Plaintiffs argue that the gather plan fails to provide sufficient information supporting its conclusion that horses are impacting the range. (ECF No. 38 at 46.)

The EA includes a table summarizing rangeland health utilization with an explanation of methodology. SC_6214–15, SC_6272–74. BLM relied upon this data in its analysis of the cumulative effects of the proposed action and alternatives. SC_6229–30. Plaintiffs' motion does not demonstrate what portion of this information or analysis is deficient; instead, it asserts generally that "[n]o data has been provided to show that horses are a primary or necessary cause of damage at these sites." (ECF No. 38 at 46.) In their joint opposition and reply, Plaintiffs argue that BLM should have provided the underlying study and data, including the specific locations for each of the 28 plots summarized, rather than providing only the summary in the table. (ECF No. 44 at 26.) In *WildEarth Guardians*, the location of big game was important because the plan involved allowing snowmobiles on federal land. Plaintiffs do not explain why the precise location of each sub-plot is significant here, where there is no similar location-

1    specific plan.

2        Commenters expressed concerns about rangeland health utilization, and

3    there is no indication from those comments that insufficient data prevented

4    meaningful public participation. *See, e.g.,* SC_6348, SC_6349, SC_6357,

5    SC_6367.

6                    **2. Consideration of Range of Alternatives**

7        Agencies developing an EA for a proposal involving unresolved conflicts

8    over how to use available resources must consider "appropriate" alternatives to

9    the proposed action, including a 'no action' alternative. 42 U.S.C. §§

10    4332(2)(C)(iii), (H). Agencies need not consider alternatives that do not advance

11    the purpose of a project or are otherwise infeasible or impractical. *See Native*

12    *Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1247 (9th Cir. 2005);

13    *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 877 (9th Cir. 2022).

14                        **i.    Purpose and Need Statement**

15        Plaintiffs argue that BLM's purpose and need statement is unsubstantiated

16    by the administrative record and drawn too narrowly. "Courts afford significant

17    but not unlimited discretion to agencies to articulate an action's statement of

18    purpose and need." *Wild Wilderness v. Allen*, 871 F.3d 719, 728 (9th Cir. 2017).

19    Courts evaluate a statement of purpose and need under a reasonableness

20    standard. *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 866 (9th

21    Cir. 2004). "Where an action is taken pursuant to a specific statute, the statutory

22    objectives of the project serve as a guide by which to determine the

23    reasonableness[.]" *Id.*

24        The EA provides that the purpose of the proposed action is to "gather and

25    remove excess wild horses from within and outside of the Stone Cabin Complex

26    and to reduce the wild horse population growth rates to achieve and maintain

27    established AML." SC_6189. The need is "to prevent undue or unnecessary

28    degradation of the public lands associated with excess wild horses, and to restore

a [thriving natural ecological balance] and multiple-use relationship on public lands[.]" *Id.*

Plaintiffs argue that this purpose and need statement is not substantiated because it "relies on faulty AMLs and unsupported assumptions on rangeland health." (ECF No. 38 at 47.) As explained above, the AMLs, though old, were appropriate to use in this EA, and the rangeland health data was sufficient. Plaintiffs fail to provide any caselaw to support this argument.

Plaintiffs next argue that the purpose and need statement is drawn too narrowly and resulted in failure to analyze alternatives such as "consideration of seeding for purposes of improving rangeland health, limiting off-road vehicles and other surface damaging activities, or developing additional water sources in the Complex." (ECF No. 38 at 47.) These arguments fail to acknowledge the narrow statutory authority that BLM was acting under in issuing this EA. The WHA tasks the BLM with "manag[ing] wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance." 16 U.S.C. § 1333(a). The WHA mandates that once BLM determines that an area is overpopulated and that action is necessary to remove excess animals, BLM must immediately remove excess animals from the range to achieve AML and to restore a thriving natural ecological balance. 16 U.S.C. § 1333(b)(2). Given this strict statutory mandate, the purpose and need statement was reasonable.

### 3. Hard Look at Environmental Impacts

To satisfy NEPA's 'hard look' requirement, agencies preparing an EA must provide "a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *350 Montana v. Haaland*, 50 F.4th 1254, 1265 (9th Cir. 2022) (quoting *Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1194 (9th Cir. 2008)). Compiling an "exhaustive examination of each and every tangential event that potentially could impact the local environment," however, would be an "impossible, and never-ending," task. *Tri-Valley CAREs v. U.S. Dep't*

*of Energy*, 671 F.3d 1113, 1129 (9th Cir. 2012). As a result, EAs are designed "not to amass and disclose all possible details regarding a proposal but to . . . briefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI]." *Id.* at 1128 (cleaned up).

Plaintiffs argue that BLM failed to provide sufficient analysis of all direct, indirect, cumulative, and ecological impacts associated with the proposed action. (ECF No. 38 at 48.) Specifically, Plaintiffs assert that the EA did not sufficiently address impacts associated with "wild horse gathers and population growth suppression, livestock grazing, mineral exploration and extraction, oil and gas exploration, recreation including dispersed camping and hunting, land use authorizations and wildfire suppression," despite noting that each was a past action and reasonably foreseeable future action. (ECF No. 38 at 48); SC_6243–45. The Court addresses each in turn.

"[I]n order for Plaintiffs to demonstrate that BLM failed to conduct a sufficient cumulative impact analysis, they need not show what cumulative impacts would occur." *Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 608 F.3d 592, 605 (9th Cir. 2010). Instead, they must show "the potential for cumulative impact." *Id.*

### i.   Gathers and Population Growth Suppression

The entire EA addresses the environmental effects of the proposed action, which consists of gathering and removing excess wild horses and using population growth suppression methods. SC_6185. The EA considers a wide range of impacts in detail, including impacts on the wild horses themselves, riparian and wetland areas, wildlife, special status plant and animal species, livestock grazing, wilderness, noxious weeds and invasive species, vegetation, and soils and watersheds. SC_6209–46. The EA discusses other resources or areas of concern and provides a rationale for those which did not require detailed analysis (for example, air quality and fish habitat). SC_6209–10.

18

Aside from the issues discussed in the following sections, Plaintiffs have not pointed to any potential impact of gathers and population growth suppression that did not receive a reasonably thorough discussion. Plaintiffs cannot meet their burden by summarily concluding that the BLM needed to conduct a better cumulative impacts analysis. *Ctr. for Cmty. Action & Env't Just. v. Fed. Aviation Admin.,* 61 F.4th 633, 645 (9th Cir. 2023).

### ii.    Livestock Grazing

Commenters raised concerns that the EA focused only on gathers of wild horses rather than reducing livestock grazing. SC_6354–58. BLM provided thorough responses to these comments, explaining that changes to livestock grazing were outside the scope of the gather plan and that reductions to grazing would not reduce impacts that are directly attributable to wild horses (for example, in areas where that has been no livestock grazing). *Id.* The EA notes that wild horse gather operations have "few direct impacts to cattle grazing" and that the proposed action would, over the long term, reduce competition between livestock and wild horses in water and forage resources, improving the health of the range resource. SC_6235.

Given that the gather plan could not change livestock allotments, the EA's consideration of the impacts associated with livestock grazing was sufficient. *See Leigh I*, 726 F. Supp. 3d at 1227 ("[l]owering livestock grazing allotments was [] outside the scope of the Final EA"); *Cloud Found. v. BLM*, 802 F. Supp. 2d 1192, 1206 (D. Nev. 2011) (BLM "simply could not reduce livestock grazing allotments through the gather process").

### iii.    Mineral and Oil and Gas Exploration and Extraction

In its discussion of cumulative impacts, the EA notes that some past actions, including mineral extraction and oil and gas exploration, have "increased infestations of invasive plants, noxious weeds, and pests and their associated

treatments." SC_6243. All past actions are expected to continue into the foreseeable future. SC_6245. The EA explains that under the proposed action, there would be fewer multiple-use conflicts within the Stone Cabin Complex and adjacent areas. SC_6246. One commenter expressed concerns that prior gathers preceded approval of increased livestock, mining exploration, and oil and gas sale leasing, and that gathers had minimal impacts on decreasing stress on the landscape. SC_6361. In response, BLM explained that the plan was based upon evidence of excess horse-related impacts and that limiting multiple use would not conform with the area's existing land use plan. *Id.*

Plaintiffs have not explained how further examination of the impacts of mineral and oil and gas exploration was relevant to the agency's decision. Plaintiffs have also failed to show how failure to consider those topics in greater depth rendered the decision arbitrary and capricious.

### iv. Recreation and Land Use Authorizations

The EA lists recreation as a possible environmental effect and concludes that detailed analysis is unnecessary because the horse gathering activities "are only temporary and would not majorly affect recreation resources in the area." SC_6211–12. The EA states that hunting would be the most affected activity and that hunters should check with local BLM offices to inquire about horse gathering activities within their area. *Id.* The EA similarly lists land use authorizations as a possible environmental effect and concludes that detailed analysis is unnecessary because "[t]he proposed actions and alternatives would not affect land use authorizations." SC_6211.

Here again, Plaintiffs have not explained how further examination of the impacts associated with recreation and land use authorization was relevant to the agency's decision. Plaintiffs have also failed to show how failure to consider these topics in greater depth rendered the decision arbitrary and capricious.

### v.     Wildfire Suppression

Plaintiffs assert that the EA failed to sufficiently address wildfire suppression. (ECF No. 38 at 48.)

The only commenter who addressed wildfires expressed a concern that wild horses eat "brush and other weeds that will cause more fire hazards" and that "[b]y keeping the wild equines on the range, there will be less fire's [sic] taking place." SC_6386. In response, BLM explained that the inability to control where wild horses graze makes use of the herds for targeted grazing (for wildfire prevention) unviable and explained that an "overpopulation of wild horses and burros can encourage the spread of invasive species such as annual grasses, which can increase fire risk," citing a 2019 study. SC_6387. Though it did not include wildfire risk in its summary of environmental effects, *see* SC_6209–10, the EA included a discussion of the effects of wild horses on rangeland ecosystems that responded to the comments it received and explained that post-fire grazing by domestic livestock can foster recovery, but wild horse grazing may not because it is year-round. SC_6282.

By pointing to a quote in the EA and asserting that analysis was insufficient, Plaintiffs have not met even the low burden of showing the "potential for cumulative impact" related to wildfire suppression. *Te-Moak Tribe*, 608 F.3d at 605. BLM did not violate NEPA in its analysis of wildfire suppression and risks.

### IV.     CONCLUSION

It is therefore ordered that Plaintiffs' motion for summary judgment (ECF No. 38) and Defendants' motion for summary judgment (ECF No. 43) are granted in part and denied in part as discussed in this order.

The Court grants Defendants' motion and denies Plaintiffs' motion as to the mandamus claim.

The Court grants Plaintiffs' motion and denies Defendants' motion as to the claim under APA § 706(1) that BLM unreasonably delayed preparing an HMAP

for the Saulsbury HMA. The Court remands to compel Defendants to prepare and approve an HMAP for the Saulsbury within one year of the date of this order.

The Court grants Defendants' motion and denies Plaintiffs' motion as to all claims under APA § 706(2).

The Court grants Defendants' motion and denies Plaintiffs' motion as to the National Environmental Policy Act claim.

It is further ordered that the Clerk of Court enter judgment in accordance with this order and close this case.

DATED: July 22, 2025

_____
ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE