UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

LAURA LEIGH AND WILD HORSE          )
EDUCATION,                          )
                                    ) Case No. 3:23-cv-00568-ART-CSD
              Plaintiff             )
vs.                                 )  Reno, Nevada
                                    )  June 18, 2025
                                    )  2:03-3:50 p.m.
UNITED STATES DEPARTMENT OF         )
INTERIOR, BUREAU OF LAND            )
MANAGEMENT, et al.,                 )  Courtroom 6
                                    )  MOTION FOR SUMMARY JUDGMENT
              Defendants.           )
_____)  *CERTIFIED COPY*


REPORTER'S TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE ANNE R. TRAUM
UNITED STATES DISTRICT COURT JUDGE




APPEARANCES:    (noted on the following page.)






Court Reporter:  Rhonda L. Aquilina, RMR, CRR, CRC
                 RhondaAquilina@aol.com


Proceedings reported by machine shorthand.  Transcript produced
by computer-aided transcription.

1                          **APPEARANCES**

2   For the Plaintiff:

3       **J. RAE LOVKO, ESQ.**
        Lovko & King
4       1061 Eastshore Highway, Suite 206
        Berkeley, CA 94710
5       (510) 859-7377

6

7   For the Defendants:

8       **JOSEPH CRUSHAM, ESQ.**
        **YOUNG KANG, ESQ.**
9       United States Department of Justice
        Civil Division
        1100 L Street, NW
10      Washington, DC 20005

11

12  Also present:  Laura Leigh

13

14                          *   *   *

15

16

17

18

19

20

21

22

23

24

25

1    LAS VEGAS, NEVADA; Wednesday - June 18, 2025; 2:03-3:50 p.m.

2                    P R O C E E D I N G S

3                        ---o0o---

4            THE COURTROOM ADMINISTRATOR:  The United States

5    District Court for the District of Nevada is now in session.

6    The Honorable Ann Traum presiding.

7            This is the date and time set for a video motion

8    hearing in case number 3:23-CV-568-ART-CSD, Laura Leigh and

9    Wild Horse Education versus United States Department of

10   Interior Bureau of Land Management, and others.

11           Counsel, please state your appearances for the record

12   beginning with plaintiffs' counsel.

13           MS. LOVKO:  My name is Rae Lovko.  I represent the

14   Plaintiffs Laura Leigh and Wild Horse Education in this case.

15           MR. CRUSHAM:  Good afternoon, Your Honor, Joseph

16   Crusham for the Federal Defendants.

17           MR. KANG:  Good afternoon, Your Honor.  Young Kang

18   also for the Federal Defendants.

19           THE COURT:  Okay.  And the other person is Ms. Leigh;

20   is that correct?

21           MS. LEIGH:  (Nods.)

22           THE COURT:  Perfect.  Okay.  So we have cross-motions

23   for summary judgment.  Welcome, everyone.  Glad you're here

24   today.

25           I think what I'll do is I will start with

1  Mr. Crusham.  Are you arguing?

2      **MR. CRUSHAM:**  Good afternoon, Your Honor.  I'll be

3  handling most of the argument.  So the Herd Management Area

4  Plan claims, or HMAP claims, so Counts 1 through 4, and

5  Mr. Kang will be handling the fed claim, Count 5.

6      **THE COURT:**  Okay.  So why don't we start with the NRD

7  attorneys, and then I'll move to plaintiff, and then I'll go

8  back to NRD and end with plaintiff.  So I just -- so that you

9  can -- obviously, we have the issues are joined with the

10 cross-motions, but I'll start with the NRD and then give the

11 last word to Ms. Lovko, okay?

12      And so you can, obviously, Mr. Crusham and Mr. Kang,

13 you can split your time, but it would be great if you could

14 limit your sort of initial argument to not more than 20

15 minutes, and that way we can fit it all in within an hour.

16      Thank you.

17     **MR. CRUSHAM:**  Certainly.  Thank you, Your Honor.

18      As the Court is aware from the related *Colvin* case,

19 the Stone Cabin Complex contains an unsustainable

20 overpopulation of wild horses that BLM has determined it must

21 remove as promptly as reasonably possible under the Wild Horse

22 Act.

23      Without meaningfully challenging BLM's expert

24 determination that gathers are necessary, plaintiffs here try

25 to vacate BLM's gather decision to prevent BLM from gathering

1    animals.  Their arguments lack merit.

2          So first, as I said, I'll explain that Plaintiffs'

3    HMAP claims fail because their either precluded, moot, or fail

4    on the merits, and then Mr. Kang will explain that BLM fully

5    complied with NEPA here.

6          So turning directly to the HMAP claims, Plaintiffs'

7    claims related to the creation of a Saulsbury HMAP, or the

8    Saulsbury HMA, fail.

9          And some minor housekeeping here, but I believe the

10   only non-precluded, non-conceded claim here is that BLM has

11   unreasonably delayed issuing a Saulsbury HMAP under APA

12   Section 7061.  Plaintiffs did bring claims that BLM had

13   unlawfully withheld the HMAP under 7061, and that the gather

14   decision is unlawful because it was issued without an HMAP in

15   place.  And so I believe, pursuant to Judge Du's decisions in

16   Leigh 1 and Leigh 2, those issues have both been decided.

17         And turning to their Mandamus and Venue Act claim,

18   which is actually their first claim pled --

19         **THE COURT:**  Can you just pause for a second?

20         **MR. CRUSHAM:**  Yeah.

21         **THE COURT:**  So your argument there is that on the

22   Saulsbury there is no HMAP, that there's -- that they

23   haven't -- based on Leigh, that they haven't -- that the BLM

24   hasn't withheld it, that it's not unlawful to do a gather

25   without it; and then that basically leaves the unreasonably

1  delayed, which is what Judge Du decided in favor of plaintiffs

2  in that case, ordering that the HMAP be done within a year.

3           **MR. CRUSHAM:**  That's correct, yes.

4           **THE COURT:**  Okay.

5           **MR. CRUSHAM:**  And then, relatedly, the Plaintiffs'

6  first claim is pled under the Mandamus and Venue Act, and we

7  argued in our opening brief that that claim failed on the

8  merits, and it's at best duplicative of the 7061 claims, which

9  I think Judge Du had also held.  I don't think plaintiffs

10 contest that.

11          So I just want to set the table that I think we're

12 only dealing with the unreasonable delay claim for the HMAP.

13          And so here, BLM, you know, acknowledges that Judge

14 Du has decided that there is a mandatory duty to create HMAPs,

15 but that BLM does not have to do so before gathers, and that

16 was held in Leigh 1 and Leigh 2.  And so pursuant to those

17 decisions, which issued after this gather decision was signed,

18 BLM has already begun doing a new HMAP for the entire Stone

19 Cabin Complex.  So the new HMAP will cover both the Saulsbury

20 HMA and the Stone Cabin HMA.

21          And so as we argued in our brief, we believe this

22 claim is prudentially moot.  And we submitted a declaration

23 from BLM personnel attesting to the fact that BLM is not merely

24 intending to do the HMAP.  They've formally begun the process

25 of doing so and expect the issue by February of 2026.

 1          And, you know, clearly, prudential mootness, it's not

 2    constitutional mootness.  This is a discretionary call by the

 3    courts, and sort of similar to the court's inquiry in deciding

 4    whether to stay a case in terms of judicial economy,

 5    convenience, you know, whether an order is really necessary to

 6    tell BLM to do that which it is already doing.

 7          But to the extent, Your Honor --

 8          **THE COURT:**  Can I ask you a question about that?

 9          **MR. CRUSHAM:**  Please.

10          **THE COURT:**  I believe that there was a prudential

11    mootness claim argument made in the Leigh case -- I'm not sure

12    which one, but, anyway, that Judge Du rejected it.  But I guess

13    I'm curious, in this situation, now that we have Judge Du's

14    order, and that that work is now taking place, is underway on

15    the HMAP, do you think that that shifts the context of the

16    prudential mootness argument that you're making?

17          **MR. CRUSHAM:**  I think it does, Your Honor.  I mean, I

18    don't -- I think it's similar to -- so I think it was in Leigh

19    2 that Judge Du rejected the Government's prudential mootness

20    argument.  I think a distinguishing factor here is that BLM has

21    submitted a declaration attesting to this; whereas, I think in

22    Leigh 2 it was simply pointing to the public notice that it

23    issued.

24          But we certainly recognize Judge Du's holding there,

25    which is why we argue that to the extent the Court is inclined

1    to agree with her argument rejecting prudential mootness, we

2    acknowledge that if a court were to apply the track factors

3    here as to reasonable delay with respect to this Saulsbury

4    HMAP, the Court would come to a similar conclusion here, and

5    we're not contesting that.

6            I think we would ask the Court follow Judge Du's

7    reasoning in the sense of not ordering, you know, when she did

8    set a date certain for the HMAP, she didn't say it will be

9    done, like, here in February of 2026.  She gave the Government

10   a few months when she was putting a binding deadline.

11           So I think there we said that it would be done in May

12   of 2025, and I think her order reflected September of 2025.  So

13   I think that that would be our point there.

14           **THE COURT:**  Okay.

15           **MR. CRUSHAM:**  And so I think that Saulsbury HMAP is

16   probably the easiest of the questions Your Honor will have in

17   this case.

18           And so turning to the more complicated questions with

19   regard to the 1983 HMAP, I think it's uncontested in the sense

20   that BLM has issued an HMAP for that HMA and complied with the

21   mandatory duty that Judge Du found in Leigh 1 and Leigh 2.

22           And so plaintiffs have two claims related to the

23   Stone Cabin HMAP.  The first one is under APA Section 7061 and

24   seeks to compel BLM to update or attain the 1983 HMAP's

25   objectives, and this claim fails because it's either moot or

1    plaintiffs have not met the standard for compelling agency

2    action.

3            So turning to the mootness argument.  As explained,

4    BLM is doing an HMAP for the entire complex.  It's going to

5    cover both the Saulsbury HMA and the Stone Cabin HMA, and so it

6    will effectively update and supersede the Stone Cabin HMAP from

7    1983.

8            And so while we certainly would not concede that

9    there is a legal duty to update the 1983 HMAP or that there's

10   been a legal violation requiring it to be updated, I don't

11   think the Court needs to get into that authority issue because,

12   again, BLM is already doing it.

13           And as we argued, I think in our reply brief, to the

14   extent the Court does find it prudent to issue an order

15   requiring a Saulsbury HMAP by a date certain, that would render

16   this claim constitutionally moot in the sense that there's only

17   going to be one HMAP.  If the Court orders that to be done by a

18   date certain, I don't think that there's additional relief that

19   the Court could grant to plaintiffs on this Stone Cabin HMAP

20   claim in the sense that updating the HMAP is something that

21   they're asking for through the claim, and I don't think it

22   would make any sense to separately order BLM to attain the

23   objectives of that document while it's in the process of

24   updating it.

25           **THE COURT:**  I guess one question I have on that is

1    just, if I'm correctly understanding the arguments here, if I

2    acknowledge, well, this is all in the works, this -- the Stone

3    Cabin Complex HMAP, it includes this, so we should just hold

4    off.

5         Is that -- I mean, you're arguing that it

6    shouldn't -- that I don't need to decide, basically, whether

7    there's an enforceable duty, that there is an enforceable duty,

8    but I don't actually need to reach that issue.

9         I guess I'm just kind of curious, is this an

10    enforceable promise, like, if I were to say that with respect

11    to, you know, the Stone Cabin Complex.  You know, is it -- is

12    there anything that's enforceable about that from plaintiffs?

13         **MR. CRUSHAM:**  Well, I think that if Your Honor were

14    to enter an order requiring the new HMAP to be done by a date

15    certain, pursuant to the Saulsbury claim, that would certainly

16    be enforceable.  And I think it's clear from the record and the

17    declaration we submitted that that HMAP is going to include

18    both HMAs at issue, and so in that sense it would be.

19         But we certainly, like I said, we wouldn't be

20    conceding that there's an enforceable legal duty requiring the

21    Stone Cabin HMAP to be updated.  And, you know, we can get into

22    explaining why that is the case.  But I think if the Court were

23    to find this claim prudentially moot, which we think is

24    appropriate, or constitutionally moot, there wouldn't be an

25    enforceable promise with respect to, I guess, the Stone Cabin

1  HMAP, separate and apart from the Saulsbury HMAP claim, if that

2  makes any sense.

3      THE COURT:  It does, but I just wanted to make sure I

4  heard you correctly.  You said that there would not be an

5  enforceable promise or that there would be an enforceable

6  promise?

7      MR. CRUSHAM:  It would be enforceable in the sense

8  that through the Saulsbury HMAP claim, but not with respect to

9  separately the Stone Cabin HMAP.

10      THE COURT:  Okay.

11      MR. CRUSHAM:  But I think if the Court does --

12      THE COURT:  And that's -- wait.  Sorry, just want to

13  make sure I'm tracking this.

14      And that's because for Saulsbury there's a duty to do

15  an HMAP, but with respect to Stone Cabin there's not, based on

16  your position, a duty to update the HMAP; is that correct?

17      MR. CRUSHAM:  That's correct, there's no duty to

18  update the HMAP or to attain the objectives of the HMAP, that's

19  right.

20      THE COURT:  Right.  Okay.

21      MR. CRUSHAM:  And turning to that argument under APA

22  Section 7061 to compel agency action, plaintiffs have to

23  identify legally required and discrete action to be eligible to

24  be compelled.  And we believe that *Norton* and the Supreme Court

25  is quite clear on this, that absent indication in the Plan

1   itself of a binding commitment, so unless there's proof within

2   that document that BLM intended to bind itself 40 years into

3   the future, a planning document's terms like this 1983 HMAP are

4   not legally required actions that can be compelled.

5          And I think from the -- based on the HMAP documents,

6   it describes sort of broad aspirational objectives, and it's

7   designed to facilitate those objectives.  And I don't think

8   Plaintiffs have identified anything here that indicates an

9   intent to bind themselves in a legally required sense that

10  could be compelled.

11         Rather, all of the statements that Plaintiff

12  identify, Plaintiffs identify, rather, are "will do" statements

13  similar to those in *Norton* that the Court found to be not

14  legally required in the sense that BLM will do XYZ monitoring

15  or will do a certain project.

16         And I actually think this case is more clear than

17  *Norton* in the sense that, in *Norton* the Supreme Court sort of

18  implied in the Plan issue the fact that the Land Use Plan's

19  terms were contingent on funding, based on the sense that if a

20  document was going to theoretically be binding the agency in

21  future years, it wouldn't make sense to say that it's binding

22  itself intentionally absent the express commitment, because how

23  is the agency to know what its appropriations are going to be

24  in the future; and so that lended the Court to think that these

25  weren't legally required obligations.

1        And in there, there was no express statement making
2   the actions contingent, where as here, obviously, there is a
3   statement saying everything in the HMAP is contingent on
4   available funding.  And so I think that just adds to the fact
5   that these -- this document does not create binding legal
6   obligations on BLM.
7        And I think given the context here where BLM is
8   already doing -- updating the HMAP as Plaintiffs request, I
9   think it sort of highlights the concern that *Norton* expressed
10  about compelling these sorts of actions, because it would
11  divert funding from other more pressing, more current
12  objectives in the sense that, here, the Court, if it were to
13  order BLM, for example, to attain these objectives, it would be
14  taking the same folks who are working and updating that HMAP
15  away from that to attaining objectives from a document that
16  issued 40 years ago, based on old monitoring and sort of not
17  the current conditions on the ground.
18       And so I think it can be resolved pretty clearly on
19  the legally-required prong, but we would also say that the
20  objectives are not discrete actions in the sense that they
21  could not be compelled without the Court having to superintend
22  BLM's sort of day-to-day processes and attain these objectives.
23       And so there are -- a lot of the objectives are broad
24  in the sense that I think one of them is just maintain the wild
25  free-roaming characteristics of the horses, which it is

1    certainly open to interpretation and sort of the hallmark of

2    the an agency discretionary of what that means.  And so we

3    would say that the objectives are also not discrete

4    requirements.  And so because they're not legally required, and

5    because they're not discrete, they're not eligible to be

6    compelled under APA Section 7061.

7            Turning to Plaintiffs' other claim with respect to

8    the Stone Cabin HMAP, they also argue under APA Section 7062

9    that the Gather Plan should be set aside because it did not

10   attain the 1983 HMAP's objectives or because BLM did not do

11   every action that plaintiffs think is required by the 1983

12   HMAP.

13           So this claim also fails.  First, BLM is not required

14   to attain the 1983 HMAP's objectives or to do everything listed

15   in that document before authorizing the gather.  And I think

16   this flows pretty cleanly from Judge Du's decision in Leigh 1

17   and Leigh 2 where these same plaintiffs were arguing that BLM's

18   regulations required BLM to prepare and consider an HMAP before

19   authorizing gathers.

20           And while Judge Du agreed with them that there was a

21   mandatory duty to do an HMAP, she expressly disagreed with them

22   that this was tied to BLM's ability to do management actions.

23   And so she found -- including gathers.

24           And so she found that BLM could conduct gathers even

25   if no HMAP had been prepared; and she found that to hold

1   otherwise would conflict with the Wild Horse Act's mandate to

2   immediately gather animals after making the requisite excess

3   and necessity determinations; and as this Court held in the

4   *Colvin* case, that requires BLM to gather animals as promptly as

5   reasonably possible.

6           And so, again, from Leigh 1 and Leigh 2, I think it

7   follows that an alleged failure to attain the objectives

8   properly or to do every action listed in the HMAP is not a

9   basis to find the gather decision unlawful.

10          Here, BLM substantiated its finding that there are a

11  dramatic excess of horses within the range, that the

12  rangeland -- it's necessary to conduct a gather in order to

13  achieve a thriving, natural, and ecological balance.  And I

14  don't think plaintiffs have directly even challenged that

15  through this HMAP claim.

16          And so preventing BLM from conducting gathers, so

17  vacating this gather decision or rendering it unlawful until it

18  has attained the goals of this 40-year-old document, that will

19  soon be superseded and would be contrary to the Wild Horse

20  Act's mandate.

21          And then -- so that's sort of at the legal threshold

22  we think the claim fails.  But if the Court does look at the

23  record, we think that the record shows that this gather

24  decision is not inconsistent with the goals of the 1983 HMAP,

25  and so plaintiffs have failed to show any inconsistency to the

1    extent there even is a requirement to show consistency.

2            So the -- I think the -- oh, sorry.  The 1983 HMAP

3    itself does not require BLM to do -- to attain its objectives

4    or to do every action in there before BLM gathers horses.  And

5    so I think the premise of plaintiffs' claim here that a failure

6    to attain the objectives before a gathering or a failure to do

7    every action in the HMAP before a gathering sort of fails at

8    the first step here.

9            But if the Court does look at the record and what BLM

10   has done here, the gather decision is consistent with, and I

11   think actually supports, the objectives that plaintiffs are

12   concerned about in terms of objective 1 that relates to setting

13   AML, and BLM has used the current AML for this complex in the

14   gather decision as required by the governing Land Use Plan, the

15   Tonopah Research Management Plan.

16           And Plaintiffs' arguments about objective 1 -- we're

17   into subunits -- all rely on old, outdated monitoring, and the

18   fact that at the time BLM determined there was a heavy use of

19   the range via livestock, but, again, that was 40 years ago, and

20   so it's not based on the current information, which as Your

21   Honor knows from the *Colvin* case, BLM is obligated when doing a

22   gathering decision to act on information that is currently

23   available to it.

24           And so here, if BLM had gone and said, well, the 1983

25   HMAP says we need to do this based on an old AML and based on

1    old monitoring, I think that it would have been potentially in

2    violation of the Wild Horse Act's mandate.

3        **THE COURT:**  Just to clarify there, the AML, which

4    might be more of a NEPA argument, but the AML that you're

5    relying on is '92, '94 -- '96 on these two areas.  The AML

6    itself as set is old.  But what you're talking about is not the

7    AML, but just sort of current range conditions; is that what

8    you're addressing?

9        **MR. CRUSHAM:**  So the current AML was, you're right,

10    for one of the HMAs -- I can't remember which one it is -- one

11    was set in '92 and one in '96, and then the Tonopah Research

12    Management Plan issued in 1997, and that is the governing Land

13    Use Plan that reflects those updated AMLs.

14        The 1983 HMAP uses an outdated AML for the Complex,

15    so not the ones that were updated in the '90's.  And so if --

16        **THE COURT:**  Okay.

17        **MR. CRUSHAM:**  Yeah, I'd use that.  It would have been

18    relying on updated information.

19        Objective 2 relates to preventing overutilization of

20    key forage species, and the Gather explains that -- the Gather

21    Plan, rather, explains that gathering horses here is going to

22    improve the rangeland health and include the availability of

23    forage for the wild horses that remain on the range.

24        And objective 3 relates to maintaining the wild

25    free-roaming characteristics of the horses in the Gather Plan

1  analyzing the effects to horses in detail, including their wild

2  free-roaming nature.

3          Objective 4 relates to providing water for the

4  horses.  And as the Gather Plan finds, gathering horses and

5  getting closer to AML and achieving AML will increase the

6  available water to the horses that remain relative to what the

7  current situation is.

8          And objective 5, again, is about doing studies to

9  acquire data on horses, and there's -- the record here is

10  teeming with that sort of information of monitoring data and

11  the health and wellbeing of the horses, which would benefit

12  from the gather decision.

13          And so I think that their Section 7062 claim fails

14  because, again, BLM is not legally required to do everything in

15  that document before gathering horses, and even if the Court

16  looks to the record, it certainly substantiates that BLM has

17  acted consistent with that document.

18          And I think with that, I'll turn it over to my

19  colleague, unless Your Honor has questions to address the NEPA

20  claim.

21          **THE COURT:**  No, I'm good.  I'd like to hear about the

22  NEPA claim, please.

23          **MR. KANG:**  Good afternoon, Your Honor.  Here on

24  behalf -- Young Kang here on behalf of the United States to

25  discuss the NEPA issues.

1          BLM's environmental assessment satisfied NEPA's

2     requirement for a hard look, a reasonable explanation of the

3     project, and the decision, and they disclosed the underlying

4     data.

5          Furthermore, BLM appropriately framed the project's

6     purpose and need to adequately consider the alternatives.

7          I think it's important to understand NEPA as a

8     procedural statute as to kind of frame BLM's analysis and the

9     environmental assessments.  It dictates procedures but not any

10    substantive outcomes, and, as a result, judicial review of the

11    NEPA analysis is focused on whether the agency provided an

12    adequate discussion of the probable environmental consequences.

13         And a recent decision by the Supreme Court, 7

14    *Counties*, reiterated the high level of deference that courts

15    are supposed to give to any agency's decisions, not just on

16    sort of the kind of fact determinations and expert sort of

17    decisions about what the facts are on the ground, but also the

18    way that the agency crafts its analysis, you know, determining

19    what is relevant, how much you need to look into something.

20    These are all the sorts of, like, expert determinations that we

21    leave to the agencies.  And that was kind of a main --

22         **THE COURT:**  Oh, just one quick question.

23         7 *Counties*, I think 7 *Counties* involved an EIS as

24    opposed to an EA and a FONSI.  Does that make any difference in

25    your estimation in terms of that deference?

1            **MR. KANG:**  No, Your Honor, it doesn't make any

2    difference.

3            You know, an EA, generally speaking, is less rigorous

4    than an EIS, and if there is any difference, it would kind of

5    point to more deference towards the agency.  But the fact that

6    there, that that involved an EIS and this involves an EA is not

7    different -- does not cause any sort of change.

8            The core sort of principle of 7 *Counties*, that when

9    agencies are conducting their NEPA analysis, the decisions

10   about how to conduct that analysis involve agency expertise

11   that warrants deference from the Court.

12           **THE COURT:**  And does that deference also apply to,

13   like, the purpose and need and the scope of the decision?

14           **MR. KANG:**  Yes.  And so there's -- there's that sort

15   of -- the 7 *Counties* deference of the purpose and need applies

16   the purpose and just because that involves, again, agency

17   expertise, but also there's, like, a plethora of case law

18   discussing that.  The purpose and need generally is given

19   substantial deference, kind of just for the fact that the

20   agencies, when they define the purpose and need, they're

21   defining the project.  That is kind of what agencies do, you

22   know.

23           And so that -- because it's kind of moot within the

24   providence of what the agency's duty is as to define what

25   projects are, do certain things, and manage certain things,

1  that also gives their definition of purpose and need to the

2  level of deference.

3       **THE COURT:**  So one of the questions I had is just, it

4  seems that the plaintiffs are sort of indirectly trying to

5  challenge the AML.  And I was just curious, sort of, is AML

6  something that you get to challenge in the context of something

7  like this, or is the AML -- in this case very old AML setting,

8  but is the AML something that you challenge separately from a

9  particular gather?

10       **MR. KANG:**  I think you're exactly correct, that they

11  are attempting to challenge AML through NEPA here, and there

12  is -- there would be a separate thing for it for AML.

13       You know, I don't know exactly what kind of the

14  formal word for that process would be, in the sense that I

15  don't know if there's sort of an AML setting a rule.  But

16  what -- we can come at it kind of from the negative aspect of

17  it in the sense that a gather plan does not set AML.

18       BLM is not required to set or verify AML when it

19  conducts a gather plan.  AML is not considered a verified, you

20  know, they don't reaffirm it every time they do a gather plan.

21  There's no requirement to -- I believe Leigh 1 reaffirmed that

22  BLM does not have to reconsider, you know, there's this -- I

23  think to reconsider AML in a gather plan carries a high risk of

24  violating the Wild Horses Act, which requires sort of an

25  immediate removal of horses based on the information available

 1   at the time.  Going through the process of reaffirming AML

 2   would bring -- could potentially bring BLM into violation, most

 3   likely into violation of the Wild Horses Act.

 4         And that's kind of one of the sorts of things that

 5   hems in this NEPA analysis here, is that anything that would

 6   result in a violation of the statutory mandate is kind of

 7   presumptively unreasonable and not something that BLM could

 8   consider.

 9         And so insofar as plaintiffs are trying to challenge

10   the AML through NEPA, the fact that, you know, NEPA is about a

11   project, and the project is the Gather Plan.  The Gather Plan

12   uses AML, but has nothing to do with the setting or

13   verification of AML.  And for that reason anything kind of

14   involving AML, challenging AML, asking for data about AML was

15   outside of the scope of this NEPA analysis, because the NEPA

16   analysis is about the Gather Project -- or the Gather Plan.

17         **THE COURT:**  So I don't want to skip over impact

18   analysis, if there's something that you want to spend more time

19   on.  But I do want to ask about the sharing of information and

20   whether it's sort of typical and/or adequate and/or needs to be

21   supplemented, and the way to do that.

22         Can you just sort of address those issues?

23         **MR. KANG:**  Absolutely, Your Honor.

24         I don't think there's much to say about the impact

25   analysis.  I don't think Plaintiffs have much to say about the

1    impacts analysis either.  Their focus is on sort of the

2    disclosure of information, on the disclosure of data.  NEPA

3    only requires that agency shares relevant information, so that

4    can play a role in the decision-making process.

5         The stuff that plaintiffs might raise issue with are

6    either not relevant, in the case of AML data.  You know, we

7    built this project as a set AML, so AML data is irrelevant, or

8    they have not clearly explained how it's necessary for engaging

9    in the public decision-making process.

10         For example, the rangeland health data, that seems to

11   be kind of the other core complaint that they have in terms of

12   underlying data.  BLM provided the results of that study.  That

13   data is in the AR.  And plaintiffs have not explained how that

14   raw data kind of underneath the results is necessary for

15   participating in the process.

16         You know, they complain -- they raise issue with the

17   fact that they're not able to discern sort of the allocation of

18   where forage is happening and where certain animals are and

19   where certain animals aren't, but that's irrelevant to the

20   Gather Plan.

21         You know, what triggers the gather is are there more

22   horses than AML, and on that front there's plenty of data.  The

23   rangeland health data demonstrates that kind of as a

24   qualitative measure of the environment that the environment is

25   being degraded.  There are horses above AML.

1          Plaintiffs have not made any sort of argument why

2     they need the raw data, the rangeland health study, to

3     meaningfully engage in the NEPA process here.

4          And so ultimately the BLM --

5          **THE COURT:**  And what about the AML -- the documents;

6     I think one was a consent decision and one was a multiple use

7     decision, the '92 and '96 documents --

8          **MR. KANG:**  Yes.

9          **THE COURT:**  -- do you concede that those are not --

10    you concede those are not in the administrative record.  I

11    guess the question is should they be in the administrative

12    record, not necessarily because challenging the AML is a

13    relevant exercise, but even as to -- I assume that this is not

14    about setting AML.  Is the AML data itself sufficiently

15    pertinent and relevant that it should be in the administrative

16    record and needs -- should be supplemented?

17         **MR. KANG:**  No, Your Honor.  The AML -- anything

18    underlying the AML isn't relevant.  There's nothing that could

19    be done about AML here.

20         If, you know, if BLM wanted to do something about AML

21    in a gather project, that would very likely bring it in

22    violation of WHB.  And we could put all of that stuff in here

23    and it would not change the discussion at all and have no

24    effect.

25         You know, NEPA's procedure has focused on making sure

1    that the agency looks at the relevant things for the decision

2    that it's making, and the decision it made is are there more

3    horses than AML; how do we do a gather plan to stay in

4    compliance with the Wild Horses and Burros Act.  The consent

5    decree underlying the AML doesn't inform this -- doesn't inform

6    that sort of discussion.

7         And the 1992 document is actually in the record, and

8    they -- and plaintiffs did try to get the 1996 document in the

9    record as well, but the Court denied it precisely because

10    AML -- the setting of AML, the verifying of AML is completely

11    irrelevant to the Gather Plan.

12         If Your Honor doesn't have anymore questions on kind

13    of the data issue, I will move on to the purpose and the need

14    and alternatives discussion.

15         **THE COURT:**  Oh, yeah, please do.

16         **MR. KANG:**  And so the thing about the purpose and

17    need, right, is, once again, the agencies are given

18    considerable deference in defining the purpose of an amenable

19    project.  But there are some guardrails, right?  One of them is

20    that they are required to quite reasonably consider statutory

21    mandates, right?

22         The purpose here of the project is to gather access

23    horses to achieve AML, while the need is to restore a thriving

24    natural ecological balance.  This perfectly tracks and is

25    informed by the Wild -- the statutory mandate and the Wild

1    Horses Act.

2         It's hard to imagine what else they could have done

3    in terms of defining the purpose and need.  And so for that

4    sort of reason alone the purpose and need is adequately

5    defined.  It's not unreasonably narrow.  It's something that is

6    more or less mandated by what the statute requires of BLM and

7    this project.

8         Then the consideration of the alternatives was

9    reasonable in light of the purpose and need, because the

10   alternatives can only -- BLM's consideration of alternatives is

11   limited by the purpose and need, and so it can only consider

12   alternatives are reasonable in light of that purpose and need.

13        The plaintiffs propose alternatives, such as

14   livestock grazing reallocation, reevaluation of AML.  They were

15   rejected precisely because they would require too much time

16   before a gather, and bring BLM into violation of the Wild

17   Horses and Burros Act.

18        There are kind of other reasons for that, for

19   example, with AML.  All the monitoring data shows that with

20   AML, where it's at, that the rangeland is degrading; and so it

21   would be unreasonable for BLM to consider raising an AML with

22   the monitoring data that it has.

23        Towards the livestock grazing reallocation, that

24   requires a change to the RMP, which is outside of the scope of

25   the Gather Plan.

1          So, you know, kind of the big principle thing is the

2     statutory mandate that requires BLM to act immediately, but

3     there are these other reasons underlying the rejection of the

4     alternatives.

5          THE COURT:  Can I ask you just a question?  We talked

6     a little bit about the state of play with respect to creating

7     this new HMAP for this bigger -- for the whole complex.  But

8     what is the state of play with actual, like, horses on the

9     ground right now?  Do you have information about that?

10          MR. KANG:  The --

11          THE COURT:  Like, how much over AML are you now?  I

12     just wasn't sure of that.

13          MR. KANG:  Yes, that is in the -- that is in the EA,

14     and I can -- I have the numbers right here.

15          Yeah.  So according to the population data, these are

16     direct counts from helicopter flights, emergency gathers, and

17     all this methodology is described in the EA.  The data shows

18     that the population exceeded the combined high AML for Stone

19     Cabin Saulsbury by approximately 527 animals, which is more

20     than a hundred percent over the high AML.  And the idea --

21          THE COURT:  I guess my question is have you done --

22     you did the emergency gather, and then you did the Gather Plan,

23     right?

24          MR. KANG:  Yes.

25          THE COURT:  Have there been more gathers since the

1    Gather Plan?

2         **MR. KANG:**  I don't believe that there have been more

3    gathers, Your Honor.  I would need to confirm with agency

4    counsel, but I'm almost certain that there have not been any.

5         **THE COURT:**  Okay.  Thank you.

6         Sorry.  I diverted you from fishing up on NEPA.

7         **MR. KANG:**  Absolutely, Your Honor.  I'm here to

8    answer your questions.

9         Still, that was kind of the purpose and need and --

10        **THE COURT:**  Okay.

11        **MR. KANG:**  Yeah, and I think if -- I don't have -- if

12   Your Honor doesn't have any other questions for me regarding

13   NEPA --

14        **THE COURT:**  Just to sum up your purpose and need

15   argument, your purpose and need is that the purpose and need is

16   framed by the -- by the Wild Horses statute.

17        And then to kind of consider things that really go

18   beyond that, and to explore alternatives that go beyond that

19   just kind of put the agency at risk of going too far afield

20   from their statutory mission in this context, which is to get

21   rid of -- to remove the horses that are over AML, quickly, to

22   remove them promptly.

23        **MR. KANG:**  Yes, Your Honor.  So the purpose of NEPA

24   is framed by the Wild Horses statutory mandate.  And then in

25   the consideration of alternatives, right -- because all these

1  alternatives that Plaintiffs propose have been considered in

2  the EA.  The reason they were rejected is because they are not

3  reasonable in light of the purpose and need and cannot even be

4  reasonable in light of the Wild Horses member of that statute.

5           Does that make sense?

6           **THE COURT:**  Yes.

7           **MR. KANG:**  Okay.  And I realize we went over 20

8  minutes, so if you have no other questions regarding NEPA, Your

9  Honor, I'll --

10          **THE COURT:**  I think I'm okay.  I would just like to

11  hear from plaintiffs, and I'll circle back.

12          So when I circle back, you know, I want your argument

13  to be responsive.  You can figure out how to -- which one of

14  you steps in and for how much time, that kind of thing.

15          Okay.  So Ms. Lovko, I'd like to hear from you next.

16  Thank you.

17          **MS. LOVKO:**  Thank you, Your Honor.

18          I want to be really clear before kind of delving into

19  a couple of legal arguments.

20          Plaintiffs have never sought to prevent BLM from

21  rounding up horses where an overpopulation exists and removal

22  of horses is necessary to protect the animals' range.  But

23  Plaintiffs are only seeking here to have BLM make that sort of

24  determination in accordance with law.  No more, no less.

25          If they comply with law and a roundup is necessary,

 1    then of course that is a tool that the Wild Horse Act provides

 2    to them.

 3          I'll begin with addressing Plaintiff's claims

 4    regarding the HMAP for the Stone Cabin HMAP.  Before doing so,

 5    I want to clarify that an HMAP establishes management actions,

 6    and both short-and long-term management and monitoring

 7    objectives.

 8          Mr. Crusham said a few times that the HMAP is old,

 9    but such language, you know, referring to it as old is not

10    material.  The HMAP was, at the time it was adopted --

11          (Telephone interruption.)

12          I'm so sorry.  I thought I turned this off.

13          Okay.  I think I muted it now.  My apologies, Your

14    Honor.

15          But the fact that, you know, it was adopted in the

16    1980s isn't material, because the HMAP is operative.  I mean,

17    it's the operative document.  If they find that it being old

18    somehow lacks something, they can update it.  In fact, they

19    should have updated it already.

20          **THE COURT:**  Is there any legal -- is there any legal

21    duty to update it?

22          **MS. LOVKO:**  Nope.  No.  The agency does have a

23    handbook that states it should be updated, I think it's every

24    10 or 15 years, but it's just -- that's guidance.  It's not,

25    you know, a rule or regulation.

1              **THE COURT:**  Okay.  Thanks.

2              **MS. LOVKO:**  Yeah.  Okay.  Moving on to then the

3    discussion of the HMAP.

4              Basically, Plaintiffs, as defense counsel stated,

5    have both a 7061 and a 7062 claim, and these are quite

6    different in what the results would be if Plaintiff's motion is

7    granted.

8              The 7061 claim, as to the Stone Cabin HMAP, would

9    just ask that -- I think it's seven or eight specific

10   commitments made in the HMAP are found to have been either

11   unlawfully delayed or unlawfully withheld or unreasonably

12   delayed.

13             The 7061 claim does not ask that broad objectives be

14   implemented.  It identifies some very specific commitments, and

15   I think those are on line -- page 41, page 40 or 41 of the

16   opening brief in identifying them.

17             The 7061 claim actually is fairly straight forward.

18   They're both Wild Horse Act and NEPA.  The HMAP committed BLM

19   to implement certain provisions.  BLM argues that, however,

20   that this is not discrete agency action that is legally

21   required, in that regard relying upon the Supreme Court

22   decision in *Norton*.

23             Plaintiffs don't disagree with the general

24   proposition that 7061 claims only apply to legally required

25   discrete action, but the *Norton* case does not negate

1    Plaintiff's claim.

2         The *Norton* case focused on a challenge to a land use

3    plan, or LUP statement.  Well, it said BLM would conduct

4    monitoring associated with off-road vehicle use.  In

5    considering whether that language was sufficient to create a

6    legal duty to act, the Court looked to see if the challenged --

7    well, it looked to certain factors, and it found, one, that the

8    LUP stated that this monitoring of off-road use was only to

9    occur, quote, if warranted, end quote.

10        The Court also noted that LUPs typically are not

11   site-specific implementation decisions, but, instead, policy

12   determinations that identify agency priorities.

13        The Court also looked at the factor that the Board of

14   Land Appeals does not review LUPs.

15        And the fourth factor the Court looked at was whether

16   LUPs are normally constrained by funding considerations, and

17   it's that last one that the defendant focuses primarily on.

18        But here in this case the factors that the Court was

19   looking at in *Norton* do not exist.

20        First, HMAPs are discrete agency actions.  I heard

21   Mr. Crusham state that they are not.  That's simply not true.

22   Their own handbook identifies them as discrete actions.  And

23   Judge Miranda Du, in *Leigh -v- Raby*, also said they were

24   discrete agency actions.

25        Second, HMAPs are implementation decisions, whereas

1    LUPs aren't.  They are indeed site-specific implementation

2    decisions that establish certain management actions and

3    monitoring objectives for specific HMAs.  It is not a plan that

4    only contains, quote, broad aspirational planning goals, end

5    quote, as BLM asserts, without citation to anything that could

6    lead this Court to believe so.

7            The third factor is the Board of Land Appeals does

8    refute HMAPs, and so it's different from the LUP addressed by

9    the Supreme Court.

10           And, finally, there's no evidence that generally

11   HMAPs are normally constrained by funding by the court.

12           And I want to take a quick moment to respond to

13   Defendants' briefs regarding the HMAPs inclusion of the

14   statements that it's contingent on funding.

15           First, BLM's failing to implement any of the HMAP,

16   including the provisions that the plaintiffs are seeking to

17   have acted upon, has not shown that this failure was based upon

18   funding availability.  Instead, it seems likely that BLM's

19   failure has more to do with the fact that its Tonopah field

20   office just made a decision to ignore the HMAP and create its

21   own management actions, such lassitude reflecting a general

22   rule of recalcitrance in many BLM offices to actually comply

23   with the law.

24           But after creating an HMAP, public participation,

25   going through a NEPA process, and issuing a record decision,

1    the agency simply is not free to ignore the HMAP commitments.

2            BLM, nonetheless, argues that that language about

3    funding is determinative, in and of itself.  That's not so, and

4    the Supreme Court decision in *Norton* doesn't compel such a

5    conclusion either.

6            In that case the Court noted that LUPs, as I said,

7    may create -- may be assumed to normally be constrained by

8    funding.  However, despite this, despite saying that that was

9    one factor they looked at, the Supreme Court said LUPs

10   nonetheless can still create legally required obligations.  And

11   on this point, the Supreme Court said such obligations can

12   arise when the LUP is either reiterating duties that it's

13   already obligated to perform or if the LUP's language is such

14   that a binding commitment is determined to exist.

15           So, again, yes, funding was a factor the Supreme

16   Court looked at in *Norton*, but it was not a determinative

17   factor in and of itself.

18           So we come back to whether the HMAP here, the Stone

19   Cabin HMA, indicates a commitment to act, and it does.  For

20   example, in regards to the wild horse population and habitat

21   studies, the HMAP says such studies are, quote, essential, end

22   quote, to BLM's Wild Horse and Burro Program for this HMA, and

23   that the key studies, quote, will be conducted, end quote -

24   each HMAP objectives.

25           Secondly, the HMAP, even the old, actually, does a

1  really nice job of laying out what proactive obligations the

2  agency commits to prior to engaging in gather operations.

3          Are we simply to ignore all of this language?  It

4  would be a perversion --sorry.

5          **THE COURT:**  Well, let me ask you a question.  What do

6  I do -- so let's say I take it -- I take your argument as true.

7  What do I do about the fact that the agency is right now

8  working on a new HMAP that will supersede, my understanding,

9  this old HMAP?  What -- how does that rework your situation?

10          **MS. LOVKO:**  Certainly.  Certainly.  No, let's just

11  shift real quick and address that prudential mootness argument.

12          So there are basically really only two claims that

13  are being addressed by Defendants' argument.  One, the 7061

14  claim for the Saulsbury HMA, which they admit they've

15  unlawfully delayed on creating an HMAP for, and then we have

16  this 7061 claim for the Stone Cabin HMA HMAP, right?

17          The Court should find that they have unreasonably

18  delayed and unlawfully withheld implementation of these

19  provisions that plaintiff addressed, and order a remand to

20  either implement them or create an HMAP.  And I have no problem

21  with the Court, you know, setting that date for sometime early

22  in 2026.

23          I do not think, you know, completely letting them off

24  the hook is warranted.  Yes, they did provide a declaration

25  saying they intended.  That declaration also did not say:  And

1    we will complete it.  Notably, that's kind of absent.  So I

2    think they're moving in that direction, and that's fine, but we

3    still need, you know, a decision on their conduct and a date

4    certain by when that will occur.

5           I'll also note in this regard, they're only doing

6    this because we continue, you know, because these plaintiffs in

7    particular litigated this issue.  You know, and they kind of

8    like to duck and dodge:  We don't have to do any HMAP; oh,

9    well, maybe we have to do an HMAP, we don't have to consider an

10   HMAP; well, maybe we have to consider an HMAP, but it means

11   this, right -- requiring us to have to keep litigating this.  I

12   don't think that shows any sort of behavior to let them off the

13   hook without a date certain.

14           **THE COURT:**  Okay.  So let me just -- I want to ask,

15   particularly, it seems like there's certainly a willingness to

16   be -- there seems to be an argument from the Government, which

17   is this is already underway, so you don't -- Court, you don't

18   have to do anything versus I should at least do what Judge Du

19   did in the *Leigh* cases and actually set a date; and whether

20   that date has a little bit more, you know, wiggle room for the

21   Government to get it done, that's just a sub issue.

22           But it is meaningful to you to actually set a date,

23   particularly -- I mean, definitely on the Saulsbury, because

24   there is no HMAP that tracks exactly with *Leigh*.

25           You're making this argument, this is a slightly

```
 1  different context on the Stone Cabin one, because you're making
 2  this argument, a different argument or it's a different context
 3  because there is an HMAP that you're making this other argument
 4  about, either delaying compliance with the objectives, I guess,
 5  or not achieving them; is that correct?
 6          MS. LOVKO:  Yes.  Yes.
 7          THE COURT:  Okay.  I wanted to ask you, you haven't
 8  mentioned mandamus.  I just wanted to ask the question.  The
 9  Government has argued that you're not entitled to mandamus
10  action.  I'm just curious, is there something that you think
11  that you could possibly get through mandamus that you can't get
12  legally as a remedy?
13          MS. LOVKO:  No, no.  I think it's dealt with through
14  the other causes of action, Your Honor.
15          THE COURT:  Okay.  Good.
16          Go ahead.
17          MS. LOVKO:  Okay.  So those are pretty much, you
18  know, the 7061 claims that we --
19          (Telephone interruption.)
20          MS. LOVKO:  Okay.  I'm going to go throw this in
21  another room, because it will not mute.
22          (Pause in proceedings.)
23          MS. LOVKO:  Okay.  That problem is solved.
24          Moving to the 7062 claims.  The 7062 claim also
25  addresses the Stone Cabin HMAP, but now the focus slightly
```

1    shifts.  Now we're looking at whether BLM can adopt a gather

2    plan that does not contain any management actions necessary to

3    attain the Stone Cabin HMAP's objectives.

4           Section 4710.4 of the Wild Horse Act's implementing

5    regulations are a, quote, constraint, end quote, on BLM

6    management, stating that the agency shall manage wild horses at

7    the minimum level necessary to attain the objectives in

8    Approved Herd Management Area Plans.

9           Somehow BLM says that language doesn't really have

10   any meaning.  "Having to, shall," you know, means nothing there

11   regarding management; having to attain objectives has no

12   meaning.  It also then argues, well, if it does have meaning,

13   in the alternative, again, the client is consistent with the

14   Stone Cabin HMAP, which is, one, a complete fabrication.  And,

15   anyway, Section 4710.4's language does not ask for consistency;

16   it asks for management that is tailored to the attainment of

17   specific provisions contained within the HMAP.

18          Focusing just on Defendants' contention that this

19   section does not require the agency to attain HMAP objectives

20   for the purposes of adopting a gather plan, BLM did refer to

21   two of the *Leigh* cases, which plaintiffs here also were

22   involved in.  Both of these cases were ruled on by Judge

23   Miranda Du.  Defendant argues that these cases imply that where

24   an approved HMAP has been issued, they still don't need to look

25   at it, but it's an incorrect confabulation from Judge Du's

1    ruling.

2            With these cases, here's the only thing that Judge Du

3    ruled upon:  One, that 4710.4 is a constraint on BLM's own

4    discretion, which is valid because BLM chose to adopt that

5    regulation.

6            Two, BLM must create HMAPs for all HMAs.

7            Three, BLM may not evade its duty of creating HMAPs,

8    but, instead, rule on Land Use Plans.

9            Four, BLM may not conduct management activities on

10   HMAs, but it may conduct management activities on HMAs which do

11   not yet have an approved HMAP.

12           But Judge Du did not -- it's not before her -- rule

13   that BLM may conduct management activities which do have an

14   approved HMAP.  In such circumstances she did not say that you

15   can still ignore the then approved HMAP's objectives.

16           And if you look at Judge Du's ruling -- and I think

17   if you look at the first one it's probably a little bit more

18   in-depth, because it was her first time she addressed that --

19   it does not support an implication that the Defendants'

20   position has any validity.

21           In Leigh 1, *Leigh -v- Raby*, for the purposes of

22   determining which prong of 7061 applied, whether it was the

23   unlawfully withheld prong or the unreasonably delayed prong,

24   the Plaintiffs asked Judge Du to find that HMAPs must be

25   created prior to implementing any gather operation, with this

 1  deadline triggering the unlawfully withheld prong, 7061.

 2          To address this the Court said, the requirement to

 3  prepare HMAPs should be read in the context of other

 4  regulations of the Wild Horse Act as well as statutory

 5  language.  Recognizing that the Wild Horse Act directs BLM to,

 6  A, manage horses in a manner that maintains depriving natural

 7  ecological balance, or TNEB, because we love our acronyms; and,

 8  B, also provides that the agency must immediately remove excess

 9  animals from the range when the agency finds gather operations

10  necessary.

11          The Court reached the conclusion that 7 -- that

12  Section 4710.4 and its directives to create HMAPs did not mean

13  that HMAPs have to necessarily be created prior to gather

14  operations; otherwise, it might force Wild Horse Act's

15  directives regarding TNEB and immediacy.

16          And in this regard, Judge Du appeared most concerned

17  that the time necessary to create an HMAP, which she stated

18  might take, quote, years or perhaps even decades, end quote,

19  would frustrate Congress' intent in adopting the Wild Horse

20  Act.

21          But her, you know, examination of the statutory and

22  regulatory context, if applied here, does not similarly excuse

23  BLM.  First, here, there's no deadline issue in this case, as

24  regards to HMAP creation, because the HMAP for the Stone Cabin

25  HMA has already been approved and is operable.

 1              Second, there's no concern that undertaking

 2    management in a manner necessary to attain the HMAP's

 3    objectives will somehow frustrate the Wild Horse Act's

 4    requirements regarding TNEB and immediacy.

 5              Focusing first on TNEB.  Just, you know, to be clear,

 6    TNEB really means that wild horses are to be managed in a

 7    manner that ensures progress towards achieving healthy range

 8    conditions for plants, watershed, and animals.

 9              The HMAP for the Stone Cabin HMA actually focuses on

10    TNEB, because it creates objectives that address the means by

11    which BLM will protect the healthy range conditions for plants,

12    watershed and animals.  In other words, the statute said manage

13    for TNEB, not really giving a huge amount of direction in that

14    regard.  BLM created an HMAP created specifically for Stone

15    Cabin HMA that said here's how we will achieve TNEB.

16              So there's no reason to excuse its consideration of

17    that in the Gather Plan.  It's actually doing what it needs to

18    do.  It is in alignment with the law.  In this way, you know,

19    consider it's a blueprint for how it can comply with its duty

20    to achieve TNEB.

21              Judge Du had also, you know, looked at the immediacy

22    requirements under the Wild Horse Act.  But here again, to --

23    if BLM had looked to the Stone Cabin HMAP, it would not have

24    frustrated that immediacy requirement.  A couple points are

25    relevant here.

1          First, the Gather Plan adopted that's being

2     challenged here is a 10-year Gather Plan that allows gathers

3     throughout the Plan's life.  Also, it's designed to achieve the

4     objectives of adjusting sex ratios and implementing population

5     growth suppression treatments.

6          So it's obvious from this that BLM does not see the

7     Wild Horse Act's immediacy requirement as demanding that it do

8     nothing more than, you know, an immediate one-time gather.

9     Instead, BLM recognizes the Gather Plan is going to include

10     other management actions, such as dealing with sex ratios,

11     population growth suppression, or what have you.

12          Here, the management actions that BLM should have

13     addressed are those that were contained in the Stone Cabin

14     HMAP.  They didn't do so.

15          So the duty under the implementing regulation to

16     manage at the minimum level necessary to obtain objectives and

17     HMAP must be given some effect.  And as addressed in

18     Plaintiff's opposition motion, at the very least this means

19     that any gather plan adopted by BLM needs to include management

20     actions that bear a rational relationship to the Stone Cabin

21     HMAP's provisions.  That's all we're looking for, some rational

22     relationship.

23          **THE COURT:**  So I have a question about that, which is

24     just, practically, let's say you were to win all of that.

25     Wouldn't the remedy be that the agency has to do some --

1    either -- I mean, I'm just torn about the fact that there's

2    going to be a new HMAP which sort of updates, supersedes all of

3    this information within a period of time.  Then if there's a

4    new HMAP, if we're arguing about consistency with the old HMAP,

5    that just seems to be all sort of -- it's going to be

6    overshadowed by that new action.

7        **MS. LOVKO:**  For the 7061 claims, definitely.  I

8    understand your concern.

9        For the 7062 claims it's different, because now we're

10   talking about whether the Gather Plan needs to be vacated,

11   right?

12       7061 claim does not vacate the other claim.  It's

13   unrelated to the Gather Plan action.

14       But 7062 claim, yeah, is right on point, so by

15   vacating it or setting aside this, then, yes, then they're free

16   to rely upon whichever plan they think is important or to

17   conduct emergency gathers, if they think that's necessary, or

18   whatever.  But they -- yeah.

19       And by way of example, you know, how this should have

20   played out is had BLM complied with Section 4710.4, this would

21   have been that the Gather Plan would have provided the roundup

22   of horses with removal occurring in five subunits of the Stone

23   Cabin HMA, as dictated by actual use and forage utilization

24   within each subunit.

25       Instead, BLM completely ignores its need to consider

1   subunits.  And this is not insignificant.  This is not just

2   some sort of bureaucratic procedural error.  It is very

3   significant, because the whole purpose behind allocating

4   roundups in these five subunits is because BLM, in the HMAP,

5   analyzed and concluded that each subunit has unique features

6   regarding range conditions and horse populations.  Thus, to

7   ensure TNEB and determine where roundups are necessary, the

8   HMAP committed the agency to gather operations based on these

9   subunits, and that's simply on an overall population inventory

10  roundup for the HMA as a whole.

11         And finally, Defendant gives no rationale in its

12  Gather Plan for making no mention of the subunits and giving no

13  consideration to the HMAP's management actions for these

14  subunits.

15         And to be clear, BLM ignored this both during its

16  NEPA review as well as during its briefing for this motion.  It

17  makes no mention of the subunits, despite Plaintiff, you know,

18  making this argument again and again.  Thusly, the Court should

19  find that the management actions in the Gather Plan are not

20  rationally related to the objectives.

21         Similarly, had BLM complied with Section 4710.4, this

22  also would have meant that forage utilization studies would

23  have addressed specific key forage species and determined

24  whether utilization ceded allowable use factors by more than

25  10 percent, as mandated by the HMAP.

1          While BLM did consider forage use, the adopted Gather

2    Plan does not focus on the Plaintiffs' identified forage

3    species nor address allowable use factors.  And BLM does not

4    explain how its conclusions regarding forage bear rational

5    relationship with HMAP's provisions.

6          Had BLM -- sorry.

7          Had BLM complied with Section 4710.4, it also would

8    have meant that they looked at cumulative impacts.  I'm going

9    to hold off on that, and I'll address it when we get into the

10   NEPA section, if that's all right.

11   **THE COURT:**  Okay.  Good.

12   **MS. LOVKO:**  Had BLM complied with Section 4710.4, it

13   would have considered the HMAP's objectives regarding the

14   provision of water resources.  Instead, the Gather Plan really

15   says little more than there are limited water sources for

16   horses, and it wants us to take on faith that removing horses

17   somehow will be a sufficient answer to address TNEB and horse

18   health.

19          BLM's refusal to give the HMAP any serious

20   consideration is arbitrary and capricious and exceeds its

21   authority.  Thusly, it should be set aside pursuant to 7062.

22          Again, Plaintiffs aren't saying that removal of

23   horses is not warranted at times.  You just have to do it

24   legally so that the management is comprehensive and actually

25   ensures TNEB.

 1          THE COURT:  Can you address the NEPA claim?

 2          MS. LOVKO:  I can.  Thank you.

 3          BLM -- the main problems with the NEPA analysis is

 4    that BLM did not really identify the necessary data and

 5    information that NEPA requires for a hard look.

 6          And also very, you know, fatal to their approach is

 7    they just didn't respond to public comments in a sufficient

 8    manner to explain the rationale for its choices and the

 9    methodology employed.

10          You'd had some discussion with defense counsel

11    regarding AMLs, for example.  First, kind of, is, of some

12    things that were stated in their opening oral argument, it is

13    true that AMLs do tend to be set by Land Use Plans and not in

14    HMAPs.  However, there's nothing to say you can't do it in an

15    HMAP.

16          THE COURT:  Are you challenging directly the AML?

17          MS. LOVKO:  I'm not directly challenging the AML for

18    the very reason that what would I be challenging?  What is this

19    1992 Consent Decree?  What is this 1996 Final Multiple Use

20    Decision?

21          I have asked BLM to provide these documents during

22    the NEPA review.  The public asked for these documents or for

23    information on how the AML numbers were reached, right?  And --

24          THE COURT:  And are those documents not -- are you

25    asking for them to be inserted into the -- I mean, I know

1  you're asking them to be inserted into the administrative

2  record so that you could consider them, but are they not

3  publicly available, these documents?

4       **MS. LOVKO:**  I suppose they might be publicly

5  available through a FOIA request.  I have not conducted one on

6  that, so I just can't answer that question.

7       They are -- I'm a very good Internet sleuth, and I

8  have not found them.

9       **THE COURT:**  Okay.

10      **MS. LOVKO:**  Or I think, actually, one of them I

11 found, like, the first two pages, but not the analysis.

12      **THE COURT:**  And why are they so significant?  I mean,

13 it seems like the Government is arguing, look, the number, the

14 number that's set by the AML is a number that we're just

15 required to deal with.  This process is not about setting that

16 number, reconsidering that number, the age of the number;

17 that's just not what the Gather Plan is intended -- that's not

18 the focus of that process and decision-making process.

19      **MS. LOVKO:**  Yeah, I disagree.

20      Yeah, AML is really the standard by which to

21 determine -- in part, that's one of the things that have to be

22 considered -- a standard to determine whether there are certain

23 impacts occurring on the range, and overpopulation exists,

24 right?  So that's the standard.  However --

25      **THE COURT:**  Is there case law that considers that

 1   sort of in this context of considering a gather that either the

 2   NEPA review process and information sharing for the decision

 3   itself really should be reevaluating AML or just exactly on

 4   what the AML is?

 5           MS. LOVKO:  So there are court decisions, you know,

 6   basically saying that AML is the number that kind of should be

 7   relied upon.  But just like any standard that's used, right,

 8   it's a -- it's a methodological standard, right?  And at times

 9   we know standards don't work no more, right?

10           I mean, in an air quality analysis under NEPA, right,

11   normally we rely on the NAAQS, but sometimes the NAAQS, and

12   then courts revise, becomes very suspect, right?  And so

13   plaintiffs will argue you can't rely on that standard.

14           The same when you're looking at Endangered Species

15   Act or old growth, you know, whatever issue, it's a standard

16   triggering action.  But if that standard is faulty, then you

17   can't properly rely upon it.  It's triggering it.

18           THE COURT:  But isn't BLM, in this sort of trying to

19   walk the line, they have a statutory obligation to act on horse

20   population over AML, and it would be potentially they might be

21   in violation of the Act if either they start to renegotiate or

22   reconsider AML in that process.  I mean, that just becomes

23   perhaps a diversion that --

24           MS. LOVKO:  I don't think -- sorry, Your Honor.

25           THE COURT:  -- that might be in conflict with their

1    statutory duty, and either to just move the horses or with

2    their sort of timing obligations under the Act.

3          **MS. LOVKO:**  I don't think it is against their

4    obligations.

5          There are a couple things that come into play here.

6    Yes, you have AML, and that's one of the factors that's

7    involved in making a determination for a roundup.  But AML is

8    specifically connected to some determination that it represents

9    the optimal number of horses that can live in the HMAs while

10   still maintaining and achieving TNEB, right?

11         If you have an AML that is not connected to that, it

12   is totally unrelated to the optimal number of horses that can

13   exist, right?  Then relying on AML is actually a violation of

14   their duty, right?

15         So, yeah, they could -- on one hand, yes, they have

16   to rely upon AML.  But on the other hand, that AML has to --

17   you know, some sort of scientific methodological basis, both

18   under the Wild Horse Act and under NEPA.

19         **THE COURT:**  Is there an AML process that you're aware

20   of in which -- in which a plaintiff directly becomes engaged in

21   questioning the number that's set, sort of separate and apart

22   from a gathering decision, which is what we're talking about

23   today, but actually just a stand-alone decision.

24         **MS. LOVKO:**  I do happen to know that, because I'm

25   involved in litigation in a case like that right now.  And, not

 1  surprisingly, BLM says I can't be challenging that decision.  I
 2  should be somehow maybe challenging it, you know, in other
 3  things, in other documents.  So, again, you know, it's just
 4  kind of weaving back and forth of, you know, not wanting to
 5  make these changes.

 6      But BLM certainly has, you know, a number of duties
 7  here.  It must create an AML within certain parameters.  It
 8  must make determinations about ranges, certain parameters; it
 9  must do so with -- you know, I understand there are a lot of
10  things, but simply because an agency, you know, has more than
11  one statute directing it to do something doesn't mean you get
12  to ignore all others.

13      And I really think in this case, more than a direct
14  challenge of the AML -- because who knows, if they provide the
15  public with all of the information that was used to reach AML
16  in the '92 and '96 decisions, that's fine.  But NEPA requires
17  that the public be given information upon which to decide
18  whether it makes sense that a gather plan is adopted or not,
19  right?  I mean, why such resistance to just providing these
20  documents?  Why such resistance?

21      **THE COURT:**  So it's your position that providing
22  these documents -- I mean, I think one of the -- maybe the 1992
23  decision is in the administrative record.  It's the '96 one
24  that isn't.  I'm not -- I could be wrong about that.  But is it
25  your position that supplementing the record to include these

1  documents would be meaningful or --

2      **MS. LOVKO:**  I think it would be, yeah, because

3  whenever, you know, comments question the methodology being

4  used, and, you know, as long as those comments, you know, are

5  substantive, right?  And here they are, because AML is a huge

6  issue, and with BLM.

7      It's interesting, you say these 1990 AMLs are old.  I

8  mean, BLM is relying on ones from the '80s, you know, still.

9  So I think to challenge that I think is really important.  And

10  not only do they have to respond and say, well, that's what

11  we're relying upon; they have to give kind of their reasoning.

12  Why are we relying upon it?  Oh, look, here's all the

13  documents.  You see, they did look at all the things they were

14  supposed to look at, right?  Thank you.

15      **THE COURT:**  Can you address just the -- can you

16  address the purpose and need?  I think you argue that it's sort

17  of too narrow, but I'm curious if you think that there's -- it

18  seems like I'm required to defer to the agency's framing.  So

19  I'm curious about just authority that you think supports your

20  position that it is too narrow.

21      **MS. LOVKO:**  Yeah.  I mean, other than what I've cited

22  in the briefing, I don't really have any other authority to

23  issue at this time.

24      **THE COURT:**  Okay.

25      **MS. LOVKO:**  I think partly this, again, just goes to

1  kind of pattern and practice that we see in NEPA review more

2  than anything else, right?  Which is that BLM too frequently

3  kind of cedes the procedural requirements of NEPA as something

4  you can kind of check off without thought:  Oh, we're going to

5  do this, without really thinking.

6          And management isn't all about gathering.  Management

7  is about a lot of other things, right?  And we can do those,

8  you know, actively together.  Management isn't just about

9  looking at forage species or age as a whole.  Maybe it's about

10 looking at subunits, right?

11         So that's really the purpose of that, is to, again,

12 show that they kind of go through a rubber stamping process

13 with gather operations without really giving serious attention

14 to their other legal duties.

15         **THE COURT:**  Okay.

16         **MS. LOVKO:**  So I've kind of addressed AML.

17         And, you know, NEPA is clear:  If the methodology

18 relied upon is challenged, then the agency has to explain its

19 choice, and they just didn't do so reasonably here.

20         Also, before adopting a gather plan, BLM has to do

21 more than simply identify the number of horses that exist, but

22 it also must show that a roundup is necessary, which, once

23 again, connects to protecting the range and maintaining TNEB.

24         And the Gather EA here states that horses are

25 impacted on the range, but it's just a conclusion without

 1   support.  BLM failed to provide any data or information to

 2   support the opinion that its horses were impacted on the range.

 3          In this regard, really, the only, quote, evidence,

 4   end quote, that BLM provides is a table that summarizes

 5   monitoring that occurred in 28 different plots.  The location

 6   of these plots are not identified.  Any data or information

 7   collected at these plots was not provided to the public.  But

 8   as the Ninth Circuit noted in *WildEarth Guardians*, the failure

 9   to identify the location in and of itself is fatal.

10          Where BLM, you know, reaches the conclusion that

11   forage utilization is significant, it then allocated causation

12   to horses, livestock, it says other animals and wildlife,

13   though it actually somehow found that other wildlife make no

14   impact.  And it doesn't really show how it came to this

15   allocation other than to say, so, basically, BLM was making a

16   judgment call.

17          As a result, and even if you were to give them some

18   discretion in this regard, Your Honor, the transparency that

19   NEPA requires was obstructed, and the public must be provided

20   data to show that horses are a primary or unnecessary cause of

21   any range management occurring at these 28 locations.

22          BLM does not demonstrate in its NEPA review that

23   horses -- that removal of horses will actually remedy any

24   observed rangeland damage.  I don't know if Your Honor has

25   looked at that table which I cite to, but, I mean, I don't know

1  what does it mean?  How do you come upon this?  It's not an

2  open, transparent disclosure to the public.

3        As a result of BLM's refusal, neither the public nor

4  this court really can determine that removal of horses is

5  necessary.  Because, again, just that there's an overpopulation

6  doesn't mean anything.  It has to be shown that the removal is

7  necessary for the very purpose of cause and effect.  You want

8  to then protect the range by removing the horses.  We don't --

9  we don't know if that would happen, and without that

10  information, NEPA is violated.

11        To address the cumulative effects issue, Mr. Kang

12  stated that the 7 *Counties* case, which was issued, means that

13  this court has to give deference to the agency on this and

14  other issues.  I actually don't read that case to so hold.

15  *Loper/Bright Enterprise* case that the Supreme Court issued

16  specifically said that no deference is to be given to agencies

17  on legal requirements.  7 *Counties* does not change this.

18  Instead --

19        **THE COURT:**  So are you arguing that --

20        So let me just try to understand what you're saying.

21  Are you basically arguing that there's a *Loper/Bright* issue of

22  statutory interpretation that's in front of me, because that's

23  how --

24        **MS. LOVKO:**  There -- yes.  Yeah.  I mean, I don't

25  even know if you have a statute --

1        **THE COURT:**  What is the statutory interpretation that

2   you're pointing to?

3        **MS. LOVKO:**  So the issue is that the U.S. Supreme

4   Court, or, no, the Ninth Circuit in *U.S. Forest Service* looked

5   at NEPA and made -- and established legally that in considering

6   cumulative effects, some quantified or detailed information

7   must be presented.  That's the legal standard:  Got to provide

8   some quantification, some data, something.

9        Now, had BLM done so, and the public questioned

10  perhaps the methodology used to arrive at that data, or

11  something like that, or perhaps simply said, well, you didn't

12  consider this impact, instead, you only looked at these, then 7

13  *Counties* might come into issue, because that's where the

14  discretion occurs to look at what can -- what sort of data can

15  be collected, how it should be collected, whether it's

16  reasonably foreseeable to be part of any cumulative effect.

17  That's not what happened here.

18        Here, basically, BLM said there are cumulative

19  impacts that will occur from -- I'm sorry, I don't remember all

20  the categories, but it was, like, mining, so on and so forth,

21  LHV use, and then they don't quantify the impact, whether it's

22  significant or insignificant or how significant.  They don't

23  give you any data.  They don't even describe what these

24  projects or actions are that are causing the effects, right?

25        Again, they just checked off the list:  Let's list

1    everything that might be a possible multiple use in these HMAs,

2    we'll just list them, and we're good to go.  That's not how

3    NEPA reports.  NEPA requires more than just these bald

4    assertions that are unsupported by the information and data.

5              **THE COURT:**  Okay.

6         **MS. LOVKO:**  Okay.  The only other thing is I don't

7    know if you would like the parties to address vacatur, but I'm

8    happy to do so if Your Honor would like.

9              **THE COURT:**  Sure.  Briefly.

10        **MS. LOVKO:**  Sure, yeah.  Again, vacatur, we all know,

11   is a presumptive remedy.  And I want to, you know, state that

12   the only time you don't vacate is if the agency was in error or

13   somehow not serious or the disruptive consequences would be

14   severe.

15             BLM has repeatedly attempted to evade its obligations

16   under the Wild Horse Act in its implementing regulations,

17   forcing plaintiffs to repeatedly seek judicial relief.

18             Your Honor, as I said, firstly, we don't have to

19   create HMAPs.  We do have to create HMAPs, but we don't have to

20   follow them.  And I see down the pike other evasions occurring

21   as well.

22             These are serious.  I mean, it really goes to the

23   heart of what does it mean to manage these wild horses?  Is it

24   just removing horses?  Is it really just, hey, let's remove

25   horses; we don't care about anything else; we don't care about

 1    the range; we don't care about data; we don't care about public

 2    disclosures; we don't care about sound methodological choices.

 3    If that's all to mean something, then these are very serious

 4    errors.

 5          And the only disruptive consequence that the agency

 6    refers to is that if it doesn't remove horses, the range and

 7    wild horse population, you know, might be damaged, but there's

 8    no evidence presented in that regard.  Because what BLM really

 9    is saying is that this Court should believe BLM's conclusions

10    on faith, when the whole purpose of the Wild Horse Act and NEPA

11    is to ensure that the removal of horses is actually based on

12    facts and data that are publicly disclosed.

13          I would also just mention that only if there were

14    truly an emergency situations that arose, BLM does have the

15    power to act with emergency roundups, usually, you know, in

16    severe drought or things like that they will.

17          **THE COURT:**  Can you specify, when you're talking

18    about vacatur, exactly what you would want?

19          **MS. LOVKO:**  That the Gather Plan is set aside until

20    they comply with the Wild Horse Act and NEPA.

21          **THE COURT:**  Okay.  But in terms of mandating the BLM

22    to do specific things to fix what you think are undone or

23    things missing from the record.

24          **MS. LOVKO:**  Oh, I see what you're saying, Your Honor.

25    Yes, I see what you're saying.

1          The order that I would love would be that, for NEPA

2    purposes, that BLM comply with case law requiring disclosure of

3    documents that reasonably explain their reliance on the current

4    AMLs.  I would assume that would be through the '92 Consent

5    Decree and Final Multiple Use Decision.  But, you know, if they

6    think there are some other documents that -- and reasoning and

7    why they're relying upon it, just say so; that their NEPA

8    review include dissemination of information regarding forage

9    and not simply rely upon a summarizing table; that the agency

10   provides some quantified or detailed information regarding

11   cumulative effects.  I think that's it just for the NEPA case.

12          If Your Honor would like something more detailed, I

13   could get you a draft proposed order tomorrow.

14          **THE COURT:**  No, I appreciate you highlighting those

15   points.

16          Okay.  I'm going to hear from the Department again.

17          **MR. CRUSHAM:**  Thanks, Your Honor.  And I'll try to be

18   quick.  I know we're already at the time allotted for the

19   hearing.

20          So I just wanted to address at the outset this

21   dispute about the 1996 AML document.  Plaintiffs moved to

22   supplement the record with that document last year, and

23   Magistrate Judge Denney denied their motion.  He found that

24   just because the document is mentioned in the Gather Plan does

25   not mean it needs to be in the record, and that Plaintiffs had

1  not provided clear evidence that consideration of these

2  materials is necessary for the Court's determination of the

3  issues or that the current record isn't adequate.  So I think

4  that's a resolved issue here.

5          And so moving on to Plaintiffs' other arguments, they

6  led off talking about, like, you know, that they don't think

7  necessity or an excess determination has been properly made

8  here.  I certainly didn't read the parties to be briefing that

9  issue in any way.  I don't think plaintiffs have argued under

10  the Wild Horse Act that BLM has not determined adequately that

11  its guides are necessary or that there's an excess.  I don't

12  think they would be able to, and we're not talking about being

13  a horse or two over.  I think they were -- at the time that the

14  Gather Decision issued, it was four times low AML.  And either

15  way, BLM gets considerable determination in the sort of

16  scientific, factual realm in terms of determining whether a

17  gather is necessary.

18          And I'll let Mr. Kang address the emergence of a

19  *Loper/Bright* issue for the first time in oral argument as well.

20  I don't think that was briefed anyway.

21          Turning to the 7061 claim about the Stone Cabin HMAP.

22  Again, it's news to me that Plaintiffs are conceding now.  I'm

23  happy to hear them concede that there's no duty to update the

24  HMAP.  I think that makes this quite easy for the Court.

25          And if you're looking at just whether there's been an

1    attainment or an achieving of the objectives, I think

2    plaintiffs in their briefing are sort of doing this -- they're

3    trying to make it seem more discrete and more sort of concrete

4    what they're asking for by saying:  We're just asking for these

5    management objectives.  But if the Court looks at the way this

6    claim has been pled, I mean, it says that BLM needs to achieve

7    the objectives, and that's in their complaint as to all of the

8    HMAP claims.

9         And I understand they've tried to narrow it, but

10   either way I don't think they've really put forward evidence

11   that these are legally required.  They're sort of inverting the

12   standard, saying we haven't shown why it's not binding, but

13   they need to point to affirmative evidence showing that this

14   plan evinces a binding commitment on the agency.  I don't think

15   that they've done so.

16        I mean, there might be a world where an HMAP does

17   create binding commitments, if it was clear that that was the

18   agency's intent, but there's nothing in this document saying

19   that.

20        And as we note in our briefing, the funding

21   contingency here does not merely go to whether there's been a

22   delay.  I think *Norton* is clear that the funding contingency,

23   which it implied in that plan, but here is expressed, goes to

24   whether there's a legal requirement in the first place.

25        And then turning to the discreteness, just as a

1    clarification, Plaintiffs' counsel stated that Judge Du decided

2    that HMAPs contain discrete obligations.  She held that the

3    duty to create an HMAP at all is a discrete obligation, which

4    we're not contesting, as the Saulsbury HMAP, that she did not

5    hold that the objectives of the HMAP itself or the management

6    activities within that document are discrete.

7              And then hopping down to the 7062 claim.  Again, I

8    think Plaintiffs are sort of engaging in a technical argument

9    about what exactly was at issue in Leigh 1 and Leigh 2.  But I

10   think if the Court follows the Court's reasoning in that case,

11   it leads to our conclusion that there's not a legal -- that the

12   Gather Decision itself is not unlawful for failure to attain

13   the objectives of the HMAP.

14             And I think that conclusion that Judge Du reached was

15   based on her reading of 4710.4 of the regulation, which is

16   related to the amenable feasible language, right?  It says that

17   management should now be at the minimal level necessary to

18   attain the objectives in the Land Use Plans for HMAPs.

19             And she basically said, well, if you look at the Wild

20   Horse Act, that minimal feasible level language is in

21   subsection (a), and then subsection (b) is where it talks about

22   the duty to immediately gather when there's an excess of

23   animals.  And so basically that minimal feasible level language

24   can't be subservient to the duty to immediately gather, and so

25   that can't override that mandatory duty to gather as soon as

```
 1   reasonably possible.
 2          And, again, obviously, it's factually different here
 3   where there is a Stone Cabin HMAP; it isn't like there is not
 4   one.  But I think, again, as we pointed out in our briefing, I
 5   understand there's not a deadline to do an HMAP, but the 7062
 6   claim there, Judge Du relied on her reasoning about that
 7   requiring an HMAP to be done before a gather would violate the
 8   immediately provision in finding that the Gather Decision there
 9   was not unlawful for having no HMAP at all.  And so I think
10   that's why we're arguing about her reasoning on that.
11          And as to Plaintiffs' argument about this wouldn't
12   had -- the way it gathers I think rings hollow when they're
13   asking to vacate the Gather Decision.  I mean, I know Your
14   Honor is acutely aware from the *Colvin* case that there are, you
15   know, certainly people that would be upset to see that there
16   aren't even going to be any gathers in the future.
17          And so -- and I think plaintiffs are, you know,
18   obviously, maybe it wouldn't take as long to do a whole new
19   HMAP as it would to attain the objectives.  But that being
20   said, Plaintiffs seem to have a quite literal reading of these
21   things, and so who knows what it would take for BLM to go back
22   and sort of comply with this plan to satisfaction.
23          And so I think it would necessarily be dealing with
24   the situation which BLM would be -- if the Court were to order
25   something as Plaintiffs had suggested, it would be putting
```

 1  gathers on hold indefinitely in a way that violates that

 2  statutory mandate.

 3         And I would also just say this. We didn't really

 4  address in our briefing, because I don't think it has any

 5  basis, but this rational relationship test that plaintiffs have

 6  sort of come up with doesn't have any bearing in the

 7  regulations or statutes.

 8         Again, the regulation they're relying on says that --

 9  well, it says that the management shall be at a minimal level

10  necessary to attain the objectives. It doesn't talk about

11  having management actives be rationally related to the

12  objectives. So I think that's sort of a -- something that

13  they're grafting onto that doesn't exist.

14         And also, just more broadly, I'm not really sure why

15  doing a gather to achieve AML is not -- does not achieve that

16  goal in the sense that I don't believe anything about the --

17  within the 1983 document that says that BLM has to do X,Y,Z

18  before it courses down to the AML level, and so I don't -- I

19  think their argument fails at that juncture, too.

20         And then just to quickly touch on vacatur before I

21  pass it off to Mr. Kang. You know, obviously, we think the

22  legal issues are minor here. We're talking about whether they

23  considered certain plans or not. But, again, I don't really

24  read any of the briefing here to say, oh, you're wrong, there

25  actually isn't or there wasn't two years ago four times as many

1    horses as there should be, or anything like that.

2          So I don't think -- and I think that, you know, to

3    the extent the Court thinks that BLM needs to do some

4    additional analysis related to the 1983 HMAP, which is my

5    province -- I'll let Mr. Kang talk about NEPA -- I think that

6    could easily done on remand without vacating the *Gavin*

7    decision.

8          And then as to the environmental consequences, I

9    think they sort of speak for themselves.  The record -- the

10   whole reason the Gather Decision was issued is because BLM

11   found the range conditions to be quite dire.  And, you know,

12   when there's too many horses over the summer, you know, horses

13   die of starvation, they die of lack of water and not enough

14   forage, and so to prevent BLM from doing gathers indefinitely,

15   while the decisions to vacate it would now be consistent with

16   the Wild Horse Act.

17         **THE COURT:**  Okay.  Mr. Kang, would you like to

18   address the Court really quickly?

19         **MR. KANG:**  Yes, Your Honor.

20         I think, first, I'd like to talk about this

21   discussion about it being a NEPA violation to not have

22   considered AML, I think appears to be kind of part of

23   Plaintiffs' argument, and that's just false.

24         Leigh was quite explicit, right?  I'm reading it

25   here.  (As read) WHA does not require BLM to terminate NEPA

1    AMLs based on herd conditions each time.  They decided to

2    restore an already established an AML.  BLM show that AML range

3    remains valid... the court relying on it.  Just like in *Leigh*,

4    there are no management plans committing BLM to extend AML.

5         And on top of all that, in terms of NEPA compliance,

6    BLM explained why its consideration of AML is not appropriate

7    here.  It specifically said that if it took the time to

8    consider AML here, that it would be continued degradation of

9    the horses; that it would bring itself into violation of its

10   statutory duty, severe range degradation would occur, more

11   excess horses would immediately need to be removed.

12        In terms of needing to set AML as a NEPA violation,

13   that is, it is not a NEPA violation, both because BLM

14   considered it, and because it's not required by any sort of

15   law.

16        In terms of the ability to challenge AML, I think

17   that would be in the agency action which it sets AML, right?

18   The Gather Plan does not set AML.  Anything regarding the

19   setting of AML is just entirely irrelevant to this Gather Plan.

20        And that kind of brings us to this next point about

21   necessary data.  You know, the whole point of the data, sort

22   of, process is to give information that allows a meaningful

23   engagement with a decision here.

24        And the reasons that Plaintiffs have brought up to

25   release data are irrelevant to the decision here, right?  The

 1    decision is that because if there are excess horses, they must

 2    remove these horses.  None of the points brought up by

 3    plaintiff are relevant to the point.  They danced around it.

 4            For example, you know, whether or not horses are

 5    impacting the range or not, that's not the standard here.  You

 6    know, the statute states that there are excess horses; you must

 7    remove horses.  But also there is plenty of data, the rangeland

 8    study, demonstrating that.  There are -- the rangeland is

 9    degrading.

10            And on top of that, BLM did describe how it did the

11    study.  This is pulling from Plaintiffs' brief.  (As read) At

12    each plot BLM personnel made a judgment as to whether

13    utilization was attributable to wild horses, domestic cattle or

14    wildlife.  Determination was based on relative abundance,

15    recency of sign, sign of the animal, including animal feces,

16    trailing hoofprints, and known grazing management actions.

17            The kind of core of Plaintiffs' argument on the

18    underlying data is that the -- you have to ignore the things

19    that the agency did, the expertise that the agency applied in

20    making its NEPA conclusions to say that there is data missing.

21    The agency provided data that allowed plaintiffs to engage in

22    the process.

23            The fact that they don't mention that they don't sort

24    of make form arguments about the methodology here kind of

25    demonstrates that all they're trying to do is flyspeck what we

1    didn't -- what BLM did not include.  There is a methodology

2    here to critique that they did not.  They point to it, but they

3    don't critique it.  The fact that -- I think that kind of

4    demonstrates that the issue is not -- that they were not

5    allowed to engage in the process.

6         And Plaintiffs bring up *WildEarth Guardians* as this

7    sort of claim that, oh, *WildEarth Guardians* says that you

8    always have to introduce location data.  But while the holding

9    in *WildEarth Guardians* was context-specific, *WildEarth*

10   *Guardians* was a plan about allowing snowmobiles on federal

11   lands, and in that regard the location of big game is very

12   relevant to where you allow snowmobiles.

13        Here, the location of the horses is irrelevant to the

14   question of are there horses above AML?  And so this thing

15   about, oh, we need to know the location data of everything,

16   that's, again, another red herring.  That information is

17   ultimately irrelevant to the question of are there horses above

18   AML; therefore, we have to do a gather.

19        And, you know, Plaintiffs try to argue that

20   *Loper/Bright* somehow negates 7 *Counties* here.  I don't know

21   where BLM has interpreted the statute.  You know, we, BLM has

22   provided data underlying its cumulative impact effects.  Again,

23   this rangeland health study is kind of one of the -- and the

24   results that are included, the methodology described, along

25   with the plethora of scientific studies, application of BLM

1    observations and expertise.

2          You know, for the Court to hold that BLM did not

3    provide any sort of underlying data or facts or journals or

4    research for its conclusions would require the Court to say

5    that that application of agency expertise and fact-finding is

6    false.  That's -- it would quite literally require the Court to

7    completely ignore the deference owed to agency experts on these

8    sorts of questions.

9          And finally, on the cumulative impacts, it's more

10   than just the table, right?  It's all those other things that I

11   mentioned that were involved in the cumulative effects

12   discussion, and that was all that data and all that sort of --

13   all those sources that underlie the cumulative impact

14   discussion.

15         And finally, you know, there was no commitment in any

16   of the record decisions, either the 1983 HMAP, and certainly

17   not here, about committing to achieving HMAP objectives.  And

18   as far as NEPA is concerned, there's been no commitment made

19   and no NEPA violation, kind of, in that regard.

20         **THE COURT:**  Okay.

21         **MR. KANG:**  And that is all.  Thank you.

22         **THE COURT:**  Okay.  Thank you.

23         **MS. LOVKO:**  Can I just -- yeah.

24         **THE COURT:**  I'm going to give you just a very

25   quick -- very quick opportunity to rebut.

1      **MS. LOVKO:**  I'll keep it very brief.

2      I would note that defense counsel referred to

3  Plaintiffs' motion in this litigation as requiring a literal

4  reading of the law.  Yes, we do.  We really do.  I think that's

5  part of our feeling of what's best to do here.

6      It was raised that, in the motion regarding the

7  administrative record in another case, the Court did not put

8  into the administrative record the decrees, consent decrees

9  that were at issue in that case, because it said it wasn't

10  needed to determine the issues.

11      First off, this is kind of thrown out there without

12  any briefing, but I just wanted to clarify.  The Court did say

13  that it didn't need to determine the issue, but I inferred that

14  to mean the Court would be finding that they did not respond

15  adequately to the public, because they have no evidence to show

16  what they were relying on, so it wasn't somehow to conclude

17  that those documents aren't relevant.

18      Regarding the language I brought up for 4710.4,

19  saying that it's rational; you have to show that whatever

20  management actions you engage in, that they're rationally

21  related.  As I stated in my briefing, there's no case right now

22  that specifically says what does it mean to use the minimum

23  management tools.  But I am familiar enough with the court

24  rulings regarding minimum levels in wild horse cases, and the

25  rationally-relate standard really fits nicely with that.

1          It's not so much that they had to do everything that

2     the HMAP said they had to do, you know, in adopting a gather

3     plan.  They just had to show that it was taking steps to make

4     sure they were attained or give some rational relationship or

5     explanation why they weren't, right?  I mean, you just can't,

6     again, just don't ignore it.  Disclose.

7          **THE COURT:**  Okay.

8          **MS. LOVKO:**  One other quick thing.  There was mention

9     that, you know, BLM has expertise, and that -- I'm not saying

10    that BLM doesn't have expertise in certain things.  That's not

11    the issue.  The issue is they've not disclosed the basis for

12    this expertise and the conclusions reached.

13         It's kind of like -- I don't know, when you're in

14    school and you're doing math, right?  You can't just give the

15    answer to the teacher.  She wants to see your homework.  How

16    did you get to that conclusion?  That's all the NEPA claims are

17    saying.

18         **THE COURT:**  Okay.  I want to thank you all for being

19    here and spending time on this case, and I will take this under

20    submission and try to get a ruling out.  I appreciate it, your

21    expertise on both sides.

22         **MS. LOVKO:**  Thank you very much, Your Honor.

23         **THE COURT:**  Thank you.  We're adjourned.

24         **MR. KANG:**  Thank you, Your Honor.

25         (Proceedings adjourned at 3:50 p.m.)

1          <u>**CERTIFICATE OF REPORTER**</u>

2          I certify that the foregoing is a correct transcript

3     from the record of proceedings in the above-entitled matter.

4

5

6     Dated:  October 13, 2025

7

8

9

10

11     _____

12          Rhonda L. Aquilina, CSR No. 9956, RMR, CRR
                      Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES COURT REPORTERS**